
ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

OCT 1 7 2016

12:05 pm

CLERK, U.S. DISTRICT COURT
By _____
         Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **STEVEN LAWAYNE NELSON,**<br>TDCJ No. 999576<br><br>     Petitioner,<br><br><br>     -VS-<br><br><br>**LORIE DAVIS, DIRECTOR**<br>Texas Department of Criminal Justice,<br>Correctional Institutions Division,<br><br><br>     Respondent. | § § § § § § § § § § § § § § §  CIVIL NO. 4:16-CV-904-A<br><br>**\*\*DEATH PENALTY CASE\*\*** |

---

## PETITION FOR A WRIT OF HABEAS CORPUS

---

### THIS IS A DEATH PENALTY CASE

Katherine C. Black
Texas Bar No. 24064907

TEXAS DEFENDER SERVICE
1927 Blodgett Street
Houston, Texas 77004
TEL: (713) 222-7788
FAX: (713) 222-0260
kateblack@texasdefender.org

Meaghan VerGow
Appearing *Pro Hac Vice*

O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
TEL: (202) 383-5300
FAX: (202) 383-5414
mvergow@omm.com

*Counsel to Steven Lawayne Nelson, Petitioner*

*\*The local counsel requirement was waived by an order signed October 4, 2016.*

# TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ................................................................................ 2

    A.    Mr. Nelson's Arrest and Trial .......................................................... 2

        1.    Pre-Trial Investigation ............................................................ 4

        2.    Guilt Phase ................................................................................ 5

        3.    The Sentencing Phase .............................................................. 7

    B.    Direct Appeal ................................................................................. 13

    C.    State Habeas Proceeding ................................................................ 13

        1.    Investigation ............................................................................ 13

        2.    State Habeas Application ........................................................ 15

    D.    Post-State-Habeas Investigation .................................................... 16

STATEMENT OF JURISDICTION ............................................................ 18

CLAIMS FOR RELIEF ................................................................................ 18

I.    MR. NELSON WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS WHEN DEFENSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE, PREPARE, AND LITIGATE SENTENCING. ................................. 18

    A.    Defense Counsel's Performance Was Deficient. ................................. 19

        1.    Defense Counsel Deficiently Failed to Investigate, Prepare, and Develop a Case Involving Mr. Nelson's Diminished Role in the Crime............................................................................................ 20

        2.    Defense Counsel Deficiently Failed to Explore, Prepare, and Develop Evidence That the Holden Death Was a Suicide. ...................... 28

        3.    Defense Counsel's Performance Was Deficient for Failing to Reasonably Investigate, Develop, and Present Evidence About Mr. Nelson's Background and Mental Health. ................................................ 33

            a.    Defense Counsel Ignored Red Flags That Should Have Led Them to Adequately Explore and Present Mr. Nelson's History of Trauma, Neglect, and Mental Illness. ......................... 37

            b.    The Facts Presented to the Jury, Disconnected from an Adequate History of Mr. Nelson's Life and Mental Health, Were Either Unpersuasive or Counterproductive. ....................... 47

            c.    Facts Discovered During Post-Conviction Investigation Reveal Severe PTSD from Major Childhood Trauma. ................ 48

    B.    Defense Counsel's Deficient Performance Prejudiced the Sentencing Phase on All Three Special Issues. ........................................................ 52

**TABLE OF CONTENTS**
**(continued)**

Page

| | | |
|---|---|---|
| | 1. | Special Issue Number 1: There is a reasonable probability the jury's answer to the future dangerousness special issue would have been different absent defense counsel's deficient performance. ............ 53 |
| | 2. | Special Issue Number 2: There is a reasonable probability the jury's answer to the second special issue would have been different absent defense counsel's deficient performance...................................... 57 |
| | 3. | Special Issue Number 3: There is a reasonable probability the jury's answer to the mitigation special issue would have been different absent defense counsel's deficient performance...................... 59 |
| C. | | The Procedural Default of This Claim Is Excused ............................................. 62 |
| II. | | DEFENSE COUNSEL'S FAILURE TO OBJECT TO VIOLATIONS OF MR. NELSON'S FAIR TRIAL RIGHTS AND OTHERWISE SECURE A FAIR TRIAL ENVIRONMENT CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS................. 63 |
| | A. | Defense Counsel Failed to Diligently Seek the Change of Venue Necessary to Preserve a Fair Trial. ........................................................................ 64 |
| | B. | Defense Counsel Failed to Object to Mr. Nelson's Visible Shackling and Wearing of a "Stun Cuff." .......................................................................... 66 |
| | C. | Defense Counsel's Failures Prejudiced Mr. Nelson. ........................................... 68 |
| | D. | The Procedural Default of This Claim Is Excused............................................. 68 |
| III. | | MR. NELSON'S CONVICTION AND SENTENCE VIOLATE THE FOURTEENTH AMENDMENT BECAUSE THE PROSECUTION USED RACE TO SELECT THE JURY. ........................................................................................ 68 |
| | A. | Factual and Procedural Background Regarding Jury Selection........................... 70 |
| | B. | The State Intentionally Used Race to Secure an All-White Jury........................ 71 |
| | 1. | A statistical comparison of the treatment of white and nonwhite panelists demonstrates that race was used to select the jury................... 72 |
| | 2. | The proffered reasons for striking nonwhite panelists were pretextual because they were neither accurate nor invoked against similarly situated white panelists. ............................................................ 72 |
| | | a. Martima Mays (Prospective Juror No. 100; Qualified Juror No. 41) .................................................................................................. 73 |
| | | b. Sheracey Golightly-Hooper (Prospective Juror No. 92; Qualified Juror No. 38). .............................................................. 77 |
| | | c. Talmadge Spivey (Prospective Juror No. 41; Qualified Juror No. 17)................................................................................. 79 |

iii

**TABLE OF CONTENTS**
**(continued)**

Page

          d.    Somsouk Southichack (Prospective Juror No. 50; Qualified Juror No. 21) .............................................................................. 83

C.    28 U.S.C. § 2254(d) Does Not Bar Relief. ......................................... 85

      1.    Mr. Nelson Is Entitled to Merits Review of His *Batson* Claim Because the State Court Decision Involved an Unreasonable Application of Clearly Established Federal Law Under 28 U.S.C. § 2254(d)(1) .............................................................................. 86

      2.    Mr. Nelson Is Entitled to Merits Review of His *Batson* Claim Because the State Decision Was Based on an Unreasonable Determination of Facts, in Light of the Evidence Before the State Court ........................................................................................ 87

IV.    DEFENSE COUNSEL'S FAILURE TO LITIGATE THE THIRD STEP OF THE *BATSON* CLAIM CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS................. 88

A.    Legal Standard ................................................................................ 89

B.    Defense Counsel's Failure To Offer Any *Batson* Step 3 Rebuttal Constitutes Ineffective Assistance of Counsel....................................... 90

      1.    Defense Counsel's Performance Was Deficient....................................... 90

      2.    Mr. Nelson Was Prejudiced by Defense Counsel's Deficient Performance. ................................................................................ 93

C.    Any Procedural Default of This Claim Is Excused............................................. 94

V.    MR. NELSON WAS DEPRIVED OF DUE PROCESS, IN VIOLATION OF *NAPUE V. ILLINOIS* AND *GIGLIO V. UNITED STATES*, WHEN THE STATE KNOWINGLY PRESENTED FALSE TESTIMONY DURING THE SENTENCING PHASE. ................................................................................ 95

A.    Rick Seely Falsely Testified That He Did Not Expect to Receive Any Benefits For His Testimony. ................................................................ 95

B.    There Is a Reasonable Likelihood That the False Testimony Affected the Jury's Answer to the Future Dangerousness Special Issue................................. 96

C.    The *Napue/Giglio* Claim Is Unexhausted But Not Defaulted ............................ 97

CONCLUSION.................................................................................................... 98

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abdul-Kabir v. Quarterman,*
    550 U.S. 233 (2007)............................................................................ 33

*Batchelor v. Cain,*
    682 F.3d 400 (5th Cir. 2012) ............................................................. 88

*Batson v. Kentucky,*
    476 U.S. 79 (1986)..................................................................... *passim*

*Bess v. State,*
    No. AP-76377, 2013 WL 827479 (Tex. Crim. App. Mar. 6, 2013) ....................... 33

*Blanton v. Quarterman,*
    543 F.3d 230 (5th Cir. 2008) ............................................................. 89

*Canales v. Stephens,*
    765 F.3d 551 (5th Cir. 2014) ............................................................. 18

*Cargle v. Mullin,*
    317 F. 3d 1196 (10th Cir. 2003) ......................................................... 97

*Caro v. Calderon,*
    165 F.3d 1223 (9th Cir. 1999) ........................................................... 20

*Chandler v. Florida,*
    449 U.S. 560 (1981)...................................................................... 68

*Coble v. State,*
    330 S.W.3d 253 (Tex. Crim. App. 2010).................................................. 56

*Deck v. Missouri,*
    544 U.S. 622 (2005)...................................................................... 67

*Drain v. Woods,*
    902 F. Supp. 2d 1006 (E.D. Mich. 2012).............................................. 90, 94

*Duhamel v. Collins,*
    955 F.2d 962 (5th Cir. 1992) ............................................................. 89

*Eagle v. Linahan,*
    279 F.3d 926 (11th Cir. 2001) ......................................................... 90, 94

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Ege v. Yukins,*
485 F.3d 364 (6th Cir. 2007) ............................................................56

*Estes v. Texas,*
381 U.S. 532 (1965) ............................................................68

*Feit v. Great-W. Life & Annuity Ins. Co.,*
460 F. Supp. 2d 632 (D.N.J. 2006) ............................................................33

*Ford v. Norris,*
67 F.3d 162 (8th Cir. 1995) ............................................................90

*Foster v. Chatman,*
136 S. Ct. 1737 (2016) ............................................................69, 70, 71, 73

*Giglio v. United States,*
405 U.S. 150 (1972) ............................................................95

*Gongora v. Thaler,*
710 F.3d 267 (5th Cir. 2013) ............................................................86, 87

*Harrison v. Quarterman,*
496 F.3d 419 (5th Cir. 2007) ............................................................56

*Iowa v. Tyler,*
867 N.W.2d 136 (Iowa 2015) ............................................................33

*Jones v. Thigpen,*
788 F.2d 1101 (5th Cir. 1986) ............................................................18

*Juniper v. Zook,*
117 F. Supp. 3d 780 (E.D. Va. 2015) ............................................................94

*Lewis v. Dretke,*
355 F.3d 364 (5th Cir. 2003) ............................................................20

*Lockett v. Anderson,*
230 F.3d 695 (5th Cir. 2000) ............................................................20

*Maine v. Vining,*
645 A.2d 20 (Me. 1994) ............................................................33

*Martinez v. Ryan,*
132 S. Ct. 1309 (2012) ............................................................62, 68, 94

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Miller v. Dretke,*
   420 F.3d 356 (5th Cir. 2005) ................................................................20

*Miller-El v. Cockrell,*
   537 U.S. 322 (2003)..........................................................................88

*Miller-El v. Dretke,*
   545 U.S. 231 (2005)................................................................... *passim*

*Moore v. Johnson,*
   194 F.3d 586 (5th Cir. 1999) ................................................................21

*Napue v. Illinois,*
   360 U.S. 264 (1959) ..........................................................................95

*Nelson v. Texas,*
   136 S. Ct. 357 (2015)........................................................................13

*Nelson v. Texas,*
   No. AP–76,924, 2015 WL 1757144 (Tex. Crim. App. Apr. 15, 2015)........................... *passim*

*Padilla v. Kentucky,*
   559 U.S. 356 (2010)..........................................................................34

*Porter v. McCollum,*
   558 U.S. 30 (2009)...........................................................................33

*Purkett v. Elem,*
   514 U.S. 765 (1995) ..................................................................... 70, 73

*Raether v. Meisner,*
   608 F. App'x 409 (7th Cir. 2015) ...........................................................56

*Reed v. Quarterman,*
   555 F.3d 364 (5th Cir. 2009) ........................................................ *passim*

*Rhines v. Weber,*
   544 U.S. 269 (2005) .........................................................................97

*Richards v. Quarterman,*
   566 F.3d 553 (5th Cir. 2009) ....................................................26, 52, 53

*Riggins v. Nevada,*
   504 U.S. 127 (1992).........................................................................63

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Rompilla v. Beard,*
   545 U.S. 374 (2005) ................................................................ 18, 20

*Scott v. Hubert,*
   610 F. App'x 433 (5th Cir. 2015) ............................................. 90, 94

*Sheppard v. Maxwell,*
   384 U.S. 333 (1966) ..................................................................... 65

*Snead v. Shearin,*
   No. DKC-09-2080, 2010 WL 145883 (D. Md. Jan. 8, 2010) ............... 94

*Snyder v. Louisiana,*
   552 U.S. 472 (2008) ..................................................................... 70

*Strickland v. Washington,*
   466 U.S. 687 (1984) ............................................................. *passim*

*Tassin v. Cain,*
   517 F. 3d 770 (5th Cir. 2008) ....................................................... 95

*Tenny v. Cockrell,*
   420 F. Supp. 2d 617 (W.D. Tex. 2004) .......................................... 19

*Thomas v. Moore,*
   866 F.2d 803 (5th Cir. 1989) ....................................................... 93

*Trevino v. Thaler,*
   133 S. Ct. 1911 (2013) ........................................................ 62, 68, 94

*United States v. Harper,*
   527 F.3d 396 (5th Cir. 2008) ....................................................... 29

*United States v. Landerman,*
   109 F.3d 1053 (5th Cir. 1997) ...................................................... 29

*United States v. McAllister,*
   693 F.3d 572 (6th Cir. 2012) ....................................................... 90

*United States v. Wade,*
   388 U.S. 218 (1967) ..................................................................... 63

*United States v. Waldrip,*
   981 F.2d 799 (5th Cir. 1993) ....................................................... 30

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*United States v. Williamson,*
   533 F.3d 269 (5th Cir. 2008) .................................................................86

*Walbey v. Quarterman,*
   309 F. App'x 795 (5th Cir. 2009) ..........................................................18

*White v. Thaler,*
   610 F.3d 890 (5th Cir. 2010) .................................................................53

*Wiggins v. Smith,*
   539 U.S. 510 (2003)..............................................................18, 20, 34

*Williams v. Taylor,*
   529 U.S. 362 (2000)..............................................................18, 86, 87

*Wood v. Allen,*
   558 U.S. 290 (2010) ..............................................................................87

*Woodward v. Epps,*
   580 F.3d 318 (5th Cir. 2009) .................................................................72

**U.S. CONSTITUTIONAL AMENDMENTS**

U.S. Const. amend VI. ...................................................................... *passim*

U.S. Const. amend VIII. ..............................................................................33

U.S. Const. amend XIV. ............................................................63, 68, 89, 95

**STATUTES**

28 U.S.C. § 2241 ........................................................................................18

28 U.S.C. § 2254.........................................................................................18

28 U.S.C. § 2254(d) ..............................................................................69, 85

28 U.S.C. § 2254(d)(1) ..........................................................................86, 87

28 U.S.C. § 2254(d)(2) ......................................................................86, 87, 88

28 U.S.C. § 2254(e)(1)...............................................................................87

**RULES & PROCEDURES**

Tex. Code Crim. Proc. art 11.07 ..................................................................97

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Tex. Code Crim. Proc. art. 37.071, § 2(b)(1)................................................................7

Tex. Code Crim. Proc. art. 37.071, § 2(e)................................................ 8, 58, 59

Tex. Code. Crim. Proc. § 11.071(a)(1) ..............................................................97

Texas Rule of Evidence 703 ............................................................................32

## OTHER AUTHORITIES

Edward A. Dowlman et. al., *The prevalence of mixed DNA profiles on fingernail
swabs*, 50 Sci. & Justice 67 (2009)..............................................................32

Forrest Wickman, *Paddling: A History*, Slate (Oct. 5, 2012),
http://www.slate.com/blogs/browbeat/2012/10/05/who_invented_paddling_th
e_history_of_spanking_people_s_butts_with_paddles_.html ...............................48

Health, Medline Plus, *Phenobarbital*,
https://medlineplus.gov/druginfo/meds/a682007.html .........................................37

x

**TABLE OF EXHIBITS**

| EXHIBIT | DATE | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|---|

### VOLUME I

| EXHIBIT | DATE | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | 5/22/2012 | Letter from William "Bill" Ray to Dr. Wm. Barry Norman regarding appointment to the Nelson case... | NELSON_00001 |
| 2 | 11/6/2012 | Itemization for Billing from William "Bill" Ray ...... | NELSON_00003 |
| 3 | 6/10/2016 | Itemized Bill for Steve Gordon ................................ | NELSON_00016 |
| 4 | 7/19/2013 | Itemized Statement for Services Rendered by David R. Pearson ....................................... | NELSON_00025 |
| 5 | 6/13/2013 | Letter from William "Bill" Ray to John Stickels regarding Nelson file ................................. | NELSON_00031 |
| 6 | 8/15/2013 | Letter from John Stickels to Gerald Byington regarding appointment as mitigation investigator for purposes of post-conviction writ.......................... | NELSON_00032 |
| 7 | 10/8/2013 | Appellant's Opening Brief, *Soliz v. Texas*, No. AP-76,768, 2013 WL 5757241 (Tex. Crim. App. Oct. 8, 2013) ................................. | NELSON_00033 |
| 8 | 4/15/2014 | Application for Writ of Habeas Corpus Capital Murder - Death Penalty, *Ex Parte Steven LaWayne Nelson*, No. C-4-010180-1232507A (Tex. Crim. App. Apr. 15, 2014)............................... | NELSON_00084 |
| 9 | 5/16/2014 | Service and Expense Summary of Gerald Byington ................................................... | NELSON_00206 |
| 10 | 5/22/2014 | Defense Claim for Fee Payment/Expenses................ | NELSON_00207 |
| 11 | N/A | Review of Mitigation Activities by Gerald Byington ................................................... | NELSON_00213 |
| 12 | 9/25/2012 | Voir Dire Proceedings, Volume 31 (excerpts) .......... | NELSON_00219 |
| 13 | 7/19/2013 | Appellant's Opening Brief (excerpts), *Nelson v. Texas*, No. AP-76,924 (Tex. App. Crim. App.)......... | NELSON_00241 |
| 14 | 9/19/2016 | Declaration of Susan Meares Hickey ........................ | NELSON_00248 |
| 15 | 9/25/2016 | Declaration of James Kirk Vanderbilt....................... | NELSON_00250 |

**TABLE OF EXHIBITS**
**(continued)**

| EXHIBIT | DATE | EXHIBIT DESCRIPTION | PAGE |
|---------|------|---------------------|------|
| 16 | 9/26/2016 | Declaration of Justin Tyler Markle............................ | NELSON_00252 |
| 17 | 10/11/2016 | Affidavit of Eleanor Jane Frazier regarding the Declaration of Elizabeth Anne Gonzales.................. | NELSON_00255 |
| 18 | 10/11/2016 | Affidavit of Jack William Burnett regarding the Declaration of Elizabeth Anne Gonzales.................. | NELSON_00260 |
| 19 | 10/11/2016 | Affidavit of Callie F. Heller regarding the Declaration of Byron Caruthers................................ | NELSON_00265 |
| 20 | 1/14/2013 | Letter from Rick Seely to Page Simpson................... | NELSON_00269 |
| 21 | N/A | Photo of Steven Nelson on Stand during Testimony, *Trial Continues for Man Accused of Slaying Pastor*, NBC 5 Dallas-Fort Worth............... | NELSON_00275 |
| 22 | 9/27/2012 | Brantley Hargrove, *Imaginary Monsters Chased Jonny Holden All His Life, Then a Real One Caught Him*, Dallas Observer.................................... | NELSON_00276 |
| 23 | 10/10/2012 | Robbie Owens, *Fellow Inmates Testify Against Man Sentenced For Killing Pastor*, CBSDFW.com.. | NELSON_00290 |
| 24 | 10/11/2012 | Mola Lenghi, *Inmate Testifies Against Steven Nelson*, NBC 5 Dallas-Fort Worth ........................... | NELSON_00293 |
| 25 | 10/24/2012 | Note regarding removal of medication...................... | NELSON_00296 |
| 26 | 3/7/2011 | Incident Report, Arlington, Texas Police Department ................................................................ | NELSON_00297 |
| 27 | 3/7/2011 | Photos of Anthony Gregory Springs Injuries ........... | NELSON_00326 |
| 28 | 3/19/2011 | Defendant's Trial Exhibit No. 4, AT&T Phone Records................................................................ | NELSON_00332 |
| 29 | N/A | EXHIBIT 29 REMOVED ........................................ | N/A |
| 30 | 7/31/2012 | State's Exhibit No. 375, Records from the University of Texas at Arlington ............................... | NELSON_00459 |

**TABLE OF EXHIBITS**
(continued)

| EXHIBIT | DATE | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|---|
| | | **VOLUME II** | |
| 31 | 9/19/2012 | State's Exhibit No. 370, Records from MetroPCS, Inc.. | NELSON_00470 |
| 32 | 9/25/2012 | Memorandum from Mary Burdette, Mitigation Specialist, to William "Bill" Ray and Steve Gordon regarding Allison Cobb Interview | NELSON_00494 |
| 33 | 10/16/2012 | Court's Charge on Punishment (Clerk's Record at 411) | NELSON_00497 |
| 34 | 6/23/2014 | Defendant's People List (Clerk's Record at 151) | NELSON_00503 |
| 35 | 6/27/2014 | Affidavit of Stephen Gordon in Response to Writ of Habeas Corpus (Clerk's Record at 164) | NELSON_00516 |
| 36 | 9/19/2016 | Email from Kate Black to Lindsey Freeman, et al. regarding University of Texas at Arlington Echo Recording | NELSON_00519 |
| 37 | 3/6/2012 | Tarrant County Medical and Mental Impairments Admission Form for Jonathan Holden | NELSON_00525 |
| 38 | 3/19/2012 | Tarrant County Sheriff's Office Police Report from Cpl. J. Campos regarding Jonathan Holden Suicide Attempt | NELSON_00527 |
| 39 | 3/19/2012 | Voluntary Statement of Jon Campos | NELSON_00529 |
| 40 | 3/20/2012 | Voluntary Statement of Andrea D. Jimenez | NELSON_00531 |
| 41 | 3/20/2012 | Tarrant County Sheriff's Office Case Supplemental Report regarding Jonathan Holden | NELSON_00532 |
| 42 | 3/21/2012 | Autopsy Report of Jonathan Holden | NELSON_00539 |
| 43 | 3/21/2012 | Tarrant County Sheriff's Office Report from Capt. Cedric R. Simon regarding Jonathan Holden | NELSON_00554 |
| 44 | 9/11/2013 | Indictment and Judgment of Ricky Seely, *Texas v. Seely*, No. 2011-0150-M-CR (Montague Cnty. Dist. Ct.) | NELSON_00555 |

**TABLE OF EXHIBITS**
**(continued)**

| EXHIBIT | DATE | EXHIBIT DESCRIPTION | PAGE |
|---------|------|---------------------|------|
| 45 | 9/23/2016 | Tarrant County District Clerk Online, Criminal Case List for Rick Darryl Seely | NELSON_00558 |
| 46 | N/A | Transcript of the Interview of Charles Bailey (2012-03490) | NELSON_00561 |
| 47 | 2/1/2003 | American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra Law Rev. 913 (Revised Feb. 2003) | NELSON_00591 |
| 48 | 5/22/2012 | Letter from William "Bill" Ray to Dr. Antoinette McGarrahan | NELSON_00769 |
| 49 | 8/8/2012 | Invoice from Dr. Antoinette McGarrahan | NELSON_00771 |
| 50 | 8/14/2012 | Conference Memo Prepared for Defense Counsel | NELSON_00772 |
| 51 | 8/20/2012 | Letter from Antoinette McGarrahan to William "Bill" Ray | NELSON_00775 |
| 52 | 10/22/2012 | Invoice from Dr. Antoinette McGarrahan | NELSON_00777 |
| 53 | 10/6/2016 | Declaration of Cora Lee | NELSON_00778 |
| 54 | 10/6/2016 | Declaration of Joaine Gibson | NELSON_00780 |
| 55 | 10/8/2016 | Declaration of Britany Beal | NELSON_00782 |
| 56 | 10/9/2016 | Declaration of Anthony Luckey | NELSON_00786 |
| 57 | 10/9/2016 | Declaration of Kitza Nelson | NELSON_00788 |
| 58 | 10/9/2016 | Declaration of Linda Whelchel | NELSON_00795 |
| 59 | 10/9/2016 | Declaration of Maggie Nelson Luckey | NELSON_00797 |
| 60 | 10/9/2016 | Declaration of Martha Kay Blevins | NELSON_00799 |
| 61 | 10/10/2016 | Declaration of CJ James | NELSON_00801 |
| 62 | 10/10/2016 | Declaration of Sheila Sturgeon | NELSON_00803 |
| 63 | 10/10/2016 | Declaration of Terry Luckey | NELSON_00805 |

**TABLE OF EXHIBITS**
**(continued)**

| EXHIBIT | DATE | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|---|
| 64 | 10/11/2016 | Declaration of Gregory Burns | NELSON_00808 |
| 65 | 10/11/2016 | Declaration of Paula Tucker | NELSON_00811 |
| 66 | 10/11/2016 | Declaration of Tonya Willoughby | NELSON_00813 |
| 67 | 10/11/2016 | Declaration of Tracey Nixon | NELSON_00815 |
| 68 | 2/18/1987 | Certificate of Live Birth | NELSON_00818 |
| 69 | 2/25/1993 | PCC Ambulatory Encounter Record | NELSON_00819 |
| 70 | 3/4/1993 | PCC Ambulatory Encounter Record | NELSON_00820 |
| 71 | 3/31/1993 | PCC Ambulatory Encounter Record | NELSON_00821 |
| 72 | 1/14/1994 | PCC Ambulatory Encounter Record | NELSON_00822 |
| 73 | 1/17/1995 | PCC Ambulatory Encounter Record | NELSON_00823 |
| 74 | 5/19/1995 | Problem List Updates | NELSON_00825 |
| 75 | 10/6/1995 | Problem List Update | NELSON_00845 |
| 76 | 10/23/1995 | PCC Ambulatory Encounter Record | NELSON_00847 |
| 77 | 10/27/1995 | Problem List Updates | NELSON_00848 |
| 78 | 11/30/1995 | Problem List Update | NELSON_00864 |
| 79 | 1/18/1996 | Psychiatric Evaluation from the Chickasaw Nation Health System, Carl Albert Indian Health Facility | NELSON_00865 |
| 80 | 10/29/1996 | Problem List Update | NELSON_00867 |

**VOLUME III**

| | | | |
|---|---|---|---|
| 81 | 6/4/1998 | Intake Face Sheet | NELSON_00868 |
| 82 | 7/16/1998 | PCC Mental Health/Social Service Encounter Record | NELSON_00869 |
| 83 | 10/28/1998 | PCC Mental Health/Social Service Encounter Record | NELSON_00870 |

**TABLE OF EXHIBITS**
**(continued)**

| EXHIBIT | DATE | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|---|
| 84 | 5/20/1999 | PCC Ambulatory Encounter Records | NELSON_00871 |
| 85 | 1/14/2000 | Discharge Summary | NELSON_00884 |
| 86 | 5/30/2000 | State of Oklahoma Office of Juvenile Affairs, Receipt for Juvenile | NELSON_00885 |
| 87 | 3/21/2000 | Order After Adjudicatory Hearing, *In re Steven LaWayne Nelson*, No. J-2000-15 (Pontotoc Cnt. Dist. Ct.) | NELSON_00886 |
| 88 | 5/16/2000 | Incident Report without Use of Physical Force, Sac & Fox Nation Juvenile Facility | NELSON_00888 |
| 89 | 6/16/2000 | Diagnostic Evaluation, Central Oklahoma Juvenile Center | NELSON_00889 |
| 90 | 6/22/2000 | Central Zone Request for High Risk Transportation | NELSON_00903 |
| 91 | 5/19/2000 | Detention Order, *In re Steven Nelson*, No. J-2000-15 (Pontotoc Cnty. Dist. Ct.) | NELSON_00904 |
| 92 | 3/30/2001 | Application for Compact Services | NELSON_00905 |
| 93 | 8/22/2001 | Email from James Eakins to Ronnie Meeks | NELSON_00919 |
| 94 | 10/24/2001 | Email from James Eakins to Ronnie Meeks | NELSON_00921 |
| 95 | 11/26/2001 | Incident Report, Arlington, Texas Police Department | NELSON_00922 |
| 96 | 12/4/2001 | Warning to Child Offender | NELSON_00924 |
| 97 | 12/4/2001 | Handwritten Note from Steven Nelson to Bedford Police Department | NELSON_00931 |
| 98 | 12/10/2001 | Petition Regarding Child Engaged in Delinquent Conduct | NELSON_00932 |
| 99 | 12/10/2001 | Texas Department of Criminal Justice, Record Access System | NELSON_00936 |
| 100 | 12/11/2001 | Tarrant County Juvenile Services Mental Health Assessment | NELSON_00937 |

**TABLE OF EXHIBITS**
**(continued)**

| EXHIBIT | DATE | EXHIBIT DESCRIPTION | PAGE |
|---------|------|---------------------|------|
| 101 | 12/21/2001 | Texas Youth Commission, Initial Health Screening | NELSON_00938 |
| 102 | 2/6/2002 | Individual Case Plan: Assessment | NELSON_00940 |
| 103 | 5/9/2002 | Suicide Alert | NELSON_00942 |
| 104 | 8/4/2003 | Texas Youth Commission, Suicide Alert Form for Secure Programs | NELSON_00944 |
| 105 | 1/19/2004 | Nursing Clinic Note | NELSON_00946 |
| 106 | 1/19/2004 | Excerpt of Incident Report | NELSON_00951 |
| 107 | 1/19/2004 | CCF-225 Incident Report | NELSON_00952 |
| 108 | 1/20/2004 | Suicide Alert Removal/Change in Observation Level | NELSON_00954 |
| 109 | 1/29/2004 | Texas Youth Commission, Psychiatric Referral | NELSON_00955 |
| 110 | 6/2/2004 | Nursing Assessment Protocol for Altered Level of Consciousness | NELSON_00960 |
| 111 | 6/2/2004 | CCF-225 Incident Report | NELSON_00962 |
| 112 | 4/15/2005 | CCF-225 Incident Report | NELSON_00964 |
| 113 | 4/16/2005 | Nursing Clinic Note | NELSON_00966 |
| 114 | 4/26/2005 | Patient Discharge Form | NELSON_00968 |
| 115 | 4/26/2005 | UTMB-Galveston Physician Order Sheet | NELSON_00972 |
| 116 | 9/21/2008 | Tarrant County Jail Mental Health Services Request | NELSON_00987 |
| 117 | 9/24/2008 | Tarrant County Sheriff's Department, Confinement Bureau, Change of Inmate Housing Assignment | NELSON_00988 |
| 118 | 9/24/2008 | Tarrant County Jail Mental Health Services Request | NELSON_00989 |
| 119 | 10/13/2008 | TCMHMRS Client Progress Note | NELSON_00990 |

xvii

**TABLE OF EXHIBITS**
**(continued)**

| EXHIBIT | DATE | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|---|
| 120 | 9/24/2008 | Tarrant County Sheriff's Department, Detention Bureau Incident Report | NELSON_00991 |
| 121 | 10/6/2008 | Request for Services | NELSON_00992 |
| 122 | 11/17/2008 | Tarrant County Corrections, Inmate Request for Health Services | NELSON_00995 |
| 123 | 1/14/2009 | Tarrant County Mental Health, Mental Retardation Services Progress Notes | NELSON_00997 |
| 124 | 1/14/2009 | Correctional Health-Clinic Notes | NELSON_00998 |
| 125 | 1/14/2009 | Tarrant County Mental Health, Mental Retardation Services Progress Notes | NELSON_00999 |
| 126 | 2/6/2009 | Texas Department of Criminal Justice, Pen Packet Document Checklist | NELSON_01000 |
| 127 | 3/18/2009 | Safe Prison Program Offender Protection Investigation | NELSON_01001 |
| 128 | 1/21/2010 | Sick Call Request | NELSON_01007 |
| 129 | 1/22/2010 | Mental Health Evaluation | NELSON_01008 |
| 130 | 4/9/2010 | Triage Interview | NELSON_01014 |
| 131 | 7/1/2010 | Homosexual Card | NELSON_01015 |
| 132 | 10/7/2010 | Adult Identification Information Incident Report | NELSON_01016 |
| 133 | 12/1/2010 | TCU A-RSK Information Report | NELSON_01018 |
| 134 | 1/27/2011 | Correctional Health-Clinic Notes | NELSON_01028 |
| 135 | 3/13/2011 | Written Assessment of Mental Health, MHMRTC Forensic Unit | NELSON_01029 |
| 136 | 3/14/2011 | Email from Tuan M. Tri to Tarrant County Magistrate Court | NELSON_01030 |
| 137 | 3/19/2011 | Nurses Notes | NELSON_01031 |

**TABLE OF EXHIBITS**
**(continued)**

| EXHIBIT | DATE | EXHIBIT DESCRIPTION | PAGE |
|---------|------|---------------------|------|
| 138 | 3/19/2011 | Tarrant County Sheriff's Office, Detention Operations Command Medical Report | NELSON_01032 |
| 139 | 4/1/2011 | Inmate Classification | NELSON_01033 |
| 140 | 4/2/2011 | Tarrant County Mental, Health Mental Retardation Services Progress Note | NELSON_01034 |
| 141 | 6/21/2011 | Tarrant County Corrections, Inmate Request for Health Services | NELSON_01035 |
| 142 | 6/30/2011 | Tarrant County Corrections, Inmate Request for Health Services | NELSON_01036 |
| 143 | 10/5/2011 | Correctional Health-Clinic Notes | NELSON_01037 |
| 144 | 10/5/2011 | TCHD Correctional Health Code Run Sheet | NELSON_01038 |
| 145 | 10/10/2011 | Tarrant County Corrections, Inmate Request for Health Services | NELSON_01039 |

**VOLUME IV**

| EXHIBIT | DATE | EXHIBIT DESCRIPTION | PAGE |
|---------|------|---------------------|------|
| 146 | 10/12/2011 | Medical Records Affidavit | NELSON_01040 |
| 147 | 12/26/2011 | Tarrant County Jail Mental Health Services Request | NELSON_01201 |
| 148 | 12/26/2011 | TCHD Correctional Health Code Run Sheet | NELSON_01202 |
| 149 | 12/26/2011 | Tarrant County Sheriff's Department Report from Sgt. T. Wall | NELSON_01204 |
| 150 | 4/19/2016 | Criminal Person Booking List | NELSON_01205 |
| 151 | 10/15/2012 | Trial Testimony of Dr. Antoinette McGarrahan, Volume 43 (excerpts) | NELSON_01206 |
| 152 | 12/22/2014 | State's Proposed Memorandum, Findings of Fact, and Conclusions of Law | NELSON_01247 |
| 153 | 4/19/2016 | Texas Juvenile Justice Department, Correctional Care System Section 7 - Family History | NELSON_01287 |
| 154 | N/A | Plan of Services | NELSON_01288 |

xix

**TABLE OF EXHIBITS**
**(continued)**

| EXHIBIT | DATE | EXHIBIT DESCRIPTION | PAGE |
|---------|------|--------------------|------|
| 155 | 2008 | Kathleen Wayland, *The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations*, 36 Hofstra L. Rev. 923 (2008)........... | NELSON_01289 |
| 156 | 1/1/2013 | Kathleen Wayland & Sean D. O'Brien, *Deconstructing Antisocial Personality Disorder and Psychopathy: A Guidelines-Based Approach to Prejudicial Psychiatric Labels*, 42 Hofstra L. Rev. 519 (2013) ........................................ | NELSON_01330 |
| 157 | N/A | William Hudenko, *The Relationship Between PTSD and Suicide*, PTSD: National Center for PTSD (last visited Oct. 12, 2016).............................. | NELSON_01401 |
| 158 | 10/12/2016 | Declaration of Darrell Washington............................ | NELSON_01406 |
| 159 | 10/3/2016 | Preliminary Report, Psychological Evaluation of Steven Nelson by Bekh Bradley, Ph.D....................... | NELSON_01408 |
| 160 | 9/19/2016 | Declaration of Henry C. Hackbusch III...................... | NELSON_01430 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **STEVEN LAWAYNE NELSON,** | § | |
| TDCJ No. 999576 | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 4:16-CV-904-A |
| | § | |
| | § | **DEATH PENALTY CASE** |
| **LORIE DAVIS, DIRECTOR** | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| | § | |
| Respondent. | § | |

## PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner Steven Lawayne Nelson was convicted and sentenced to death as a party to the murder of a popular local pastor. The Arlington Police Department filed complaints against Mr. Nelson and Anthony Springs, asserting a belief that both were involved in the pastor's death. Only Mr. Nelson was indicted and tried. During jury selection, the State discriminatorily used peremptory strikes to prosecute Mr. Nelson, who is a Black man, before an all-white jury. Defense counsel abandoned Mr. Nelson's equal protection challenge to the State's strikes, opting instead to let "the record speak[] for itself." Racialized jury selection was just one of many errors and deficiencies, amplified by the ineffectiveness of defense counsel, that culminated in Mr. Nelson's unconstitutional death sentence.

In the absence of any evidence establishing that Mr. Nelson caused the pastor's death, the State had to obtain a "parties instruction" for the jury to find guilt vicariously, and thus faced a difficult sentencing-phase case for death. But Mr. Nelson's defense counsel unreasonably failed

to conform their investigation and preparation to the unique circumstances of his case, unnecessarily ceding a major opportunity to discredit the State's vulnerable sentencing arguments. The jury was thus not presented with (among many other things) evidence: that at least one other man was a major participant in the crime; that a pretrial death of an inmate attributed to Mr. Nelson was in fact a suicide; or that Mr. Nelson's behavior and demeanor were the product of profound childhood trauma and mental illness, not what the expert *engaged by Mr. Nelson's defense counsel* described as "psychopathy" likely to make him a future danger.

Throughout their representation of Mr. Nelson, defense counsel simply went through the motions, with no regard for the facts and circumstances of Mr. Nelson's case. Counsel neglected to perform the basic gatekeeping functions necessary to secure a fair trial, permitting Mr. Nelson to appear in court amidst a media frenzy, perceptibly shackled, and surrounded by guards. The accumulation of errors at Mr. Nelson's trial all but sealed his fate before the jury decided whether to sentence him to death or spare his life.

## STATEMENT OF FACTS

### A. Mr. Nelson's Arrest and Trial

On March 3, 2011, Clinton Dobson, pastor of NorthPointe Baptist Church in Arlington, Texas, was killed during a burglary of the church. Judy Elliott, the church's secretary, was severely beaten. The assailants stole a laptop, Dobson's cell phone, credit cards, and Elliott's car. The next day, on March 4, Morgan Cotter and Allison Cobb reported to police that a man matching Mr. Nelson's description had approached them at the QuikTrip for a ride to Dallas, stating he had a black iPhone belonging to a deceased pastor and needed to get out of town. *See*

Incident Report, Arlington, Texas Police Department, Ex. 26 at NELSON 306.[1] Surveillance footage proved this story false, and the police contacted Cotter and Cobb again. After further questioning, Cotter admitted the fabrication and told detectives she believed that two men—Steven Nelson and Anthony "A.G." Springs—were involved in the crime. Both Cotter and Cobb said they were with Mr. Nelson and Springs on the evening of March 3. Cotter told police that a news story about the church murder came on the television while she was with Mr. Nelson and Springs, prompting them to comment on the crime. Springs told the group he was trying to sell "an iPhone that belonged to the dead Pastor"—contrary to Cotter's initial story that it was Mr. Nelson who had the phone. *Id.* at NELSON 306–08.

Arlington police arrested Springs and found that he was in possession of Ms. Elliott's car keys and had been in possession of Mr. Dobson's iPhone. Photos of Springs taken on March 7, 2011, showed extensive bruising on both his hands, as well as "a large bruise on [his] inner left arm at or near his lower biceps/elbow." *Id.* at NELSON 315; *see* Photos of Springs's Injuries (Mar. 7, 2011), Ex. 27 at NELSON 327. Detectives questioned Springs about his involvement in the murder, which he denied. Springs told police that Mr. Nelson had admitted the murder to him. On March 5, police arrested Mr. Nelson, who was in possession of items purchased with Elliott's credit cards. Mr. Nelson told police he was a lookout during what he thought would be a burglary. He admitted to using the stolen credit cards, but maintained that he did not kill anyone, or anticipate that anyone would be hurt. Ex. 26 at NELSON 312–13. The Arlington Police Department filed sworn complaints expressing a belief that both Mr. Nelson and Springs committed capital murder. The State ultimately indicted only Mr. Nelson for intentionally

---

[1] Citation conventions in this Petition are as follows: Appendix ("Ex. X at NELSON [PAGE]"); Trial Court's Clerk's Record ("[VOLUME] C.R. [PAGE]"); Trial Court Transcript ("[VOLUME] R.R. [PAGE]"); and State Habeas Clerk's Record ("S.H.C.R. [PAGE]").

causing Dobson's death in the course of committing or attempting to commit robbery or burglary of a building.

### 1. Pre-Trial Investigation

On March 14, 2011, the trial court appointed William "Bill" Ray and Stephen Gordon to represent Mr. Nelson. 1 C.R. 28-29. Over the course of their pretrial investigation, defense counsel failed to pursue evidence establishing that Mr. Nelson's role in the multi-party crime was substantially exaggerated—they did not follow up on leads or interview available witnesses that could have implicated Springs as the individual who caused the pastor's death, even as their client insisted that Springs was the assailant. Ex. 26 at NELSON 312-13. Defense counsel's records contain no indication that they even attempted to interview Springs, though Springs had Dobson's phone, Elliott's car keys, and extensive bruising consistent with a recent physical assault. *See* Itemized Bill for Bill Ray (Nov. 16, 2012), Ex. 2 at NELSON 3–15.

Defense counsel also did not interview Claude Jefferson, a third accomplice whom Mr. Nelson placed at the scene. Jefferson's alibi was that he was in class at the University of Texas, Arlington from 11:00 a.m. until 12:20 p.m. on the day of the murder. *See* State's Ex. No. 375, Records from the Univ. of Texas at Arlington (July 31, 2012), Ex. 30 at NELSON 459–65. Jefferson falsely maintained he had a test that day, yet defense counsel never verified his alibi. *See id.* at NELSON 464–65. In particular, defense counsel knew that a video recording could have established whether Jefferson entered class on March 3, 2011, *id.*, but never subpoenaed the tape.[2]

Before Mr. Nelson's trial, defense counsel conducted a rudimentary investigation into Mr. Nelson's background and mental health, by obtaining official documents; hiring Mary

---

[2] This recording has since been destroyed. *See* Email Chain from K. Black to Univ. of Texas at Arlington (Sept. 19, 2016), Ex. 36 at NELSON 519.

Burdette, a mitigation specialist, to interview individuals who knew Mr. Nelson; and retaining Dr. Antoinette McGarrahan, a neuropsychologist, to evaluate him. Defense counsel obtained records from schools, hospitals, juvenile detention facilities, and criminal justice institutions, though it is unclear to what extent defense counsel reviewed these documents, since (as explained further below) virtually none were used at trial. *See* Ex. 2 at 3–15; 47 R.R. 7-8 (defense offered 27 exhibits, none of them the foregoing). The mitigation specialist, Burdette, interviewed some family, friends, and a few people who worked with Mr. Nelson while he was in juvenile detention, and delivered summaries of these interviews to defense counsel.

Dr. McGarrahan was retained by counsel before counsel received and reviewed key background information about Mr. Nelson's social history. She was given no specific purpose and no referral question. Indeed, counsel made the decision to use Dr. McGarrahan as a testifying expert before she had even met with Mr. Nelson. Counsel gave Dr. McGarrahan various records, along with a report from Burdette that was dated just 14 days after Burdette's appointment and reflected only a single interview, with Mr. Nelson himself. A letter to Dr. McGarrahan dated May 22, 2012, revealed that defense counsel had done little background investigation as of that date, and reported that Mr. Nelson's mother was "not very interested or helpful." Letter from B. Ray to Dr. McGarrahan (May 22, 2012), Ex. 48 at NELSON 769. On August 20, 2012, Dr. McGarrahan wrote to defense counsel stating that she would "[i]f asked on cross . . . *agree that [Mr. Nelson] has several traits associated with psychopathy.*" Letter from Dr. McGarrahan to B. Ray (Aug. 20, 2012), Ex. 51 at NELSON 775 (emphasis added). Defense counsel chose to call her anyway.

### 2. Guilt Phase

Voir dire began on August 2, 2012. 8 R.R. 1. During voir dire, the State was acutely concerned with selecting jurors willing to render a capital murder conviction based on a theory

of vicarious criminal liability. The State repeatedly asked potential jurors whether they would be willing to convict and sentence Mr. Nelson even if he was not the individual directly responsible for the pastor's death. *See, e.g.*, 21 R.R. 70-74 ("So we have to prove either that they actually caused the death of someone or we have to prove if they did not actually cause the death of the person on trial, they either intended to kill someone or they anticipated that someone would be killed. Okay?"); *accord* 28 R.R. 172-73.

The guilt phase of the trial began on October 1, 2012. 32 R.R. 1. The State called 38 witnesses, including two—Kelsey Duffer and Darion McClain—who provided testimony supporting Springs's alibi that he was with Duffer at the time of the crime, which was likely between 11:15 a.m. and 1:30 p.m. *See* Ex. 26 at NELSON 311; 35 R.R. 10-40. Duffer was Springs's girlfriend and the mother of his child, and McClain was Duffer's close friend. *See id.* at 13-16. Duffer stated that Springs came to her home in Venus, Texas, on the evening of Wednesday, March 2, 2011, to celebrate her birthday. According to Duffer, Springs and Duffer slept in till 11:00 a.m. on the morning of March 3, and Duffer left to collect McClain from school around 11:35 a.m., returning home afterward. *See id.* at 17-18. Duffer testified that at around 2:30 p.m., she, McClain, and another friend dropped Springs off at a gas station in Arlington, where Springs met up with Mr. Nelson. *See* 35 R.R. 18. McClain's testimony was similar, although she testified that Duffer picked her up at school earlier, between 11:00 a.m. and 11:15 a.m. *See id.* at 24–36. The State relied on these witnesses to establish that Springs was not in Arlington at the time of the murder. Defense counsel was not prepared for this testimony; they had interviewed neither Duffer nor McClain, *see* Ex. 2, and they failed to cross-examine either about bias. *See* 35 R.R. 25–29.

6

After the State presented its 38 witnesses, defense counsel called Mr. Nelson to testify as the defense's sole guilt-phase witness. 36 R.R. 55–87. According to Mr. Nelson, on March 3, 2011, he was with Springs and Jefferson at the NorthPointe Baptist Church. *Id.* at 69–76. Mr. Nelson testified that he knew Springs and Jefferson planned to rob the church, but that he did not know or intend that anyone would get hurt. *Id.* at 86–87. According to Mr. Nelson, he acted as a lookout during the robbery while Springs and Jefferson entered the church. *Id.* at 71, 109. After some time, Springs came to the door to let Mr. Nelson in, and Mr. Nelson saw what Springs and Jefferson had done to Dobson and Elliott. *Id.* at 72–73. Experts who testified for the State regarding DNA evidence from the scene confirmed that the lab did not find Mr. Nelson's DNA on the ligatures used to bind the victims. Rather, consistent with Mr. Nelson's story, the only DNA evidence linking Mr. Nelson to the scene was DNA from the victims found on one of Mr. Nelson's shoes, which could have been transferred when Mr. Nelson entered the church. *See id.* at 109. During closing arguments at the guilt phase, the State repeatedly emphasized that Mr. Nelson was a "lone assassin." *See* 37 R.R. 7–13, 31.

Mr. Nelson was found guilty of capital murder as a party on October 8, 2012. *See* 2 C.R. 401.

### 3.   The Sentencing Phase

As a condition of imposing the death penalty, Texas law requires a sentencing jury to unanimously answer "yes" or "no" to two standard special issues, and a third special issue in cases involving vicarious liability. First, the jury must answer whether there is a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society (the "future dangerousness" issue). Tex. Code Crim. Proc. art. 37.071, § 2(b)(1). In capital cases involving vicarious liability, the second special issue (the "parties" issue) requires the jury to determine if the defendant intended to cause death or anticipated a loss of life. *See id.*

7

§ 2(b)(2). Mr. Nelson's jury was asked to answer this additional special issue because the involvement of additional perpetrators was a central question in the case. Finally, the jury must answer whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there are sufficient mitigating circumstances to warrant a life sentence (the "mitigation" issue). *See id.* § 2(e). An absence of unanimity on any question precludes a death sentence.

With Mr. Nelson's role in the multi-party crime in question, the State aggressively sought to introduce evidence of other bad acts at the sentencing phase. The linchpin of the State's case at sentencing was an allegation that Mr. Nelson murdered Jonathan Holden, an inmate on his cell block, while Mr. Nelson was awaiting trial. 40 R.R. 7–152. On March 19, 2012, officers at the Tarrant County Jail discovered Holden hanging from a blanket tied around his cell bars. Holden and Mr. Nelson were confined in the same "rotation tank," containing ten individual cells in two rows separated by a common area. One inmate at a time is allowed into the common area for an hour. At the time of Holden's death, Mr. Nelson was out on his hour-long "rotation." Holden's death was initially considered a suicide, but the State used the sentencing proceeding to argue that Holden had been strangled by Mr. Nelson.

The State called six witnesses to testify regarding Holden's death. The first witness it presented was inmate Rick Seely. *See* 40 R.R. 7–32. Seely occupied cell ten, directly across from the cell occupied by Holden. At the time, Seely was serving a two-year sentence for family assault. Seely stated that on the morning of March 19, Holden had been mumbling to himself and muttered the "N" word, causing friction with the other inmates. According to Seely, Mr. Nelson was carrying a blanket around while he was on his rotation. Seely testified that Mr.

8

Nelson and Holden discussed how Holden could be moved from the tank. Mr. Nelson told Holden to push the call button for the guards and to tell the guards that he (Holden) was trying to hurt himself. Holden pushed the button, but no one answered.[3]

After the guards failed to answer Holden's call for assistance, Seely testified, Mr. Nelson and Holden agreed that they would stage a suicide attempt. *See* 40 R.R. 18. "They were going to make it look like [Holden] was going to commit suicide and the guards were going to come in and get him and take him out of there." *Id.* According to Seely, Holden let Mr. Nelson loop the blanket around Holden's neck, and then Mr. Nelson pulled the blanket for four minutes. *Id.* at 19–21. Seely testified that, with Holden's last breath, he "reached around and grabbed [Mr. Nelson] by the arm and scratched his arm and then he just fell out." *Id.* at 20. Afterward, Seely said, Mr. Nelson tied the blanket to the outside of the top bar. Seely testified that he wrote "murdered" on a piece of paper and showed it to EMS when they arrived, though he also testified that neither he nor the other inmates attempted to notify the guards about what was happening using the intercom buttons every cell had. *Id.* at 22, 40.

On cross-examination, Seely was impeached with some of his prior convictions (for assault, burglary, and DWI), but denied receiving or expecting any benefit from the State in exchange for his testimony. *See* 40 R.R. at 41–44. He told the jury he was testifying "because [Mr. Nelson] doesn't need to be out on the street. I've got children and grandchildren out there, you're not going to kill mine." *Id.* at 44.

Officer Ricky Dominguez testified that he let Mr. Nelson out of his cell the morning of March 19, 2012. *See* 40 R.R. 57. Later that morning, Dominguez saw Mr. Nelson with a

---

[3] It was common knowledge within the jail that an inmate would be removed from his cell if he expressed a desire to harm himself. *See* 40 R.R. 17–18.

blanket wrapped around his neck. *Id.* at 58. Dominguez told Mr. Nelson to take the blanket off, and Mr. Nelson complied. *Id.* at 58.

Sergeant John Campos also testified about the events on the morning of March 19. He said that another officer, Officer Wimberly, told him that somebody from Tank G (Holden's tank) was pushing the intercom button for assistance and that "somebody down there is trying to hurt themselves." 40 R.R. 72. Campos went to the tank and heard "[s]omebody hollering out, you need to get one cell out of here. He's a racist. And he might want to hurt himself." *Id.* at 73. Campos approached cell one—Holden's cell—and after a brief discussion concluded Holden did not want to hurt himself; Campos then left. *Id.* at 73–75.

Later that morning, Campos saw Mr. Nelson waving at him through a window from inside the tank. *See* 40 R.R. 78. Campos went to the door, and Mr. Nelson told him the inmate in cell one was trying to hang himself. *Id.* When Campos entered, he found Holden hanging from a blanket wrapped around his neck, its ends tied to two cell bars. *Id.* at 79. Campos called a "Code 6, Signal 2"—the code for an attempted suicide. *Id.* Campos testified that it later "seemed strange" that the knots were tied loosely, *id.* at 79, but on the morning of March 19 he told his lieutenant that it appeared somebody had tried to hang himself. *Id.* at 81–82. Holden was pronounced dead at the hospital the next day. *Id.* at 87, 89.[4]

Dr. Lloyd White performed an autopsy of Holden's body. *See* 40 R.R. 135. Although White conducted the autopsy on March 21, 2012, he did not finalize his report until June 27, 2012. *See* Autopsy Report (Mar. 21, 2012), Ex. 42 at NELSON 539, 545 (indicating completion date of June 27, 2012). White's report was delayed because he waited for the sheriff's

---

[4] Two other State witnesses, Timothy Stewart and Constance Patton, testified that Mr. Nelson's DNA could not be excluded as a possible contributor to the clippings from Holden's right fingernails. *Id.* at 122, 128, 131.

department's report, which contained witness interviews and statements. 40 R.R. 144. After

using the sheriff's department's report to formulate his opinion, Dr. White opined that "the cause

of death was complications of anoxic brain injury due to ligature strangling due to assault by

another person." 40 R.R. 139. In fact, Dr. White's opinion that the death was a homicide was

based exclusively on "the results of the investigation by the sheriff's department," not on a

clinical examination of Holden's body. *Id.* at 141, 144, 149-50. Defense counsel raised no

objection to White's opinion testimony that the cause of death was "due to assault by another

person." *Id.* at 139.

The defense called three witnesses to testify regarding the incident, including Sergeant

Campos again. Campos testified that Wimberly told Campos that he was worried that the

inmates would blame Wimberly for Holden's death. *See* 43 R.R. 13-14. Some of the inmates

claimed that they tried to push the intercom buttons during the incident but that Wimberly did

not respond. *Id.* at 14. Campos also testified that Holden could have reached the intercom

button from the position in which he had died. *Id.* at 19.

The defense also called Dr. John Plunkett, a forensic pathologist who reviewed records

related to Holden's death. *See* 43 R.R. 28–31. Dr. Plunkett testified there was no medical

evidence that Holden had been pulled up against the cell bars: there were no bruises, scrapes, or

skin tears on the back of Holden's neck. *Id.* at 31–32. Dr. Plunkett explained that a person could

have suffocated himself simply by leaning into the blanket the way it was hung. *Id.* at 34–35.

Dr. Plunkett could not reach a medical conclusion regarding whether Holden's death was a

suicide or not, but he could conclude that Holden was at the very least "an active participant" in

his own death. *Id.* at 35–36. If Holden did not act alone, Holden would have had to give

someone the blanket, and allowed that person to put the blanket around his neck and tie the

11

blanket to the bars. *Id.* at 36. Moreover, Dr. Plunkett explained, all Holden had to do to avoid asphyxiation was stand up. *Id.*[5]

In minimal service of a mitigation showing, defense counsel called six witnesses to testify about Mr. Nelson's background. Though counsel had access to records replete with evidence of trauma and neglect, they did not call a trauma expert, but rather relied on the expert testimony of neuropsychologist Dr. Antoinette McGarrahan. As she had warned defense counsel she would, Dr. McGarrahan testified about what she viewed as Mr. Nelson's "psychopathic" traits. On questioning by the State, Dr. McGarrahan confirmed that Mr. Nelson "has many, many psychopathic characteristics," that "he meets most of that criteria [for being a psychopath]," and that the only criteria for psychopathy that Mr. Nelson does not meet is "short-term marital relationships," but only because "he's never been out of prison long enough to get married." 43 R.R. 274–75. Dr. McGarrahan testified that Mr. Nelson "likes violence," and that he finds violence "emotionally pleasing." *Id.* at 269. When asked the ultimate question whether Mr. Nelson would pose a future danger to society, Dr. McGarrahan testified that Mr. Nelson would prove dangerous "as long as there are other people around him that are preventing him from getting his way." *Id.* at 277. Defense counsel chose not to redirect Dr. McGarrahan, or to put her statements in any context. *Id.* On the contrary, Mr. Nelson's counsel *reinforced* Dr. McGarrahan's damaging testimony by telling the jury that Mr. Nelson was "past the point of no return," *id.* at 258, and at "the point where there's no fixing it," *id.* Dr. McGarrahan agreed, stating that the damage to Mr. Nelson "can't be undone." *Id.* at 259. After hearing Dr. McGarrahan's testimony, the State decided it was no longer necessary to present its own mental

---

[5] The third witness called by the defense, an inmate who occupied the cell adjacent to Holden (Michael Thomas), asserted his right against self-incrimination and did not testify. 43 R.R. 279.

health expert, Dr. Randall Price—though Dr. Price had been retained by the State and was present in the courtroom, ready to testify.

On October 16, 2012, the jury returned their verdict on all three sentencing special issues, answering the future dangerousness and parties issues "yes," and "no" to the mitigation issue. The trial judge sentenced Mr. Nelson to death. *See* 2 C.R. 417-19.

## B. Direct Appeal

On October 16, 2012, the trial court appointed David Pearson as Mr. Nelson's counsel on direct appeal. 2 C.R. 431. On March 25, 2013 and June 18, 2013, Pearson sought extensions of time to file Mr. Nelson's opening brief with the Texas Court of Criminal Appeals (CCA). *See* First Motion for Extension of Time, *Nelson v. Texas*, No. AP-76,924 (Tex. Crim. App. Mar. 25, 2013), and Second Motion for Extension of Time, *Nelson v. Texas*, No. AP-76,924 (Tex. Crim. App. June 25, 2013). Appellate counsel filed Mr. Nelson's opening brief on July 19, 2013. On April 15, 2015, the CCA affirmed the judgment. Opinion, *Nelson v. Texas,* No. AP-76,924 (Tex. Crim. App. Apr. 15, 2015). The Supreme Court denied Mr. Nelson's certiorari petition on October 19, 2015. Order, *Nelson v. Texas,* No. 15-5265 (U.S. Oct. 19, 2015).

## C. State Habeas Proceeding

### 1. Investigation

On October 16, 2012, the trial court appointed John W. Stickels to represent Mr. Nelson in state habeas proceedings. 2 C.R. 432. Over the course of approximately one and a half years, from October 16, 2012 to April 15, 2014, Stickels failed to reasonably investigate and prepare Mr. Nelson's state habeas application.

State habeas counsel's neglect of Mr. Nelson's case led to significant delays in the investigation. Following his appointment on October 16, 2012, state habeas counsel completed

13

only three hours of work on Mr. Nelson's case that year. *Id.* at NELSON 212. State habeas counsel waited until April 2013—six months after his appointment—to even meet with Mr. Nelson to discuss the case. *Id.* at NELSON 211-12. State habeas counsel waited even longer, until June 2013, to request Mr. Nelson's files from defense counsel, though Stickels briefly consulted them after his appointment. *Id.* at NELSON 211; Letter from B. Ray to J. Stickels (June 13, 2013), Ex. 5 at NELSON 31.[6] In April 2013, state habeas counsel contacted a mitigation specialist, Gerald Byington, for the first time. *See* Ex. 10 at NELSON 211.

Though Byington is a mitigation specialist by trade, he did not conduct any investigation in Mr. Nelson's case. Over the course of nine months, from August 2013 through May 2014, Byington provided 29.5 hours of services, totaling $2,802.50—using only about half of the court's allotted $5,000 budget. *See* Serv. and Expense Summary for G. Byington (May 16, 2014), Ex. 9 at NELSON 206. Byington spent the majority of his time simply reviewing legal files. *Id.* He did not interview any witnesses or aid in the hiring of any experts. *Id.* Byington generated a report which simply summarized his review of the trial record and defense counsel's mitigation materials. *See id.* Byington's report contained no original analysis or new factual development. *See* Rev. of Mitigation Activities, Ex. 11 at NELSON 213-18.

Deeply concerned about state habeas counsel's lack of preparation and unresponsiveness, Mr. Nelson wrote a letter to the trial court on March 11, 2014—just 35 days before the deadline to submit the application—describing state habeas counsel's ineffectiveness and pleading for a new attorney. *See* S.H.C.R. 131. Other than docketing the letter, the trial court took no action on Mr. Nelson's request for new counsel.

---

[6] In the process, state habeas counsel further delayed the investigation by failing to secure a proper release for Mr. Nelson's records. *Id.*

14

### 2. State Habeas Application

State habeas counsel filed Mr. Nelson's application for state habeas relief on April 15, 2014. *See* Ex. 8. The application contained 17 claims challenging Mr. Nelson's capital conviction and death sentence. Eleven were boilerplate challenges to various aspects of the Texas capital sentencing scheme. Four had already been raised and denied on direct appeal. The 14-page "Guilt/Innocence Facts" section in the application simply reproduced the direct appeal brief. *Compare* Opening Br., *Nelson v. Texas*, No. AP-76,924 (Tex. Crim. App. July 19, 2013) at 7–24, *with* Highlighted State Habeas Application (Apr. 15, 2014), Ex. 8 at NELSON 111–25. State habeas counsel alleged ineffective assistance of defense counsel in the barest possible terms, vaguely asserting that defense counsel did not present enough witnesses or "gather relevant records." Ex. 8 at NELSON 139. No witness affidavits or extra-record evidence was submitted with the application, consistent with state habeas counsel's failure to conduct any independent investigation.

State habeas counsel also lifted whole passages of Mr. Nelson's application from a brief for a different client, asserting claims that were inapplicable to Mr. Nelson, including that he suffered from Fetal Alcohol Spectrum Disorder (FASD). *See id.* at 189–204. There is no record basis for that assertion; the FASD claims were simply copied *verbatim* from the brief in Stickels's archives. *Compare id., with Soliz v. Texas* Opening Br. (Oct. 8, 2013), Ex. 7 at NELSON 56–68.[7] In a similar vein, the state habeas application repeatedly referred to Mr. Nelson's mother as an alcoholic who was addicted to "paint sniffing and other drugs." Ex. 8 at NELSON 137, 192. For her many faults, there is no evidence whatsoever that this was true of

---

[7] State habeas counsel likewise copied verbatim, from the same brief, a generic claim alleging that Texas's "10-12" rule is unconstitutional. *Compare* Ex. 8 at NELSON 175–81 (Highlighted State Habeas Appl.), *with* Ex. 7 at NELSON 69–71.

Mr. Nelson's mother. Another section of the application, titled "Presentation of Choices that were Made for Tony," misidentifies Mr. Nelson ("Tony" was the nickname of Mark Anthony Soliz, from whose brief Stickels lifted the FASD claim) and contains a generic discussion of FASD that was likewise copied from a different application. *Id.* at NELSON 136.

On January 29, 2015, the trial court signed an order recommending the adoption of the State's proposed findings of fact and conclusions of law, dismissing seven claims as presenting "no valid basis to reconsider the prior decisions of the Court of Criminal Appeals." *See* Order, S.H.C.R. 352; State's Proposed Findings of Fact & Conclusions of Law (Dec. 22, 2014), Ex. 152 at NELSON 1263–65, 1267–70, 1275–77. Predictably, the Sixth Amendment claims asserted by state habeas counsel were rejected as "conclusory" and "not firmly founded in the record," since counsel had failed "to identify a single undiscovered or uncalled witness," and "offered no proof that further investigation would have uncovered any other…witness." *Id.* at NELSON 1267, 1273, 1284. The trial court dismissed the four claims already raised on direct appeal because such claims were "not cognizable in this post-conviction habeas proceeding" under Texas law. *Id.* at NELSON 1266, 1274, 1276–77. Finally, the trial court concluded, "there is no evidence that Applicant was exposed to alcohol or any other drug while his mother was pregnant with him." *Id.* at NELSON 1280.

On October 14, 2015, the CCA denied Mr. Nelson's application for relief, adopting the trial court's findings of fact and conclusions of law. Order, *Ex Parte Steven Lawayne Nelson*, No. WR-82,814-01 (Tex. Crim. App. Oct. 14, 2015).

**D.       Post-State-Habeas Investigation**

In preparation for federal habeas proceedings, undersigned counsel undertook the investigation that should have taken place before trial. Undersigned counsel's team located and

interviewed people whom defense counsel failed to contact during the pretrial investigation. It also interviewed people with whom the trial mitigation specialist did speak, in order to determine if there were areas of Mr. Nelson's background that defense counsel failed to explore. The new investigation yielded numerous records detailing Mr. Nelson's background, including but not limited to records obtained by defense counsel that were never presented to the jury. Undersigned counsel's investigation pursued the unexplored "red flags" that defense counsel failed to pursue, including evidence of childhood trauma, severe abuse, neglect, mental illness, poverty, and issues relating to Mr. Nelson's sexual identity.

Review of defense counsel's files revealed substantial evidence of trauma and neglect, including one document—ignored or overlooked by trial counsel—from Tarrant County in which Mr. Nelson was diagnosed with Posttraumatic Stress Disorder with a PTSD score more than twice the facility average. TCU A-RSK Information (Dec. 1, 2010), Ex. 133 at NELSON 1025. Undersigned counsel therefore engaged Dr. Bekh Bradley to evaluate Mr. Nelson. Dr. Bradley is a professor of psychiatry and behavioral sciences at Emory University and an expert in the area of childhood and adolescent trauma. Dr. Bradley evaluated Mr. Nelson on October 3 and 4, 2016. After reviewing records—most of which defense counsel had in their possession at the time of trial—and spending over 8.5 hours with Mr. Nelson, Dr. Bradley found that Mr. Nelson suffered "extreme childhood trauma and adversity, which has likely resulted in unrecognized and untreated trauma-related symptoms including symptoms of posttraumatic stress disorder (PTSD)." Preliminary Report of Dr. Bekh Bradley, Ph.D. (Oct. 3, 2016), Ex. 159 at NELSON 1408 ("Bradley Report"). Dr. Bradley further found that Mr. Nelson "exhibits characteristics of dissociative behavior, bipolar and/or other mood disorders (such as major depression) that are present at increased rates among individuals who experienced childhood

17

trauma." *Id.* Dr. Bradley opined that "a failure to take into the account the influence of early

trauma/adversity and PTSD is likely to have led to an inappropriate assessment of [Mr. Nelson]

as having antisocial personality disorder." *Id.*

## STATEMENT OF JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 2241 and § 2254.

## CLAIMS FOR RELIEF

**I.      MR. NELSON WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS WHEN DEFENSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE, PREPARE, AND LITIGATE SENTENCING.**

The Sixth Amendment entitles defendants to the effective assistance of defense counsel,

including during the sentencing phase of a capital proceeding.  Under the standard set forth in

*Strickland v. Washington*, 466 U.S. 687 (1984), a successful ineffective-assistance-of-counsel

("IAC") claim requires a showing that "[trial] counsel's performance was deficient, and that the

deficiency prejudiced the defense," *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), *viz.*, that "there

is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.  A reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The mainstay of effective assistance at the sentencing phase is a reasonable investigation,

of the facts as well as the law.  *Id.* at 690-91; *Wiggins*, 539 U.S. at 534-35 (failure to investigate

family and social history).[8]  In *Strickland* itself, the Court explained that "choices made after less

---

[8] *See also, e.g., Rompilla v. Beard*, 545 U.S. 374, 389 (2005) (failure to review prior conviction file); *Williams v. Taylor*, 529 U.S. 362, 399 (2000) (lack of preparation for sentencing phase); *Canales v. Stephens*, 765 F.3d 551, 570 (5th Cir. 2014) (counsel did not "do any investigating" in preparation); *Walbey v. Quarterman*, 309 F. App'x 795, 800-03 (5th Cir. 2009) (defense counsel was ineffective for not adequately preparing for penalty phase); *Jones v. Thigpen*, 788 F.2d 1101, 1103 (5th Cir. 1986) (counsel "either neglected or ignored critical matters of mitigation at the point when the jury was to decide whether to sentence [defendant] to death");

than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91. Rather than explore and develop theories that appropriately reflected the strengths of Mr. Nelson's case, however, his defense counsel took a check-the-boxes approach to sentencing preparation—resulting in a sentencing proceeding in which the jury was deprived of powerful information indicating that Mr. Nelson's life should be spared. This constitutional error warrants relief, and the procedural default of this IAC claim is excused because its forfeiture is owing to the deficient performance of state habeas counsel.

### A.      Defense Counsel's Performance Was Deficient.

Defense counsel failed to investigate and prepare multiple, crucial sentencing-phase issues. Mr. Nelson's attorneys failed to adequately investigate and prepare evidence showing that another person at the crime scene may have caused the death of Mr. Dobson and the attack on Ms. Elliott. Defense counsel failed to adequately investigate and prepare evidence demonstrating that Mr. Nelson did not cause the death of a fellow inmate before trial (the underpinning of the State's case for future dangerousness). And defense counsel unreasonably narrowed the investigation into Mr. Nelson's background and mental health, eventually presenting the jury with a defense expert who testified that Mr. Nelson was a "psychopath" and a future danger, instead of an expert capable of accurately testifying about the relationship of Mr. Nelson's severe life trauma to mental health and criminality.

The ground rules for effective representation at the sentencing phase are well established. As noted, an appropriate investigation and sufficient preparation are key. *Supra* at 18-19, n.8. The Sixth Amendment binds defense counsel not only to reasonably prepare for mitigation, but

---

*Tenny v. Cockrell*, 420 F. Supp. 2d 617, 634 (W.D. Tex. 2004), *aff'd sub nom*, 416 F.3d 404 (5th Cir. 2005) (counsel failed to present "sudden passion" as mitigating circumstance to avoid harsh sentence).

also "to make reasonable efforts to obtain and review material that counsel knows the prosecution *will probably rely on as evidence of aggravation* at the sentencing phase of trial." *Rompilla*, 545 U.S. at 377 (emphasis added). Moreover, capital defense counsel may not truncate "their investigation of [a defendant's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. The failure to present particular mitigation evidence is thus deficient and not a "strategic" or "tactical" decision if it is based on an unreasonably narrowed investigation and preparation. *See Wiggins*, 539 U.S. at 527; *Miller v. Dretke*, 420 F.3d 356, 366 (5th Cir. 2005); *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003) (per curiam); *Lockett v. Anderson*, 230 F.3d 695, 711-14 (5th Cir. 2000). This rule—that decisions about sentencing-phase evidence are neither strategic nor tactical if they are the result of unreasonably narrowed preparation—includes the use of proper expert testimony. *See Caro v. Calderon*, 165 F.3d 1223, 1226-27 (9th Cir. 1999) (counsel was ineffective despite consulting four different experts because they were not the right experts).

1. Defense Counsel Deficiently Failed to Investigate, Prepare, and Develop a Case Involving Mr. Nelson's Diminished Role in the Crime.

At both phases of trial, the State prosecuted and sought to have Mr. Nelson sentenced to death as the lone assailant responsible for the death of Mr. Dobson and the injuries to Ms. Elliott. Defense counsel's narrowed and inadequate pretrial investigation into the involvement of other participants was unreasonable, preventing the jury from considering evidence at sentencing showing that Mr. Nelson in fact had a diminished role in the incident.

The State immediately zeroed in on the importance of neutralizing a defense based on Mr. Nelson's diminished role in a multi-party crime. During voir dire, the State systematically interrogated potential jurors about the parties special issue, their willingness to find Mr. Nelson guilty for the act of another party, *e.g.*, 28 R.R. 172, and their willingness to impose the death

penalty even if Mr. Nelson was not personally responsible for the assaults, *e.g.*, 21 R.R. 70-74. The State viewed these issues as so critical that it articulated as the reason for multiple peremptory strikes its doubts about potential jurors' willingness to apply these aspects of the law. *See, e.g.*, 31 R.R. 19-20.

In contrast, defense counsel did not reasonably investigate or prepare to litigate Mr. Nelson's limited role. Defense counsel failed to adequately investigate the roles of likely accomplices, leaving counsel unable to credibly dispute Mr. Nelson's status as a principal assailant. Defense counsel admitted as much in affidavits offered in state habeas proceedings: "We knew from the initial review of the case that most of our time would be spent attempting to build a strong mitigation case ...." *See* Gordon Affidavit, S.H.C.R. 164. Defense counsel's failure to investigate, prepare, and present the "plausible alternative defensive theory" that Mr. Nelson was not the lone assailant was objectively unreasonable. *Moore v. Johnson*, 194 F.3d 586, 611 (5th Cir. 1999), *superseded by statute* ("Counsel's decision to exclude exculpatory evidence ... by precluding reliance upon a plausible alternative defensive theory that was supported by other evidence in the record, was professionally unreasonable.").[9]

By failing to reasonably investigate and explore the roles of accomplices, defense counsel effectively and unnecessarily foreclosed an argument that Mr. Nelson's role and intent did not warrant a sentence of death under Texas law. Defense counsel should have investigated and presented images of co-conspirator Anthony Springs, for example, who had "extensive bruising

---

[9] Defense counsel's "decision" not to make this showing—which would have supported Mr. Nelson's testimony that he was not the lone assailant—cannot be justified as "strategy." In closing, defense counsel alluded to the "lone assailant theory" at least 16 different times. *See, e.g.*, 37 R.R. 13 (Gordon: "And for the State to believe that he is the lone -- or try to convince you that [Mr. Nelson] is the lone actor doesn't make much sense."); *id.* at 20 (Ray: "This is not the lone assassin theory."). Defense counsel's jury arguments against the "lone assailant theory" only make worse their failure to present supportive evidence, leaving the jury with the (incorrect) impression that no such evidence existed. *Moore*, 194 F.3d at 604.

and swelling on [the] knuckles of both hands" just days after the murder, reflecting that he had recently been in a violent altercation. *See* Ex.26 at NELSON 315; *see also* Ex. 27. Or defense counsel could have undermined Claude Jefferson's alibi by requesting a video to verify whether he was really in class the morning of the murder. *See* Ex. 30 at NELSON 464; *see also* Ex. 36 at NELSON 519-24. Because of defense counsel's failures, the jury was not presented with (among other things) evidence that Springs possessed stolen property from the crime scene, or that the co-conspirators' alibis were impossibly inconsistent. These failures alone and together were inexplicable deficiencies.

- **Defense counsel unreasonably failed to adequately investigate Anthony Springs's substantial involvement in the crime.**

Mr. Nelson testified during the guilt phase that Springs was directly involved in the murder of Mr. Dobson and the aggravated assault of Ms. Elliott. *See* 36 R.R. 69-73. Yet defense counsel made no serious attempt to corroborate their client's account, ultimately presenting virtually no evidence of Springs's involvement.[10] Springs's role should have been one of the most important issues at trial. Defense counsel could and should have investigated and prepared to undermine the State's theory that Mr. Nelson was the primary assailant and thus deserving of death.

First, police records and photographs reflected that Springs's hands and arm were extensively bruised just three days after the murder. *See* Ex. 26 at NELSON 315; *see also* Ex.

---

[10] Defense counsel hinted that there is a gap where Springs's cell phone was silent from between 10:18 p.m. on March 2, 2011 and 12:13 p.m. on March 3, 2011 (subtly suggesting Springs could have been at the church that day), *see* 59 R.R. 10-18. During the cross-examination of Detective Caleb Blank, defense counsel also established that Springs was in possession of Dobson's iPhone. However, on re-direct the State established that the police had never seen Springs in possession of Dobson's phone, and defense counsel did nothing to undermine this point (even though they could have called Ronika Austin, who would have testified that Springs gave her the iPhone, or presented Detective Blank's own report where Springs attested to possessing the iPhone). *See* Ex. 26 at NELSON 310-11; *see also infra* at 24-25.

22

27. The jury heard nothing about this fact, much less saw the actual photographs. The decision to forego that evidentiary presentation cannot have been strategic; defense counsel simply failed to investigate the likely source of these injuries, the altercation with Mr. Dobson. Defense counsel never interviewed witnesses to ascertain the timing of the injuries or Springs's explanation, if any, for them. Springs told detectives he "got th[e] bruise from lying on his arm while in jail" and that the "extensive bruises and swelling" on his knuckles were "from beating his fists together ... as some sort of nervous fidget." *See* Ex. 26 at NELSON 315. Defense counsel never entertained the possibility of using expert or lay testimony to discredit Springs's improbable account of his injuries.

In contrast to Springs, Mr. Nelson had no injuries. Maria Esquivel, assistant manager at the Tetco/Chevron where Mr. Nelson purchased items on the afternoon of March 3, 2011, testified that mere hours after the incident Mr. Nelson appeared "clean," and that it did not look as though Mr. Nelson had been in a fight. 33 R.R. 171.[11] That Springs had substantial, visible injuries and that Mr. Nelson did not is consistent with Mr. Nelson's testimony that Springs killed Mr. Dobson and assaulted Ms. Elliott while Mr. Nelson waited outside. No reasonable justification explains defense counsel's failure to adequately investigate this argument.

Second, defense counsel failed to ask Tracey Nixon, Mr. Nelson's girlfriend, basic questions that would have revealed crucial evidence for sentencing. Ms. Nixon was with Mr. Nelson on the night after the murder, and was later called as a witness for the State. According to Ms. Nixon's testimony, she picked Mr. Nelson up on March 4, 2011 (the day after the crime), sometime after 9:20 p.m., to go to a club in Dallas. *See* 34 R.R. 41; *see* Declaration of Tracey Nixon (Oct. 11, 2016) ("Nixon Decl.") ¶ 27, Ex. 67 at NELSON 816. If defense counsel had

---

[11] This eyewitness observation is inconsistent with Springs's claim to detectives that "Nelson confessed to Springs he had fought the pastor with his fists...." Ex. 26 at NELSON 311.

adequately reviewed phone records, they would have discovered that Mr. Nelson made three outgoing phone calls to Springs—all over a minute in length—while Ms. Nixon and Mr. Nelson were headed to the club. *See* State's Tr. Ex. 370, Ex. 31 at NELSON 487 (noting calls to Springs on March 4, 2011, at 22:08:45, 22:28:33, and 22:30:22); 37 R.R. 21. Had defense counsel known enough about the phone records to ask about the calls, they would have learned that Nixon overheard telephone conversations between Mr. Nelson and Springs. In a sworn declaration refuting Springs's claimed absence from the crime scene, Nixon states that "on [their] way to a club, [Mr. Nelson] put some guy on speakerphone. *This guy said that the woman at the church couldn't have seen or identified anyone because 'her eyes were swollen shut.'*" Nixon Decl. ¶ 27 at NELSON 816 (emphasis added). According to Nixon, the individual knew precise, intimate details of the crime that had occurred the day before.

Third, defense counsel failed to adequately present evidence that Springs was in possession of valuable property of the victims: Dobson's iPhone and Elliott's car keys. The State stressed to the jury how important it was that "all" of the victims' property was found on Mr. Nelson:

> Consider why on earth two other people would commit a murder and give this Defendant everything. He walks away with everything. He walks away with the car. He walks away with the credit cards. He walks away with the GPS, the laptop and [*Mr. Dobson's*] *iPhone. He walks away with all of that. Why does he get everything if he did nothing?*

*See* 37 R.R. 9-10. The State's assertions were incorrect: Springs had both the iPhone and the car keys.[12] Defense counsel could have presented testimony from Ronika Austin to prove that it was *Springs*, not Mr. Nelson, who initially had Mr. Dobson's iPhone. *See* Ex. 26 at NELSON 316 (summary of Detective Blank's interview with Ronika Austin where she states "she did trade

---

[12] Moreover, while Mr. Nelson had the credit cards in his possession, the State admitted that both Springs and Jefferson intended to purchase items with the cards. *See* 37 R.R. 31.

Springs a black G-1 cell phone for an iPhone"); *see also id.* at NELSON 307-08 (Cotter's report

to police of seeing Springs with the iPhone that "belonged to the dead Pastor"). And defense

counsel never investigated Springs's possession of Elliott's car keys,[13] which Springs had on him

when he was arrested. Springs stated during his interview with the police that he received them

from Brittany Bursey after Mr. Nelson left Bursey's apartment, but defense counsel never

interviewed Bursey to determine whether Springs's account was accurate.[14] *See* Springs

Interview Video at 56:06–57:39 (Mar. 5, 2011), included as Disks 10 & 11 on State's

Memorialization of Delivery of Discovery, 1 C.R. 195.

Finally, defense counsel did not investigate and prepare to address the testimony of the

alibi witnesses who furnished rickety stories about Springs's whereabouts at the time the crime

took place, *or even interview Springs himself.* Springs was arrested as the subject of the criminal

complaint, but—for reasons still unknown—was not indicted or tried as a co-party; defense

counsel knew as much, since their investigator noted that Springs was "not indicted/alibi."

S.H.C.R. 155; Ex. 34 at NELSON 507. The alibi testimony for Springs was critical: it was used

to exclude Springs from the scene, and thus to establish Mr. Nelson as the principal assailant.[15]

---

[13] While this information emerged during the cross-examination of Detective Blank, *see* 34 R.R. 166-167, no evidence was proffered to support Mr. Nelson's testimony that Springs was doling out property from the offense. *See* 36 R.R. 74.

[14] During his police investigation, Detective Blank noted that Springs stated "he was offered a car by Mr. Nelson which he believed to be a Ford because that was the brand name on the keys. Springs said he threw the keys away soon after he was given them, but he could not provide us the exact location." Ex. 26 at NELSON 311.

[15] As explained above, the State relied on the alibi testimony of Kelsey Duffer and Darian McClain to establish that Springs was not in Arlington, TX, at the time of the murder and assault. *Supra* at 21-22. Defense counsel failed to verify—or even attempt to undermine—this testimony. Defense counsel never investigated whether Springs was really at Duffer's house the night before the murder, as she claimed. Defense counsel never requested school records or pursued other sources to see if McClain attended school and was picked up the morning of March 3, 2011, by Duffer, as McClain testified. *See* 35 R.R. 35-37. Defense counsel also never

25

Preparation for these witnesses' accounts, and for the Springs alibi generally, was necessary to raise reasonable doubt as to the State's theory that Mr. Nelson acted alone.[16]   Defense counsel's failure to attempt to interview Springs or any alibi witnesses was clearly deficient. *See Richards v. Quarterman*, 566 F.3d 553, 571 (5th Cir. 2009) ("[T]he lack of any sort of evidence of pre-trial interviews … fell below an objective standard of reasonableness and was constitutionally inadequate.").

- **Defense counsel failed to adequately investigate Claude ("Twist") Jefferson's substantial involvement in the crime.**

Mr. Nelson testified that *both* Springs and Jefferson were involved in—and directly perpetrated—the homicide and assault. *See* 36 R.R. 69-73. While defense counsel alluded to the fact that Jefferson was at the church on March 3, 2011, *see* 37 R.R. 11-20, defense counsel again failed to adequately investigate and prepare evidence to support these assertions. The only evidence put forth by Mr. Nelson's counsel regarding Jefferson's involvement was one exhibit (which was never admitted), *see* Ex. 28 at NELSON 332-95 (Def. Tr. Ex. 4, Claude Jefferson's AT&T phone records), and limited questions during the cross-examination of Brittany Bursey, Jefferson's aunt. An examination of the full record, however, shows that there were arguments

---

raised the issue of bias. Duffer is the mother of Springs's child and McClain is her close friend, yet sources of bias were never raised before the jury on cross-examination.

[16] Defense counsel also failed to call two witnesses, Morgan Cotter and Allison Cobb, who would have corroborated Mr. Nelson's version of the events. Cotter and Cobb stated during a police interview that they believed two of their friends, Springs and Mr. Nelson, were involved in the death of Mr. Dobson. While at a friend's apartment, a group including Cotter, Cobb, Springs, Mr. Nelson, and Bursey were watching television when the story of the NorthPointe Baptist Church murder came on. Ex. 26 at NELSON 307-08. According to Cobb and Cotter, both Springs and Mr. Nelson made inappropriate comments at that time. Springs also noted that he was trying to sell the iPhone "that belonged to the dead Pastor." *Id.* Cobb stated that, based on Springs's tone and phrasing, she did not think he was joking when he said the phone belonged to Mr. Dobson. Ex. 26 at NELSON 308. She later reported to defense counsel's mitigation specialist that she "believe[d] it is more likely that AG [Springs] did the killing because he's that kind of guy." M. Burdette Memorandum (Sept. 25, 2012), Ex. 32 at NELSON 496. Defense counsel failed to present any of this evidence to the jury.

defense counsel should have prepared and raised regarding Jefferson's involvement, including further investigation of inconsistencies related to Jefferson's alibi that he was in class at the time of the murder.

Jefferson maintained he was in General Chemistry at the University of Texas, Arlington from 11:00 a.m. until 12:20 p.m. on the day of the murder. *See* Ex. 30 at NELSON 465. Defense counsel never confirmed the accuracy of this alibi. Although aware that a video recording could have proved whether Jefferson entered class on March 3, 2011, *see id.* at NELSON 464, defense counsel never subpoenaed the tape.[17] Defense counsel even had evidence that Jefferson lied about attending class that day. While Jefferson maintained he had a test on March 3, 2011, an email from his professor revealed that no test or quiz was given on that day. *See id.* Instead, the only evidence defense counsel attempted to present was to ask Bursey whether it looked like someone had forged Jefferson's signature on the sign-in sheet that day. *See* 35 R.R. 148-49. Bursey was not qualified as a handwriting expert, but defense counsel nevertheless attempted to elicit her testimony that Jefferson's signature was similar to another on the sheet. *Id.* The effort failed, because defense counsel should have conducted this investigation—with a handwriting expert—before Bursey's cross-examination, when her uninformed answer substantially weakened Mr. Nelson's case. The failure to investigate Jefferson's alibi, particularly in view of evidence that he was lying, constituted deficient performance.

---

[17] By the time Nelson's federal habeas counsel requested the tape, it had been destroyed. If defense counsel had sought the tape before trial, however, it would have been available. *See* Ex. 36 at NELSON 519-23.

2.    Defense Counsel Deficiently Failed to Explore, Prepare, and Develop
      Evidence That the Holden Death Was a Suicide.

At the sentencing phase, the jury heard evidence that, while Mr. Nelson was awaiting

trial, he allegedly murdered another inmate in his cell block, Jonathan Holden. Although Mr.

Nelson was never prosecuted for the murder, the State relied on the incident to argue that Mr.

Nelson was a future danger and deserved the death penalty. The State spent almost an entire day

of the sentencing phase questioning witnesses regarding the incident, and closed at sentencing by

arguing that it was the central evidence that Mr. Nelson was a future danger. 44 R.R. 7 ("I am

not sure what other evidence we could bring you to show you that this Defendant is a future

danger. We brought you another murder.").

Defense counsel planned to argue that Holden's death was a suicide, but were badly

deficient in their preparation for what was, in effect, a second murder trial nested in the

sentencing phase.[18] Defense counsel did not prepare to impeach the State's eyewitness, to elicit

other information that would have reinforced Mr. Nelson's position that the death was a suicide,

or to move to exclude Dr. White's lay opinion testimony that Holden's death was "due to assault

by another person." 40 R.R. 139.

---

[18] According to the attorney vouchers, from March 2012 to October 2012, defense counsel billed
a total of 37 hours to working on the Holden matter, roughly six hours in conferences and
meetings, about 30 hours reviewing various files and videos, and one hour writing a motion to
appoint Dr. John Plunkett as an expert. *See e.g.* Ex. 2 at NELSON 6–15; Ex. 3 at NELSON 16–
24. Effective attorneys spend thousands of hours preparing for a murder trial. *See* American Bar
Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death
Penalty Cases*, 31 Hofstra Law Rev. 913 (Revised Feb. 2003), Ex. 47, Comment to ABA
Guideline 6.1 at NELSON 646 ("In terms of actual numbers of hours invested in the defense of
capital cases, recent studies indicate that several thousand hours are typically required to provide
appropriate representation.").

- **Defense counsel failed to adequately impeach State's witness Rick Seely.**

Inmate Rick Seely, the only eyewitness to testify at trial, testified that Nelson strangled

Holden for four minutes. 40 R.R. 21. Seely testified that he could estimate the timing because

Nelson kept asking him whether four minutes was up, as that was how long it would take to

suffocate him. *Id.* Seely's testimony, however, was inconsistent with the story he originally told

investigators in March 2012. Seely told detectives that he saw Mr. Nelson choke Holden for

seven minutes. *See* Ex. 41 at NELSON 533; *see also* Seely Interview Video at 05:06-10:37

(Mar. 20, 2012), included as Disk 18 on State's Memorialization of Delivery of Discovery.

Seely said he knew that Mr. Nelson choked Holden for seven minutes because Seely "was

counting." *Id.* Seely explained that the "reason [he] was counting [was he] do[es] it a lot in

there. When you don't have a clock . . . and you only got a certain amount of time to do things,

you count." *Id.* Although defense counsel had Seely's prior interview, they failed to question

Seely about this major discrepancy.

Defense counsel also failed to adequately impeach Seely's character and his motivation

to accuse Mr. Nelson of causing Holden's death. Although defense counsel cross-examined

Seely about his prior convictions for felony assault, DWI, and burglary, 40 R.R. 42-44, they

inexplicably failed to ask about four felony charges *pending against him*, and thus to explore a

substantial incentive to curry favor with the State. *See* Tarrant Cnty. Dist. Clerk Criminal Case

List for Seely (Sept. 23, 2016), Ex. 45 at NELSON 560; *see, e.g., United States v. Harper*, 527

F.3d 396, 407 (5th Cir. 2008) (evidence of pending charge against witness admissible to show

bias); *United States v. Landerman*, 109 F.3d 1053, 1062 (5th Cir.), *opinion modified on reh'g*,

116 F.3d 119 (5th Cir. 1997) (it was for the jury to "determine what effect, if any, the pending

criminal charge had on [witness's] motivation to testify"). At the time Seely came forward and

29

began speaking to detectives about Holden, he was already under one felony indictment (forgery of a financial instrument) and charged with three additional felonies: two assault charges against his wife in which he was alleged to have caused bodily injury, and a retaliation charge alleging he threatened to murder his wife and her family for reporting him to police.[19] He had a very strong incentive to try to ingratiate himself with the State when he came forward with his account of the Holden death—a propensity for bias that defense counsel never explored.

Defense counsel also failed to elicit before the jury that Seely had been convicted of additional crimes relevant to his character. At the time of trial, Seely's felony charge of forgery of a financial instrument had become a felony conviction. Seely also had a second burglary conviction, a felony conviction for evading arrest, and misdemeanor convictions for assault causing bodily injury and harassment. *See* Ex. 45 at NELSON 560. All of these, but especially the forgery conviction, would have been highly probative of Seely's low credibility. *See, e.g., United States v. Waldrip*, 981 F.2d 799, 803 (5th Cir. 1993).

- **Defense counsel failed to elicit and present evidence to rebut the State's evidence about Holden's death which they knew or should have known.**

Although defense counsel's strategy was to demonstrate that Holden's death was a suicide, defense counsel inexplicably failed to elicit evidence about Holden's mental health, past assaultive behavior, and past suicide attempts. Defense counsel asked Sergeant Campos whether Holden had previously been on suicide watch but did not follow up with any other witness when Campos answered that he did not know; counsel never elicited testimony that Holden had attempted suicide just weeks before his death on March 19, 2012. 40 R.R. 102–03.

---

[19] Seely was arrested for these offenses on February 19, 2012. *See* Ex. 45 at NELSON 560. Felony charges were filed on February 22, 2012, less than a month before Holden's death. He was indicted for each offense on April 13, 2012. *See* Indictment (Sept. 11, 2013), Ex. 44 at NELSON 555–57. He was given a deal in which he received two years for one of the assault charges and the second assault and retaliation charges were dismissed.

Holden was arrested for burglary of a building on March 5, 2012. He was booked into the Tarrant County jail on March 6. During booking, Holden told the officer at intake that he was depressed and had attempted to commit suicide just three weeks prior to his arrest by cutting his wrist with a razor blade. Tarrant County Medical and Mental Impairments Admission Form for Jonathan Holden, Ex. 37 at NELSON 525–26. Holden told the intake officer that he wanted to see a mental health worker. *Id.* He was referred to the Mental Health & Mental Retardation department and immediately placed in a suicide prevention cell. Tarrant County Sheriff's Office Report from Capt. Cedric R. Simon regarding Jonathan Holden, Ex. 43 at NELSON 554. The very next day, Holden was escorted to the Nurses Resource Station because he had scratched his chest and stomach to the point of bleeding. While being treated, Holden struck a detention officer on the nose, causing it to bleed. This conduct caused him to be classified as an assaultive inmate, but Holden remained on suicide watch. On March 16, 2012, Holden was discharged from suicide watch and placed in a rotation tank. Three days later, he was found hanging from his blanket. Defense counsel failed to present any of this information to the jury. *See* 43 R.R. 10–47.

Defense counsel also failed to present testimony at sentencing from Charles Bailey, who had suggested in a statement to investigators that Holden committed suicide. Bailey, an inmate housed in Mr. Nelson's cell block, told investigators that he believed that the blanket was wrapped around Holden's neck "[m]aybe three times." Interview of Charles Bailey, Ex. 46 at NELSON 569. When detectives asked Bailey how the blanket was wrapped, Bailey responded, "Like a suicide patient would wrap a rope around his neck and hang his self [sic]." *Id.* Although Bailey never explicitly said that Holden killed himself, Bailey's answers to investigators'

questions make clear his conclusion that Holden had committed suicide. *Id.* at NELSON 56 ("I don't know what happened what he do what made him feel like that [sic] . . . .").[20]

- **Defense counsel failed to move to exclude Dr. Lloyd White's opinion testimony that Holden was assaulted.**

Dr. Lloyd White performed an autopsy of Holden's body. 40 R.R. 135. As discussed above, *supra* at 10-11, Dr. White's report was delayed because he waited for the sheriff department's report, and the witness interviews and statements in it, to draw conclusions about Holden's death. 40 R.R. 144. Dr. White ultimately opined that "the cause of death was complications of anoxic brain injury due to ligature strangling due to assault by another person," but this conclusion was based entirely on the sheriff's investigation, not on the medical evidence or his own medical evaluation. *Id.* at 139, 141, 144-45. Indeed, Dr. White testified that he could *not* conclude based on the medical evidence that the cause of death was homicide. *Id.* at 149-50. Dr. White's opinion was therefore based entirely on his assessment of the credibility of witness statements made to detectives during their investigation; that is, it was simply lay opinion testimony based largely on Seely's tainted (and hearsay) statements to the Sheriff's department, repackaged as an expert pathology opinion. Dr. White's conclusion that Holden's death was a homicide based on witness statements, as opposed to medical findings, fails to meet the Texas Rule of Evidence 703 standard for allowing expert testimony. Tex. R. Evid. 703 (expert must base opinion on evidence of a type that "experts in the particular field would

---

[20] Defense counsel also did not adequately cross-examine the State's DNA expert about the suggestion that Mr. Nelson's DNA ended up on Holden because Mr. Nelson murdered Holden. *Supra* at 10 n.4. There were several other ways for Mr. Nelson's DNA to have transferred to Holden: there may have been transfer DNA on the blanket from Mr. Nelson's possession of it before the incident, for example, and all the inmates shared the common "dayroom." 40 R.R. 14-15; Edward A. Dowlman et. al., *The prevalence of mixed DNA profiles on fingernail swabs*, 50 Sci. & Justice 67-69 (2009) (finding "high level mixtures" of DNA under fingernails of individuals who simply "share[ed] accommodation"). Defense counsel failed to explore any of these alternative possibilities when cross-examining the State's DNA witnesses.

reasonably rely on").[21] Yet defense counsel inexplicably did not object to or move to exclude

Dr. White's opinion testimony that the cause of death was "due to assault by another person," 40

R.R. 139, a motion that should have succeeded.

> 3.    Defense Counsel's Performance Was Deficient for Failing to Reasonably
>       Investigate, Develop, and Present Evidence About Mr. Nelson's
>       Background and Mental Health.

Defense counsel violated critical professional norms by failing to reasonably investigate,

develop, and present mitigating evidence regarding Mr. Nelson's background and mental health

history.  The Sixth Amendment requirement that defense counsel reasonably investigate and

present mitigating evidence flows from the cardinal Eighth Amendment rule that "sentencing

juries must be able to give meaningful consideration and effect to all mitigating evidence that

might provide a basis for refusing to impose the death penalty on a particular individual,

notwithstanding the severity of his crime or his potential to commit similar offenses in the

future." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007).

Because of the central role that mitigating evidence plays in the sentencing

determination, an unbroken line of Supreme Court precedent establishes that "[i]t is

unquestioned that under the prevailing professional norms[,] counsel ha[s] an 'obligation to

conduct a thorough investigation of the defendant's background.'" *Porter v. McCollum*, 558

---

[21] *See also, e.g., Bess v. State*, No. AP-76377, 2013 WL 827479, at *26 (Tex. Crim. App. Mar. 6, 2013) (pathologist's testimony admissible under Texas Rules of Evidence if pathologist "properly relies on the principles in his field"); *Feit v. Great-W. Life & Annuity Ins. Co.*, 460 F. Supp. 2d 632, 641 (D.N.J. 2006) (forensic pathologist's opinion that cause of death was head and neck injuries sustained in a car accident was inadmissible "[i]n the absence of any objective medical findings regarding head or neck injury"); *Iowa v. Tyler*, 867 N.W.2d 136, 144 (Iowa 2015) (trial court abused its discretion by allowing testimony of medical examiner based "primarily, if not exclusively, on witness's inconsistent and uncorroborated statements to the police 'as opposed to objective, scientific, or medical evidence'"); *Maine v. Vining*, 645 A.2d 20, 21 (Me. 1994) (medical examiner's testimony that victim's death was a homicide and not an accident was erroneously admitted since examiner's "opinion was based solely on her discussions with the police investigators and therefore amounted to an assessment of the credibility and investigatory acumen of the police").

U.S. 30, 39 (2009) (citing *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). The IAC inquiry must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

The contours of defense counsel's obligation to effectively investigate, develop, and present mitigating evidence are expressed in the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), which the Supreme Court treats as material professional norms when it evaluates deficiency in IAC cases. *See Padilla v. Kentucky*, 559 U.S. 356, 367 (2010) ("Although they are . . . not inexorable commands, [the ABA] standards may be valuable measures of the prevailing professional norms of effective representation, especially as these standards have been adapted to deal with the intersection of modern criminal prosecutions and immigration law.") (quotation and citations omitted); ABA, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (rev. ed. 2003), Ex. 47 at NELSON 693. The ABA Guidelines specify a basic level of competency for investigating, assimilating, and presenting mitigation in capital cases—including for the selection of experts. *See* ABA Guideline 10.7(A) at NELSON 693 ("Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."); ABA Guideline 10.8 at NELSON 706 (specifying diligence in identifying and excluding claims, and requiring that asserted claims be "[presented] as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case"); ABA Guideline 10.11.F at NELSON 734 (providing that the selection of expert witnesses should reflect the expert's ability "to provide medical, psychological, sociological, cultural or other insights into the client's mental

34

and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s)" and "to give a favorable opinion as to the client's capacity for rehabilitation"). Defense counsel violated every one of these norms.

To begin, defense counsel improvised their expert strategy without regard for the mitigating evidence in their possession. Defense counsel obtained the appointment of mitigation specialist Mary Burdette on April 13, 2011, and she began collecting some records and contacting potential sources of mitigating information. Ex. 2 at NELSON 3–4; Ex. 34. Defense counsel reviewed State-provided discovery on May 23, 2011. Ex. 2 at NELSON 7. Rather than selecting an appropriate expert equipped to address the background and mental health information supplied by Burdette and the State—much less conducting an appropriate level of investigation that would have revealed *still more* important information about Mr. Nelson's personal history—defense counsel arbitrarily hired neuropsychologist Dr. Antoinette McGarrahan. There appears to have been no particular reason to have selected Dr. McGarrahan, and defense counsel gave her no discernible guidance as to what her role would be.

Not only did defense counsel select Dr. McGarrahan without regard for the mitigation evidence in their possession, counsel decided to present Dr. McGarrahan's opinion at trial *before even learning what that opinion would be*—a decision from which they neither retreated nor recovered. A letter from defense counsel to Dr. McGarrahan dated May 22, 2012, before Dr. McGarrahan had met or evaluated Mr. Nelson, explained, "[a]s we discussed about a month ago, I think it best to call you as a witness, even if all we have is a client who is basically disowned by his mother, father, and family, and has no alternative but to strike out against others violently, just for attention." Letter from B. Ray to Dr. McGarrahan (May 22, 2012), Ex. 48 at NELSON 769–70.

Defense counsel's decision to select and unconditionally proceed with Dr. McGarrahan as the sole testifying mental health expert was particularly inexplicable in view of the substantial evidence related to childhood and adolescent trauma—an area in which Dr. McGarrahan expressly disclaimed expertise. Had defense counsel familiarized themselves with Mr. Nelson's records and adequately investigated his background, the red flags of serious trauma would have led them to retain and present an expert who could appropriately contextualize Mr. Nelson's background and mental health history. Defense counsel knew that Dr. McGarrahan did not consider herself to be appropriately equipped to analyze trauma, because Burdette communicated the same to defense counsel on August 14, 2012. M. Burdette Conference Memorandum (Aug. 14, 2012), Ex. 50 at NELSON 772-74. Dr. McGarrahan had explained that she viewed herself not as a "generalist in this case, but just a neuropsychologist," and recommended that counsel retain a "drug expert" as well as a "psychologist to testify to the environmental/social issues," since this was "not her area of expertise." *Id.* at NELSON 773. A psychologist specializing in childhood and adolescent trauma would have been positioned to identify and explain to the jury these environmental and social issues. Defense counsel failed to procure such an expert.

Instead, defense counsel chose to call Dr. McGarrahan even though she had made clear that her testimony would severely damage the client's sentencing-phase case. On August 20 2012, Dr. McGarrahan advised defense counsel that, "if asked on cross . . . I will agree that [Mr. Nelson] has several traits associated with psychopathy." Ex. 51 at NELSON 775-76. She likewise advised the defense team in advance that she believed Mr. Nelson posed a future danger. *See* Ex. 50 at NELSON 773. Despite the warnings from Dr. McGarrahan about the content of her testimony, and without an expert equipped to address Mr. Nelson's background and mental health history, the defense team called Dr. McGarrahan anyway. Dr. McGarrahan

did the work of an expert for the State (truly: after her testimony, the State no longer saw any need to put on its own expert) as she testified about Mr. Nelson's purported "psychopathy" and future dangerousness, *exactly as she had warned defense counsel she would.* 43 R.R. 272-73. Dr. McGarrahan's testimony that Mr. Nelson was a societal danger whose criminality was attributable to psychopathy, not trauma, effectively destroyed Mr. Nelson's chance to avoid the death penalty.

a. **Defense Counsel Ignored Red Flags That Should Have Led Them to Adequately Explore and Present Mr. Nelson's History of Trauma, Neglect, and Mental Illness.**

Even though defense counsel presented almost no mitigating evidence to the jury, retained no expert to evaluate or explain it, and never followed up on it, they possessed a host of red flags signaling that Mr. Nelson's case in mitigation should have been about a life scarred by trauma. *See supra* at 17.

Information in the possession of defense counsel indicated that Mr. Nelson's trauma dated back as far as infancy and early childhood. Available records indicated that Mr. Nelson began to experience regular seizures at a very young age, for example. To control them, he was prescribed Phenobarbital, an intense barbiturate,[22] when he was only one year old. 43 R.R. 249. He continued to take Phenobarbital until he was at least three. *Id.* at 251. When Mr. Nelson was seven, his seizures prompted doctors to conduct an electroencephalogram, or EEG, to determine if he had a seizure disorder. Medical Appointment Records (Jan. - May 1995), Ex. 74 at NELSON 825-44; PCC Ambulatory Encounter Record (Jan. 17, 1995), Ex. 73 at NELSON 823-24. The test came back inconclusive, and no follow-up was ever requested by his family, schools, or residential institutions. Ex. 74 at NELSON 834. Mr. Nelson was never formally

---

[22] Nat'l Inst. of Health, Medline Plus, *Phenobarbital*, https://medlineplus.gov/druginfo/meds/a682007.html (last visited Oct. 15, 2016).

diagnosed with seizure disorder, although additional reports of seizures—and of high doses of anti-seizure medication—are found throughout his life. *See, e.g.*, PCC Mental Health/Social Service Encounter Record (July 16, 1998), Ex. 82 at NELSON 869 (showing a prescription of seizure drug Divalproex at age 11); Tarrant Cnty. Hosp. Dist. Nurses Notes (Mar. 19, 2011), Ex. 137 at NELSON 1031; Tarrant Cnty. Sheriff's Office Med. Report (Mar. 19, 2011), Ex. 138 at NELSON 1032.

Defense counsel had access to—and indeed interviewed—witnesses who later confirmed that Mr. Nelson witnessed violent explosions at home during these formative years.[23] Mr. Nelson's father, Tony Nelson, routinely came home drunk, on drugs, or both. Declaration of Kitza Nelson (Oct. 9, 2016) ("K. Nelson Decl.") ¶¶ 25, 27, 29, Ex. 57 at NELSON 790. Mr. Nelson's mother, Kathy James, was notorious for her short temper and violent outbursts. Declaration of Anthony Luckey (Oct. 9, 2016) ("A. Luckey Decl.") ¶ 4, Ex. 56 at NELSON 786; Declaration of Britany Beal (Oct. 8, 2016) ("Beal Decl.") ¶ 9, Ex. 55 at NELSON 783; Declaration of C.J. James (Oct. 10, 2016) ("James Decl.") ¶ 9, Ex. 61 at NELSON 801. Mr. Nelson's parents fought frequently, and those fights often resulted in physical violence that Mr. Nelson witnessed as a young child. In one particularly gruesome fight, Kathy stabbed Tony in the groin with a large knife while Mr. Nelson and his sister, Kitza, were home. K. Nelson Decl. ¶ 30 at NELSON 790 ; A. Luckey Decl. ¶ 4 at NELSON 786; Declaration of Terry Luckey (Oct. 10, 2016) ("T. Luckey Decl.") ¶ 4, Ex. 63 at NELSON 805; James Decl. ¶ 9 at NELSON 801. Kitza described her and Mr. Nelson's horror seeing their father's blood splattered throughout the house. K. Nelson Decl. ¶ 30 at NELSON 790. The fighting stopped only after Mr. Nelson's

---

[23] Some of these details were uncovered by undersigned counsel, but all were available to defense counsel—as made obvious by the fact that an appropriate investigation unearthed them.

father left the home permanently. Mr. Nelson's father was eventually incarcerated, and was intermittently incarcerated throughout Mr. Nelson's formative years.

Defense counsel's records included information that Mr. Nelson's early-childhood trauma soon created problems for him, as he exhibited troubling behavior and signs of mental illness at an early age. At only six, Mr. Nelson would often tear up at school, saying that he wanted to stay there so he did not have to go home. PCC Ambulatory Encounter Record (Jan. 4, 1994), Ex. 72 at NELSON 822. Medical professionals diagnosed Mr. Nelson with depression when he was eight years old. Ex. 74 at NELSON 825-44; Appointment Records (May - Oct. 1995), Ex. 77 at NELSON 848-63. That same year, Mr. Nelson's school became so concerned about him that they requested a formal psychiatric evaluation (though it is unclear whether he ever received one). PCC Ambulatory Encounter Record (Oct. 23, 1995), Ex. 76 at NELSON 847. At the age of ten, Mr. Nelson's doctor noted that he was a "very quiet, sad looking young man." Various Appointment Records (June 1998 - May 1999), Ex. 84 at NELSON 874. Mr. Nelson's mental health further suffered as he struggled with bedwetting (enuresis) until he was at least eleven years old. *See id.* at NELSON 877. By this time, Mr. Nelson was taking medications for depression. *See* Ex. 74 at NELSON 827, which "frequently co-occur[s] with PTSD." Kathleen Wayland, *The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations*, 36 Hofstra L. Rev. 932, 942 (2008), Ex. 155 at NELSON 1309.

Other records in defense counsel's possession disclosed that Mr. Nelson's depression was not the only manifestation of his trauma and mental health issues. He also acted out. One telling note from a doctor states that Mr. Nelson "wants to control [his behavior], but can't." PCC Ambulatory Encounter Record (Mar. 4, 1993), Ex. 70 at NELSON 820. At the age of eight, Mr.

Nelson's school bus privileges were revoked because he kicked a driver, making it harder for Mr. Nelson to attend school regularly. Problem List Update (Nov. 30, 1995), Ex. 78 at NELSON 864. Mr. Nelson's first arrest came at the age of nine, when he was accused of assault. The next year, at age ten, he was arrested several times for entering homes to steal food and other items. Intake Face Sheet (June 4, 1998), Ex. 81 at NELSON 868; Discharge Summary (Jan. 28, 2011), Ex. 85 at NELSON 884.

      Mr. Nelson had a highly unstable adolescence in which he was in and out of state-run institutions. Defense counsel had information showing that, after some additional run-ins with the law, including a home burglary, Mr. Nelson was put on probation and removed from his home, periodically staying at a detention facility institution in Ada, Oklahoma. Ex. 81 at NELSON 868; Ex. 85 at NELSON 884. After a number of additional juvenile offenses, including grand larceny, assault, and burglary,[24] *see, e.g.*, OPS Record Access Sys. (Feb. 10, 2001), Ex. 99 at NELSON 936; Order After Adjudicatory Hearing (Mar. 21, 2000), Ex. 87 at NELSON 886-87), Mr. Nelson was sent to the Sac & Fox Detention Center. Receipt for Juvenile (May 30, 2000), Ex. 86 at NELSON 885. He was eventually transferred to the Central Oklahoma Juvenile Center at the age of 13. Detention Order (May 19, 2000), Ex. 91 at NELSON 904. On June 22, 2000, Mr. Nelson was transferred to the Youth Habilitation Center ("YHC") in Norman, Oklahoma. Request for High Risk Transp. (June 21, 2000), Ex. 90 at NELSON 903. Just as Mr. Nelson was making progress in this center, he was removed, placed on parole, and sent to Texas to live with his mother in Arlington, Texas. Application for Compact Servs. (Mar. 30, 2001), Ex. 92 at NELSON 905-18. This move was not in Mr.

---

[24] While the record is not clear, it appears that Kathy moved to Texas while Mr. Nelson was in and out of different facilities in Oklahoma before his permanent incarceration at the age of 13. It is unclear who—if anyone—was responsible for Mr. Nelson during this time period while he was in Oklahoma.

Nelson's best interests, as illustrated by a complaint lodged by the YHC staff protesting Mr.

Nelson's release: "[w]e feel that an additional 90 days would allow [Mr. Nelson] to achieve an

Expeditor level, and work on his anger management and better prepare him for life in the

community. Our goal for Mr. Nelson in this time period is for him to start family therapy, and

work on his relationship with his mom. He will start taking passes when he achieves the level of

Expeditor Trainee to reintegrate himself back in the community." *Id.* at NELSON 918.

Nonetheless, Oklahoma transferred Mr. Nelson to Texas, where he was released into the custody

of his mother. *Id.* at NELSON 915; Email from James Eakins to Ronnie Meeks (Aug. 22, 2001),

Ex. 93 at NELSON 919-20.

The information that defense counsel had showed that Mr. Nelson regressed, and again

found himself facing charges for various nonviolent crimes, less than one month after his

mother's move forced him out of the rehabilitation program. *See* Pet. Regarding Child Engaged

in Delinquent Conduct (Dec. 11, 2001), Ex. 98 at NELSON 932-35; Arlington Police Dept.

Incident Report (Oct. 26, 2001), Ex. 95 at NELSON 922-23; Warning To Child Offender (Dec.

4, 2001), Ex. 96 at NELSON 924. Mr. Nelson's nascent criminality might have been an attempt

to secure mental health care; after one arrest Mr. Nelson asked to "go back to Oklahoma to

Y.H.C. in Norman, OK [where he] was [able] to get help." Bedford Police Dept., Handwritten

Note by Steven Nelson (Dec. 4, 2001), Ex. 97 at NELSON 931. This request was ignored, and

in December 2001, Texas confined him in Texas Youth Commission ("TYC") facilities where he

remained for the next four years. *See* Initial Health Screening (Dec. 24, 2001), Ex. 101 at

NELSON 938-39. Mr. Nelson remained in juvenile detention until August 2006.

Defense counsel's file shows that the trauma Mr. Nelson experienced began to present

itself in new, self-destructive ways while he was housed in TYC. In May 2002—only a few

months after he was admitted—Mr. Nelson began to exhibit suicidal tendencies, telling a guard that he wanted to kill himself. Suicide Alert (May 9, 2002), Ex. 103 at NELSON 942-43. These comments were so serious that TYC placed him on "close observation," requiring a guard to check on him every three minutes. *Id.* A year later, in August 2003, records indicate that Mr. Nelson again told staff that he wanted to kill himself, although he later said he was "just playing." Suicide Alert Form (Aug. 4, 2003), Ex. 104 at NELSON 944-45. A few months later, on January 19, 2004, it became apparent that Mr. Nelson was not "just playing"; he asked for a "self-referral" because he had not eaten for two days. CCF-225 Incident Report (Jan. 19, 2004), Ex. 107 at NELSON 952-53. When the guard refused, Mr. Nelson drank half a bottle of Windex. *Id.*; *see also* Nursing Clinic Note (Jan. 19, 2004), Ex. 105 at NELSON 946-50. A medical professional noted that Mr. Nelson was "a danger to self" after the incident, Incident Report (Jan. 19, 2004), Ex. 106 at NELSON 951, and Mr. Nelson was again placed on suicide watch. Suicide Alert Removal/Change in Observation Level (Jan. 20, 2004), Ex. 108 at NELSON 954. While follow-up materials indicate Mr. Nelson had difficulty acknowledging his behavior as "suicidal," these materials also state that Mr. Nelson "thinks of death often," and that if he was not at TYC, he would find a way to "shoot himself in the head."[25] Psychiatric Referral (Jan. 24, 2004), Ex. 109 at NELSON 955-59. Nor was this an isolated incident. In June 2004, Mr. Nelson was sent to the emergency room after he was found to have taken a handful of pills in a "threat of harm to self." CFF-225 Incident Report (June 2, 2004), Ex. 111 at NELSON 962; Nursing Assessment Protocol For Altered Level of Consciousness (June 2, 2004), Ex. 110 at NELSON 960-61.

---

[25] TYC records from this period indicate that there may have been other suicide attempts: "there is data to indicate that he has two previous attempts of suicide," but no specifics are given. Ex. 109 at NELSON 955-59.

Defense counsel had Mr. Nelson's TYC records, which showed that, despite verbal warning signs and conduct demonstrating that Mr. Nelson may hurt himself, TYC failed to take protective action. In 2005, TYC required Mr. Nelson to clean a floor, leaving him unattended for over an hour-and-a-half with corrosive chemicals—despite a clear history of self-harm in such situations (e.g., drinking Windex). CFF-225 Incident Report (Apr. 15, 2005), Ex. 112 at NELSON 964-65. Mr. Nelson poured this corrosive substance on his legs and feet, severely burning himself. This incident was so severe that it required immediate skin graft surgery in which skin from Mr. Nelson's thigh was grafted onto his burned feet. Univ. Texas Med. Branch Hosp. Med. Records and Discharge Sheet (Apr. 26, 2005), Ex. 115 at NELSON 972-86; Univ. Texas Med. Branch Hospital Medical Record (Apr. 27, 2005), Ex. 114 at NELSON 968-71; Nursing Clinic Note (Apr. 16, 2005), Ex. 113 at NELSON 966-67.

The TYC records also showed that, while he was in detention, officers often noted Mr. Nelson's diminished understanding of consequences and his foreshortened sense of future. *See* Plan of Services (1998), Ex. 154 at NELSON 1288 (noting a goal for Mr. Nelson to "understand there are consequences for his negative actions"); Diagnostic Evaluation (June 16, 2000), Ex. 89 at NELSON 889-92 (noting that Mr. Nelson "gives no thought to consequences"). At the time, these issues were interpreted as a lack of progress on Mr. Nelson's part, but in fact they are consistent with "symptom frequently seen in highly traumatized individuals." *See* Kathleen Wayland & Sean O'Brien, *Deconstructing Antisocial Personality Disorder and Psychopathy: A Guidelines-Based Approach to Prejudicial Psychiatric Labels*, 42 Hofstra L. Rev. 519, 578 (2013), Ex. 156 at NELSON 1390. In August 2006, Mr. Nelson was released from TYC.

Defense counsel knew that Mr. Nelson's struggles to deal with his childhood and adolescent trauma did not stop after his release from TYC. As reflected in a 2010 Mental Health

43

Evaluation, Mr. Nelson reported that he attempted suicide numerous times outside of state custody.  Mental Health Evaluation (Jan. 22, 2010), Ex. 129 at NELSON 1008-13.  He described how he would expose himself to harm by driving a motorcycle recklessly, and even by playing with a gun.  *Id.* at NELSON 1009.  He also reported that he turned to Xanax "when he gets depressed which is pretty much every day."  *Id.* at NELSON 1010.

After yet another arrest, Mr. Nelson's symptoms of trauma were documented immediately.  Defense counsel had a report from September 2008 stating that Mr. Nelson "seems to be very depressed."  Mental Health Services Request (Sept. 21, 2008), Ex. 116 at NELSON 987.  Three days later Mr. Nelson reported that "he was going to kill himself" because "his family [was] not visiting him."  Change of Inmate Housing Assignment (Sept. 24, 2008), Ex. 117 at NELSON 988; Mental Health Services Request (Sept. 24, 2008), Ex. 118 at NELSON 989; Detention Bureau Report (Sept. 24, 2008), Ex. 120 at NELSON 991.  A week later, Mr. Nelson reported that he had not slept in days,[26] and requested medication for his depression, asking to talk to a mental health professional as soon as possible.  Inmate Request for Health Servs. (Oct. 6, 2008), Ex. 121 at NELSON 992-94.  Only a week after this request, in October 2008, Mr. Nelson was found biting the inside of his mouth so hard that he was spitting up blood.  TCMHMRS Client Progress Note (Oct. 13, 2008), Ex. 119 at NELSON 990.

Information in defense counsel's possession disclosed that, at the time Mr. Nelson began making these reports, he once again exhibited extreme depression, rating his depression a "9" on a scale from 1 to 10.  Inmate Request for Health Servs. (Nov. 17, 2008), Ex. 122 at NELSON 995-96.  Less than a month later, Mr. Nelson reported that he was thinking of harming himself with a razor.  Texas Dept. Corrections Untitled Report (Apr. 1, 2011), Ex. 139 at NELSON

---

[26] Importantly, "difficulty falling asleep" is one of the "core symptom categor[ies]" for PTSD.  *See* Ex. 156 at NELSON 1391, n.364.

1033. Soon thereafter, he rang the emergency intercom because his suicidal thoughts were becoming overwhelming. *See* Progress Notes - Med. (Jan. 14, 2009), Ex. 123 at NELSON 997. The prison's only response was to increase his Elavil prescription to 150 mg. Correctional Health Clinic Notes (Jan. 14, 2009), Ex. 124 at NELSON 998. These treatments were temporary, lasting only 90 days. *Id.* Once his prescriptions expired, Mr. Nelson asked to "be put back on my meds, ASAP! For Depression, and for not sleeping, and talking to myself." Sick Call Request (Jan. 21, 2010), Ex. 128 at NELSON 1007. Mr. Nelson made multiple requests asking for a "screening" stating that he is "depressed," "seeing things," and was "bi-polar." Triage Interview (Apr. 9, 2010), Ex. 130 at NELSON 1014. In September 2010, Mr. Nelson once again followed through on his suicidal thoughts, swallowing a shaving razor. Parkland By Ambulance Incident Report (Oct. 7, 2010), Ex. 132 at NELSON 1016-17. He was found spitting up blood, and was rushed to Parkland Memorial Hospital. *Id.* Critically, in December 2010, Mr. Nelson was diagnosed with PTSD, scoring almost twice as high as the facility average on the PTSD scale, Ex. 133 at NELSON 1025, but nothing was done to treat this condition. Shortly after this diagnosis, it appears that Mr. Nelson began experiencing seizures, receiving 900 mg doses of Trileptal. Correctional Health-Clinic Notes (Jan. 27, 2011), Ex. 134 at NELSON 1028.

After Mr. Nelson was arrested for the instant offense, physicians at Tarrant County recognized that Mr. Nelson had "significant mental illness," MHMR Written Assessment of Mental Health (Mar. 14, 2011), Ex. 135 at NELSON 1029, notifying the Magistrate's Court that they suspected Mr. Nelson "of having mental illness or mental retardation" in an official communication under CCP 16.22. Email from Tuan M. Tri to Tarrant Cnty. Magistrate Court (Mar. 14, 2011), Ex. 136 at NELSON 1030. A week after returning to jail, Mr. Nelson notified

staff that he was again suffering from suicidal thoughts. Tarrant Cty. MHMR Progress Notes (Mar. 22, 2011), Ex. 146 at NELSON 1073. James Rucker, a licensed counselor, noted that Mr. Nelson was experiencing "increased depression." Tarrant Cty. MHMR Servs. Progress Note (Apr. 21, 2011), Ex. 140 at NELSON 1034. Mr. Nelson repeatedly asked for help with his depression, but received little. Inmate Request for Health Servs. (June 21, 2011), Ex. 141 at NELSON 1035 ("I'm very depressed & stressed out. I need help. I keep putting in request to talk to MHMR. This is my 3rd request."); Inmate Request for Health Servs. (June 30, 2011), Ex. 142 at NELSON 1036 ("I Been writing And Requesting every day to Been Seen by MHMR. I'm very Depressed And Stressed out. My Mood changes every Second. [sic]"); Inmate Request for Health Servs. (Oct. 11, 2011), Ex. 145 at NELSON 1039 ("I'm very depressed. My mood is up and down. I'm stressed out all the time. I got the shakes. I need to see a doctor. ASAP!!"). Mr. Nelson tried to hang himself twice while awaiting trial: first by tying socks around his neck, Health Code Run Sheet (Oct. 5, 2011), Ex. 144 at NELSON 1038, and then by tying a towel around his neck and the cell door bars, Letter from Sgt. T. Wall to Capt. Pilkington and Lt. Black (Dec. 26, 2011), Ex. 149 at NELSON 1204; Tarrant Cnty. Jail Mental Health Servs. Request (Dec. 26, 2011), Ex. 147 at NELSON 1201; Health Code Run Sheet (Dec. 26, 2011), Ex. 148 at NELSON 1202–03.

Defense counsel did not follow up on these red flags regarding the existence and depth of Mr. Nelson's trauma and resulting mental health issues. Their failure to do so led directly to the jury hearing profoundly damaging expert testimony at trial, instead of the testimony of a suitable expert who could have presented an actual case for mitigation based on Mr. Nelson's history of profound childhood and adolescent trauma.

b.  **The Facts Presented to the Jury, Disconnected from an Adequate History of Mr. Nelson's Life and Mental Health, Were Either Unpersuasive or Counterproductive.**

Defense counsel's unreasonable failure to investigate and prepare a case in mitigation led them to put on a mitigation case centered on the idea that Mr. Nelson exhibited violent behaviors because he had a number of "risk factors" that "put him on the track for permanent derailment." 44 R.R. 23.  Defense counsel appeared to elicit evidence of "risk factors" present in Mr. Nelson's past that made him more prone to violent acts.  *See* 43 R.R. 253 (testimony regarding seven risk factors).  Counsel offered evidence that the effects of medications on Mr. Nelson caused his issues.  *Id.* at 145-46 (Kathy James testimony that Mr. Nelson had no issues "until he got on Ritalin"); *id.* at 188 (medications made Mr. Nelson "spacey").  The defense alluded to Mr. Nelson's struggle with seizures, *id.* at 124-25, but failed to explain its effects.  Defense counsel hinted at Kathy's poor parenting, but elicited conflicting testimony about whether she was a competent caregiver, *see id.* at 187 (testimony that Kathy did not leave Mr. Nelson alone, and "was a pretty good mom"); *id.* at 199-200 (testimony that Kathy "did as good as she could . . . under the circumstances" raising Mr. Nelson), notwithstanding Kitza's testimony that Kathy left her and Mr. Nelson alone on an "ongoing" basis, *id.* at 229.  Defense counsel offered scant evidence of the violence surrounding or directed at Mr. Nelson.  *Id.* at 227-29.

It was the State, not the defense, who told the jury about Nelson's lengthy history of suicide attempts, and then only by eliciting testimony from Dr. McGarrahan that these events were little more than an attempt "to manipulate his cell location." *Id.* at 270.  Mr. Nelson's dissociative behavior—a common indicator of trauma, *see infra* at 59-61—was mentioned by defense counsel, but summarily dismissed by Dr. McGarrahan. *Id.* at 259-60.  The jury was told by the defense that Mr. Nelson was a psychopath; no one so much as mentioned the words

"trauma," "traumatized," or "traumatic" during the entirety of the sentencing phase. The selective and often contradictory trial testimony presented to the jury failed to convey the major, continuous trauma that defined Mr. Nelson's life.

c. **Facts Discovered During Post-Conviction Investigation Reveal Severe PTSD from Major Childhood Trauma.**

Had defense counsel properly investigated and developed the evidence of trauma in Mr. Nelson's life, and had counsel retained and elicited testimony from an appropriate expert, the jury would have heard a completely different sentencing-phase case. Even a preliminary investigation focused on trauma, *see supra* 16-18, has both revealed important new facts and demonstrated how they might have been used to mount the sentencing-phase case.

Because defense counsel failed to follow up on the trauma flags, the jury did not learn about Mr. Nelson's childhood, which was marked by deprivation, violence, and instability. Mr. Nelson's mother, Kathy, subjected him to severe physical abuse. His sister, Kitza, explained that "I often witnessed our mother beating Steven." K. Nelson Decl. ¶ 39 at NELSON 791. Kitza described how Kathy would hit Mr. Nelson with a wooden paddle and then record the date of each beating on the paddle itself after she finished.[27] *Id.* ¶ 40 at NELSON 791. She said Steven would often have red welts on his body and head after these beatings. *Id.* at NELSON 791-92. Kitza confirmed that this was not an isolated incident, but rather something that occurred "two or three times a day." *Id.* ¶ 41 at NELSON 792. Kitza is not the only witness who described Mr. Nelson's abusive home life. *See* Nixon Decl. ¶ 12 at NELSON 815; Ex. 129 at NELSON 1010

---

[27] Kitza described this board as a "flat baseball-type bat that was like a wooden paddle. This paddle was thick and had holes in it. It also had a long handle." K. Nelson Decl. ¶ 40 at NELSON 791. A cobbing board or paddle of this type originally came to the United States as a way to punish slaves without visibly scarring them. *See* Forrest Wickman, *Paddling: A History*, Slate (Oct. 5, 2012), http://www.slate.com/blogs/browbeat/2012/10/05/who_invented_paddling_the_history_of_spank ing_people_s_butts_with_paddles_.html (last visited Oct. 15, 2016).

(noting Mr. Nelson reported that he had a history of physical abuse as a child). Dr. Bradley concluded after meeting with Mr. Nelson that Mr. Nelson had been subject to "punishment" that "clearly constituted severe physical abuse." Ex. 159 at NELSON 1422. Dr. Bradley described additional instances of abuse of Mr. Nelson, including beatings by Mr. Nelson's stepfather Romero Fernando and another of his mother's boyfriend "Jimmy," and sexual abuse by a friend of his mother's on multiple occasions beginning when Mr. Nelson was 8. *Id.* at NELSON 1410, 1423 - 24.

Mr. Nelson's father abandoned him when he was three years old, and Mr. Nelson thereafter lacked any other adult to protect him from his mother's wrath, or to care for him during her frequent periods of absence and neglect. Mr. Nelson's mother often abandoned him, leaving him home alone to fend for himself at a very young age. T. Luckey Decl. ¶¶ 8 - 9 at NELSON 805; Declaration of Linda Whelchel (Oct. 9, 2016) ("Whelchel Decl.") ¶ 12, Ex. 58 at NELSON 795; Declaration of Gregory Burns (Oct. 11, 2016) ("Burns Decl.") ¶¶ 5, 23, Ex. 64 at NELSON 808 - 09. Mr. Nelson was sometimes without food, water, or electricity. K. Nelson Decl. ¶¶ 35 - 37, 51 at NELSON 791, 793; Declaration of Cora Lee (Oct. 6, 2016) ("Lee Decl.") ¶ 11, Ex. 53 at NELSON 778; T. Luckey Decl. ¶ 17 at NELSON 806. Kitza recounted times when their mother's absences would require her to care for Mr. Nelson when she was home on the weekends, even though Kitza was only a child herself. K. Nelson Decl. ¶ 10 at NELSON 788. Family members recall repeatedly finding young Mr. Nelson riding his bike alone late at night on busy streets. T. Luckey Decl. ¶ 8 at NELSON 805; A. Luckey Decl. ¶ 8 at NELSON 786. Others relate instances where Kathy appeared to either forget, or was unconcerned with, her child's whereabouts. *See* Declaration of Martha Kay Blevins (Oct. 9, 2016) ("Blevins Decl.") ¶ 15, Ex. 60 at NELSON 800. When people would return Mr. Nelson home, Kathy was

often nowhere to be found. T. Luckey Decl. ¶ 8 at NELSON 805. Much of the time, Kathy was gone because she was out partying or spending time with the various men in her life. K. Nelson Decl. ¶ 15 at NELSON 789; T. Luckey Decl. ¶ 7 at NELSON 805; Burns Decl. ¶¶ 20-21 at NELSON 809. When she finally came home, she would be accompanied by men—often strangers to Mr. Nelson—with whom she would have sex near Mr. Nelson's room. A. Luckey Decl. ¶ 7 at NELSON 786; T. Luckey Decl. ¶ 13 at NELSON 806; K. Nelson Decl. ¶¶ 12-14 at NELSON 788-89. Kathy would host parties in her home while Mr. Nelson was confined to his room, chastising him if he emerged. K. Nelson Decl. ¶ 17 at NELSON 789.

Some of Kathy's friends have called her "Ms. It" and a "hustler," Beal Decl. ¶ 11 at NELSON 783; Declaration of Joaine Gibson (Oct. 6, 2016) ("Gibson Decl.") ¶ 13, Ex. 54 at NELSON 781, and explained that she simply did not want to be a mother. Whelchel Decl. ¶ 6 at NELSON 795; T. Luckey Decl. ¶ 7 at NELSON 805. In keeping with this assessment, Kathy admitted that she wanted Mr. Nelson out of her home when he was barely a teenager. Email from James Eakins to Ronnie Meeks (Oct. 24, 2001), Ex. 94 at NELSON 921. One close friend noted that Kathy "preferred when Steven was locked up because she didn't have to acknowledge him." Burns Decl. ¶ 24 at NELSON 809. Kathy's reluctance to prioritize her children's wellbeing resulted in living conditions characterized by abject poverty. While Kathy often had clothes, shoes, and spending money to support her social life, K. Nelson Decl. ¶ 53 at NELSON 793; A. Luckey Decl. ¶ 7 at NELSON 786; T. Luckey Decl. ¶ 15 at NELSON 806; Lee Decl. ¶ 10 at NELSON 778, food was scarce and utilities were often turned off at home. K. Nelson Decl. ¶¶ 37, 51 at NELSON 791-93; T. Luckey Decl. ¶ 17 at NELSON 806; Lee Decl. ¶ 10 at NELSON 778 ("They would go without while [Kathy] had whatever she wanted."). Kitza described how Mr. Nelson would hoard food under his bed along with his dirty clothes, only to

50

be chastised and punished by his mother when she found out. K. Nelson Decl. ¶¶ 33-34 at

NELSON 791; *see also* Ex. 159 at NELSON 1422-23 (describing "emotional abuse" by Mr.

Nelson's mother). Kathy's inability to pay rent and utilities led the family to move among at

least seven different residences in his first thirteen years of life (not counting state institutions).

K. Nelson Decl. ¶ 32 at NELSON 791; Declaration of Maggie Nelson Luckey (Oct. 9, 2016)

("M. Luckey Decl.") ¶ 4, Ex. 59 at NELSON 797. TYC records note that Steven suffered from

"chronic poverty" and "frequent family or school moves." Correctional Care System, Family

History (undated), Ex. 153 at NELSON 1287; *see also* Whelchel Decl. ¶ 9 at NELSON 795.

Mr. Nelson was exposed to further trauma and victimization due to his sexual identity.

While in jail in Texas, he began a relationship with a transgender woman. Nixon Decl. ¶¶ 3-8 at

NELSON 815. This relationship was a caring one, perhaps the most caring Mr. Nelson had ever

experienced. *Id.* ¶ 9. Mr. Nelson was attacked and beaten because of this relationship. *Id.* ¶ 11.

After these beatings, Mr. Nelson asked for protection, and a unit change.[28] Ex. 127 at NELSON

1001-06. On July 1, 2010, Steven signed a "homosexual card" which was a request for a special

housing assignment for his own protection. Homosexual Card (July 1, 2010), Ex. 131 at

NELSON 1015. Denied a support network or any mental health resources to understand himself,

Mr. Nelson struggled with his sexual identity after he was released from jail; he was "conflicted"

and "confused." Nixon Decl. ¶ 21 at NELSON 816. He thus lost his close relationship with the

"first person with whom he had a relationship in which he could let his guard down and actually

show emotion." *Id.* ¶ 8 at NELSON 815.

---

[28] Mr. Nelson, however, felt it necessary to lie about the actual reasons why he was seeking
protection, stating that he was under threat from gang members because he "shot offender aka
Black brother during a drug deal in the world." Offender Protection Investigation (Mar. 18,
2009), Ex. 127 at NELSON 1004. There is no indication that this is true, but it was widely
known that Mr. Nelson had an open relationship with Ms. Nixon.

Armed with this additional information, which would have been available had defense counsel performed a reasonable sentencing-phase investigation, Dr. Bradley found that Mr. Nelson "suffered extreme childhood trauma and adversity," and that this experience likely resulted in PTSD, as well as potential dissociative behavior, bipolarity, and other mood disorders. Ex. 159 at NELSON 1408. Dr. Bradley concluded that Mr. Nelson should be evaluated for other conditions, including bipolar and dissociative disorders, as well for the mental-health effects of near constant institutionalization. *Id.* at NELSON 1427-28.

The foregoing verifies what defense counsel knew or should have known: Mr. Nelson's childhood was defined by severe and ongoing trauma and neglect. Provided with this evidence, a mental health expert experienced in childhood and adolescent trauma would have evaluated Mr. Nelson for PTSD, and could have recommended further review by a psychiatrist familiar with Mr. Nelson's diagnoses and medications. Mr. Nelson would not have been labeled as a dangerous "psychopath" by his own expert witness.

### B. Defense Counsel's Deficient Performance Prejudiced the Sentencing Phase on All Three Special Issues.

Defense counsel's deficient performance meant that the jury did not have access to substantial evidence favoring a life sentence, irretrievably prejudicing Mr. Nelson's opportunity to avoid death. In evaluating whether counsel's performance was objectively unreasonable under the deficiency prong, the court must cumulate the mistakes across the sentencing phase and determine whether that cumulative error prejudiced the defendant. *See, e.g., Richards v. Quarterman*, 566 F.3d 553, 571 (5th Cir. 2009) (defendant was prejudiced "considering the cumulative effect of [counsel's] inadequate performance"). There is prejudice under *Strickland* if, but for all of counsel's deficiencies, there is a reasonable probability that the outcome would

have been different. *See White v. Thaler*, 610 F.3d 890, 906 (5th Cir. 2010); *Richards*, 566 F.3d at 571 .

As explained *supra* at 7-8, Texas law required Mr. Nelson's sentencing jury to unanimously answer "yes" or "no" to three special issues before a death sentence could be imposed. Because of the unanimity requirement, a single holdout on any question posed to the jury would result in a life sentence. Accordingly, applied to Texas's capital sentencing scheme, *Strickland*'s prejudice requirement requires a "reasonable probability" that a single juror might have answered one of the special issues differently. *See White*, 610 F.3d at 898-99.

      1.    Special Issue Number 1: There is a reasonable probability the jury's answer to the future dangerousness special issue would have been different absent defense counsel's deficient performance.

To vote "yes" on Special Issue Number 1, the jurors had to believe Mr. Nelson was a future danger to society *beyond a reasonable doubt*. But defense counsel presented no evidence to raise that doubt in the jurors' minds, or to undermine the State's sentencing-phase case. Defense counsel did extraordinary damage to the defense case by failing to investigate and present a case in mitigation, and by failing to prepare a sentencing-phase response to the State's allegation that Mr. Nelson killed Jonathan Holden.

Perhaps the most egregiously self-inflicted damage on the future dangerousness issue was the decision to put Dr. McGarrahan on the stand to testify that Mr. Nelson is a psychopath, aware that she would testify if asked that he posed a future danger. As counsel knew she would, Dr. McGarrahan testified that Mr. Nelson "has many, many psychopathic characteristics," that "he meets most of that criteria [for being a psychopath]," and that the only criteria for psychopathy that Mr. Nelson did not meet is "short-term marital relationships" because "he's never been out of prison long enough to get married." 43 R.R. 274-75. Dr. McGarrahan agreed that Mr. Nelson "likes violence," and that he finds violence "emotionally pleasing." *Id.* at 269. When

asked whether Mr. Nelson "is a very dangerous individual," Dr. McGarrahan said "essentially, yes." *Id.* at 277. Dr. McGarrahan then proved the State's case on the ultimate question of future dangerousness: when asked whether "he's going to continue to be dangerous," Dr. McGarrahan testified that he would, stating that Mr. Nelson would prove dangerous "[a]s long as there are other people around him that are preventing him from getting his way." *Id.* at 277.

This was a gift to the State. In view of Dr. McGarrahan's testimony, the State decided it was no longer necessary to put on its own mental health expert. During closing arguments, the State reiterated that "[e]ven *the Defendant's own expert* told you-all yesterday that [Mr. Nelson] will continue to be a danger." 44 R.R. 8 (emphasis added). Mr. Nelson's *own lawyers* agreed, telling the jury that "the prosecutors have presented a good case on the idea of future danger. There's certainly been enough of that for you to find if that's what you want to find . . . ." *Id.* at 18. Defense counsel's deficient performance left the jury with only the State's case on future dangerousness, and little basis to reject it.

Defense counsel's inadequate preparation and presentation permitted the misattribution of Mr. Nelson's behavior to psychopathy. Had a trauma expert like Dr. Bradley testified, the jury would not have heard Mr. Nelson's own expert declare him a dangerous "psychopath," but instead would have appreciated that Mr. Nelson's behavior and affect were attributable to PTSD and other mental illness associated with trauma. Dr. Bradley noted that:

> [The presence of PTSD in ] [Mr. Nelson's] case may have led to the inappropriate attribution of such traits as being "antisocial" or "sociopathic." For example, even though PTSD is usually thought of as an "internalizing disorder," research on children and adolescents with PTSD secondary to childhood abuse and neglect has demonstrated that they are also at increased risk for externalizing symptoms including aggressive and impulsive behaviors. In addition, behaviors such as running away from home or a tendency to present with "flat affect" (lack of demonstration of a full range of emotional reactions), which may be strongly influenced by exposure to trauma and neglect, can be misattributed to antisocial

54

characteristics. It is my expert opinion that this occurred in the case of [Mr. Nelson].

Ex. 159 at NELSON 1426–27. Properly contextualized, Mr. Nelson's criminal history, odd behavior, and "flat affect" were all symptoms exhibited by a survivor of trauma—not features of a "psychopath" or "sociopath" beyond redemption.

Defense counsel's failure to adequately investigate, develop, and present sentencing-phase evidence compromised the future dangerousness deliberations in another way: Mr. Nelson's perceived responsibility for the Holden death. The State spent almost an entire day during the sentencing phase questioning witnesses regarding the incident, and the State emphasized the incident in its closing. 44 R.R. 7 ("I am not sure what other evidence we could bring you to show you that this Defendant is a future danger. We brought you another murder."). Years later, jurors recall that Holden's death strongly influenced their sentencing decision. *See, e.g.*, Affidavits of Eleanor Jane Frazier and Jack William Burnett regarding the Declaration of Elizabeth Anne Gonzales ("Gonzales Decl.") ¶ 4, Exs. 17 & 18 at NELSON 257, 262 ("But then in the sentencing phase we were shown a video of people trying to bring a jail inmate back to life .... That was the day I made my decision."); Declaration of Justin Tyler Markle (Sept. 26, 2016) ("Markle Decl.") ¶ 19, Ex. 16 at NELSON 253 ("I had been set on life after the guilt phase of the trial. But I was pushed over the limit when during the punishment phase, they told us about [Mr.] Nelson killing someone in jail."). Rick Seely's largely unchallenged testimony lingered in jurors' memories four years later. *See* Gonzales Decl. ¶ 6 at NELSON 257, 262 ("Another inmate testified during the sentencing phase about the death of the jail inmate."); Declaration of James Kirk Vanderbilt (Sept. 25, 2016) ("Vanderbilt Decl.") ¶ 11, Ex. 15 at NELSON 250 ("[T]hey brought in another prisoner who described what [Mr. Nelson] had done to that other

inmate in the jail. I didn't have any reason to dismiss the testimony of the other prisoner. Effectively, we had to go through a second murder trial.").

There is a reasonable likelihood that, absent defense counsel's deficient failure to develop evidence undermining the theory that Mr. Nelson murdered Holden, at least one juror would not have found that Nelson was a future danger. Defense counsel did not elicit exculpatory evidence by calling their own witnesses; by adequately challenging the testimony of the State's witnesses; by including Seely's testimony as the only eyewitness; by objecting to the pathologist's expert opinion that Holden's death was a homicide even though the opinion was not based on medical evidence; or by adequately challenging the State's DNA evidence, all of which severely prejudiced Mr. Nelson. *See, e.g., Harrison v. Quarterman*, 496 F.3d 419, 427 (5th Cir. 2007) (defense counsel's failure to interview and have eyewitness testify at trial prejudiced defendant when there was little physical evidence and "case turned on witness testimony"); *Raether v. Meisner*, 608 F. App'x 409, 415 (7th Cir. 2015) (defendant was prejudiced when defense counsel did not cross-examine witnesses with prior inconsistent statements; "[h]ad counsel cross-examined the witnesses adequately, he could have cast significant doubt on [state witnesses'] testimon[ies], which w[ere] ripe for impeaching"); *Ege v. Yukins*, 485 F.3d 364, 379 (6th Cir. 2007) (defendant prejudiced by defense counsel's failure to object to unfounded expert witness testimony that inculpated defendant).

Finally, the jury did not hear evidence strongly undermining the State's theory that Mr. Nelson was a "lone assassin." It is considerably more difficult for a jury to infer future dangerousness in a case where a non-principal's criminal liability is vicarious than in a case where the defendant is the principal assailant. *See Coble v. State*, 330 S.W.3d 253, 269 (Tex. Crim. App. 2010). If defense counsel had investigated and presented evidence of Springs's and

Jefferson's involvement in the offense, *see supra* at 20-28, the jury would have heard evidence and testimony corroborating Mr. Nelson's insistence that he was not a "lone wolf."

        2.    Special Issue Number 2: There is a reasonable probability the jury's answer to the second special issue would have been different absent defense counsel's deficient performance.

Because Mr. Nelson was convicted under the Texas law of parties, Special Issue Number 2 required the jury to find "beyond a reasonable doubt" that Mr. Nelson "intended to kill the deceased … or anticipated that a human life would be taken." Court's Charge on Punishment, Ex. 33 at NELSON 499; *supra* at 7-8. Here, the jury was asked to infer that intent from Mr. Nelson's allegedly dominant role in the offense. Once again, if defense counsel had adequately presented the substantial evidence of Springs's and Jefferson's involvement in the crime, corroborating Mr. Nelson's own account of the events of March 3, 2011, it is reasonably probable that the jury would also have believed that Mr. Nelson did not anticipate and did not intend for anyone to get hurt.

The State and defense counsel agreed that whether the jury believed Mr. Nelson was the sole perpetrator of the crime would be critical to the jury's decision at sentencing. *See supra* 5-6. During closing arguments of the guilt phase, the State and the defense mentioned the "lone assassin" theory a combined total of 27 times. The State argued, for example:

- "One person committed this act, not the other two people he wants to incriminate because he thinks he can con you all into believing something that's not true." 37 R.R. 8.

- "He is the only killer." *Id.* at 9.

- "Only one person did this, ladies and gentleman." *Id.* at 10.

- "The other two, the other two are scavengers, Jefferson and Springs. They showed up later in the day. They were perfectly willing to participate in the use of those credit cards, which, by the way, they never got anything from because the card was shut down the second time at Sheikh shoes, the second time they were there…. They were scavengers. They're like remoras that attach themselves to a shark. And there's the

shark right over there. And that shark should be found guilty of the offense of capital murder." *Id.* at 31.

The "lone assassin" theory was again raised during closing arguments at the sentencing phase. The State reiterated: "[T]he only person who is responsible for these murders [is] this Defendant." 44 R.R. 10.

Due to defense counsel's unreasonable lack of preparation and investigation, however, the jury had no access to the evidence suggesting that Springs and Jefferson had a substantial role in the crime, a glaring absence that did not escape the jury's notice. *See* Vanderbilt Decl. ¶ 9 at NELSON 250 (stating defense counsel appeared to "tr[y] to pin it on other people, but there was no evidence to support that"). Even if defense counsel did not prove beyond a reasonable doubt that Springs and Jefferson committed the murder, they could have raised sufficient doubt that Mr. Nelson was the sole perpetrator. *See* Declaration of Susan Meares Hickey (Sept. 19, 2016) ("Hickey Decl.") ¶ 7, Ex. 14 at NELSON 248 ("There was still the opportunity after [the State] closed for the defense to raise something new, to persuade me. They didn't do anything really."). As discussed above, defense counsel could have called Ronika Austin to testify about Springs's possession of Dobson's iPhone; presented photos of Springs's bruising after the offense (and compared it to Mr. Nelson's lack of injuries); undermined Springs's alibi witnesses with their inconsistent statements; and subpoenaed school records and video recordings that would have undermined the validity of Springs's and Jefferson's alibis.

Because of defense counsel's deficient performance, the jury had almost no evidence that undermined the State's "lone assassin" theory. If counsel had investigated and presented evidence to support Mr. Nelson's testimony, it is reasonably probable that the jury's determination on Special Issue Number 2 would have been different.

3.   Special Issue Number 3:  There is a reasonable probability the jury's answer to the mitigation special issue would have been different absent defense counsel's deficient performance.

Under Special Issue Number 3, the jury was asked whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there were sufficient mitigating circumstances to warrant a life sentence. *See* Tex. Code Crim. Proc. art. 37.071, § 2(e). As discussed above, *supra* 33-52, defense counsel's deficient performance resulted in a dearth of evidence for the jury to consider.

Defense counsel's failure to properly identify the effects of trauma in Mr. Nelson's life deprived the jury of key mitigating evidence. Instead, the jury heard from Mr. Nelson's own witness that Mr. Nelson was a psychopath. It is not uncommon for clinicians to confuse PTSD for ASPD ("psychopathy") when they lack a correct understanding of the individual's childhood trauma. *See* Ex. 156 at NELSON 1386-95 (noting how various indicators of psychopathy overlap with symptoms of PTSD). But the mistake has profound consequences in a capital case, because the ASPD and PTSD diagnoses lead to diametrically opposed conclusions under Special Issue Number 3. As recognized in the academic literature, "[t]estimony labeling a capital defendant antisocial or psychopathic has one overriding purpose:  to obtain and carry out a sentence of death," that is ASPD is sometimes associated with "evil." *Id.* at NELSON 1337, 1339. PTSD, in contrast, is generally viewed as a mitigating factor.

Instead of being recognized as red flags indicating trauma and neglect, Mr. Nelson's symptomology was misunderstood, mislabeled, and dismissed. There was almost no trial testimony regarding Mr. Nelson's history of suicidal ideation and conduct, for example. The United States Department of Veterans Affairs has recognized that PTSD is "significantly associated with suicidal ideation or attempts." Department of Veteran Affairs, *The Relationship*

59

*Between PTSD and Suicide*, http://www.ptsd.va.gov/professional/co-occurring/ptsd-suicide.asp (last visited Oct. 12, 2016), Ex. 157 at NELSON 1402. In light of its connection to severe traumatic stress, Mr. Nelson's long history of self-harm should have been powerful mitigating evidence. Having failed to follow up on red flags and retain appropriate experts, however, defense counsel misunderstood the significance of Mr. Nelson's history and did not present the jury with evidence of suicidal behavior or self-harm. The information surfaced only during the cross-examination of Dr. McGarrahan, in which she brushed aside Mr. Nelson's decade-long history of suicidal behavior as a ruse to "manipulate his cell location," 43 R.R. 270—a conclusion that is disproved by the extensive clinical records already discussed, *see supra* at 42-47.

Evidence of Nelson's disassociation, *see* Ex. 159 at NELSON 1419—which has been directly linked to trauma—was likewise ignored. *See* Sylvia J. Egan, *Post-Traumatic Stress Disorder (PTSD): Causes, Symptoms and Treatment* 5 (2010) (noting that dissociation has "received specific attention in the study of juvenile delinquency"). Instead, when defense counsel briefly raised the personas of "Tank" and "Rico" to ask if Nelson had "multiple personalities," Dr. McGarrahan rejected the suggestion, not realizing that Mr. Nelson's trauma history exposed him to a high likelihood of dissociation (because, again, defense counsel had not developed this factual or expert issue). 43 R.R. 259-60. Worse, Dr. McGarrahan agreed on cross-examination that these "personas" were invented "because he doesn't want to take responsibility for his own behavior." *Id.* at 276. Defense counsel's failure to develop a clear evidentiary picture and expert understanding of Mr. Nelson's dissociation, coupled with defense counsel's incorrect presentation that the disassociation supposedly lacked any evidentiary basis, did serious damage to the case for mitigation.

Had a proper mental health expert familiar with childhood and adolescent trauma evaluated Mr. Nelson, the jury would have heard extensive evidence of severe physical, emotional, and sexual abuse, and emotional and physical neglect, and would have understood its impact on Mr. Nelson. Bradley Report, Ex. 159 at NELSON 1408, 1425-27. Dr. Bradley analyzed Mr. Nelson's regular abuse by his mother, Kathy, his stepfather, Fernando Romero, and by at least one of Kathy's boyfriends. *Id.* at NELSON 1410. This abuse often included beatings with paddles, cords, belts, and switches. *Id.* at NELSON 1422. A trauma expert would have described repeated instances of sexual abuse when Mr. Nelson was between 8- and 10-years old, and helped the jury to understand the effects of that abuse on him. *Id.* at NELSON 1423-24. And a trauma expert would have contextualized Mr. Nelson's instances of dissociation and memory suppression—e.g. the "personas" of Rico and Tank—as consistent with a person who has been exposed to trauma. *Id.* at NELSON 1419. The "combination of [Mr. Nelson's] multiple exposures to trauma made the likelihood that he would develop adverse psychological consequences extremely high." *Id.* at NELSON 1425. The jury would have heard that "traumatic and adverse experiences and circumstances exert a deleterious impact on the developing brain and negatively disrupt of psychosocial development and functioning." *Id.* at 1425-26.

If the jury had even just been provided with evidence of Mr. Nelson's history of abuse, suicidal attempts, trauma, neglect, and deprivation—evidence easily within the reach of defense counsel—it could have resulted in at least one juror harboring a reasonable doubt as to the mitigation question.

Finally, as discussed *supra* at 20-27, defense counsel's deficient performance resulted in the failure to secure and present available evidence that Mr. Nelson lacked sole responsibility for

61

the pastor's death. If defense counsel had presented evidence undermining the State's theory that Mr. Nelson was the "lone assassin," it is reasonably probable that "the circumstances of the offense"—e.g., that Mr. Nelson did not act alone—would have changed the outcome on the mitigation special issue.

### C. The Procedural Default of This Claim Is Excused.

Despite the obvious strength of the IAC claim described above, ineffective state post-conviction counsel John Stickels failed to raise it, and it is now procedurally defaulted. Stickels failed to investigate anything, reprinted irrelevant portions of appellate briefing from other clients' cases, and generally failed to litigate with the standard of care expected of state post-conviction counsel in a capital case. *Supra* at 13-16. The application that resulted was risible, or would be, if this were not a capital case. Stickels cut and paste an argument from another brief about FASD that had no application to Mr. Nelson. *Supra* at 15-16. Stickels could not even remember the name of his client, misidentifying the applicant as "Tony" instead of Steven Nelson. Ex. 8 at NELSON 136. Stickels's inattention reaches absurd heights in his reference, in the application, to his own representation as ineffective. *See id.* at NELSON 171 ("[B]oth direct appeal and *state habeas counsel* overlooked the fact that the jury charge in this case did define 'mitigating evidence ....'") (emphasis added).

The procedural default of the foregoing claim is excused under the doctrine set forth by the Supreme Court in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). In *Martinez*, the Supreme Court held that "[w]here, under state law, claims of ineffective assistance of defense counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 132 S. Ct. at 1320. In *Trevino*, the Court

extended that ruling to Texas. Because Stickels's failure to raise this claim in Mr. Nelson's state habeas proceeding was a clear function of his ineffectiveness, and because the claim is substantial, Mr. Nelson may pursue the claim now.

## II.   DEFENSE COUNSEL'S FAILURE TO OBJECT TO VIOLATIONS OF MR. NELSON'S FAIR-TRIAL RIGHTS AND OTHERWISE SECURE A FAIR TRIAL ENVIRONMENT CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.

Defense counsel have a basic responsibility to secure the fairest possible trial, and to enforce specific fair-trial rights guaranteed under the Fourteenth Amendment. *See, e.g., United States v. Wade*, 388 U.S. 218, 226-27 (1967) ("The security of [the fair trial] right is as much the aim of the right to counsel as it is of the other guarantees of the Sixth Amendment []."). Rather than diligently guard against information and conditions capable of tainting the jury, defense counsel simply permitted the State to proceed with its case in a toxic atmosphere. Mr. Nelson was shackled in view of the jury, surrounded by numerous uniformed officers, and heavily medicated throughout the trial.[29] The media was a constant presence both inside and outside the

---

[29] Nelson was on at least three medications during his trial: (1) Seroquel; (2) Risperdal; and (3) Benadryl. Seroquel and Risperdal are antipsychotic medications used to treat bipolar disorder, schizophrenia, depression, and insomnia. Benadryl is an over-the-counter antihistamine often used to treat the side effects of psychotropic medications. After trial, the State immediately ceased administering these medications to Nelson. These medications—individually and in concert—affected Nelson's demeanor, which in turn influenced the jury. Jurors observed that Nelson was "unemotional," both during his testimony specifically and during the trial more generally. Affidavit of Callie F. Heller regarding the Declaration of Byron Caruthers ("Caruthers Decl.") ¶ 6, Ex. 19 at NELSON 268; *see also* Declaration of Henry C. Hackbusch III (Sept. 19, 2016) ("Hackbusch Decl.") ¶ 9, Ex. 160 at NELSON 1430; Hickey Decl. ¶ 13 at NELSON 248; Markle Decl. ¶ 17 at NELSON 253; Vanderbilt Decl. ¶ 4 at NELSON 250. Jurors also thought Nelson showed "no remorse" and that he was "non-reactional when the evidence against him was being presented." Hickey Decl. ¶ 13 at NELSON 248; Markle Decl. ¶ 17 at NELSON 253. One juror noticed that Nelson "basically just sat there" during trial and "didn't do a great deal," Vanderbilt Decl. ¶ 4 at NELSON 250, a function of how heavily he was medicated. *See, e.g., Riggins v. Nevada*, 504 U.S. 127, 137 (1992) (medication may impact a defendant's outward appearance, testimony content, ability to follow proceedings, or substance of his communication with counsel).

courtroom. Defense counsel's failure to enforce Mr. Nelson's fair-trial rights was a prejudicial

deficiency amounting to constitutionally ineffective assistance.

A. **Defense Counsel Failed to Diligently Seek the Change of Venue Necessary to Preserve a Fair Trial.**

Nelson's case received extensive pretrial publicity. At least one hundred articles from

various news organizations documented the proceedings, beginning with Mr. Nelson's arrest.

Numerous television stations covered the case, including CBS's and NBC's local affiliates; at

least one station ran footage with nightly updates.[30] The media convicted Mr. Nelson before the

trial even began.[31]

On June 13, 2012, defense counsel moved to change venue based on the extensive media

coverage. The State responded on June 25, 2012, and the court heard argument on the motion

that day. The State argued that venue should be changed only if the parties were unable to pick a

jury. The court indicated it wanted to hear evidence on the motion and that it would take the

motion under advisement until the following day. 5 R.R. 58-61. On June 26, 2012, defense

counsel re-raised the motion, and the court stated it would carry the motion forward. 6 R.R. 50-

51. Defense counsel then dropped their pursuit of the change in venue, except to "reurge" it in a

motion for mistrial filed on August 20, 2012. 2 C.R. 369. The court heard argument on the

motion for mistrial the same day, and while defense counsel informed the court that the defense

---

[30] *See, e.g.,* Mola Lenghi, *Inmate Testifies Against Steven Nelson,* NBC 5 Dallas-Fort Worth (Oct 11, 2012), Ex. 24 at NELSON 293; *see also* Robbie Owens, *Fellow Inmates Testify Against Man Sentenced For Killing Pastor,* CBSDFW.com (Oct. 10, 2012), http://dfw.cbslocal.com/2012/10/10/fellow-inmates-testify-against-man-sentenced-for-killing-pastor/, Ex. 23 at NELSON 290.
[31] *See, e.g.,* Brantley Hargrove, *Imaginary Monsters Chased Jonny Holden All His Life, Then a Real One Caught Him,* Dallas Observer (Sept. 27, 2012), http://www.dallasobserver.com/news/imaginary-monsters-chased-jonny-holden-all-his-life-then-a-real-one-caught-him-6427698, Ex. 22 at NELSON 276-89 (labeling Nelson a "monster").

was not waiving its venue change motion, counsel effectively abandoned it, neither presenting evidence in support of the motion nor obtaining a ruling on it.  14 R.R. 16‑17.

The failure to secure a venue change permitted sustained media coverage to affect the jury.  The sensationalist news coverage resulted in a carnival atmosphere, leaving the jurors with the indelible impression that the community was eager to heal through a guilty verdict.  One juror stated that he heard about the case in the news because "[i]t was a big case in the community."  *See* Caruthers Decl. ¶ 3 at NELSON 268.  Other jurors noticed the relentless media coverage as the case was ongoing.  *See* Gonzales Decl. ¶ 13; Hackbusch Decl. ¶ 11; Vanderbilt Decl. ¶ 7.  For example, one juror reported that she thought "Oh, my God!  The news people are here!"  Gonzales Decl. ¶ 13 at NELSON 258, 263.  Another said that "[t]here were some cameras in the back" and that he would "occasionally see the media in the hallway."  Vanderbilt Decl. ¶ 7 at NELSON 250.  *Cf. Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966) (reversing denial of habeas petition where trial court did not control "inherently prejudicial publicity which saturated the community" and created "disruptive influences in the courtroom").

The media presence suffused the courtroom itself; the trial court admonished at least one news photographer for taking photos from a location that was in plain sight of the jury:

> **THE COURT:** I did this for 48 hours.  My point is, if you ask, I will let you do it.  But you were taking pictures at a place I've never allowed people to take pictures.  You know how I knew you were there?  Do you know?
>
> **MR. EDS:** No, sir.
>
> **THE COURT:** *The jurors were all looking at you.  And that's the reason I don't let you over there.*  And I think I've always tried to work with y'all.
>
> **MR. EDS:** Sure.  I -- I mean, I apologize.  I've never been stricken from that side before, so...
>
> **THE COURT:** You haven't been in here then.

**MR. EDS:** Well, it must have been that day.

**THE COURT:** Because I have -- I -- started off the first time, *I saw it. Jurors paid attention it.* And that's the reason. So if you're willing to do that, I'll do that, then we'll start all over again. Okay?

33 R.R. 231-33 (emphasis added). The sustained media presence was both a constant reminder of the community's desire for swift retribution and a persistent threat to the integrity of the proceeding.

### B.   Defense Counsel Failed to Object to Mr. Nelson's Visible Shackling and Wearing of a "Stun Cuff."

On April 13, 2011, defense counsel filed a motion for Mr. Nelson "to appear at all phases of pretrial and trial in civilian clothes and without physical restraints." 1 C.R. 55. The motion asserted that the "stigma" from appearing "in shackles or restraints as he faces the public, press, or the tribunal that will judge his guilt" would violate Mr. Nelson's constitutional right to a fair and impartial trial. *Id.* But when the court took the motion up on June 25, 2012, defense counsel simply stated, "We're comfortable with what's been done so far," that is, shackling Mr. Nelson when he appeared in court. 5 R.R. 15.

Because defense counsel failed to pursue a challenge to Mr. Nelson's restraints, throughout his capital murder trial Mr. Nelson was visibly shackled, wore a stun cuff, and was flanked by multiple law enforcement officers—even during his testimony. *See* Photo of Steven Nelson on Stand During Testimony, *Trial Continue for Man Accused of Slaying Pastor*, NBC 5 Dallas-Fort Worth, Ex. 21 at NELSON 275. During sentencing, the State actually presented the jury with evidence that Mr. Nelson was wearing a "stun cuff," explaining that it was an "electronic shock device that is placed on the inmate so that if something were to get out of hand, it makes it easier to get control of him." 40 R.R. 179-80. Defense counsel failed to object to the State's presentation and characterization of this evidence.

66

The jury noticed and was influenced by the restraints on Mr. Nelson. Multiple jurors observed or suspected that Mr. Nelson was wearing handcuffs during the trial, and it was obvious that he was surrounded by armed law enforcement. *See, e.g.*, Caruthers Decl. ¶¶ 6-7 at NELSON 268; Gonzales Decl. ¶¶ 9, 20 at NELSON 257-58, 262-63; Hackbusch Decl. ¶¶ 9-10 at NELSON 1430; Hickey Decl. ¶¶ 10, 12 at NELSON 248; Markle Decl. ¶¶ 9, 14, 18 at NELSON 252-53; Vanderbilt Decl. ¶¶ 5-6 at NELSON 250. One juror stated that Mr. Nelson "seemed like an absolute psychopath" and that he "could tell that he was handcuffed." Hackbusch Decl. ¶ 9 at NELSON 1430. The same juror also noticed that Mr. Nelson "was accompanied by police at all times" and that the police "were just eyeballing him the whole time," likely because "he was just a complete nut." *Id.* ¶ 10. Another juror noticed that Mr. Nelson looked "strong" and that he was not only handcuffed but also had an "ankle monitor." Hickey Decl. ¶ 10 at NELSON 248. The same juror noted the number of bailiffs guarding Mr. Nelson increased from two to four during trial, which "definitely made him seem dangerous" to her. *Id.* ¶ 12. A third juror stated that Mr. Nelson "was cuffed the whole time on his hands and feet, and had at least two sheriffs standing behind him the whole time." Markle Decl. ¶ 14 at NELSON 253. The same juror noticed that the presence of sheriffs guarding Mr. Nelson increased towards the end of trial. *Id.* ¶ 18.

Defense counsel's failure to object to the visible restraints, thereby preserving his fair-trial right, was deficient. No strategic reason exists to explain why counsel would have foregone the objection. *See Deck v. Missouri*, 544 U.S. 622 (2005) (defendant was denied right to a fair trial when, during the penalty phase of his capital proceeding, he was required to wear leg irons, handcuffs, and a belly chain).

## C.     Defense Counsel's Failures Prejudiced Mr. Nelson.

Defense counsel's acts and omissions together served to deprive Mr. Nelson of a fair

trial. The ongoing publicity and excessive, visible restraints on Mr. Nelson negatively and

unjustifiably influenced the jury's perception of his death-worthiness.[32] These omissions had a

particularly substantial effect on the perception of Mr. Nelson's future dangerousness, which

factored heavily in the sentencing phase.

## D.     The Procedural Default of This Claim Is Excused.

State post-conviction counsel did not assert this IAC claim. The application that state

habeas counsel filed omitted discussion of Nelson's shackling, the officers circling him

throughout trial, or the media coverage. Any procedural default is therefore excused under the

doctrine announced by the Supreme Court in *Martinez*, 132 S. Ct. 1309 and *Trevino*, 133 S. Ct.

1911. *See supra* at 62-63.

## III.   MR. NELSON'S CONVICTION AND SENTENCE VIOLATE THE FOURTEENTH AMENDMENT BECAUSE THE PROSECUTION USED RACE TO SELECT THE JURY.

Mr. Nelson was sentenced to death by an all-white jury from which the State

systematically struck nonwhite prospective jurors.[33] The State peremptorily struck nonwhite

---

[32] A defendant's right to a fair trial may be violated due to the presence of media in the courtroom. *Estes v. Texas*, 381 U.S. 532 (1965). To establish a due process violation, a defendant must show either that the media coverage of the case (1) "compromised the ability of the jury to judge him fairly," or (2) "that broadcast coverage of his particular case had an adverse impact on the trial participants sufficient to constitute a denial of due process." *Id.* at 581 (emphasis added). Prejudice may be found where the courtroom had a raucous "Roman circus" or "Yankee Stadium" atmosphere or if the jury was exposed to "sensational" coverage of the trial. *Chandler v. Florida*, 449 U.S. 560, 582 (1981).

[33] Mr. Nelson's primary source regarding the racial makeup of the jury pool and the jury is the juror questionnaires. Although one alternate did not indicate his race on his questionnaire, all 12 seated jurors were white, with a Hispanic alternate juror, Ms. Rebecca Cardona. *See, e.g.*, R. Cardona Q., at 2 ("Race: Hispanic"); B. Caruthers Q., at 2 ("Race: White"); V. Crews Q., at 2 ("Race: Caucasian"); K. Garland Q., at 2 ("Race: C"); E. Gonzales Q., at 2 ("Race: White"); H. Hackbusch Q., at 2 (same); S. Hickey Q., at 2 ("Race: Caucasian"); C. James Q., at 2 (same); J.

venire panelists at more than three times the rate of white panelists. Only a single nonwhite panelist survived jury selection—a female Hispanic alternate who did not ultimately serve on the jury that convicted Mr. Nelson and sentenced him to death. When Mr. Nelson's attorneys challenged the State's discriminatory strikes, the State repeatedly proffered pretextual "race-neutral" reasons that were factually incorrect, not used against white panelists to whom they equally applied, or both. Mr. Nelson is entitled to relief because these racially motivated strikes were unconstitutional under *Batson v. Kentucky*, 476 U.S. 79 (1986), and the state disposition of the *Batson* claim does not bar relitigation under 28 U.S.C. § 2254(d).

Under *Batson*, a defendant is entitled to "a jury whose members are selected pursuant to non-discriminatory criteria. The Equal Protection Clause guarantees that the State will not exclude members of [a Defendant's] race from the jury venire on account of race." 476 U.S. at 85–86 (citations omitted). "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (quotation omitted). In *Batson*, the Supreme Court set forth "a three-step process for determining when a strike is discriminatory":

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question;

---

Markle Q., at 2 ("Race: White"); P. Mason Q., at 2 ("Race: White"); A. Melancon Q. ("Race: W"); N. Smith Q., at 2 ("Race: White"); J. Vanderbilt Q., at 2 ("Race: Caucasian"); *see also* Hackbusch Decl. ¶ 8 at NELSON 1430 ("The jury was pretty much all-white."); Vanderbilt Decl. ¶ 8 at NELSON 250 ("[T]he jury was mostly Caucasian, but there was one lady who was Hispanic."); 31 R.R. 32 (statement of counsel that "there are no black persons, no African-Americans are on this jury as seated, alternates or otherwise"). This Petition does not include the alternate juror of unknown race, Mr. Anderson Poteet, in statistical calculations regarding the racial makeup of the venire. *See* A. Poteet Q., at 2. One other venire panelist, Ms. Michaela Almanza, also did not answer the question regarding race, but she indicated that she was born in Guanajuato, a city in Mexico, M. Almanza Q., at 2, and was excused during voir dire because she did not speak English, *see* 25 R.R. 101–02. Mr. Nelson thus considers Ms. Almanza to be Hispanic for purposes of this Petition.

and third, in light of the parties' submissions, the trial court must determine
whether the defendant has shown purposeful discrimination.

*Foster*, 136 S. Ct. at 1747 (quotation and citations omitted).

At Step 3 of the *Batson* inquiry, the trial court determines whether the race-neutral

reasons that were proffered were pretextual, and "ha[s] the duty to determine if the defendant has

established purposeful discrimination." *Batson*, 476 U.S. at 98. The Step 3 inquiry "involves an

evaluation of the prosecutor's credibility" during which "all of the circumstances that bear upon

the issue of racial animosity must be consulted." *Snyder v. Louisiana*, 552 U.S. 472, 477-78

(2008); *see Purkett v. Elem*, 514 U.S. 765, 768 (1995) ("persuasiveness" of the justification is

relevant). The State's proffering of a "pretextual explanation naturally gives rise to an inference

of discriminatory intent." *Snyder*, 552 U.S. at 485.

### A.    Factual and Procedural Background Regarding Jury Selection

Mr. Nelson's jury was drawn from a venire panel of 108 potential jurors. Panelists

completed questionnaires on a variety of topics, including their race, employment, families,

education, religion, and their views on the criminal justice system and the death penalty. Of the

107 panelists whose race is known, 12 were Black, 7 were Asian, 15 were Hispanic, 2 were

Native American, and the remaining 71 were White. After conducting voir dire, the court

qualified 47 panelists to serve on a capital jury.[34] Of the 46 death-qualified panelists whose race

Mr. Nelson knows, 6 were Black, 2 were Asian, 4 were Hispanic, 1 was Native American, and

the remaining 33 were White.

On September 25, 2012, the parties exercised their peremptory strikes. The State used

nearly 60% (8) of its 14 peremptory strikes against racial minorities, who constituted less than

---

[34] The court originally qualified 48 panelists, 19 R.R. 47–48, but later excused Ms. Paula
Grenhaw due to medical reasons, 29 R.R. 125–26; *see also* 31 R.R. 8, bringing the total to 47.

30% of the qualified venire.  The State struck 4 death-qualified Black panelists,[35] all of the Native American and Asian panelists, and 1 Hispanic panelist.  The State had run out of peremptory strikes by the time it got to the Hispanic panelist who served as an alternate.

The defense raised *Batson* challenges to 5 of the State's 14 peremptory strikes.  31 R.R. 14 (challenging Mr. Talmadge Spivey, Ms. Amy Lee-Moses, Ms. Somsouk Southichack, Ms. Sheracey Golightly-Hooper, and Ms. Martima Mays).  Based on the State's use of a "disproportionate number of strikes used on minorities," the court found that the defense had made a prima facie case of discrimination.  *Id.* at 16.

In response, the State proffered purportedly race-neutral reasons for striking each of the 5 panelists.  The court accepted the State's reasons and shifted the burden back to defense counsel to rebut them.  Defense counsel declined to offer any further showing or argument and said that the defense would simply "let the record speak for itself."  The court denied the *Batson* challenges.  *See id.* at 70-71.

### B.    The State Intentionally Used Race to Secure an All-White Jury.

The tools that courts use to identify race-based strikes uniformly support the inference that the State's strikes here violated *Batson*:  (1) a "statistical analysis" comparing the rate of strikes used against white and nonwhite panelists, *see Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("*Miller-El II*"); (2) analysis of the accuracy of the reasons given for striking the nonwhite panelists, *see Foster*, 136 S. Ct. at 1754; and (3) a "comparative analysis" evaluating whether the "race-neutral" reasons for striking nonwhite panelists were used to strike similarly situated white panelists, *see Reed v. Quarterman*, 555 F.3d 364, 373 (5th Cir. 2009).

---

[35] The defense struck 2 Black panelists because they expressed strong views against criminal defendants and in favor of the death penalty. *See, e.g.*, 25 R.R. 12–13, 27 R.R. 66, 114–15, 116.

1.    A statistical comparison of the treatment of white and nonwhite panelists demonstrates that race was used to select the jury.

The State's disproportionate use of peremptory challenges against minority panelists is evidence of pretext, as the Supreme Court noted in *Miller-El II*. Indeed, the differential treatment of white and nonwhite panelists is even starker here than it was in *Miller-El II*. In *Miller-El II*, the Court found unconstitutional discrimination when only one Black panelist survived voir dire; here, none did, notwithstanding a roughly similar proportion of Black panelists. *See Miller-El II*, 545 U.S. at 241 (20 Black panelists in 108-person venire panel); *supra* at 70 (12 Black prospective jurors in Mr. Nelson's 108-person venire). Of the 36 venire panelists who were racial minorities, only one, a Hispanic woman, survived the jury selection process, to serve as an alternate, after the State had run out of peremptory strikes.[36] The State struck 8 out of 13 nonwhite panelists who were death-qualified, but only 6 of the 33 white panelists.[37] The State thus struck nonwhite panelists at more than *three times* the rate of white panelists. This statistical disparity is strong evidence of the State's discriminatory intent in selecting Mr. Nelson's jury. *Miller-El II*, 545 U.S. at 240-41.

2.    The proffered reasons for striking nonwhite panelists were pretextual because they were neither accurate nor invoked against similarly situated white panelists.

The other two tools for identifying purposeful discrimination require evaluating the race-neutral reasons proffered for striking specific panelists.

---

[36] In *Woodward v. Epps*, 580 F.3d 318, 339 (5th Cir. 2009), the Fifth Circuit held that a thorough statistical analysis "require[s] knowing the minority percentage of the venire." *Id.* As noted, Mr. Nelson has confirmed that at least 36 total racial minorities were in the venire panel. The fact that the venire panel included a substantial number of racial minorities who could have served on Mr. Nelson's jury "strengthen[s]" the inference of purposeful discrimination. *See id.*
[37] The State struck *61.5%* of the death-qualified nonwhite panelists, and only *18.18%* of the death-qualified white panelists.

72

First, comparative analysis makes use of "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." *Miller-El II*, 545 U.S. at 241. If "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Id.* That is, "[i]f the State asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination, even if the two jurors are dissimilar in other respects." *Reed*, 555 F.3d at 376.

Second, the State's mischaracterization of the record when proffering race-neutral reasons is evidence of purposeful discrimination. *See Foster*, 136 S. Ct. at 1754; *accord Miller-El II*, 545 U.S. at 244 (mischaracterization of a panelist's testimony supported finding of a *Batson* violation); *Purkett*, 514 U.S. at 768 ("implausible or fantastic justifications may (and probably will) be found to be pretexts"); *Reed*, 555 F.3d at 380 (reason contravened by juror's actual testimony was not legitimate basis for strike). It is also evidence of pretext if the State did not "engage in meaningful voir dire examination" on the subject of a proffered reason. *Reed*, 555 F.3d at 376 (citing *Miller-El II*, 545 U.S. at 246).

Here, both analyses confirm the inference required by the statistical analysis already discussed: that the State's real reasons for the strikes were race-based, not race-neutral.

> a. **Martima Mays (Prospective Juror No. 100; Qualified Juror No. 41)**

Ms. Martima Mays was one of the 6 death-qualified Black panelists, and one of the 4 Black panelists the State peremptorily struck. In explaining why it struck Ms. Mays, the State cited (1) her prior jury experience; (2) her personal beliefs regarding the death penalty; and (3) her supposed hesitation regarding Special Issue Number 2, the parties question, saying:

She served on a jury that resulted in a mistrial. She also, with regard to several questions on her questionnaire, wrote, I have not thought about it, in regard to her feelings on the death penalty.

She believed that the death penalty should never be invoked. She again writes, I've not thought about it, for two more questions dealing with the death penalty, but that she would not lose any sleep over the fact that she did not get picked.

She also believed that the death penalty was not at the top of her list for a possible punishment for a crime. She hesitated during questioning with regard to Question No. 2 with the parties issue.

31 R.R. 19–20. These stated reasons are pretextual.

During voir dire, Ms. Mays described as "neutral" her experience as a juror in a case that concluded in a mistrial (involving the unauthorized use of a motor vehicle). 28 R.R. 155–56. And the State *accepted* a white panelist whose prior jury experience posed a far greater danger to their case against Mr. Nelson—service on a capital murder jury that failed to impose the death penalty—without probing the issues they asserted against Ms. Mays. 10 R.R. 76. The white panelist, Mr. David Defalco, explained that the prior jury "couldn't come to [an] agreement" and thus "just kind of reverted to a life sentence." *Id.* at 77. The State did not ask Mr. Defalco, as they did Mays, 28 R.R. 156, whether he was "frustrated" by that result, nor did they ask whether Mr. Defalco had favored a death sentence.[38] The State's differential treatment of these two jurors exposes their use of pretext against Ms. Mays.[39]

Second, the State did not accurately characterize Ms. Mays's views regarding the death penalty, their second purportedly race-neutral reason for striking her. Ms. Mays indicated on her questionnaire that she had not thought about the death penalty, Mays Q., at 17–18; *see* 28 R.R. 158, but during voir dire she reasonably explained, "when you don't have something … in front

[38] Although Mr. Defalco did not serve as a juror, that was because the defense peremptorily struck him after the State affirmatively accepted him. *See* 31 R.R. 5.

[39] If the State's race-based motivation for striking Ms. Mays is not sufficiently clear, Mr. Nelson is entitled to discovery into the question whether the State has recorded Ms. Mays as an undesirable juror for that or any other reason.

of you, you really don't tend to think about it as much." *Id.* As the State itself said in questioning another juror, "[n]o one sits around and thinks about [the death penalty] until" summoned to jury service. 21 R.R. 5–7. Moreover, at voir dire Ms. Mays unambiguously testified that she could and would impose the death penalty if appropriate. She agreed that whether "the death penalty would be assessed depends on the facts of the case," 28 R.R. 159–60, and that it could be appropriate in a variety of situations. *Id.* at161–62. As the State put it at that time, Ms. Mays's position reflected "what the law is. It's keeping an open mind about the factual situation." *Id.* at164.

In contrast to Ms. Mays, five other white prospective jurors were not struck by the State despite expressing reservations about the death penalty. Ms. Christie James wrote on her questionnaire that she generally disfavored the death penalty, and expressed the same concern during voir dire. C. James Q., at 17; 9 R.R. 248, 250. The State nevertheless accepted her testimony that she had an open mind, *id.* at 249, and that she could participate in the process. *Id.* at 250. The State had "a little bit of pause" regarding the "reluctan[ce]" of Ms. Elizabeth Gonzales, a white juror, to impose the death penalty, 24 R.R. 170, but also credited her testimony that she was "open-minded to it," *id.*; *see* 24 R.R. 211. Another white juror, Ms. Veranna Crews, testified to ambivalence about the death penalty:

> I wouldn't say that I'm opposed to [the death penalty]. I believe that maybe under certain circumstances, based on an individual's past or other actions, maybe direct -- their direct situation surrounding, you know, what happened. I feel like there's so many factors that -- I couldn't just say yes or no, you know, for or against it in every case. I feel -- or in every situation. I feel like there's so much that would go into, I feel, my opinion surrounding whether or not someone should or should not receive the death penalty.

17 R.R. 184–85. She was not struck by the State, and neither was Mr. Henry Hackbusch, a white juror who had concerns about the legitimacy of the death penalty's social purpose:

75

> **Q.** There was a question on here, do you believe the death penalty serves a legitimate purpose or purposes in our society. And you did not answer that particular question.
>
> **A.** That's a pretty hard question. That's a very, very hard question. You know, some could say that it's a deterrent, but if it was a deterrent, then how many people do we have to put to death before somebody gets the idea, oh, maybe I better not do that. So I don't think that's an effective argument either. That's just a real tough question. I don't know really the right answer to that.
>
> **Q.** So I guess what I'm taking from your answer is that it probably does serve a legitimate purpose in our society, you're just unable to put your thumb on one right now. Is that -- I don't want to put words in your mouth though.
>
> **A.** Well, it certainly prevents a repeat offender, so, I mean, that's a -- you can make that argument. So, yeah, I guess it serves a purpose. But it's not -- I don't think it serves a deterrence though.

9 R.R. 273. And the State did not use a peremptory strike to prevent Mr. Kenneth Garland, a

white man, from serving on the jury, despite his "hesitation" about imposing the death penalty:

> **Q.** Knowing that a yes answer moves a defendant one step closer to the death penalty, would you be able to answer yes if the State proved it to you beyond a reasonable doubt?
>
> **A.** Yes.
>
> **Q.** Any issues or hesitation with that?
>
> **A.** Yes.
>
> **Q.** Tell me what you are thinking.
>
> **A.** That's -- any time you are sentenced to that, it's tough. It's got to be tough.

11 R.R. 25. Once again, the State's differential treatment of Ms. Mays relative to its treatment of

white prospective jurors confirms their discriminatory strike.

The State's third purportedly race-neutral reason—that Ms. Mays supposedly "hesitated"

during questioning about "the parties issue"—finds no support in the record. Ms. Mays

repeatedly testified that she understood and agreed with the State's explanation of the law of

parties. *See* 28 R.R. 165–67, 172–74. In particular, Ms. Mays agreed that a party to a crime is

culpable for a homicide that resulted, "[b]ecause you should have known" and "should have perceived that you were going to do harm." *Id.* at 174. Mays specifically agreed that she would find someone guilty if the State proved them to be guilty as a party, *id.*, and that she would answer "yes" to Special Issue Number 2 if proved, bringing the defendant one step closer to a death sentence. *Id.* at 188.

Ultimately, each of the rationales proffered by the State for excluding Ms. Mays supports one inescapable conclusion: that she was struck because of her race.

> b. **Sheracey Golightly-Hooper (Prospective Juror No. 92; Qualified Juror No. 38)**

Ms. Sheracey Golightly-Hooper was one of the 6 death-qualified Black panelists, and one of the 4 Black panelists the State peremptorily struck. In justifying its strike of Ms. Golightly-Hooper, the State cited (1) her church's stance against killing, and (2) her personal beliefs regarding the death penalty:

> [She] indicated on her questionnaire her church's position on the death penalty was thou shalt not kill; therefore, no one has the right to kill. She did not find herself in disagreement with this principle. She also indicated that she was not in favor of the death penalty because she did not believe we had the right to kill one another and that she believed that the death penalty should never be invoked.

31 R.R. 19. Both reasons rest on factual inaccuracies and were not applied against similarly situated White jurors. They were, rather, pure pretext.

While Ms. Golightly-Hooper's questionnaire reported her church's position that "'Thou shall not kill,' therefore no one has the right to kill," Golightly-Hooper Q., at 6, during voir dire Ms. Golightly-Hooper made it clear that her church's position would not prevent *her* from following the court's instructions, and imposing a sentence of death:

> Q.    The question was, Do you know whether your religion has taken an official position in regard to the use of a death penalty as a punishment for crime? And you -- actually, it looks like you tried to check yes and then no. And I think you scratched out no and then checked yes. If, yes, what position has it taken? And

> you wrote, Thou shalt not kill, therefore no one has the right to kill . . . . Tell me what you were thinking when you were -- when you saw that?

**A.** I was just thinking of the Ten Commandments. But it also states that we have to follow the laws of the land as well. So you have to follow the law of the land. So whatever the laws of the land are, I have to follow those as well.

27 R.R. 10; *see also id.* at 15 ("But whatever the law -- the Bible does teach us that there is a time and place for everything. And that's the time to kill, a time for death. If that is the law of the land, then I have to go with that."); *id.* at 50 ("**Q.** You won't let your belief in the Bible or your belief system or your religion interfere with that judgment call that you'll be asked to make? **A.** No."). That is, contrary to the State's statements to the court, Ms. Golightly-Hooper very much *did* "disagree[]" with the suggestion that she could not render a death verdict.

Moreover, the State did not reserve a strike for another, non-black panelist who had disclosed that her church maintained an anti-death penalty stance. Ms. Rebecca Cardona[40] testified:

**A.** [Y]'all talk about the ethical and religious, obviously, I would like to hope that I can be honest and fair. I mean, and every religion has its book of rules and dos and don'ts just like in a trial. But, again, we each have to do what we have to do individually. I mean, I'm a Catholic, however, I don't follow every Catholic rule, obviously, you know, so it's just something that you have to do.

**Q.** Well, the Catholic church has said that they are not in favor of the death penalty.

**A.** Correct. . . . I mean, I've done things that are not within my religious [sic], so it's not something that I intentionally do, but it's something that I'm an individual, you know, I do individually as I see fit.

28 R.R. 289–90. The fact that the State did not reserve a strike for Ms. Cardona when she was identically situated confirms that the State's reliance on Ms. Golightly-Hooper's "church's position" was a pretextual excuse for striking her on account of her race.

---

[40] Ms. Cardona is the Hispanic woman who served as an alternate.

As to its second reason, the State's assertion that Ms. Golightly-Hooper believed the death penalty "should never be invoked" is belied by the record. While her questionnaire stated that she was generally not in favor of the death penalty, it also stated that "as long as the law provides for it, I could assess it [the death penalty] under the proper set of circumstances." Golightly-Hooper Q., at 17-18. Ms. Golightly-Hooper's voir dire testimony likewise made it clear that she could vote for a sentence of death, whatever her personal feelings about it: "The death penalty should be available for whatever the law of the land provides. That's how I feel about it." 27 R.R. 14; *see also id.* at 15 (death sentence could be "the righteous thing to do"). When the State questioned her about how she would respond to Texas's special questions, she unequivocally indicated that she could assess the death penalty.

> **Q.** Given your personal feelings about the death penalty, are you comfortable answering [Special Issue 1] if we prove it to you?
>
> **A.** Yes. . . .
>
> **Q.** Okay. Knowing that a yes answer would move a defendant one step closer to the death penalty, would you be able to answer yes if the State proved it to you beyond a reasonable doubt?
>
> **A.** Yes.

*See id.* at 31–32.

The State's pretext is not just confirmed by the full record, but is also demonstrated by the State's differential treatment of white jurors who expressed reservations about the death penalty. *Supra* at 74-76. Once again, all available analytical tools reveal as pretextual the State's reasons for striking a Black juror.

> **c.** **Talmadge Spivey (Prospective Juror No. 41; Qualified Juror No. 17)**

Mr. Talmadge Spivey was one of the 6 death-qualified Black panelists, and one of the 4 Black panelists the State peremptorily struck. The State explained its strike of Mr. Spivey by

79

citing (1) Mr. Spivey's fatigue and concerns about missing work; (2) his denial of alleged arrests; (3) his skepticism that Mr. Nelson could get a "fair trial"; and (4) his supposed refusal to judge others:

> [H]e slept during your instructions and most of our time downstairs in the Central Jury Room. He denied arrests on his questionnaire. He actually had two, one in 1998 and one in 2010. He checked he did not want to serve on the jury because he did not believe the Defendant could get a fair trial. He also indicated that he did not like jury service because he didn't want to sit around all day and that he works a lot of forced overtime, so he did not think he wanted to be on the panel. And he had problems sitting in judgment of other people.

31 R.R. 17–18. Each of these reasons is pretextual: the State had its facts wrong, and did not apply these reasons equally to white jurors.

First, the record contradicts the State's assertion that fatigue and work would interfere with Mr. Spivey's service on a jury. During voir dire, Mr. Spivey testified that he was tired *that day*, 17 R.R. 171, because he had worked the night shift and had not had time to sleep before reporting for jury duty, *id.* at 127. The court explained to Mr. Spivey that he would be excused from his work schedule if he served on the jury, and Mr. Spivey agreed that fatigue would then not be an issue. *Id.* at 128. This reason was also selectively used against Mr. Spivey, and not against a white juror who likewise worked night shifts. The State did not question whether fatigue and work schedule would be an issue for Ms. Crews, whose jury questionnaire indicated that her work hours "varie[d]," and who also worked nights. V. Crews Q., at 3; 17 R.R. 201 ("**Q.** Probably -- that's probably like something you do, like, all day or night, whatever shift you work.").

Second, the State's claim that Mr. Spivey "denied arrests on his questionnaire" was also pretextual. The record contains no evidence that Mr. Spivey had ever been arrested, nor did the State inquire about Mr. Spivey's arrest record during voir dire. While the State did explore what it characterized as Mr. Spivey's "problems with the law," the inquiry was not fruitful. It

80

disclosed no arrests, let alone anything that Mr. Spivey had failed to correctly answer in his questionnaire. Mr. Spivey testified that his son's mother had "reported" Mr. Spivey for using corporal punishment, but that no charges had been filed against him. 17 R.R. 131–33. On the contrary, the State confirmed in its examination that "cases were never actually filed against" Mr. Spivey. *Id.* at 132.[41]

Moreover, the State did not strike a White panelist who failed to disclose issues with the law in his juror questionnaire. Mr. Henry Hackbusch had been arrested and charged with a computer-breach offense, 9 R.R. 267–68, and had also faced trial for his failure to use a seat belt, *id.* at 269. When questioning Mr. Hackbusch during voir dire, the State learned that he had not disclosed the latter charge or trial. *Id.* The State's differential treatment of Mr. Spivey and a White juror who both had and failed to disclose a criminal charge and trial confirms that the State's reason for striking Mr. Spivey was pretextual. *See* H. Hackbusch Q. at 11; *id* at 12.

Third, the State stated that it struck Mr. Spivey because he supposedly "did not believe the Defendant could get a fair trial," 31 R.R. 17–18, but the record contradicts this rationale. What Mr. Spivey *actually* testified was that he was interested in whether Mr. Nelson would be tried by a racially representative jury of his peers: "I counted the number of African-American males in the actual pool, and I believe it was like eight. And I was -- I was told that you supposed to be tried by a jury of your peers. Well, there was only -- pardon my French. There was only eight brothers in there and majority of white guys and white females." 17 R.R. 130. Nevertheless, Mr. Spivey testified "I can give you a fair trial. It's just it looked bad." *Id.* at. 131.

---

[41] The State's rationale would strain plausibility even if Mr. Spivey ever *had* been arrested. Mr. Spivey's testimony revealed a pro-prosecution orientation. *See, e.g.*, 17 R.R. 140 (no hesitation finding defendant guilty if punishment was death); *id.* at 162–63 (there was no mitigating evidence that could result in the defendant not receiving the death penalty, "because I feel they'll do it again"); *id.* at 164 (could be part of a process resulting in death penalty).

The State's final reason for striking Mr. Spivey was that he testified that he had problems sitting in judgment of others. As with the other "race neutral" reasons proffered, this reason was both inaccurate and selectively invoked against nonwhite panelists. Mr. Spivey testified that he had moral and ethical concerns about sitting in judgment of another person, but that he *could* render a verdict for the State:

> Q.    Some people when they get to this question, because of ethical or moral or sometimes religious reasons, they, like you -- at the beginning when you said only God can judge --
>
> A.    Uh-huh.
>
> Q.    -- some people feel like that's very true and I could never participate in a process that involved my judging another person.
>
> A.    Uh-huh.
>
> Q.    But are you comfortable doing that if you're selected? Or will your ethical or moral views prevent you from doing that?
>
> A.    I'll be comfortable in doing it.

*Id.* at 140–142.

Mr. Spivey's testimony about judging others mirrors the testimony of several white panelists, including some who eventually *served* on Mr. Nelson's jury. Ms. Gonzales wrote on her questionnaire, "I believe people need to be punished for their crimes I just don't know that I am anyone to judge another person for their actions." Gonzales Q. at 17. During voir dire, Ms. Gonzales, who is white, reiterated these reservations, but the State discounted them as common:

> A.    Okay. I think that the death penalty is fair depending on the circumstances. I -- I, however, am a little -- you know, I don't know how to feel about it, especially if I'm called to be on a jury where I might be in a decision where that is, you know, placed. I don't know how much I feel -- how well I feel about making a determination for somebody else's life.
>
> Q.    Well, that's not an unusual feeling.

24 R.R. 165. And Mr. Garland stated that he had "issues or hesitation" with finding against a

defendant if it brought him closer to death, even if the State proved its case beyond a reasonable

doubt. 11 R.R. 25; *see also supra* at 74-76. Once again, and in contrast to how it dealt with Mr.

Spivey, the State noted that "[a] lot of people feel that way." *Id.* The State's reliance on Mr.

Spivey's concerns about judging others when that sentiment was widespread among non-struck,

white jurors strongly suggests that this reason to exclude Mr. Spivey was pretextual.

> d.  **Somsouk Southichack (Prospective Juror No. 50; Qualified Juror No. 21)**

Somsouk Southichack was one of the 2 death-qualified Asian panelists whom the State

peremptorily struck. The State's proffered race-neutral reasons for striking Ms. Southichack

were (1) her alleged issues with judging people; (2) her supposed opposition to the death penalty;

(3) her apparent hesitance regarding the reasonable doubt standard; and (4) her purported

disagreement with the law-of-parties rule:

> Ms. Southichack . . . indicated on her questionnaire that she has a problem
> judging. She believed that if someone committed a crime, they should get a fair
> trial, but she did not want to be a jury member for that because she had issues
> with judgment. She also indicated on her questionnaire she was not in favor of
> the death penalty. She also indicated that she did not believe that it should ever
> be invoked.
>
> She had a couple of issues understanding some of the legal issues that Mr. Gill
> was trying to explain to her during the individual voir dire portion. She was very
> hesitant when asked if the State proved beyond a reasonable doubt, could you
> actually find someone guilty, because she was indicating that she had problems
> with judging someone if it led to a capital murder conviction.
>
> She also indicated that she did not agree with the second part of Question No. 2,
> the parties question and believed she would have trouble answering that yes if she
> believed that this person was not the trigger person.

31 R.R. 18–19. None of these reasons holds up to scrutiny.

With respect to the State's concern with Ms. Southichack's hesitation to sit in judgment,

she unambiguously stated during voir dire that she was capable of fairly judging another person

under the law. 21 R.R. 50 ("**Q.** And here is the real important question for you. Now that we've talked a little bit about it, is there any reason, whether it's moral, ethical, or religious, that you could not sit in judgment of another person? **A.** No."). As explained above, *see supra* at 82-83, many White panelists expressed moral qualms that were equal to or greater than those expressed by Ms. Southichack. The State's selective use of this reason suggests that it was a pretext for racialized jury selection.

Second, the State asserted that Ms. Southichack expressed opposition to the death penalty on her questionnaire. Her questionnaire responses were equivocal;[42] however, when questioned about her ability to impose the death penalty in a specific case, Ms. Southichack unequivocally testified that she would be able to do so. *See id.* at 70 ("**Q.** So knowing that, know that the yes answer moves the person on trial one step closer to receiving the death penalty, would you be able to answer yes [to Special Issue Number 1] if the State proved it to you? **A.** Yes."); *id.* at 73 (same regarding Special Issue Number 2); *id.* at 82 ("**Q.** And if they did the crime, in your opinion, they should get the death penalty? **A.** If that's the law, yes."). As already discussed at length, a number of White jurors expressed similar concerns about the death penalty but were nonetheless not struck by the State. This comparison confirms that this reason was pretextual. *See supra* 74-76.

The State also argued that Ms. Southichack "was very hesitant when asked if the State proved beyond a reasonable doubt, could you actually find someone guilty." 31 R.R. 19. But Ms. Southichack was simply initially confused about the reasonable doubt standard; once the State explained it more clearly, Ms. Southichack indicated that she understood and could apply

---

[42] Ms. Southichack's questionnaire indicates that she does not believe the death penalty "ever ought to be invoked" but that she could assess it "as long as the law provides for it"; however, she also indicated that she believes the death penalty should be available for murder and that "with proper evidence it's fair." S. Southichack Q., at 18–19.

that standard. *See* 21 R.R. 48–49. She agreed that she would find Mr. Nelson guilty if the State proved its case beyond a reasonable doubt. *Id.* at 49–50. Ms. Southichack's "hesitation" about the reasonable doubt standard reflected a non-lawyer's unfamiliarity with a legal concept. Once the State explained it to her, Mr. Southichack's commitment to apply it was unequivocal.

The State's third proffered reason for peremptorily striking Ms. Southichack was that she "indicated that she did not agree with the second part of Question No. 2, the parties question, and believed she would have trouble answering that yes if she believed that this person was not the trigger person." 31 R.R. 19. But any hesitation reflected nothing but the State's inartful questioning. *See* 21 R.R. 51–57, 71–73. When the reason for Ms. Southichack's confusion became obvious, the court itself undertook an examination of Ms. Southichack to clarify the issue. With straightforward questions, Ms. Southichack indicated that she understood the law regarding parties, could apply it as instructed, and was "not going to automatically answer that question yes just because [she] found someone guilty of capital murder." The court denied the challenge based on Special Issue Number 2. 50 R.R. 101–04. The State's concern regarding Ms. Southichack's position on Special Issue Number 2 is inconsistent with her actual testimony, and thus is pretextual.

### C.   28 U.S.C. § 2254(d) Does Not Bar Relief.

The foregoing establishes that Mr. Nelson's jury was empaneled in clear violation of *Batson.* Mr. Nelson is entitled to pursue relief for that constitutional violation in this proceeding.

The CCA disposed of Mr. Nelson's *Batson* claim on the grounds that Mr. Nelson "failed to rebut the State's race-neutral reasons for its strikes," and that its own review of the record confirmed that "the record supports the trial court's determination that the State did not engage in purposeful discrimination." *Nelson v. Texas*, No. AP–76,924, 2015 WL 1757144, at *11 (Tex.

85

Crim. App. Apr. 15, 2015), *cert. denied*, 136 S. Ct. 357 (2015). 28 U.S.C. § 2254(d) precludes

relitigation of claims decided on the merits in state court, with two exceptions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

In other words, a state inmate can obtain merits review of a *claim* decided on the merits in state

court only if the state *decision* is either legally unreasonable under subsection (d)(1) or factually

unreasonable under subsection (d)(2). Mr. Nelson satisfies both exceptions to the relitigation

bar: the CCA decision involved both an unreasonable application of clearly established federal

law, under § 2254(d)(1), and was based on an unreasonable determination of facts in light of the

record, under § 2254(d)(2).

> 1.  Mr. Nelson Is Entitled to Merits Review of His *Batson* Claim Because the
>     State Court Decision Involved an Unreasonable Application of Clearly
>     Established Federal Law Under 28 U.S.C. § 2254(d)(1).

To satisfy the "unreasonable application" clause of 28 U.S.C. § 2254(d)(1), Mr. Nelson

must show that the CCA's decision was an "objectively unreasonable" application of clearly

established federal law. *See Williams*, 529 U.S. at 409; *Gongora v. Thaler*, 710 F.3d 267, 273

(5th Cir. 2013). The Supreme Court clearly established in *Batson*, *Miller-El I*, and *Miller-El II*

that *Batson* Step 3 requires courts to engage in a comparative juror analysis to determine whether

the state engaged in purposeful discrimination. *See Miller-El II*, 545 U.S. at 241 ("If a

prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-

similar nonblack who is permitted to serve, that is evidence tending to prove purposeful

discrimination to be considered at *Batson*'s third step."). The Fifth Circuit has expressly held that clearly established Supreme Court law "requires us to consider a 'comparative juror analysis' in a *Batson* claim." *Reed*, 555 F.3d at 373. Moreover, *Reed* held that *Miller-El II* clearly established that comparative juror analysis was "something it would conduct, not something that the parties must submit." *Id.* (citing *Miller-El II*, 545 U.S. at 241); *see United States v. Williamson*, 533 F.3d 269, 274 (5th Cir. 2008) ("[T]he Supreme Court has made plain that appellate review of alleged *Batson* errors is not a hollow act."). *Batson* and *Miller-El* establish that a court cannot omit a comparative analysis of the State's treatment of white and nonwhite jurors.

In disposing of Mr. Nelson's *Batson* claim, the CCA did not engage in any discernible analysis at all, much less the comparative analysis that clearly established Supreme Court precedent requires. *See supra* at 72-85. Instead, the CCA summarily concluded that "the record supports the trial court's determination that the State did not engage in purposeful discrimination." *Nelson*, 2015 WL 1757144, at *11. Nowhere in the opinion did the CCA explain what that record support was, or how it survived the comparative analysis already discussed. The CCA's decision was thus an "objectively unreasonable" application of clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1). *See Williams*, 529 U.S. at 409; *Gongora*, 710 F.3d at 273.

2. Mr. Nelson Is Entitled to Merits Review of His *Batson* Claim Because the State Decision Was Based on an Unreasonable Determination of Facts, in Light of the Evidence Before the State Court.

Under 28 U.S.C. § 2254(d)(2), an inmate is entitled to merits review of a claim decided on the merits in state court if the state decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The CCA's ruling that "the record supports the trial court's determination that the State did not engage in purposeful

discrimination" is an objectively unreasonable determination of fact. In the Fifth Circuit, state factual propositions are presumed correct unless disproved by clear and convincing evidence.[43] *See Batchelor v. Cain*, 682 F.3d 400, 405 (5th Cir. 2012) (explaining that § 2254(e)(1) supplies standard for factual unreasonability under § 2254(d)(2)). The Supreme Court, however, has emphasized that "deference does not imply abandonment or abdication of judicial review" and that it does not "by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("*Miller-El I*").

As demonstrated at length, *supra* at 72-85, clear and convincing record evidence establishes that the State *did* engage in purposeful discrimination. Specifically, the record reflects (1) stark statistical differences in the State's use of peremptory strikes[44]; (2) repeated factual inaccuracies in the State's proffers[45]; and (3) otherwise-inexplicable differential treatment of similarly situated white and nonwhite panelists.[46] Under both *Miller-El* decisions, inaccurate characterizations of juror strikes alone qualify as unreasonable factual determinations within the meaning of § 2254(d)(2). A thorough review of the record demonstrates that the CCA's contrary conclusion "is shown up as wrong to a clear and convincing degree; the state court's conclusion was unreasonable as well as erroneous." *Miller-El II*, 545 U.S. at 266.

## IV. DEFENSE COUNSEL'S FAILURE TO LITIGATE THE THIRD STEP OF THE *BATSON* CLAIM CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.

Defense counsel challenged some of the State's race-based strikes, but the trial court ultimately accepted the strikes because Mr. Nelson's attorneys failed to make any *Batson* Step 3

---

[43] Mr. Nelson recognizes that Fifth Circuit law forecloses his argument, but he hereby preserves the position that § 2254(e)(1) does not supply the standard for § 2254(d)(2) unreasonableness. That question has remained unresolved by the Supreme Court. *See Wood v. Allen*, 558 U.S. 290, 301 (2010) (recognizing that the issue is open and expressly declining to decide it).

[44] *See supra* at 70-72.

[45] *See supra* at 72-85.

[46] *See supra* at 72-85.

showing, and did not respond to the "race-neutral" reasons proffered by the State at Step 2. Indeed, the record suggests that defense counsel may not have understood *Batson* Step 3, or appreciated their responsibility to litigate it.

The failure on the parts of Mr. Nelson's defense counsel constitutes ineffective assistance, in violation of the Sixth Amendment, as incorporated against the states by the Fourteenth Amendment. Thus, even if this Court finds that the CCA's *Batson* disposition was valid, there remains an independent IAC claim for defense counsel's failure to competently litigate the *Batson* issue. As with other claims procedurally defaulted by state habeas counsel, the forfeiture is excused by state habeas counsel's inadequate performance.[47]

## A. Legal Standard

An inmate can show a Sixth Amendment IAC violation based on defense counsel's failures to effectively litigate a *Batson* claim. *See, e.g., Scott v. Hubert*, 610 F. App'x 433, 434 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 820 (2016). An IAC claim involving a *Batson* violation requires an inmate to show that a deficiently litigated *Batson* challenge would have had a "substantial chance" of success had it been litigated properly.

An IAC claim requires an inmate to show prejudice by demonstrating that defense counsel's deficiency had a reasonable probability of affecting a certain outcome. *Strickland*, 466 U.S. at 694. For a *Batson* error, the relevant outcome is that of the *Batson* claim itself, not the

---

[47] Direct-appeal counsel was also ineffective. Direct-appeal counsel argued Nelson's *Batson* challenge without identifying a single minority panelist whose strike was racially motivated, a single non-minority comparator, or even a single statistic about the disproportionality of the State's strikes. The superficial direct-appeal briefing is internally inconsistent, shifting positions on which and how many strikes were problematic. The CCA rejected the claim on appeal, ruling that "Appellant failed to rebut the State's race-neutral reasons for its strikes, and the record supports the trial court's determination that the State did not engage in purposeful discrimination." *Nelson*, 2015 WL 1757144, at *11. Direct-appeal counsel's ineffective litigation of a *Batson* appeal is a cognizable constitutional violation. *See Blanton v. Quarterman*, 543 F.3d 230, 243 (5th Cir. 2008); *Duhamel v. Collins*, 955 F.2d 962, 967 (5th Cir. 1992).

guilt or sentencing phase verdict at trial. *See, e.g., Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001) (holding that if an omitted *Batson* "claim would have had a reasonable probability of success, then counsel's performance was necessarily prejudicial because it affected the outcome of the appeal"); *Drain v. Woods*, 902 F. Supp. 2d 1006, 1026 (E.D. Mich. 2012), *aff'd*, 595 F. App'x 558 (6th Cir. 2014) ("Since *Batson* violation is a structural error, no further prejudice is required to be shown."); *but see Scott*, 610 F. App'x at 434 (noting that although "a *Batson* violation would be a structural error," "[t]he Supreme Court has not held that prejudice is presumed in an ineffective assistance of counsel case based upon failing to make a meritorious *Batson* objection," but going on to note that "this case does not involve the failure to make a meritorious *Batson* objection"). In other words, *Batson* errors are structural, so defense counsel's deficient failure to litigate a viable *Batson* claim is prejudicial within the meaning of *Strickland. See United States v. McAllister*, 693 F.3d 572, 582 n.5 (6th Cir. 2012) ("*Batson* errors are structural errors that are not subject to harmless-error review."); *Ford v. Norris*, 67 F.3d 162, 171 (8th Cir. 1995) (a "constitutional violation involving the selection of jurors in a racially discriminatory manner is a 'structural defect' in the trial mechanism which cannot be subjected to harmless error analysis").

### B. Defense Counsel's Failure To Offer Any *Batson* Step 3 Rebuttal Constitutes Ineffective Assistance of Counsel.

Defense counsel failed to use *Batson* Step 3 to answer the "race-neutral reasons" the State proffered at Step 2, and defense counsel appear to have been unaware of their obligation to litigate this question. Defense counsel's performance fell far below the standard for litigating a *Batson* claim, and that deficient performance prejudiced Mr. Nelson.

#### 1. Defense Counsel's Performance Was Deficient.

Effective defense counsel in a capital case are expected to understand and competently

litigate issues pertaining to jury selection. ABA Guideline 10.10.02.A states that defense counsel must be "particularly" fluent in those challenges "relating to bias on the basis of race or gender." Ex. 47 at NELSON 727. Guideline 10.10.02.B further provides that "[c]ounsel should be familiar with the precedents relating to questioning and challenging of potential jurors[.]" *Id.* In light of the fact that "the history of capital punishment in this country is intimately bound up with its history of race relations," the Commentary to the Guideline explains that "[c]ounsel should listen closely to the prosecutor's voir dire, challenges for cause and reasons for exercising peremptory challenges, make appropriate objections, and ensure that all information critical to a discrimination claim is preserved on the record." *See id.* at NELSON 1052-54.

The performance of defense counsel fell badly short of the professional standards reflected in the ABA Guidelines. As discussed *supra* at 71, the defense raised *Batson* challenges to 5 of the State's 14 strikes, and the court found that the defense established a prima facie case of discrimination at *Batson* Step 1. 31 R.R. 16. After the State asserted purportedly race-neutral reasons for striking each of the 5 panelists at *Batson* Step 2, the court shifted the burden back to Mr. Nelson to show these reasons were pretextual. Mr. Nelson's defense counsel made no effort to make a distinct showing in support of *Batson* Step 3, simply stating that he would "let the record speak for itself":

> **THE COURT**: Okay. The State -- I will find that the State has offered reasonable, race-neutral reasons for exercising peremptory challenges on jurors -- Qualified Juror 17, Original No. 41, Thomas Spivey; Qualified Juror No. 20, Original No. 49, Amy Lee-Moses; Qualified Juror No. 21, Original No. 50, Somsouk Southichack; Original -- Qualified Juror No. 38, Original No. 92, Sheracey Hooper Golightly; and, Qualified Juror No. 41, Original No. 100, Martima Mays. And, Mr. Ray, I believe it then becomes your burden to show purposeful discrimination. Did you hear me?

> **MR. RAY**: I didn't hear what you said, Judge.

> **THE COURT**: I said I think it now becomes your burden to show purposeful discrimination.

91

MR. RAY:  Well, the only thing I would add to that, I mean, *the record speaks for itself*. But I would point out that Talmadge Spivey, No. 17, was not challenged by the State; nor was Ms. Southichack, No. 21; nor was Ms. Hooper Golightly, who is No. 38, former No. 92. And same thing with Ms. Mays, who's No. 41. So -- and I would just submit to the Court that while they challenged what I believe it was two of them, Ms. Lee-Moses --

THE COURT:  49 and 50, 20 and 21.

MR. RAY:  Lee-Moses and Southichack, excuse me. I don't remember No. 50 being challenged. Let me check just a second. Excuse me, the State did challenge for cause, I stand corrected. So three of the five they didn't challenge for cause. That's all I would add. *I'll let the record speak for itself*.

THE COURT:  All right. Not finding purposeful discrimination, the Defense has the burden to show that, I will deny the Batson challenge.

31 R.R. 20–21 (emphasis added).

The CCA relied on defense counsel's failure to offer a rebuttal at *Batson* Step 3 in its opinion upholding Mr. Nelson's conviction and sentence. The court explained that "[a] defendant's failure to offer rebuttal to a prosecutor's race-neutral explanation can be fatal to defendant's claim." *Nelson*, 2015 WL 1757144, at *10 (citing *Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002)). After recounting the *Batson* colloquy, the CCA noted that defense counsel's failure to rebut the State's proffered race-neutral reasons justified the trial court's denial of the challenge:

> The trial court found that the State "offered reasonable, race-neutral reasons" for its peremptory strikes against the challenged members. Appellant then pointed out that three of the members that the State exercised peremptory strikes on were not challenged for cause, and said "the record speaks for itself."
>
> Appellant failed to rebut the State's race-neutral reasons for its strikes, and the record supports the trial court's determination that the State did not engage in purposeful discrimination. His fifth point of error is overruled.

*Nelson*, 2015 WL 1757144, at *11. The record in this case makes clear that, although Mr. Nelson had a meritorious claim that the State exercised peremptory strikes on the basis of race, defense counsel were deficient in litigating Step 3 by doing nothing more than "lett[ing] the

record speak for itself." Counsel appears to have been either entirely unaware of or unprepared to provide an argument at *Batson* Step 3.

Defense counsel's decision to "let the record speak for itself" cannot be construed as an attempt to advance Mr. Nelson's *Batson* claim. The trial court already had ruled that the "State ha[d] offered reasonable, race-neutral reasons for exercising peremptory challenges on [the challenged] jurors." 31 R.R. 20. After the State offered its rationale for striking each of the challenged panelists, it was defense counsel's duty to explain why those reasons were pretextual, by arguing, for example, that the State's use of peremptory strikes was statistically disproportionate and therefore evidence of purposeful discrimination, *supra* at 71-72 or by offering a comparative analysis discussing how the State's proffered reasons for its peremptory strikes demonstrated that the State excluded individual panelists on the basis of race, *supra* at 72-85.

Moreover, defense counsel's assertion that the State failed to challenge 3 of the 5 *Batson*-challenged panelists for cause was a non sequitur, not a plausible *Batson* Step 3 argument. A challenge for cause is not a prerequisite to a race-neutral strike, because challenges for cause and peremptory strikes serve fundamentally different purposes. *See Thomas v. Moore*, 866 F.2d 803, 805 (5th Cir. 1989). *Batson* itself emphasizes that "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." 476 U.S. at 97. The failure to challenge a prospective juror for cause is unlikely to alone rebut a race-neutral justification for a strike.

2.    Mr. Nelson Was Prejudiced by Defense Counsel's Deficient Performance.

As explained *supra* at 18-19, an IAC violation ordinarily requires a specific showing of prejudice—that there is a "reasonable probability" that the deficiency affected an outcome. In the *Batson* context, prejudice requires the inmate to show that the *Batson* challenge, properly

made and argued, had a substantial chance of being granted. *Supra* at 89-90; *see, e.g.*, *Eagle*, 279 F.3d at 938; *Drain*, 902 F. Supp. 2d at 1026; *but see Scott*, 610 F. App'x at 434.[48]

Had defense counsel litigated *Batson* Step 3, there is a substantial likelihood that the challenge would have succeeded. As discussed above, the State's statistically disproportionate use of peremptory strikes evidences its purposeful discrimination. *Supra* at 71-72. Moreover, an analysis of the State's proffered reasons for its peremptory strikes, which were inaccurate and/or applied differently to accepted jurors, demonstrates that the State excluded individual panelists on the basis of race. *Supra* at 72-85. Defense counsel's failure to competently argue Mr. Nelson's *Batson* claim prejudiced his defense.

### C. Any Procedural Default of This Claim Is Excused.

Despite the obvious failures of defense counsel to litigate Nelson's *Batson* claim, state post-conviction counsel John Stickels failed to raise any IAC claims related to *Batson*. The omission was not the result of a diligent attempt to economize space; as explained above, Mr. Stickels's failed to investigate anything, reprinted portions of appellate briefing from other cases on issues having nothing to do with Mr. Nelson, and generally failed to litigate with the standard of care expected of state post-conviction counsel in a capital case.

For the reasons set forth in the prior subsections explaining the excuse for default of an IAC claim, *see supra* at 62-63, 68, Stickels's inadequacies excuse any defaulted IAC claim under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).

---

[48] In other words, there is IAC prejudice where there is "a reasonable probability that the trial court would have deemed the prosecutor's basis for striking [a juror] to be pretext." *Juniper v. Zook*, 117 F. Supp. 3d 780, 794-95 (E.D. Va. 2015); *see Snead v. Shearin*, No. DKC-09-2080, 2010 WL 145883, at *3 (D. Md. Jan. 8, 2010) (concluding that an ineffective assistance of counsel claim for "failure to present facts contradicting the state's rationale for striking" a panelist "might have merit" and justifies a stay to exhaust in state court).

V.   **MR. NELSON WAS DEPRIVED OF DUE PROCESS, IN VIOLATION OF**
     ***NAPUE V. ILLINOIS* AND *GIGLIO V. UNITED STATES*, WHEN THE STATE**
     **KNOWINGLY PRESENTED FALSE TESTIMONY DURING THE**
     **SENTENCING PHASE.**

The Fourteenth Amendment forbids the State to knowingly elicit false testimony or fail to

correct testimony it knows to be misleading, as the Supreme Court recognized in *Napue v.*

*Illinois*, 360 U.S. 264, 265-72 (1959). In *Giglio v. United States*, 405 U.S. 150 (1972), the Court

further explained that, when the State has reason to know that a witness may expect a benefit

from testimony, the State violates due process if it fails to disclose that potential source of bias.

*See id.* at 153-54. "*Giglio* and *Napue* set a clear precedent, establishing that where a key witness

has received consideration or potential favors in exchange for testimony and lies about those

favors, the trial is not fair." *Tassin v. Cain*, 517 F. 3d 770, 778 (5th Cir. 2008). A *Giglio/Napue*

violation requires a new trial if the truth, such as a witness's deal with prosecutors, could "in any

reasonable likelihood have affected the judgment of the jury." *Id.* at 780 (quotation omitted).

At Mr. Nelson's sentencing phase, inmate Rick Seely falsely testified that he had not

struck a deal with prosecutors and did not expect any benefits from the State in exchange for his

testimony against Mr. Nelson. He was the only eyewitness to testify about the Holden incident,

and his testimony was the linchpin of the State's punishment case against Mr. Nelson, requiring

relief.

A.   **Rick Seely Falsely Testified That He Did Not Expect to Receive Any Benefits**
     **For His Testimony.**

Seely testified at the sentencing phase of Mr. Nelson's trial that he had witnessed Mr.

Nelson commit murder on Mr. Nelson's cell block while Mr. Nelson was awaiting trial. Seely

maintained that he did not expect to receive any favorable treatment in consideration of his

testimony. 40 R.R. 44. Seely explicitly testified that he had had no discussions with the State

about his coming eligibility for parole. *Id.* at 43 ("A. I'm up for parole, I should be out in

95

January.  Q.  So you didn't have that discussion with the D.A.'s at all?  A.  No.").[49]  That was

false.  In a letter dated January 4, 2013, from Seely to prosecutor Catherine Simpson, Seely

wrote: "Bob had told me that he (yall) would help me make parole for my efforts in the trial."

Letter from R. Seely to P. Simpson (Jan. 4, 2013), Ex. 20 at NELSON 269.  Later in the letter he

also asked for the prosecutors to "please assist [him] once more."  *Id.* at NELSON 270.  This

letter to the lead prosecutor at Mr. Nelson's trial reflects a deal with their lead witness that was

never disclosed to the defense.  Moreover, at no point during Mr. Nelson's trial did the State

correct Seely's false statement that no benefit was expected.

### B.    There Is a Reasonable Likelihood That the False Testimony Affected the Jury's Answer to the Future Dangerousness Special Issue.

Seely gave the only testimony from which the jury could have concluded that Mr. Nelson

caused Mr. Holden's death—shoring up the State's case for death after the jury found Mr.

Nelson guilty only as a party to the underlying capital offense.  As the sole testifying eyewitness

to Mr. Holden's death, Seely provided crucial testimony supporting the State's burden to prove

future dangerousness beyond a reasonable doubt.  Jurors found Seely credible and his testimony

influential, feeling that they had no reason to doubt it.  *See* Gonzales Decl. ¶ 6 at NELSON 257,

262 ("Another inmate testified during the sentencing phase about the death of the jail inmate.");

Vanderbilt Decl. ¶ 11 at NELSON 250 ("There was testimony regarding a towel or blanket, and

they brought in another prisoner who described what [Mr. Nelson] had done to that other inmate

in the jail.  I didn't have any reason to dismiss the testimony of the other prisoner.").  There is a

reasonable likelihood that the false sense of objectivity that came with Seely's professed

---

[49] Seely testified that he previously received a plea bargain from the State on his cases which was unrelated to his testimony at Mr. Nelson's trial.  *See* 40 R.R. 42 (A.  "[] What happened was the deal that I was offered before all of this ever happened is the deal I received, which was my wife's deal with the prosecutor [sic] wanted me for two years.").

96

impartiality affected the jury's evaluation of his testimony, and with it the death of Holden and

the jury's answers to the future dangerousness special issue.[50]

**C.  The *Napue/Giglio* Claim Is Unexhausted But Not Defaulted.**

Mr. Nelson's *Napue/Giglio* claim is not exhausted, and he will be submitting a request,

under *Rhines v. Weber*, 544 U.S. 269 (2005), to stay and hold in abeyance these proceedings so

that he may exhaust the claim in state court, along with other claims.  There remains a clear

pathway to merits consideration of the claim in state court.  Tex. Code. Crim. Proc.

§ 11.071(a)(1) provides:

> (a)  If a subsequent application for a writ of habeas corpus is filed after filing an initial
> application, a court may not consider the merits of or grant relief based on the subsequent
> application unless the application contains sufficient specific facts establishing that:
> (1)  the current claims and issues have not been and could not have been presented
> previously in a timely initial application or in a previously considered application filed
> under this article or Article 11.07 because the factual or legal basis for the claim was
> unavailable on the date the applicant filed the previous application[.]

Subsection (e) further defines when a "factual basis" was unavailable:  "For purposes of

Subsection (a)(1), a factual basis of a claim is unavailable on or before a date described by

Subsection (a)(1) if the factual basis was not ascertainable through the exercise of reasonable

diligence on or before that date."

The letter that Seely wrote to the State was unavailable to Mr. Nelson when he filed his

initial state application because he only discovered it on August 16, 2016, when Mr. Nelson's

counsel came upon this document while searching through the prosecutor's files.  The State

inexplicably failed to disclose the letter earlier, despite multiple requests for *Brady* material

---

[50] When assessing whether a reasonable likelihood that the jury's verdict was affected exists, the
Court should also consider prejudice from defense counsel's deficient representation affecting
the future dangerousness special issue.  *See Cargle v. Mullin*, 317 F. 3d 1196, 1206-07 (10th Cir.
2003).

during trial. Mr. Nelson should accordingly be permitted to exhaust this claim in state court, and renew it in this Court as necessary thereafter.

## CONCLUSION

For the foregoing reasons, the Court should grant a writ of habeas corpus and grant all other relief to which he may be entitled.

Respectfully submitted,

Katherine C. Black
State Bar No. 24064907
Texas Defender Service
1927 Blodgett Street
Houston, Texas 77004
TEL: (713) 222-7788
FAX: (713) 222-0260
kateblack@texasdefender.org

Meaghan VerGow
*Appearing Pro Hac Vice*
O'Melveny & Myers LLP
1625 Eye Street NW
Washington, DC 20006
TEL: (202) 383-5300
FAX: (202) 383-5414
mvergow@omm.com

*Counsel to Steven Lawayne Nelson, Petitioner–Appellant*

## VERIFICATION

We, undersigned counsel for Petitioner in the above-entitled action, state that to the best of our knowledge and belief, the facts set for in this Petition are true.

We declare under penalty of perjury that the foregoing is true and correct. Executed on October 14, 2016.

Katherine. C. Black                    Meaghan VerGow

## CERTIFICATE OF SERVICE

On Tuesday, October 18, 2016, I served a copy of the foregoing pleading on the Office of the Attorney General by electronic mail at the following address:

**Stephen M. Hoffman**
Office of the Attorney General
Post Office Box 12548
Austin, Texas 78711-2548
TEL: (512) 936-1400
stephen.hoffman@oag.texas.gov

**Katherine C. Black**