

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

2013 WL 5758241 (Tex.Crim.App.) (Appellate Brief)
Court of Criminal Appeals of Texas

Mark Anthony SOLIZ, Appellant,

v.

THE STATE OF TEXAS, Appellee.

No. AP-76,768.

October 8, 2013.

Appealing the Conviction and Sentence of Death in Cause No. F45059 in the 413th
District Court of Johnson County, Texas, Honorable Phillip Vick, Judge Presiding,
Jury Selection, and the Honorable William C. Bosworth, Trial on the Merits

**Appellant's Opening Brief on Appeal**

Stickels & Associates, P.C., John W. Stickels, TBN: 19225300, 770 N. Fielder Rd., P. O. Box 121431, Arlington, Texas 76012, Phone: (817) 479 - 9282, Fax: (817) 622 - 8071, Attorney for Appellant, Mark Anthony Soliz.

**ORAL ARGUMENT REQUESTED**

*THE PARTIES*

Pursuant to Rule 38(a) of the Texas Rules of Appellate Procedure, the following is a complete list of the names and addresses of all parties to the trial court's final judgment and counsel in the trial court, as well as appellate counsel, so the members of the Court may at once determine whether they are disqualified to serve or should recuse themselves from participating in the decision of the case and so the Clerk of the Court may properly notify the parties to the trial court's final judgment or their counsel, if any, of the judgment and all orders of the Court of Appeals.

Trial Judge: The Honorable Phillip Vick - Jury Selection
Visiting Judge - Jury Selection

Tarrant County, Texas

401 Belknap

Fort Worth, Texas 76196

The Honorable William C. Bosworth

Trial on the Merits

413th District Court

Guinn Justice Center

204 S Buffalo Ave, Room: 202

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

Cleburne, Texas 76033

Appellant: Mark Anthony Soliz
TDC# 00999571

Polunsky Unit

3872 FM 350 South

Livingston, Texas 77351

*i  Appellant's Trial Counsel: Honorable Michael P. Heiskell
TBN: 09383700

5601 Bridge Street, Suite 220

Fort Worth, Texas 76112

Honorable Gregory B. Westfall

TBN: 00788646

1400 W. Abram St.

Arlington, Texas 76013

Appellant's Counsel on Appeal: Honorable John W. Stickels
TBN: 19225300

770 N. Fielder

P.O. Box 121431

Arlington, Texas 76012

Appellee: The State of Texas

Appellee's Trial Counsel: Honorable Dale Hanna
TBN: 08919500

Johnson County District Attorney

Honorable Larry Chambers

TBN: 04086320

NELSON_00034

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

Johnson County Assistant District Attorney

Honorable Martin Strahan

TBN: 00797765

Johnson County Assistant District Attorney

Guinn Justice Center

204 S. Buffalo Ave.

Cleburne, Texas 76033

Honorable Elizabeth Christina Jack

TBN: 10445200

Tarrant County Assistant District Attorney

401 Belknap, Suite 401

Fort Worth, Texas 76196


  *ii  Appellee's Counsel on Appeal Johnson County Criminal District Attorney
Appeals Division

Guinn Justice Center

204 S. Buffalo Ave.

Cleburne, Texas 76033


## *iii *TABLE OF CONTENTS*

| | |
|---|---|
| THE PARTIES | i |
| TABLE OF CONTENTS | iv |
| TABLE OF AUTHORITIES | xii |
| STATEMENT OF THE CASE | 1 |
| STATEMENT AS TO WHY ORAL ARGUMENT WOULD BE HELPFUL | 2 |
| STATEMENT OF PROCEDURAL HISTORY | 3 |
| POINTS OF ERROR | 5 |
| POINT OF ERROR 1 | 5 |
| THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO SUSTAIN THE CONVICTION | 5 |
| POINT OF ERROR 2 | 5 |
| THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO SUSTAIN DEFENDANT'S DEATH SENTENCE | 5 |
| POINT OF ERROR 3 | 5 |

NELSON_00035

THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION
TO SUPPRESS HIS STATEMENTS TO AGENTS OF THE FORT WORTH POLICE
DEPARTMENT BECAUSE APPELLANT'S STATEMENTS WERE INVOLUNTARY ....... 5

POINT OF ERROR 4 ................................................................................. 5
APPELLANT'S RIGHTS AS GUARANTEED UNDER THE FIFTH, SIXTH, EIGHTH, 5
AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION WERE
VIOLATED BECAUSE APPELLANT'S STATEMENTS TO AGENTS OF THE FORT
WORTH POLICE DEPARTMENT WERE INVOLUNTARY ...............................................

*iv  POINT OF ERROR 5 ..................................................................... 5
APPELLANT'S RIGHTS AS GUARANTEED UNDER THE ARTICLE I, SECTIONS 3, 5
10, 13, 15 AND 19 TO THE TEXAS CONSTITUTION WERE VIOLATED BECAUSE
APPELLANT'S STATEMENTS TO AGENTS OF THE FORT WORTH POLICE
DEPARTMENT WERE INVOLUNTARY ...............................................................

POINT OF ERROR 6 ................................................................................. 6
APPELLANT'S RIGHTS AS GUARANTEED UNDER THE ARTICLES 38.21, 38.22, 6
AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE WERE VIOLATED
BECAUSE APPELLANT'S STATEMENTS TO AGENTS OF THE FORT WORTH
POLICE DEPARTMENT WERE INVOLUNTARY ...............................................

POINT OF ERROR 7 ................................................................................. 6
THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE EIGHTH 6
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND CONSTITUTES CRUEL OR UNUSUAL PUNISHMENT BECAUSE DEFENDANT
HAS PERMANENT BRAIN DAMAGE RESULTING FROM FETAL ALCOHOL
SYNDROME ...............................................................................................

POINT OF ERROR 8 ................................................................................. 6
THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE 6
HEIGHTENED PROTECTION AFFORDED PERSONS UNDER ARTICLE I, SECTION
13, OF THE TEXAS CONSTITUTION AND CONSTITUTES CRUEL OR UNUSUAL
PUNISHMENT BECAUSE DEFENDANT HAS PERMANENT BRAIN DAMAGE
RESULTING FROM FETAL ALCOHOL SYNDROME ...............................................

POINT OF ERROR 9 ................................................................................. 6
THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE FIFTH, 6
SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION AND VIOLATES SOLIZ'S DUE PROCESS RIGHTS BECAUSE
HE HAS PERMANENT BRAIN DAMAGE RESULTING FROM FETAL ALCOHOL
SYNDROME ...............................................................................................

POINT OF ERROR 10 ................................................................................. 7
THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE 7
HEIGHTENED PROTECTION AFFORDED PERSONS UNDER ARTICLE I, SECTIONS
10, 13, AND 19, OF THE TEXAS CONSTITUTION AND VIOLATES SOLIZ'S DUE
PROCESS RIGHTS BECAUSE HE HAS PERMANENT BRAIN DAMAGE RESULTING
FROM FETAL ALCOHOL SYNDROME ...............................................................

*v  POINT OF ERROR 11 ..................................................................... 7
SPECIAL ISSUE NO. THREE OF ARTICLE 37.071 IS UNCONSTITUTIONALLY 7
VAGUE AND INDEFINITE, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE
FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION ...............................

POINT OF ERROR 12 ................................................................................. 7
SPECIAL ISSUE NO. THREE OF ARTICLE 37.071 IS UNCONSTITUTIONALLY 7
VAGUE AND INDEFINITE, IN VIOLATION OF APPELLANT'S RIGHTS UNDER
ARTICLE I, SECTION 19 OF THE TEXAS CONSTITUTION.............................

POINT OF ERROR 13 ................................................................................. 7
THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO 7
DECLARE THE "10-12" RULE UNCONSTITUTIONAL ON THE GROUNDS THAT IT
CREATES AN IMPERMISSIBLE RISK OF ARBITRARY IMPOSITION OF THE DEATH
PENALTY. (2 C. R. 201, 427) .......................................................................

POINT OF ERROR 14 ................................................................................. 8

NELSON_00036

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT IF A SINGLE JUROR "HOLDS OUT" FOR LIFE, THE APPELLANT WOULD RECEIVE A SENTENCE OF LIFE IMPRISONMENT BY OPERATION OF LAW. (2 C. R. 182, -265) ..... 8

POINT OF ERROR 15 .................................................................................................................... 8

THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT IF A SINGLE JUROR "HOLDS OUT" FOR LIFE, THE APPELLANT WOULD RECEIVE A SENTENCE OF LIFE IMPRISONMENT BY OPERATION OF LAW. (C. R. 269, 302, 308, 338 AND 427) ........................................................................................................................... 8

POINT OF ERROR 16 .................................................................................................................... 8

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO PRECLUDE THE IMPOSITION OF THE DEATH PENALTY ON GROUNDS THAT THE INDICTMENT FAILED TO CONTAIN ANY ALLEGATIONS REGARDING THE PUNISHMENT SPECIAL ISSUE. (C. R. 388) ...................................................................................... 8

*vi  POINT OF ERROR 17 .......................................................................................................... 8

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE APPLICATION OF TEXAS' DEATH PENALTY SCHEME BECAUSE IT HAS BEEN ARBITRARILY IMPOSED IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS. (C. R. 193) ............................................................................................................ 8

POINT OF ERROR 18 .................................................................................................................... 9

THE LETHAL INJECTION PROTOCOL - AS IT IS CURRENTLY ADMINISTERED IN TEXAS - PRODUCES UNNECESSARY PAIN, TORTURE, AND LINGERING DEATH, AND VIOLATES THE EIGHTH AMENDMENT. (C.R. 496) .................................................. 9

SUMMARY OF THE ARGUMENTS ............................................................................................ 10

Appellant's right to be free from cruel and unusual punishment were violated because he is subject to the penalty of death even though he is the victim of Fetal Alcohol Spectrum Disorder that has ruled his entire life and influenced every decision he has made. In addition, Appellant's three custodial statements were obtained in violation of his rights under the United States and Texas Constitutions. As a result, this Court should enter a judgment of acquittal ....................... 10

STATEMENT OF THE FACTS ...................................................................................................... 11

A. Guilt/Innocence Facts ............................................................................................................... 12

B. Punishment Facts ....................................................................................................................... 15

ARGUMENT AND AUTHORITIES .............................................................................................. 20

JURISDICTION .............................................................................................................................. 20

ARGUMENT AND AUTHORITIES POINT OF ERROR 1 ......................................................... 21

POINT OF ERROR 1 - RESTATED .............................................................................................. 21

THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO SUSTAIN THE CONVICTION ..... 21

A. INSUFFICIENCY OF THE EVIDENCE - STANDARD OF REVIEW: ............................... 21

B. APPLICABLE LAW ................................................................................................................... 22

C. CONCLUSION: .......................................................................................................................... 24

*vii  POINT OF ERROR 2 - RESTATED .................................................................................... 25

THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO SUSTAIN DEFENDANT'S DEATH SENTENCE ...................................................................................................................... 25

A. INSUFFICIENCY OF THE EVIDENCE - STANDARD OF REVIEW: ............................... 25

B. ARGUMENT AND AUTHORITIES ......................................................................................... 25

C. THE EVIDENCE AT TRIAL WAS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S FINDING THAT THERE WAS A PROBABILITY THAT SOLIZ WOULD COMMIT FUTURE ACTS OF VIOLENCE .................................................................................. 28

DISCUSSION AND AUTHORITIES POINTS OF ERROR 3, 4, 5, AND 6: ............................. 32

POINT OF ERROR 3 - RESTATED .............................................................................................. 32

THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO SUPPRESS HIS STATEMENTS TO AGENTS OF THE FORT WORTH POLICE DEPARTMENT BECAUSE APPELLANT'S STATEMENTS WERE INVOLUNTARY ....... 32

POINT OF ERROR 4 - RESTATED .............................................................................................. 32

APPELLANT'S RIGHTS AS GUARANTEED UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION WERE VIOLATED BECAUSE APPELLANT'S STATEMENTS TO AGENTS OF THE FORT WORTH POLICE DEPARTMENT WERE INVOLUNTARY .................................................... 32

POINT OF ERROR 5 - RESTAtED ............................................................................................... 32

NELSON_00037

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

APPELLANT'S RIGHTS AS GUARANTEED UNDER THE ARTICLE I, SECTIONS 3, .......... 32
10, 13, 15 AND 19 TO THE TEXAS CONSTITUTION WERE VIOLATED BECAUSE
APPELLANT'S STATEMENTS TO AGENTS OF THE FORT WORTH POLICE
DEPARTMENT WERE INVOLUNTARY ..................................................................
POINT OF ERROR 6 - RESTATED ...................................................................... 32
APPELLANT'S RIGHTS AS GUARANTEED UNDER THE ARTICLES 38.21, 38.22, .......... 32
AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE WERE VIOLATED
BECAUSE APPELLANT'S STATEMENTS TO AGENTS OF THE FORT WORTH
POLICE DEPARTMENT WERE INVOLUNTARY ...........................................................
*viii A. ERROR IN ADMITTING STATEMENT AND EVIDENCE [CONSTITUTIONAL] .......... 33
- STANDARD OF REVIEW: .............................................................................
B. ERROR IN ADMITTING STATEMENT AND EVIDENCE [CONSTITUTIONAL] - .......... 34
RELEVANT FACTS: ......................................................................................
C. ERROR IN ADMITTING STATEMENT AND EVIDENCE (CONSTITUTIONAL) - .......... 35
THE APPLICABLE LAW: .................................................................................
D. ERROR IN ADMITTING STATEMENT AND EVIDENCE (CONSTITUTIONAL) - .......... 38
APPLICATION OF THE LAW TO THE FACTS: ........................................................
E. ERROR IN ADMITTING STATEMENT AND EVIDENCE [CONSTITUTIONAL] - .......... 42
HARM ANALYSIS: ........................................................................................
DISCUSSION AND AUTHORITIES POINTS OF ERROR 7, 8, 9, AND 10: ...................... 44
POINT OF ERROR 7 - RESTATED ...................................................................... 44
THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE EIGHTH .......... 44
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND CONSTITUTES CRUEL OR UNUSUAL PUNISHMENT BECAUSE DEFENDANT
HAS PERMANENT BRAIN DAMAGE RESULTING FROM FETAL ALCOHOL
SYNDROME ...............................................................................................
POINT OF ERROR 8 - RESTATED ...................................................................... 44
THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE .......... 44
HEIGHTENED PROTECTION AFFORDED PERSONS UNDER ARTICLE I, SECTION
13, OF THE TEXAS CONSTITUTION AND CONSTITUTES CRUEL OR UNUSUAL
PUNISHMENT BECAUSE DEFENDANT HAS PERMANENT BRAIN DAMAGE
RESULTING FROM FETAL ALCOHOL SYNDROME ....................................................
POINT OF ERROR 9 - RESTATED ...................................................................... 44
THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE FIFTH, .......... 44
SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION AND VIOLATES SOLIZ'S DUE PROCESS RIGHTS BECAUSE
HE HAS PERMANENT BRAIN DAMAGE RESULTING FROM FETAL ALCOHOL
SYNDROME ...............................................................................................
*ix POINT OF ERROR 10 RESTATED .................................................................. 45
THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE .......... 45
HEIGHTENED PROTECTION AFFORDED PERSONS UNDER ARTICLE I, SECTIONS
10, 13, AND 19, OF THE TEXAS CONSTITUTION AND VIOLATES SOLIZ'S DUE
PROCESS RIGHTS BECAUSE HE HAS PERMANENT BRAIN DAMAGE RESULTING
FROM FETAL ALCOHOL SYNDROME ..................................................................
A. FACTS SUPPORTING BASES FOR CRUEL AND UNUSUAL PUNISHMENT .......... 47
CLAIM: ....................................................................................................
B. CRUEL AND UNUSUAL PUNISHMENT - APPLICATION OF THE LAW TO THE .......... 60
FACTS: .....................................................................................................
C. CRUEL AND UNUSUAL PUNISHMENT - CONCLUSION ............................................ 73
POINT OF ERROR 11 - RESTATED ...................................................................... 75
SPECIAL ISSUE NO. THREE OF ARTICLE 37.071 IS UNCONSTITUTIONALLY .......... 75
VAGUE AND INDEFINITE, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE
FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION ..........................................
POINT OF ERROR 12 - RESTATED ...................................................................... 75
SPECIAL ISSUE NO. THREE OF ARTICLE 37.071 IS UNCONSTITUTIONALLY .......... 75
VAGUE AND INDEFINITE, IN VIOLATION OF APPELLANT'S RIGHTS UNDER
ARTICLE I, SECTION 19 OF THE TEXAS CONSTITUTION...............................................
POINT OF ERROR 13 - RESTATED ...................................................................... 77

NELSON_00038

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DECLARE THE "10-12" RULE UNCONSTITUTIONAL ON THE GROUNDS THAT IT CREATES AN IMPERMISSIBLE RISK OF ARBITRARY IMPOSITION OF THE DEATH PENALTY. (C. R. 201, 427) ................................................................................. 77

POINT OF ERROR 14 - RESTATED ........................................................................... 84

THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT IF A SINGLE JUROR "HOLDS OUT" FOR LIFE, THE APPELLANT WOULD RECEIVE A SENTENCE OF LIFE IMPRISONMENT BY OPERATION OF LAW. (2 C. R. 182, 265, and 427) ............................................................................................................................ 84

*x   POINT OF ERROR 15 - RESTATED ........................................................................ 87

ART 37.071 OF THE TEX. CODE CRIM. PROC. IS UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE. (C. R. 269, 302, 308, 338 and 427) .......................................... 87

POINT OF ERROR 16 - RESTATED ........................................................................... 91

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO PRECLUDE THE IMPOSITION OF THE DEATH PENALTY ON GROUNDS THAT THE INDICTMENT FAILED TO CONTAIN ANY ALLEGATIONS REGARDING THE PUNISHMENT SPECIAL ISSUE. (C. R. 388) ................................................................. 91

POINT OF ERROR 17-RESTATED .............................................................................. 93

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE APPLICATION OF TEXAS' DEATH PENALTY SCHEME BECAUSE IT HAS BEEN ARBITRARILY IMPOSED IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS. (C. R. 193 and 302) ................................................................................ 93

POINT OF ERROR 18 - RESTATED ........................................................................... 97

THE LETHAL INJECTION PROTOCOL - AS IT IS CURRENTLY ADMINISTERED IN TEXAS - PRODUCES UNNECESSARY PAIN, TORTURE, AND LINGERING DEATH, AND VIOLATES THE EIGHTH AMENDMENT.(C.R. 496) ................................................ 97

PRAYER ........................................................................................................................ 116

CERTIFICATE OF SERVICE ..................................................................................... 117

CERTIFICATE OF COMPLIANCE ............................................................................ 117

*xi *TABLE OF AUTHORITIES*

**Cases**

*Anderson* v. *State*, 932 S.W.3d 502 (Tex. Crim. App. 1996) ....... 79

*Andres* v. *United States*, 333 U.S. 740 (1948).............................. 85

*Arizona* v. *Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).................................................................. 36, 43

*Beltran* v. *State*, 728 S.W.2d 382 (Tex. Crim. App. 1987)........... 30

*Berry* v. *State*, 233 S.W.2D 846, 860 (Tex. Crim. App. 2007) ..... 25

*Berry* v. *State*, 233 S.W.3d 847 (Tex. Crim. App. 2007).............. 25, 29, 30, 31

*Boyce* v. *State*, No. 04-04-00267-CR (Tex. App. ¶ San Antonio, July 13, 2005); 2005 Tex. App. LEXIS 5395 (mem. op.) ............ 92

*Brooks* v. *State*, 323 S.W.3d 893 (Tex.Crim. App. 2010)............ 21

*Burden* v. *State*, 55 S.W.3d 608 (Tex. Crim. App. 2001)............. 21

*Caldwell* v. *Mississippi*, 472 U.S. 240 (1985) .............................. 85

*California* v. *Brown*, 479 U.S. 538, 541 (1987)............................ passim

*Chaney* v. *Heckler*, 718 F.2d 1174 (D.C. Cir. 1983), ................. 98

*Clewis* v. *State*, 922 S.W.2d 126,(Tex. Crim. App. 1996)........... 23

*Cobarrubio* v. *State*, 675 S.W.2d 749 (Tex. Crim. App. 1983) overruled in part, *Lawrence* v. *State*, 700 S.W.2d 208 (Tex. Crim. App. 1985).................................................................. 89

*xii *Coble* v. *State*, 330.W.3D 253, 265 (Tex. Crim. App. 2010) ................................................................................................ 25

*Coker* v. *Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982(1997).................................................................................. 46

*Dansby* v. *State*, 960 S.W.2d 668 (Tex. App. - Tyler 1997, pet. ref'd)...................................................................................... 43

NELSON_00039

Mark Anthony SOLIZ, Appellant. v. THE STATE OF..., 2013 WL 5758241...

*Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 2355-56, 129 L.Ed.2d 362 (1994)............................................................ 39

*Delao v. State*, 235 S.W.3d 235 (Tex. Crim. App. 2007)............ 37

*Dinkins v. State*, 894 S.W.2d 330, *(Tex.Crim.App.1995)*, cert. denied, 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59(1995)........ 39

*Duggar, Adams*, 489 U.S. 401, 407 (1989).................................... 85

*Eddings v. Oklahoma*, 455 U.S. 104 (1982)................................. 78, 83

*Elliott v. State*, 858 S.W.2d 478 (Tex. Crim. App. 1993)........... 89

*Ex parte Tucker*, 973 S.W.2d 950 (Tex. Crim. App. 1998).......... 79

*Fare v. Michael C*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)............................................................................................ 36

*Faulder v. State*, 611 S.W.2d 630 (Tex. Crim. App. 1979)........... 40

*Feldman v. State*, 71 S.W.3d 738 (Tex. Crim. App. 2002)........... 76

*Fetterly v. Paskett*, 997 F.2d 1295 (9th Cir. 1993)...................... 95

*Fierro v. Gomez*, 865 F. Supp. 1387 (N.D. Cal. 1994)................ 97

*Franks v. State*, 90 S.W.3d 771 (Tex. App. - Fort Worth 2002, no pet.)......................................................................................... 33, 36

*Furman v. Georgia*, 408 U.S. 238, (1972)................................. 93, 94, 95, 97

*xiii Galliford v. State*, 101 S.W.3d 600 (Tex. App.-Houston (1st Dist.) 2003, pet. ref'd)........................................................ 33,36

*Graham v. Florida*, U.S. (No. 08-7412; May 17, 2010) .............. 79

*Griffin v. State*, 765 S.W.2d 422 (Tex. Crim. App. 1989)............ 37

*Hall v. Texas*, 225 SW3d 524 (Tex. Crim. App. 2007)................ 72

*Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)....................................................................... 45,114

*Heitman* v. State, 815 S.W.2nd 681 (Tex.Crim.App. 1991)........ 61

*Henderson v. State*, 962 S.W.2d 544 (Tex. Crim. App. 1997)...... 33, 35

*In Interest of R.D.*, 627 S.W.2d 803 (Tex. App.-Tyler 1982, no writ).............................................................................................. 37

*In re Kemmler*, 136 U.S. 436 (1890)........................................... 97

*Jackson v. Virginia*, 443 U.S. 307 (1979).................................... 21, 26, 35, 38

*Jimenez v. State*, 32 S.W.3d 233 (Tex. Crim. App. 2000)............ 79

*Keeton v. State*, 724 S.W.2d 58, 60-61, 64 (Tex. Crim. App. 1987)............................................................................................ 30

*Kennedy v. Louisiana*, 554 U.S. 407 (2008)................................ 79

*Kuba v. Thieret*, 867 F.2d 531, 369-73 (7th Cir.), ...................... 85

*Laddy. State*, 3 S.W.3d 547 (Tex. Crim. App. 1999)................... 76

*Lockett v. Ohio*, 438 U.S. 586 (1978)........................................... 78

*Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947)....... 97

*xiv McFarlane v. State*, 254 S.W.2d 136 (Tex. Crim. App. 1953)............................................................................................ 89

*Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 325, 46 L.Ed.2d 313 (1975)..................................................................................... 39

*Miller v. Alabama*, U.S. (No. 10-9646; June 25, 2012) .............. 79

*Mills v. Maryland*, 486 U.S. 367 (1988)...................................... 86

*Miranda v. Arizona*, 384 U.S. 436 (1966)................................... 38, 39, 40, 42

*Morris v. State*, 940 S.W.2d 610 (Tex. Crim. App. 1996)............ 79

*Muniz v. State*, 851 S.W.2d 238 (Tex. Crim. App. 1993)............. 21

*Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007)....................................................................... 46

*Perry v. State*, 158 S.W.3d 438 (Tex. Crim. App. 2004)............. 92

*Rayford v. State*, 125 S.W.3d 521 (Tex. Crim. App. 2003).......... 92

*Ring v. Arizona*, 122 S. Ct. 2428 (2002)..................................... 91

*Romero v. State*, 800 S.W.2d 539 (Tex. Crim. App. 1990).......... 33, 36

*Rummel v. Estelle*, 445 U.S. 263, 274, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980)....................................................................... 115

*Scales v. State*, 380 S.W.3d 780 (Tex. Crim. App. 2012)............ 80, 81, 82, 83

*Simmons v. South Carolina*, 512 U.S. 154 (1994 ...................... 79, 80, 83

**NELSON_00040**

*Spaziano* v. *Florida*, 468 U.S. 447, 464 (1984)..............................94
*State* v. *Ramseur*, 524 A.2d 188 (N.J. 1987)..............................85
*State* v. *Williams*, 392 So.2d 619 (La. 1980) (on rehearing) ........84, 85
*Threadgill* v. *State*, 146 S.W.3d 654 (Tex. Crim. App. 2004)........90
**\*xv** *Tibbs* v. *Florida*, 457 U.S. 31, 102 S. Ct. 2211, 2213(1982)...23
*Trop* v. *Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)..45, 46, 99, 114
*Valle* v. *State*, 109 S.W.3d 500, 503 (Tex. Crim. App. 2003)........28
*Wallace* v. *State* 618 S.W.2d 67 (Tex. Crim. App. 1981)............29, 30
Warren v. State, 562 S.W.2d 474 (Tex. Crim. App. 1981)...........31
*Watson* v. *State*, 762 S.W.2d 591 (Tex. Crim. App. 1988)...........39
*Weems* v. *United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910)..................................................................45
*Woods* v. *State*, 152 S.W.3d 121 (Tex. Crim. App. 2004) ...........92
**Statutes**
2 CSR 30-9.020(F)(5) ...........................................................113
510 111. Comp. Stat, ch. 70, § 2.09 ....................................114
510 111. Comp. Stat., ch. 70, § 2.09 ...................................113
Conn. Gen.Stat. § 22-344a....................................................113
Del. Code Ann., Tit. 3, § 8001..............................................113
Fla. Stat § 828.058..............................................................112
Fla. Stat. 828.065.................................................................112
Ga. Code Ann. § 4-11-5.1(1990); .........................................112
Kan. Stat. Ann. § 47-1718(a); ..............................................113
Kansas, Kan. Stat. Ann. § 47-1718(a)....................................114
**\*xvi** Ky. Rev. Stat. Ann. § 321.181(17)...............................113
La. Rev. Stat. Ann. § 3:2465.................................................114
La. Rev. Stat. Ann. § 3:2465.................................................113
Massachusetts, Mass. Gen.Laws § 140:151A (1985) .................113
Md. Code Ann., Criminal Law, § 10-611(2002) .......................112
Me. Rev. Stat. Ann., Tit. 17, § 1044(1987)..............................112
N.Y. Agric. & Mkts § 374 (1987) ...........................................113
Okla. Stat, Tit. 4, § 501 (1981)...............................................113
R.I. Gen. Laws § 4-1-34........................................................113
R.I. Gen. Laws § 4-1-34........................................................114
S.C.Code Ann. § 47-3-420.....................................................113
Tenn. Code Ann. § 44-17-303 (2001) .....................................113
Tex. Code Crim. Proc. Art. 37.071(2009) ................................passim
Tex. Code Crim. Proc. Art. 38.22 (2001) .................................passim
Tex. Code Crim. Proc. Art. 38.22 § 2 (2001) ...........................43
Tex. Code Crim. Proc. Art. 38.22 § 3(2001) ............................38
Tex. Code Crim. Proc. Art. 38.23 (1987) ..............................6, 32, 35, 42
Tex. Crim. Proc. Code § 38.21 (2005) ....................................36
Tex. Penal Code § 19.02(b)(l)(1994) ......................................22
**\*xvii** Tex. Penal Code § 19.03(2)(2005) .............................22
Tex. Penal Code § 2.01(2003) ...............................................22
Tex. Penal Code § 6.03(a)(1974) ...........................................22
Tex. Penal Code § 6.03(b)(1974) ...........................................23
**Rules**
Tex. R. App. P. 21.3(h)..........................................................23
Tex. R. App. P. 25.2(a)(2)......................................................4, 20
Tex. R. App. P. 44.2(a)..........................................................90
Tex. R. App. P. 71.1..............................................................3
**Treatises**
*A Practical Clinical Approach to Diagnosis of Fetal Alcohol Spectrum Disorders: Clarification of the 1996 Institute of Medicine Criteria*, Pediatrics Vol. 115 No. 1 January 1, 2005 pp. 39 -47 ...........................................................................65

NELSON_00041

*Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d 696 (6th Cir. 2000), cert, granted on other grounds, 122 S.Ct. 1463 (U.S. April 8, 2002) (No. 01-9094),. 102, 103, 106

Deborah Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us*, 63 Ohio St. L.J. 111 (February 2002) .......................................................... 109

Fetal Alcohol Spectrum Disorder CD. Chambers Department of Pediatrics and *xviii Family and Preventive Medicine, School of Medicine, University of California, San Diego, La Jolla, CA, USA doi:10.1016/B978-012564370-2/50030-l ............ 66

Judge Denies Stays of Three Executions, HOUSTON CHRONICLE, Dec. 9, 2003, at A29 ( ...................................... 98

Larry Burd, et al, Journal of Psychiatry & Law 39/Spring 2011 . 63

P.M. McClung, Jury Charges For Texas Criminal Practice 75-78 (rev. ed. 1981). 93 Peggy M. Tobolowsky, *What Hath Penry Wrought?: Mitigating Circumstances and the Texas Death Penalty*, 19 Amer. J. Crim. L. 345 (1992) ................................. 94

*Penry* v. *Lynaugh*, 492 U.S. 302 (1989)..................................... 45, 93, 115

Streissguth, A. P., Barr, H. M., Kogan, J. & Bookstein, F. L. (1996), *Understanding The Occurrence of Secondary Disabilities in Clients with Fetal Alcohol Syndrome (FAS) and Fetal Alcohol Effects (FAE)*........................................................................ 62

**Constitutional Provisions**

Tex. Const. Art. 1, § 13................................................................ 46

Tex. Const. Art, I, § 10................................................................ 42

Tex. Const. Art. I, § 13................................................................ 42

Tex. Const. Art. I, § 15................................................................ 42

Tex. Const. Art. I, § 19................................................................ 42

Tex. Const. Art. I. § 3.................................................................. 42

*xix Tex. Const. Art. I, § 9............................................................ 43

U. S. Const. Amend. VI............................................................... 61

U. S. Const. Amend. XIV............................................................ 42, 61, 75, 90

U.S. Const. Amend. IV................................................................ 43

U.S. Const. Amend. V................................................................. 42, 43, 61

U.S. Const. Amend. VIII............................................................. 42, 46

**\*xx TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

Now comes Appellant, Mark Anthony Soliz, with his Brief on Appeal from the Judgment of the 413th District Court of Johnson County, Texas, in Cause No. F45059 and shows as follows:

### *STATEMENT OF THE CASE*

Nature of the case: Criminal charges alleging capital murder alleged to have been committed on June 29, 2010 involving the death of Nancy Weatherly by shooting her with a firearm while in the course of committing the offense of burglary of a habitation. [CR. 43].

Course of the Proceedings: Tried before a jury. Convicted for the offense of capital murder. [CR. 2086].

Trial Court's disposition of the case: After the jury answered the special issues, the trial court sentenced Appellant to death. Appellant has remained in custody of the Texas Department of Criminal Justice-Institutional Division. [CR. 2130 to 2132].

NELSON_00042

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

### *1 *STATEMENT AS TO WHY ORAL ARGUMENT WOULD BE HELPFUL*

Due to the complex nature of the case against Appellant and the severity of the punishment assessed, Appellant believes oral argument would be helpful in allowing the Court to properly and fully consider the issues presented. Specifically, Appellant urges in this appeal that his sentence of death violates the provisions of the U. S. and Texas Constitutions because he suffers from Fetal Alcohol Spectrum Disorder that has ruled his entire life and influenced every decision he has made. In addition, Appellant's alleges that his three custodial statements were obtained in violation of his rights under the United States and Texas Constitutions and that he was convicted solely because of illegally obtained confessions. Oral argument is necessary to fully discuss and explain the nature and extent of these constitutional violations. Thus, Appellant requests oral argument to detail and discuss the issues presented in this appeal.

### *2 *STATEMENT OF PROCEDURAL HISTORY*

This is a direct appeal from a death sentence imposed following a conviction for capital murder. Tex. R. App. P. 71.1.

On December 16, 2010, Appellant was indicted for the offense of capital murder based on his alleged involvement in the death of Nancy Weatherly while in the course of committing the offense of burglary of a habitation. [CR. 43]. The case was tried to a Johnson County jury seated and sworn on February 20, 2012. [RR. Vol. 36, p. 26]. After the indictment was read, Appellant entered a not guilty plea to the charged offense. [RR. Vol. 38, p. 19-20]. On March 9, 2012, the jury convicted Appellant of capital murder as alleged in the indictment. [CR. 2086, RR. Vol. 47, p. 77]. The punishment phase began on March 9, 2012, and concluded on March 23, 2012, when the jury returned an affirmative answer to the special issue of 'future dangerousness,' an affirmative answer to the special issue of 'actual cause or anticipation of death,' and a negative answer to the mitigation special issue. [CR. 2130 to 2132, RR. Vol. 57, p. 94-95]. Appellant was then sentenced to death. [CR. 2195, RR. Vol. 57, p. 97]. Appellant filed a Motion for New trial on April 12, 2012. [CR. 2312], and a Notice of Appeal on April 9, 2012. [CR. 2308].

Pursuant to Appellate Rule 25.2(a)(2), the trial court has filed with the papers of this cause a Certificate of Defendant's Right to Appeal which states that *3 this is not a plea-bargain case, and the defendant has the right to appeal [C.R. 2194]. Thus, this Court has jurisdiction to hear Appellant's appeal. Tex. R. App. P. 25.2(a)(2).

### *4 *POINTS OF ERROR*

### *POINT OF ERROR 1*

THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO SUSTAIN THE CONVICTION.

### *POINT OF ERROR 2*

THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO SUSTAIN DEFENDANT'S DEATH SENTENCE.

### *POINT OF ERROR 3*

THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO SUPPRESS HIS STATEMENTS TO AGENTS OF THE FORT WORTH POLICE DEPARTMENT BECAUSE APPELLANT'S STATEMENTS WERE INVOLUNTARY.

NELSON_00043

### POINT OF ERROR 4

APPELLANT'S RIGHTS AS GUARANTEED UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION WERE VIOLATED BECAUSE APPELLANT'S STATEMENTS TO AGENTS OF THE FORT WORTH POLICE DEPARTMENT WERE INVOLUNTARY.

### POINT OF ERROR 5

APPELLANT'S RIGHTS AS GUARANTEED UNDER THE ARTICLE 1, SECTIONS 3, 10, 13, 15 AND 19 TO THE TEXAS CONSTITUTION WERE VIOLATED BECAUSE APPELLANT'S STATEMENTS TO AGENTS OF THE FORT WORTH POLICE DEPARTMENT WERE INVOLUNTARY.

### *5 POINT OF ERROR 6

APPELLANT'S RIGHTS AS GUARANTEED UNDER THE ARTICLES 38.21, 38.22, AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE WERE VIOLATED BECAUSE APPELLANT'S STATEMENTS TO AGENTS OF THE FORT WORTH POLICE DEPARTMENT WERE INVOLUNTARY.

### POINT OF ERROR 7

THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND CONSTITUTES CRUEL OR UNUSUAL PUNISHMENT BECAUSE DEFENDANT HAS PERMANENT BRAIN DAMAGE RESULTING FROM FETAL ALCOHOL SYNDROME.

### POINT OF ERROR 8

THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE HEIGHTENED PROTECTION AFFORDED PERSONS UNDER ARTICLE 1, SECTION 13, OF THE TEXAS CONSTITUTION AND CONSTITUTES CRUEL OR UNUSUAL PUNISHMENT BECAUSE DEFENDANT HAS PERMANENT BRAIN DAMAGE RESULTING FROM FETAL ALCOHOL SYNDROME.

### POINT OF ERROR 9

THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND VIOLATES SOLIZ'S DUE PROCESS RIGHTS BECAUSE HE HAS PERMANENT BRAIN DAMAGE RESULTING FROM FETAL ALCOHOL SYNDROME.

### *6 POINT OF ERROR 10

THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE HEIGHTENED PROTECTION AFFORDED PERSONS UNDER ARTICLE 1, SECTIONS 10, 13, AND 19, OF THE TEXAS CONSTITUTION AND VIOLATES SOLIZ'S DUE PROCESS RIGHTS BECAUSE HE HAS PERMANENT BRAIN DAMAGE RESULTING FROM FETAL ALCOHOL SYNDROME.

NELSON_00044

## *POINT OF ERROR 11*

SPECIAL ISSUE NO. THREE OF ARTICLE 37.071 IS UNCONSTITUTIONALLY VAGUE AND INDEFINITE, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.

## *POINT OF ERROR 12*

SPECIAL ISSUE NO. THREE OF ARTICLE 37.071 IS UNCONSTITUTIONALLY VAGUE AND INDEFINITE, IN VIOLATION OF APPELLANT'S RIGHTS UNDER ARTICLE I, SECTION 19 OF THE TEXAS CONSTITUTION.

## *POINT OF ERROR 13*

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DECLARE THE "10-12" RULE UNCONSTITUTIONAL ON THE GROUNDS THAT IT CREATES AN IMPERMISSIBLE RISK OF ARBITRARY IMPOSITION OF THE DEATH PENALTY. (2 C. R. 201, 427).**

## *\*7 POINT OF ERROR 14*

THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT IF A SINGLE JUROR "HOLDS OUT" FOR LIFE, THE APPELLANT WOULD RECEIVE A SENTENCE OF LIFE IMPRISONMENT BY OPERATION OF LAW. (2 C. R. 182,-265).

## *POINT OF ERROR 15*

THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT IF A SINGLE JUROR "HOLDS OUT" FOR LIFE, THE APPELLANT WOULD RECEIVE A SENTENCE OF LIFE IMPRISONMENT BY OPERATION OF LAW. (C. R. 269, 302, 308, 338 AND 427).

## *POINT OF ERROR 16*

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO PRECLUDE THE IMPOSITION OF THE DEATH PENALTY ON GROUNDS THAT THE INDICTMENT FAILED TO CONTAIN ANY ALLEGATIONS REGARDING THE PUNISHMENT SPECIAL ISSUE. (C. R. 388).

## *POINT OF ERROR 17*

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE APPLICATION OF TEXAS' DEATH PENALTY SCHEME BECAUSE IT HAS BEEN ARBITRARILY IMPOSED IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS. (C. R. 193).

## *\*8 POINT OF ERROR 18*

**NELSON_00045**

THE LETHAL INJECTION PROTOCOL - AS IT IS CURRENTLY ADMINISTERED IN TEXAS - PRODUCES UNNECESSARY PAIN, TORTURE, AND LINGERING DEATH, AND VIOLATES THE EIGHTH AMENDMENT. (C.R. 496).

### *9 SUMMARY OF THE ARGUMENTS

Appellant's right to be free from cruel and unusual punishment were violated because he is subject to the penalty of death even though he is the victim of Fetal Alcohol Spectrum Disorder that has ruled his entire life and influenced every decision he has made. In addition, Appellant's three custodial statements were obtained in violation of his rights under the United States and Texas Constitutions. As a result, this Court should enter a judgment of acquittal.

### *10 STATEMENT OF THE FACTS

Every business that sells alcohol, such as a restaurant, bar, or tavern has a sign by the restroom door that warns expectant mothers of the dangers of drinking *even one drink* of alcohol while pregnant. Anthony Soliz's mother did not heed the warnings against consuming alcohol while she was expecting. Anthony Mark Soliz was born to a mother who not only drank alcohol while she was expecting, but she also consumed illegal narcotics, and sniffed paint and glue while she was pregnant with Mr. Soliz. Because of this significant substance abuse, Mr. Soliz has suffered from birth from Fetal Alcohol Spectrum Disorder (FASD).

Mr. Soliz's Fetal Alcohol Spectrum Disorder has caused him severe problems and difficulties his entire life. Some of these problems include: Psychosis, attention social problems, anxiety, antisocial behavior, disruptive behavior, depression, anxiety, conduct disorder, ADHD, and O.D.D. Mr. Soliz has also been diagnosed as suffering from oppositional defiant disorder, depression, anxiety, mental health problems, delinquency, conduct disorder, ADHD, mood disorders, suicide threats, suicide attempts, panic attacks, alcohol misuse, and binge drinking.

Mr. Soliz is not responsible for his Fetal Alcohol Spectrum Disorder, as he was given this disease in his mother's womb. Yet, the State of Texas seeks to *11 execute Mr. Soliz, by lethal injection, despite the overwhelming and uncontradicted evidence of Mr. Soliz's F.A.S.D. and the problems and difficulties associated with it. As a result, Appellant's death sentence violates his rights to equal protection as guaranteed under the U. S. and Texas Constitutions.

### A. GUILT/INNOCENCE FACTS

The indictment alleged that Appellant caused the death of Nancy Weatherly, on June 29, 2010, by shooting her with a firearm. [CR. 43]. Under the State's theory of the case, Appellant shot Ms. Weatherly at her house on FM 2331, in Johnson County, Texas, in the morning hours between approximately 8 and 10 a.m. In addition, under the State's theory of the case, Ms. Weatherly's death was the culmination of Appellant's crime spree that began about a week earlier, on June 22nd of 2010.

Vincent Circelli and his wife, Chelsea Circelli, lived on El Campo Road in Fort Worth, Tarrant County, Texas, on June 22, 2010. [RR. Vol. 38, p. 48-49]. Mr. Circelli testified that he and his wife left for work at approximately 8 a.m. on June 22, 2010. [RR. Vol. 38, p. 89]. The Circelli's came home from work at about at 8:30 that night and discovered their house had been burglarized and that one pistol, a 9 millimeter handgun had been stolen. [RR. Vol. 38, p. 99].

Two days later, according to the State, Appellant participated in the robbery *12 of Sammy Abu-Lughod at a Discount Food Store at 604 North Riverside, Fort Worth, Texas. Mr. Lughod was driving a green 2005 Dodge Stratus with license plate number HGB-006. According to Mr. Lughod, Appellant and another man stole his wallet and the 2005 green Dodge Stratus. [RR. Vol. 38, p. 211-216].

NELSON_00046

On June 29, 2010, Fort Worth Police Officers were working on the car robbery case and begin looking for Appellant, Jose Ramos, and the Dodge Stratus. [RR. Vol. 38, p. 256]. During the evening hours of June 29, 2010, Fort Worth Detective Cedillo saw the Dodge Stratus, the police are looking for. [RR. Vol. 38, p. 256-257; 259-260]. Officer Cedillo began chasing the Dodge Status but he lost it in the neighborhood and communicated with other police officers who were in the area, and they begin looking for the Dodge Stratus. [RR. Vol. 38, p. 259-264].

At some later point in time, Fort Worth Police officers found the Dodge Stratus and tried to stop it. However, the Dodge Stratus evaded the officers and there was an automobile chase. The car chase took very little time and concluded on Braswell Street in Fort Worth. [RR. Vol. 38, p. 264-265]. The Dodge Stratus crashed into a fence on Braswell, the driver got out and ran. The driver of the Dodge Stratus was found to be Mark Soliz. [RR. Vol. 38, p. 265].

After the officers arrested Appellant, they went back to the Dodge Stratus. The officers discovered the stolen Hi-Point 9 millimeter on the floor of the Dodge *13 Stratus. [RR. Vol. 38, p. 266; Vol. 39, p. 175]. Also in the car with Appellant at the time that the chase Elizabeth Estrada; but Appellant was driving the Stratus. [RR. Vol. 38, p. 226].

In the early morning hours of the next day, June 30, 2010, the officers located a 2003 Tundra registered to Nancy Weatherly, Godley, Texas. [RR. Vol. 41, p. 28]. Two officers from Fort Police Department contacted the Johnson County Sheriff's Office and went to Godley and to Ms. Weatherly's house. [RR. Vol. 41, p. 31-34]. The officers found Mrs. Weatherly. She was dead and had been shot in the back of the head. [RR. Vol. 41, p. 26].

Fort Worth Police Detectives Paine and Boetcher interviewed Appellant in the homicide room of the Fort Worth Police Department after his warrantless arrest on June 29, 2010. [R.R. Vol. 5, pg. 59-60]. Appellant was brought into the homicide room by a uniformed police officer. But, only Detective Paine and Boetcher were in the room once Appellant's interview began. [R.R. Vol. 5, pg. 63]. Appellant appeared nervous, alert, but tired because it was early in the morning of June 29, 2010. [R.R. Vol. 5, pg. 64]. On December 16, 2010, Appellant was indicted for the offense of capital murder based on his alleged involvement in the death of Nancy Weatherly while in the course of committing the offense of burglary of a habitation. [CR. 43].

*14 *B. PUNISHMENT FACTS*

Appellant presented testimony through several witnesses that he is afflicted with FASD to the point where it "significantly affects" his ability to function as a normal person. In addition to 'lay witnesses' who testified about Appellant's upbringing and the extremely difficult times he had as a child because of his mother's addiction to alcohol, paint sniffing, and other drugs, Appellant produced three expert witnesses who detailed Appellant's serious affliction with FASD and how this affliction with FASD affected Appellant's behavior. These expert witnesses were Dr. Richard Adler, who testified at Volume 53, pages 5 to 35 (qualifications outside the presence of the jury) and before the jury at Volume 53, pages 36 to 215; Dr. Paul Conner, who testified at Volume 53, page 220 to and Volume 54, page 13 to 70 and Volume 54, pages 13-70 (qualifications outside the presence of the jury) and before the jury at Volume 55, page 4 to 132; Dr. Natalie Brown who testified at Volume 54, page 72-138 (qualifications outside the presence of the jury) and before the jury at Volume 55, page 132 to page 280.

Dr. Adler testified about the development and history of the disease known as Fetal Alcohol Spectrum Disorder, described its symptoms, and described its causes. [Vol. 53, pgs. 41-50]. One of the studies that Dr. Adler described in detail was a report by the Institute of Medicine describing the dangers of pregnant *15 mothers drinking alcohol and how alcohol affects the developing fetus. [Vol. 53, pgs. 50-59] This Report was entered as a defense exhibit. [DX 84]. According to all of the studies, any amount of alcohol consumed by the mother during pregnancy negatively affects the fetus. [Vol. 53, pgs. 59].

FASD affects people in very specific and standard ways, including being afflicted with impaired brains and having diagnosable psychiatric disorders. There is also a higher rate of suicide in persons afflicted with FASD. In addition, FASD victims tend to have inappropriate social behaviors including they get into trouble with sexual behavior because they don't really understand what's okay and what's not okay. They get confined, either in a psychiatric hospital, jails, and/or juvenile hall, not just once, but multiple times. FASD victims often get in trouble in school, get suspended, and expelled. They are often enrolled in Special Education. They have difficulties with being able to find and keeping employment. There is a whole host of these even more serious secondary disabilities. [Vol. 53, pgs. 71-72]. In addition, Victims of FASD often have diagnosable organic brain damage. [Vol. 53, pg. 73].

Dr. Adler made a medical diagnosis that Appellant is a victim of Partial Fetal Alcohol Syndrome (PASD) with all the related psychological problems associated with that diagnosis. [Vol. 53, pg. 86]. In addition, Dr. Adler determined *16 that Appellant was a victim of prenatal exposure to toluylene, cocaine, and likely nicotine. Toluylene is one of the compounds of spray paint and Appellant received exposure to toluylene when his mother huffed paint while pregnant with him. [Vol. 53, pg. 87-88]. Sniffing paint is a very bad thing to do while pregnant - it's worse than alcohol use during pregnancy. So, not only did Appellant's mother use alcohol while pregnant with him, she compounded the alcohol problem by huffing paint and using illegal drugs. [Vol. 53, pg. 90-91].

Appellant's victimization with PASD severely limits his cognitive ability and his ability to function in society. According to Dr. Adler, Appellant is so afflicted with PASD that he functions similar to someone suffering from mental retardation even though he does not meet the strict criteria for someone suffering from mental retardation. His cognitive function is very similar to someone suffering from mental retardation. [Vol. 53, pg. 100]. He functions like a 7 year old - well within the mental retardation range. [Vol. 53, pg. 100-101]. This made it extremely hard for Appellant to function in normal society. Finally, Dr. Adler testified that Appellant's diagnosis of PASD was not even a close case. He summed up by saying: "I hope never to see something as bad as this again, but this is incredible. [Vol. 53, pg. 115].

The State never contradicted or rebutted Appellant's diagnosis of *17 Partial Fetal Alcohol Syndrome.

Dr. Connor conducted a series of tests on Appellant to measure Appellant's degree of cognitive and mental ability and he testified about how Appellant was affected by PASD. The results of these tests are consistent with someone suffering from FASD. [Vol. 54, pg. 44]. Again, the State never contradicted or controverted the testimony that Appellant suffers from PASD.

Dr. Connor testified that of Appellant's 55 test results, 32 results were in the impaired range - this indicates that 72% of the results were impaired. This signifies that Appellant has widespread areas of deficit. Again, the results of these tests are consistent with someone suffering from PASD. According to the Center for Disease Control, only three domains of deficit are required to be consistent with Fetal Alcohol Spectrum Disorder. Appellant was deficit in seven domains. This is consistent with Appellant's diagnosis of PASD. [Vol. 54, pg. 69].

The third and final expert Appellant called was Dr. Natalie Brown, a forensic psychologist for 17 years. [Vol. 55, pg. 132-133]. Dr. Brown explained that she met with Appellant personally and "performed a lifelong assessment" of Appellant. [Vol. 55, pg. 141]. Basically, Dr. Brown examined whether there was consistency with FASD in terms of impaired behavior and any documentation that Appellant was not impaired in an important domain of functioning. Appellant is *18 impaired in most of his functioning. [Vol. 55, pg. 143].

Dr. Brown explained that research and studies of victims of FASD have consistent behavioral effects. Dr. Brown further explained that these behavioral defects that are common to victims of FASD are often manifested in severe psychological problems. In addition to the psychological problems, victims of FASD often have problems with the law. Dr. Brown, summed up Appellant's lifelong assessment and described Appellant's life in detail. [Vol 55, pg. 225, ln.4 to pg. 229, ln. 16]. Appellant rested his portion of the punishment phase of the trial after Dr. Brown testified. [Vol 55, pg. 281].

NELSON_00048

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

## *19 ARGUMENT AND AUTHORITIES

### JURISDICTION

Pursuant to Appellate Rule 25.2(a)(2), the trial court has filed with the papers of this cause a Certificate of Defendant's Right to Appeal which states that this is not a plea-bargain case, and the defendant has the right to appeal [C.R. 2194]. Thus, this Court has jurisdiction to hear Appellant's appeal. Tex. R. App. P. 25.2(a)(2).

## *20 ARGUMENT AND AUTHORITIES POINT OF ERROR 1

### POINT OF ERROR 1 - RESTATED

THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO SUSTAIN THE CONVICTION.

### A. INSUFFICIENCY OF THE EVIDENCE - STANDARD OF REVIEW;

When reviewing a claim of insufficiency of the evidence, the appellate court must determine, after considering all the evidence in the light most favorable to the verdict, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson* v. *Virginia*, 443 U.S. 307 (1979); *Burden* v. *State*, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001). In conducting this review of insufficiency, the court does not reevaluate the weight and credibility of the evidence, but only ensures that the jury reached a rational decision. *Muniz* v. *State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993). Whether the evidence satisfies the Jackson test is a matter of law. The *Jackson* v. *Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Brooks* v. *State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010).

### *21 B. APPLICABLE LAW

The State is required to prove every element of an offense beyond a reasonable doubt. Tex. Penal Code § 2.01(2003). A person commits the criminal offense of capital murder if the person commits murder as defined under section 19.02(b)(1) of the Texas Penal Code and the person intentionally commits the murder in the course of committing or attempting to commit burglary. Tex. Penal Code § 19.03(2)(2005). A person commits the criminal offense of murder if the person intentionally or knowingly causes the death of an individual. Tex. Penal Code § 19.02(b)(1)(1994). According to the evidence presented at trial, there is insufficient evidence for the jury to have found beyond a reasonable doubt that Appellant committed the murder while in the course of committing or attempting to commit burglary.

The indictment in this case alleges that Appellant intentionally caused the death Nancy Weatherly while in the course of committing the offense of burglary of a habitation. [CR. 43]. A person acts intentionally, or with intent, with respect to the nature of his conduct or as a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. Tex. Penal Code § 6.03(a)(1974). A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is *22 aware of the nature of his conduct or that the circumstances exists. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. Tex. Penal Code § 6.03(b)(1974).

In the case at bar there is insufficient evidence to support the jury's finding that Appellant was the person who caused the death of Nancy Weatherly while in the course of committing the offense of burglary of a habitation other than the illegally obtained confessions as described later herein, there is no evidence that connects Appellant to these deaths.

NELSON_00049

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

As described in this Brief, the primary item of evidence - Appellant's confessions - relied upon by the State to convict Appellant of this crime was illegally obtained. In fact, without such illegally obtained confession, there is nothing whatsoever to connect Appellant to these deaths. Because of such illegalities, the verdict is contrary to the law and the evidence. Based on this record, Appellant's conviction is clearly wrong and manifestly unjust. Therefore, Appellant should have a new trial. Tex. R. App. P. 21.3(h). The defendant must be granted a new trial ... when the verdict is contrary to the law and the evidence.") *Tibbs v. Florida*, 457 U.S. 31, 32, 102 S. Ct. 2211, 2213(1982); see also *Clewis v. State*, 922 S.W.2d 126, 133-34 (Tex. Crim. App. 1996).

**\*23 C. CONCLUSION:**

The State failed to prove that Appellant committed the offense of capital murder as alleged in the indictment because there was no proof of such offense without the illegally obtained confession. As a result, the submitted evidence insufficient to support Appellant's conviction and this Court should reverse Appellant's conviction.

**\*24 POINT OF ERROR 2 - RESTATED**

THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO SUSTAIN DEFENDANT'S DEATH SENTENCE.

**A. INSUFFICIENCY OF THE EVIDENCE - STANDARD OF REVIEW:**

In assessing the legal sufficiency of the evidence to support future dangerousness, the reviewing court "view[s] the evidence in the light most favorable to the jury's findings and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that [the defendant] would commit criminal acts of violence that would constitute a continuing threat to society." *Berry v. State*, 233 S.W.2d 846, 860 (Tex. Crim. App. 2007). If, after reviewing all of the record evidence, the reviewing court concludes that a rational jury would necessarily have entertained a reasonable doubt about the defendant's future dangerousness, will the reviewing court find that the evidence is legally insufficient. *Coble v. State*, 330 S.W.3d 253, 265 (Tex. Crim. App. 2010).

**B. ARGUMENT AND AUTHORITIES**

The evidence presented by the State during the punishment phase regarding Appellant's potential for future acts of violence consisted of the facts of the offense, his non-violent criminal record, and a few disciplinary incidents while in custody before trial. Other than the facts of the crime, the State failed to present **\*25** any other evidence that Appellant had committed any type of aggressive or violent actions in his childhood, teenage years, or adult life, before the days leading up to the crime. The prosecution relied almost exclusively on the facts of the crime as aggravating evidence. Yet, those facts were insufficient to suggest Appellant had any probability of committing violent acts in the future.

As such, the prosecution's evidence was legally insufficient for a jury to find beyond a reasonable doubt that there was a probability Appellant would be a future danger. *Jackson*, 443 U.S. at 316 ("no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof-defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."). Thus, Appellant's rights were violated under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. His death sentence should be reversed.

**A. Relevant Facts**

NELSON_00050

**1. Facts of the Crime of Conviction**

At the start of the punishment portion of the trial, the State offered all of the evidence introduced during the guilt/ innocence portion of the trial. [RR. Vol. 48, p. 32]. Thus, the significant presentation at the punishment phase of trial regarding Appellant's likelihood of violence focused almost entirely on his actions  **\*26**  surrounding the crime.

**2. Prior Criminal Record**

The State introduced State's Exhibit Numbers 404 through 424 during the punishment phase of Appellant's trial to prove Appellant's prior criminal record. [RR. Vol. 48, p. 32-33; SX 404 through 424]. State's Exhibits 404, 405, and 406 represent Appellant's juvenile record including convictions for theft and dismissed charges in exchange for other types of punishment. [RR. Vol. 48, p. 33-34; SX 404, 405, & 406]. Appellant's prior adult record was shown by State's Exhibits 407 through 424. These adult convictions include unauthorized use of a motor vehicle, theft, evading arrest, burglary of a motor vehicle, criminal trespass, and unlawful restraint. [RR. Vol. 48, p. 33-37].

None of these prior convictions can reasonably be considered as violent offenses.

**3. Disciplinary Incidents While in Custody Before Trial**

The State introduced showing that Appellant was in administrative segregation (Ad. Seg.) while in custody at the Johnson County Jail because he was charged with a murder - not because of anything he did while in custody. [RR. Vol. 48, p. 42-44]. The State also introduced evidence that Appellant had been involved in several non-violent incidents while in custody including: covering the **\*27** glass of his cell [RR. Vol. 48, p. 48], possession non-weapon type of contraband [RR. Vol. 48, p. 49], possessing tobacco [RR. Vol. 48, p. 52], possessing metal [RR. Vol. 48, p. 54], flooding his cell [RR. Vol. 48, p. 57-58], had to use chemical agents on him two times to remove Appellant from his cell [RR. Vol. 48, p. 60; SX 425 &426]. The only even remotely violent incident was a vague threat made to a correctional officer. [RR. Vol. 48, p. 78].

While interesting and entertaining, none of these prior convictions can reasonably be considered as violent incidents.

In closing argument, the one prosecutor described Appellant as "A thief who comes in the night. A coward, a bully, who comes to steal, a few pieces of silver, a few dollars." [RR. Vol. 57, p. 29]. Another prosecutor described Appellant as a "gangster." **[RR**. Vol. 48, p. 32].

**B. THE EVIDENCE AT TRIAL WAS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S FINDING THAT THERE WAS A PROBABILITY THAT SOLIZ WOULD COMMIT FUTURE ACTS OF VIOLENCE**

Although the Court of Criminal Appeals has held that the facts of a particular crime and the circumstances surrounding it can support a finding of future dangerousness, it does not follow that the underlying facts alone in all cases will provide such support. *Valle v. State*, 109 S.W.3d 500, 503 (Tex. Crim. App. 2003). For example, in *Wallace* v. *State*, the defendant was found guilty of capital **\*28** murder in the course of a robbery and sentenced to death. *Wallace v. State* 618 S.W.2d 67, 68 (Tex. Crim. App. 1981). The State's only evidence regarding whether the defendant would commit future violent acts was the defendant's own admission on cross-examination that he had attempted a robbery a few weeks before the murder, and that the defendant had a military violation for being absent without leave. Id. at 68-69. According to the CCA, "[t]here was no other evidence presented that could be considered relevant to the issue of future violent conduct. Specifically, there was no evidence of prior convictions, no prior acts of violence, no character evidence, no psychiatric evidence." Id. at 69. The CCA found the evidence of future violent conduct to be legally insufficient, and reformed the defendant's punishment to life imprisonment. Id.

Similarly, in *Berry v. State*, the defendant was found guilty of murdering her infant son and sentenced to death. *Berry v. State*, 233 S.W.3d 847, 850-51 (Tex. Crim. App. 2007). Evidence at punishment showed that Berry had abandoned one of her other children as well. Id. at 861. The State argued that because there was a possibility, albeit a slim one, that she could become pregnant in prison, she posed a danger to any hypothetical future children. Id. at 862, 864. The CCA held that the evidence indicated that the defendant had only ever been dangerous to two of her children, and had not "harmed or attempted to harm any of her other children, an *29 unrelated child, or any other person." Id. at 864. Because there was a very low probability she would have any more children, the Court found it unlikely that she would be a future danger, and reformed her sentence to one of life imprisonment. Id.

The facts of *Wallace* and *Berry* are similar to the evidence presented during Appellant's punishment phase. Besides the underlying crime itself, there was little to no other evidence of violence introduced by the State. As in *Wallace*, "there was no evidence of prior convictions, no prior acts of violence, no character evidence, no psychiatric evidence" presented by the State. 618 S.W.2d at 69. The rest of the State's case at punishment consisted of the above described testimony that Appellant was a "problem child" while at the Johnson County Jail and a few minor (non-violent) convictions. This evidence is legally insufficient to support a finding that there is a probability that Appellant would commit future acts of criminal violence. *Beltran* v. *State*, 728 S.W.2d 382, 390 (Tex. Crim. App. 1987) (defendant's multiple convictions for drunk driving were not criminal acts of violence and thus did not support a finding of future dangerousness); *Keeton* v. *State*, 724 S.W.2d 58, 60-61, 64 (Tex. Crim. App. 1987) (prior conviction for possession of marijuana and uncooperativeness during probation were not sufficient for a finding of future dangerousness); *Wallace*, 618 S.W. 2d at 68-69; *30 Warren v. State, 562 S.W.2d 474, 477 (Tex. Crim. App. 1981) (a prior felony theft conviction was insufficient to sustain a finding of future dangerousness).

Further, Appellant was found guilty of killing Nancy Weatherly, but this was the only violent or criminal act proved beyond a reasonable doubt before the jury.

Because of the lack of evidence of future dangerousness presented by the State, there is insufficient evidence to support the jury's finding that Appellant constituted a "future danger" to society as required by Article 37.071 of the Texas Code of Criminal Procedure. If "a rational jury would have necessarily entertained a reasonable doubt as to the probability of [an] appellant's dangerousness in the future," the trial court's judgment must be changed to one of life imprisonment. *Berry*, 233 S.W.3d at 860. Appellant's sentence should be vacated and reformed to life in prison, or remanded for a new punishment phase of trial.

### *31 DISCUSSION AND AUTHORITIES POINTS OF ERROR 3, 4, 5, AND 6;

#### POINT OF ERROR 3 - RESTATED

THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO SUPPRESS HIS STATEMENTS TO AGENTS OF THE FORT WORTH POLICE DEPARTMENT BECAUSE APPELLANT'S STATEMENTS WERE INVOLUNTARY.

#### POINT OF ERROR 4 - RESTATED

APPELLANT'S RIGHTS AS GUARANTEED UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION WERE VIOLATED BECAUSE APPELLANT'S STATEMENTS TO AGENTS OF THE FORT WORTH POLICE DEPARTMENT WERE INVOLUNTARY.

NELSON_00052

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

### *POINT OF ERROR 5 - RESTATED*

APPELLANT'S RIGHTS AS GUARANTEED UNDER THE ARTICLE I, SECTIONS 3, 10, 13, 15 AND 19 TO THE TEXAS CONSTITUTION WERE VIOLATED BECAUSE APPELLANT'S STATEMENTS TO AGENTS OF THE FORT WORTH POLICE DEPARTMENT WERE INVOLUNTARY.

### *POINT OF ERROR 6 - RESTATED*

APPELLANT'S RIGHTS AS GUARANTEED UNDER THE ARTICLES 38.21, 38.22, AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE WERE VIOLATED BECAUSE APPELLANT'S STATEMENTS TO AGENTS OF THE FORT WORTH POLICE DEPARTMENT WERE INVOLUNTARY.

**\*32 *A. ERROR IN ADMITTING STATEMENT AND EVIDENCE [CONSTITUTIONAL] - STANDARD OF REVIEW*;**

The standard of review regarding the voluntariness of a confession is a deferential review of the trial court's determination of the historical facts and a de novo review of the law's application to those facts. *Henderson v. State*, 962 S.W.2d 544, 564 (Tex. Crim. App. 1997). The determination of whether the confession was voluntary will turn upon the factual determinations made by the trial judge after hearing and judging the credibility of the testifying witnesses. The standard of review applied by the Appellate Court will then be one of abuse of discretion. *Franks* v. *State*, 90 S.W.3d 771, 784 (Tex. App. - Fort Worth 2002, no pet.). A court abuses its discretion when it acts without reference to any guiding rules or principles, or by acting arbitrarily or unreasonably. *Galliford* v. *State*, 101 S.W.3d 600, 604 (Tex. App.-Houston (1st Dist.) 2003, pet. ref'd). The trial court is the exclusive finder of fact in a motion to suppress hearing, and as such, it may choose to believe or disbelieve any or all of any witness's testimony. *Romero* v. *State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

**\*33 *B. ERROR IN ADMITTING STATEMENT AND EVIDENCE [CONSTITUTIONAL] - RELEVANT FACTS:***

Because they each require a detailed analysis of the same evidentiary points and involve many of the same authorities, the discussion and argument for Points of Error Two, Three, Four, and Five will be combined.

Appellant filed a Motion for Hearing on Admissibility of any Statement by Defendant Whether Written or Oral or Evidence Resulting from Same/Motion to Suppress [C.R. 264] wherein he requested the court to suppress any and all statements given to agents of the Fort Worth Police Department on or about June 29, 2010. The trial court held a pre-trial hearing on January 5th and 6th, 2011. [R.R. Vol. 5 and 6]. The following facts are taken from the pre-trial hearing:

Appellant filed a Motion for Hearing on Admissibility of any Statement by Defendant Whether Written or Oral or Evidence Resulting from Same/Motion to Suppress [C.R. 264] wherein he requested the court to suppress any and all statements given to agents of the Fort Worth Police Department on or about June 29, 2010. In this Motion, Appellant alleged that the statements given to agents of the Fort Worth Police Department on June 29, 2010 were obtained subsequent to Appellant's arrest and/or at a time after Appellant had been detained for the offense. Appellant further alleged the statements were taken after arrest and without the proper warnings and admonitions first being given to him. The **\*34** statements were not voluntarily given and were obtained in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, Article I, Sections 3, 10, 13, 15, and 19 of the Texas Constitution, and Articles 38.21, 38.22, and 38.23 of the Texas Code of Criminal Procedure and the requirements of *Jackson* v. *Denno*, 378 U.S. 368 (1963). [CR. 264].

NELSON_00053

Appellant's video-taped and written statements given to the Fort Worth Police Department was admitted in the suppression hearing. The video-taped statement was admitted as State's Exhibit No. 1, and the transcript of the videotape was admitted as State's Exhibit No. 1A. The type written statements were admitted as State's Exhibit Nos. 3 and 4. The trial court overruled Appellant's Motion to Suppress these items. [R.R. Vol. 6, pg. 122, CR 1746].

## C. ERROR IN ADMITTING STATEMENT AND EVIDENCE (CONSTITUTIONAL) - THE APPLICABLE LAW:

The standard of review regarding the voluntariness of a confession is a deferential review of the trial court's determination of the historical facts and a de novo review of the law's application to those facts. *Henderson v. State*, 962 S.W.2d 544, 564 (Tex. Crim. App. 1997). The determination of whether the confession was voluntary will turn upon the factual determinations made by the trial judge after hearing and judging the credibility of the testifying witnesses. The standard of review applied by the Appellate Court will then be one of abuse of **\*35** discretion. *Franks v. State*, 90 S.W.3d 771, 784 (Tex. App. - Fort Worth 2002, no pet.). A court abuses its discretion when it acts without reference to any guiding rules or principles, or by acting arbitrarily or unreasonably. *Galliford v. State*, 101 S.W.3d 600, 604 (Tex. App.-Houston (1st Dist.) 2003, pet. ref'd). The trial court is the exclusive finder of fact in a motion to suppress hearing, and as such, it may choose to believe or disbelieve any or all of any witness's testimony. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

Article 38.21 of the Texas Code of Criminal Procedure provides that the statements of a person accused of a crime "may be used in evidence against him if it appears that the same w[ere] freely and voluntarily made without compulsion or persuasion." Tex. Crim. Proc. Code § 38.21 (2005). The United States Supreme Court has held that the determination as to whether a confession was voluntarily rendered must be analyzed by examining the totality of the circumstances. *Arizona v. Fulminante*, 499 U.S. 279, 285-86, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). While in *Arizona* v. *Fulminante* the Supreme Court affirmed that the totality-of-the-circumstances standard is applicable to confessions given by adults, the Court has also extended this measure of review to encompass juveniles. *Fare v. Michael C*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (holding that the "totality-of-the-circumstances approach is adequate to determine whether there has **\*36** been a waiver even where interrogation of juveniles is involved"). In *Fare*, the Court explained that it could see no reason why any other standard would be more appropriate, considering that "[t]he totality approach ... mandates inquiry into all the circumstances surrounding the interrogation[,] includ[ing] evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him." *Fare*, 442 U.S. at 725, 99 S.Ct. 2560. In Texas, it is well established that confessions given by adults are to be evaluated with the totality of the circumstances standard. Following the Supreme Court's lead in *Fare*, Texas courts have also recognized that the totality-of-the-circumstances standard is sufficiently broad to cover juveniles who, because of their minority, lack of education, lesser reasoning capacity, etc., may be more susceptible to persuasion or underhanded interrogation tactics. *Griffin v. State*, 765 S.W.2d 422, 427 (Tex. Crim. App. 1989) (affirming the judgment of a trial court that a juvenile appellant's confession was voluntary under the totality of the circumstances); *In Interest of R.D.*, 627 S.W.2d 803, 807 (Tex. App.-Tyler 1982, no writ) (analyzing a juvenile appellant's confession based on the totality of the circumstances in which the statements were made). *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007).

## \*37 D. ERROR IN ADMITTING STATEMENT AND EVIDENCE (CONSTITUTIONAL) - APPLICATION OF THE LAW TO THE FACTS:

Appellant was in custody at the time he was interrogated by the Fort Worth police officers. Therefore, Article 38.22 of the Texas Code of Criminal Procedure, the 5th, 6th, 8th, and 14th Amendments to the U.S. Constitution, and Article I, Sections 3, 10, 13, 15, and 19 of the Texas Constitution require that Appellant should have been given his *Miranda* warnings prior to any custodial interrogation. For Appellant's confession to be valid and admissible, he had to waive his Miranda rights prior to any questioning. *Jackson v. Denno*, 378 U.S. 368 (1963),

NELSON_00054

Article 38.22 of the Code of Criminal Procedure establishes procedural safeguards for securing the privilege against self-incrimination. Code Crim. Proc. Art. 38.22. Among its requirements, it provides that no oral statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless (1) the statement was recorded and (2) prior to the statement but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights. Tex. Code Crim. Proc. Art. 38.22 § 3(2001). *Joseph v. State*, 309 S.W.3d 20, 23-24 (Tex. Crim. App. 2010).

A failure to cut off custodial questioning after a suspect invokes his right to remain silent violates his rights and renders any subsequently obtained statements **\*38** inadmissible. *Michigan* v. *Mosley*, 423 U.S. 96, 100-01, 96 S.Ct. 321, 325, 46 L.Ed.2d 313 (1975); *Dowthitt* v. *State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996). A law enforcement officer may not continue to question the suspect until the officer succeeds in persuading the suspect to change his mind and talk. *Dowthitt*, 931 S.W.2d at 257. But an officer need not stop his questioning unless the suspect's invocation of his right is unambiguous, and the officer is not required to clarify ambiguous remarks. *Davis* v. *United States*, 512 U.S. 452, 458-61, 114 S.Ct. 2350, 2355-56, 129 L.Ed.2d 362 (1994); see also *Dowthitt*, 931 S.W.2d at 257; *Dinkins* v. *State*, 894 S.W.2d 330, 351 (*Tex.Crim.App.1995*), cert. denied, 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995).

In addition to the above constitutional requirements, the court of criminal appeals has specifically explained that words may not be necessary to invoke a defendant's right to remain silent under *Miranda* because *Miranda* makes clear that the interrogation must cease when the person in custody "indicates in any manner" that he wishes to remain silent. *Watson* v. *State*, 762 S.W.2d 591, 597 (Tex. Crim. App. 1988). In fact, the court concluded that there need not be a formal invocation of *Miranda* rights; instead, anything said or done by the defendant that could reasonably be interpreted as a desire to invoke these rights should be sufficient to halt questioning. Id. at 598;  **\*39** *Faulder* v. *State*, 611 S.W.2d 630, 640 (Tex. Crim. App. 1979), cert. denied, 449 U.S. 874, 101 S.Ct. 215, 66 L.Ed.2d 95 (1980). As such, the court of criminal appeals, while recognizing that an express assertion of a right to remain silent is desirable, concluded that an express invocation of the right is not required. *Watson*, 762 S.W.2d at 599. Therefore, the court of criminal appeals determined that the defendant's silence and refusal to answer questions, coupled with the police officers' appreciation of the defendant's wishes was sufficient to invoke the defendant's right to remain silent. Id.

Fort Worth Police Detectives Paine and Boetcher interviewed Appellant in the homicide room of the Fort Worth Police Department after his warrantless arrest on June 29, 2010. [R.R. Vol. 5, pg. 59-60]. Appellant was brought into the homicide room by a uniformed police officer. But, only Detective Paine and Boetcher were in the room once Appellant's interview began. [R.R. Vol. 5, pg. 63]. Appellant appeared nervous, alert, but tired because it was early in the morning of June 29, 2010. [R.R. Vol. 5, pg. 64].

Detective Boetcher began Appellant's interview by advising Appellant of his rights ( *Miranda* rights) under article 38.22 of the Texas Code of Criminal Procedure. Specifically, Detective Paine testified that Detective Boetcher advised Appellant that he had the right to an attorney, the right to remain silent, the right to  **\*40** have an attorney present prior to and during any questioning, the right to have an attorney appointed if he could not afford one, and the right to terminate the interview at any time. [R.R. Vol. 5, pg. 65]. This conversation was recorded on State's Exhibit 1, the video-tape. [R.R. Vol. 5, pg. 65; SX. 1].

According to Detective Paine, Appellant indicated he understood and waived his rights. [R.R. Vol. 5, pg. 66]. However, according to the video-tape, even though Appellant stated he understood his rights and wanted to talk to the detective, he did not state that he waived his rights. [SX. 1; SX. 1A, p. 1-2]. Thus, Appellant did not waive his rights as required for his video-taped confession to be admissible.

In addition, Appellant requested several times for his interview to stop and these requests were ignored by the detectives. Specifically, at the bottom of page 14 of the Exhibit 1A transcript, Appellant stated: "I wish I could get up and leave ...

but I can't ... guys got me shackled here..." [SX 1;1A, pg. 14]. It stands to reason that Appellant wanted to terminate the interview because it was very late at night or early in the morning, he was very tired, and had been sleeping by slumping over in his chair. [R.R. Vol. 6, pg. 42]. Obviously, Appellant wanted to terminate the interview because he stated he would leave except that he was shackled.

   **\*41**  This request to leave and thereby terminate the interview was not granted by the Detectives. In fact, the Detective Boetcher talked Appellant out of terminating the interview by ignoring his request and continuing to question him. This occurred when the Detective stated to Appellant: "Am gonna get up here and leave ... because I don't waste time on people that don't feel sorry ... so ...we'll start with ...the house on Pearl." [SX 1;1A, pg. 15]. Detective Boetcher did not even acknowledge that Appellant requested to terminate the interview. This violated Appellant's right to terminate the interview at any time.

Under all of these circumstances, Appellant urges this Court to find that the interrogation was a custodial interrogation and that his rights under *Miranda*, the Texas and U.S. Constitutions, and Articles 38.23 of the Texas Code of Criminal Procedure were violated. *Miranda* v. *Arizona*, 384 U.S. 436 (1966); U.S. Const. Amend. V; U.S. Const. Amend. VIII; U. S. Const. Amend. XIV; Tex. Const. Art. I, § 3; Tex. Const. Art. I, § 10; Tex. Const. Art. I, § 13; Tex. Const. Art. I, § 15; Tex. Const. Art. I, § 19; Tex. Code Crim. Proc. Art. 38.22 (2001); Tex. Code Crim. Proc. Art. 38.23 (1987).

### E. ERROR IN ADMITTING STATEMENT AND EVIDENCE [CONSTITUTIONAL] - HARM ANALYSIS;

The harm to Appellant resulting from the trial court's wrongful overruling of his Motion for Hearing on Admissibility of any Statement by Defendant Whether **\*42** Written or Oral or Evidence Resulting from Same/Motion to Suppress [C.R. 264] is obvious. The jury heard Appellants' illegally obtained statement and it was the evidence the State used to tie Appellant to the crime thereby harming Appellant and led to his conviction. Admittedly, erroneously admitted confessions do not always cause harm to the accused. *Arizona* v. *Fulminante*, 499 U.S. 279, 309-310, 111 S.Ct. 1246, 1264-65, 113 L.Ed.2d 302 (1991). However, a confession by its nature creates more potential for harm at trial than other types of evidence. When a trial court erroneously admits a confession into evidence, usually the only implication that may be drawn is that of the defendant's guilt. *Dansby* v. *State*, 960 S.W.2d 668, 669 (Tex. App. - Tyler 1997, pet. refd).

Because Appellant was harmed by the illegally obtained confession conduct, this Court should reverse his conviction and order a new trial. Based on the above and foregoing, Appellant's rights as guaranteed under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment to the U.S. Constitution, Article I, Sections 3, 10, 13, 15, and 19 of the Texas Constitution, and Articles 38.21, 38.22, and 38.23 of the Texas Code of Criminal Procedure were all violated and such violations require Appellant's conviction to be reversed. U.S. Const. Amend. V; U.S. Const. Amend. IV; Tex. Const. Art. I, § 9; and Tex. Code Crim. Proc. Art. 38.22 § 2 (2001).

### **\*43** DISCUSSION AND AUTHORITIES POINTS OF ERROR 7, 8, 9, AND 10:

#### POINT OF ERROR 7 - RESTATED

THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND CONSTITUTES CRUEL OR UNUSUAL PUNISHMENT BECAUSE DEFENDANT HAS PERMANENT BRAIN DAMAGE RESULTING FROM FETAL ALCOHOL SYNDROME.

#### POINT OF ERROR 8 - RESTATED

NELSON_00056

THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE HEIGHTENED PROTECTION AFFORDED PERSONS UNDER ARTICLE 1, SECTION 13, OF THE TEXAS CONSTITUTION AND CONSTITUTES CRUEL OR UNUSUAL PUNISHMENT BECAUSE DEFENDANT HAS PERMANENT BRAIN DAMAGE RESULTING FROM FETAL ALCOHOL SYNDROME.

### *POINT OF ERROR 9 - RESTATED*

THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND VIOLATES SOLIZ'S DUE PROCESS RIGHTS BECAUSE HE HAS PERMANENT BRAIN DAMAGE RESULTING FROM FETAL ALCOHOL SYNDROME.

### *\*44 POINT OF ERROR 10 RESTATED*

THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES THE HEIGHTENED PROTECTION AFFORDED PERSONS UNDER ARTICLE 1, SECTIONS 10, 13, AND 19, OF THE TEXAS CONSTITUTION AND VIOLATES SOLIZ'S DUE PROCESS RIGHTS BECAUSE HE HAS PERMANENT BRAIN DAMAGE RESULTING FROM FETAL ALCOHOL SYNDROME.

### *A. CRUEL AND UNUSUAL PUNISHMENT:*

A punishment is "excessive," and therefore prohibited by the Eighth and Fourteenth Amendment to the U. S. Constitution, if it is not graduated and proportioned to the offense. *Weems* v. *United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910). An excessiveness claim is judged by currently prevailing standards of decency. *Trop* v. *Dulles*, 356 U.S. 86, 100-101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Proportionality review under such evolving standards should be informed by objective factors to the maximum possible extent, see, e.g., *Harmelin* v. *Michigan*, 501 U.S. 957, 1000, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the clearest and most reliable of which is the legislation enacted by the country's legislatures, *Penry*, 492 U.S., at 331, 109 S.Ct. 2934. In addition to objective evidence, the Constitution contemplates that this Court will bring its own judgment to bear by asking whether there is reason to agree or disagree with the judgment reached by the citizenry and its legislators, e.g., *\*45 Coker* v. *Georgia*, 433 U.S. 584, 597, 97 S.Ct. 2861, 53 L.Ed.2d 982(1997); *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 2243, 153 L. Ed. 2d 335 (2002).

### *B. AUTHORITIES - CRUEL AND UNUSUAL PUNISHMENT;*

It is black letter law that it constitutes cruel and unusual punishment to execute an insane person. *Panetti* v. *Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007). U. S. Const. Amend. VIII U.S. Const. Amend. XIV; Tex. Const. Art. 1, § 13. In *Atkins* v. *Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242 (2002), the United States Supreme Court decided that it violates the Eighth Amendment for a state to execute a mentally retarded murderer. The Supreme Court came to this decision by relying on the "evolving standards of decency" delineated in *Trop* v. *Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958): "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.... The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Id., at 100 - 101, 78 S.Ct. 590. *Atkins* v. *Virginia*, 536 U.S. 304, 311-12, 122 S. Ct. 2242, 2247, 153 L. Ed. 2d 335 (2002). Appellant urges that this Honorable Court recognize that the "evolving standards of decency" prohibit the execution of a person who suffers from Fetal Alcohol Syndrome Spectrum Disorder.

The issue presented here is clear: Does evolving standards of decency *\*46* prohibit the execution of a person who suffers from Fetal Alcohol Syndrome Spectrum Disorder (FASD) to the extent that he is disabled in areas of reasoning,

judgment, and control of their impulses? Appellant urges the facts of his particular disease of FASD show that he cannot act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, his impairments jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants. As a result of his disability, his death sentence constitutes "cruel and unusual punishments" prohibited by the Eighth and Fourteenth Amendments to the U. S. Constitution and Article 1, Section 13 of the Texas Constitution

### C. FACTS SUPPORTING BASES FOR CRUEL AND UNUSUAL PUNISHMENT CLAIM:

Appellant presented testimony through several witnesses that he is afflicted with FASD to the point where it significantly affects his ability to function as a normal person. In addition to 'lay witnesses' who testified about Appellant's upbringing and the extremely difficult times he had as a child because of his mother's addiction to alcohol, paint sniffing, and other drugs, Appellant produced three expert witnesses who detailed Appellant's serious affliction with FASD and how this affliction with FASD affected Appellant's behavior. These expert witnesses were Dr. Richard Adler, who testified at Volume 53, pages 5 to 35 *47 (qualifications outside the presence of the jury) and before the jury at Volume 53, pages 36 to 215; Dr. Paul Conner, who testified at Volume 53, page 220 to and Volume 54, page 13 to 70 and Volume 54, pages 13-70 (qualifications outside the presence of the jury) and before the jury at Volume 55, page 4 to 132; Dr. Natalie Brown who testified at Volume 54, page, 72-138 (qualifications outside the presence of the jury) and before the jury at Volume 55, page 132 to page 280.

Dr. Adler testified about the development and history of the disease known as Fetal Alcohol Spectrum Disorder, described its symptoms, and described its causes. [Vol. 53, pgs. 41-50]. One of the studies that Dr. Adler described in detail was a report by the Institute of Medicine describing the dangers of pregnant mothers drinking alcohol and how alcohol affects the developing fetus. [Vol. 53, pgs. 50-59] This Report was entered as a defense exhibit. [DX 84]. According to all of the studies, any amount of alcohol consumed by the mother during pregnancy negatively affects the fetus. [Vol. 53, pgs. 59].

FASD affects people in very specific and standard ways, including being afflicted with impaired brains and have diagnosable psychiatric disorders. There is also a higher rate of suicide in persons afflicted with FASD. In addition, FASD victims tend to have inappropriate social behaviors including they get into troubles with sexual behavior because they don't really understand what's okay and what's *48 not okay. They get confined, either in a psychiatric hospital, jails, and/or juvenile hall, not just once, but multiple times. FASD victims often get in trouble in school, get suspended, and expelled. They are often enrolled in Special Education. They have difficulties with being able to find and keeping employment. There is a whole host of these even more serious secondary disabilities. [Vol. 53, pgs. 71-72].

Victims of FASD often have diagnosable organic brain damage. As testified to by Dr. Adler:
"I mean, as a psychiatrist, plain and simple, you can call it organic brain damage, you can call it brain damage, organic brain syndrome. There's kind of ¶ neuropsychologists and psychologists are more inclined, I mean, in their lingo they're using things like dysfunction or impairment, but when it gets right down to it, we're talking about brain damage." [Vol. 53, pg. 73, ln. 13-19].

Dr. Adler made a medical diagnosis that Appellant is a victim of Partial Fetal Alcohol Syndrome (PASD) with all the related psychological problems associated with that diagnosis. [Vol. 53, pg. 86]. In addition, Dr. Adler determined that Appellant was a victim of prenatal exposure to toluylene, cocaine, and likely nicotine. Toluylene is one of the compounds of spray paint and Appellant received exposure to toluylene when his mother huffed paint while pregnant with him. [Vol. 53, pg. 87-88]. Sniffing paint is a very bad thing to do while pregnant - it's worse than alcohol use during pregnancy. So, not only did Appellant's mother use *49 alcohol while pregnant with him, she compounded the alcohol problem by huffing paint and using illegal drugs. [Vol. 53, pg. 90-91].

**Appellant's victimization with PASD severely limits his cognitive ability and his ability to function on society.** According to Dr. Adler, Appellant is so afflicted with PASD that he functions similar to someone suffering from mental retardation even though he does not meet the strict criteria for someone suffering from mental retardation. His cognitive function is very similar to someone suffering from mental retardation. [Vol. 53, pg. 100]. He functions like a 7 year old - well within the mental retardation range. [Vol. 53, pg. 100-101]. **This made it extremely hard for Appellant to function in normal society.**

According to Dr. Adler, Appellant's diagnosis was based on the following criteria:
"Well, if you go to diagnostic criteria, I guess this is a summary. You've got confirmed maternal exposure to alcohol of a significant degree, the kind that is known to cause this problem. Secondly, you do have the presence of the classic facial features, right, consistent with the computer program. And then you've got not three but seven areas of impairment. And that's the diagnostic criteria; let alone, there's all other kinds of material, like you've got the creases, the fingers, and then you've got ¶ again, this is Dr. Brown's area, but I reviewed the records. And this guy has got all kinds of the typical life course, the on ¶ the time of onset, the everything that you'd ¶ that our field knows is consistent with fetal alcohol." [Vol. 53, pg. 114-115].

**\*50** Finally, Dr. Adler testified that Appellant's diagnosis of PASD was not even a close case. He summed up by saying: "I hope never to see something as bad as this again, but this is incredible. [Vol. 53, pg. 115].

It is interesting to note that the State never contradicted or rebutted Appellant's diagnosis of Partial Fetal Alcohol Syndrome.

Dr. Connor conducted a series of tests on Appellant to measure Appellant's degree of cognitive and mental ability and he testified about how Appellant was affected by PASD. Appellant scored in the 2nd percentile on the standard achievement test - that means that 98% of the population scored better than him -placing him at the third grade level. [Vol. 54, pg. 38]. On the sentence comprehension test, Appellant scored in the 5 percentile - placing him at a sixth grade level of reading. [Vol. 54, pg. 38-39]. On the spelling test, Appellant again scored in the 2nd perecentile - the third grade level. On the math test, he scored in the 8th percentile - the 5th grade level. [Vol. 54, pg. 39-40].

Appellant also scored very low on the test of his memory function. The first time he took the test, Appellant scored below the 1st percentile - meaning that 99.9% of the population scored better than him. [Vol. 54, pg. 43]. Dr. Connor gave Appellant this test several times and he improved each time he took the test. However, the best Appellant scored was the 6 percentile. These results **\*51** demonstrated that Appellant's learning ability is "definitely impaired." [Vol. 54, pg. 43].

The results of these tests are consistent with someone suffering from FASD. [Vol. 54, pg. 44]. Again, the State never contradicted or controverted this testimony that Appellant suffers from PASD.

Dr. Connor next testified about the results of Appellant's visual-spatial test. This test is intended to test his organizational skills. [Vol. 54, pg. 47]. Appellant scored well on some of these tests and not so well on some of the tests. This lead Dr. Connor to classify Appellant as a disorganized problem solver. Again, the results of these tests are consistent with someone suffering from PASD and were never controverted by the State. [Vol. 54, pg. 48].

On the Connor's Performance Test, Appellant scored in the 10 percentile - again, meaning that 90% of the population scored better than him. [Vol. 54, pg. 49-50]. Again, the results of these tests are consistent with someone suffering from PASD. [Vol. 54, pg. 48]. Appellant scored well on some of the remaining tests and poor on some of the remaining tests, as would be expected for someone suffering from PASD.

NELSON_00059

In summation, Dr. Connor testified that of Appellant's 55 test results, 32 results were in the impaired range - this indicates that 72% of the results were **\*52** impaired. This signifies that Appellant has widespread areas of deficit. Again, the results of these tests are consistent with someone suffering from PASD. According to the Center for Disease Control, only three domains of deficit are required to be consistent with Fetal Alcohol Spectrum Disorder. Appellant was deficit in seven domains. This is consistent with Appellant's diagnosis of PASD. [Vol. 54, pg. 69].

The third and final expert Appellant called was Dr. Natalie Brown, a forensic psychologist for 17 years. [Vol. 55, pg. 132-133]. After detailing her education, experience, and qualifications, [Vol. 55, pg. 133-142], Dr. Brown explained that she met with Appellant personally and "performed a lifelong assessment" of Appellant. [Vol. 55, pg. 141]. Dr. Brown explained that a lifelong assessment:

"[I]s a comprehensive, meticulous process of examining every bit of information you can about life history that's been documented. And it's important to look carefully in particular at the childhood because you're also looking for other possible causes or sources or - or etiologies, sorry, that might be in existence for a particular condition or a particular behavior that an individual might ¶ might develop. So the process is ¶ it involves, if you would like to know the records, it involves looking at birth records, begin at the beginning, all the medical records that can be attained for the individual; the school records are really important. There are ¶ also might be juvenile placement records. In this case, there were a number of records from juvenile placements. And also many times there are juvenile justice records. There might be adoption records. There might be foster care records. And there might be other records as well. But typically, those are what I generally see when I'm **\*53** looking at childhood.

Now, when I'm looking at the adult years, I will also look at Department of Corrections records, we call that in Washington State. Here it's called something else.

T.D.C., I'll be looking at those. And I will look at work history, if there is any. I might look at if there are prior offenses, and invariably there are. I will look at that. And I'll also look at information about an instant offense if it's in a forensic context. And because I'm a forensic psychologist, many of the evaluations I do are in the forensic context, although many are clinical as well.

[Vol. 55, pg. 139, ln. 19 to pg. 141, ln. 3].

In the process of performing a lifelong assessment of Appellant, Dr. Brown examined "one of the most voluminous sources of records that I've seen in a case, and I've done hundreds of cases so this one top -is at the top." [Vol. 55, pg. 142, ln. 10-12]. Detailed records are necessary because it is important to know if there is a consistent life history that matches the symptoms of Fetal Alcohol Spectrum Disorder. Basically, Dr. Brown was examining whether there was consistency with FASD in terms of impaired behavior and any documentation that Appellant was not impaired in an important domain of functioning. [Vol. 55, pg. 143].

Dr. Brown explained that research and studies if victims of FASD have consistent behavioral effects. According to the studies, Dr. Brown described these behavioral defects as follows:

"The studies have looked at what we see in very young children These early signs of disregulation, and this is really executive function disregulation, so you can see in very young infants that if they're irritable, they can't be soothed, so forth, and **\*54** I they're very reactive and difficult to calm down, some of those things we see in Fetal Alcohol Spectrum Disorders because of the executive function impairments.

Later signs of problems in executive functioning can be seen in children who are older who are exhibiting externalizing behaviors. And these are just a few examples. This is not everything. But - or substance abuse, that's a secondary disability. A lot of studies have been done in that area and also in the other secondary - and other secondary disability:

NELSON_00060

trouble with the law, illegal behavior, impaired decision making in terms of knowing what is legal versus illegal behavior, that kind of thing." [Vol. 55, pg. 150, ln. 3-21].

Dr. Brown further explained that these behavioral defects that are common to victims of FASD are often manifested in severe psychological problems such as:
"Psychosis, attention social problems, anxiety, antisocial behavior, disruptive behavior, depression, anxiety, conduct disorder, ADHD. O.D.D. is oppositional defiant disorder, similar to conduct disorder but slightly different. Let's see, more. Depression, anxiety, mental health problems, delinquency, conduct disorder, ADHD, mood disorders, suicide threats, suicide attempts, panic attacks, alcohol misuse, binge drinking, more conduct disorder, and so on." [Vol. 55, pg. 151, ln. 10-19].

According to Dr. Brown: "[T]his is just a representative sample of the hundreds of studies that have been done on the behavioral outcomes of F.A.S.D." [Vol. 55, pg. 151, ln. 22-24].

In addition to the psychological problems, victims of FASD often have problems with the law. When asked to describe these legal problems, Dr. Brown responded as follows:
"Now, in terms of what this means in the forensic context or in the legal context, the federal government has weighed in on **\*55** this as well. And the emphasis here, just like in the general health advisory, is on behavior. In this case, real world behavior as it affects people having problems with the law. So the brain damage causes problems in executive functioning, which has already been talked about, but executive functioning or higher order thinking is very important in terms of controlling your own behavior. Self-regulation, we call it in psychology. But if you have executive problems, then you'll have difficulty controlling your emotions, and you'll have difficulty thinking ahead about consequences. It will be difficult for you to link cause and effect essentially. And this is all from the federal government, I might add, again. Planning will be difficult. Now, this does not mean that an individual or individuals with F.A.S.D. cannot plan at all, but typically their planning is very poor and they're not foreseeing consequences, they're not remembering past mistakes and applying it to a current situation. So poor planning.

Cause and effect connection, as I indicated, and empathizing. And the difficulty with empathy stems from ¶ well, first of all, empathy, the way I mean that is the ability to put yourself in somebody else's shoes and essentially experience their feelings, almost feel what their feeling, be really connected with their feelings. And that is a higher order skill. It's an executive function skill. In order to do that, you need to have unimpaired executive functioning. It's one of the last skills that children learn in the developmental years, because it's difficult and very complex and abstract.

And another difficulty that these folks have is taking responsibility for their actions. Again, that's a more mature level of executive functioning, and it's very difficult, if not impossible, for these folks. And the delaying gratification, putting off something, a lot of theft occurs in this population beginning in childhood because these kids, when they see something and they're attracted by what they see, they just take it. They don't have any concept of delaying gratification, maybe working to ¶ working to earn an allowance and buying something, for example, candy in a store. So it's impulsive behavior essentially.

And then finally, making good judgments, which is really a complex process that involves information processing that **\*56** happens in a split second in the brain. So the end result of that is impaired decision making. Decisions are faulty because the processing mechanism is faulty.

The executive functioning includes, the difficulty we see that relates to the legal context, controlling emotions. So individuals with F.A.S.D. will not have good control over strong emotion. Often its anger, could be other strong emotions as well. And so there's a tendency to behave, to act out the feelings, the emotion. And just as you might see a child

NELSON_00061

tantruming, in these individuals when they're children do tantrum quite a bit. They have a lot of tantrums. But as adults, it's a similar kind of phenomenon; acting out that emotion immediately without checking it.

Then finally, because of the impaired executive functioning, they're also ¶ they tend to be very naive and unsophisticated. They'll be followers. It's very rare when we see someone who is consistently independent, has the ability to think for himself or herself, and has F.A.S.D. In fact, I've never encountered someone who consistently does that over a decision making. Decisions are faulty because the processing mechanism is faulty.

The executive functioning includes, the difficulty we see that relates to the legal context, controlling emotions. So individuals with F.A.S.D. will not have good control over strong emotion. Often it's anger, could be other strong emotions as well. And so there's a tendency to behave, to act out the feelings, the emotion. And just as you might see a child tantruming, in these individuals when they're children do tantrum quite a bit. They have a lot of tantrums. But as adults, it's a similar kind of phenomenon; acting out that emotion immediately without checking it.

Then finally, because of the impaired executive functioning, they're also ¶ they tend to be very naive and unsophisticated. They'll be followers. It's very rare when we see someone who is consistently independent, has the ability to think for himself or herself, and has F.A.S.D. In fact, I've never encountered someone who consistently does that over a period of time. You see a lot of stubbornness in F.A.S.D. and strong opinions; but the ability to be a leader of other people is something that we do not typically see in F.A.S.D. [Vol.55, pg. 152, ln. 1 to pg. 154, ln. 24

**\*57** Dr. Brown, in summing up Appellant's lifelong assessment, described Appellant's life in the following detail: "All right. So intervention, children with F.A.S.D. and children who come from abusive and neglectful situations also need services, beyond the ¶ they need services throughout the developmental years and preferably into the early adult years across the span of domains, and including cognitive, behavioral, social, emotional, academic, motor skills, all of these, these ¶ these abilities or domains are affected, not only by F.A.S.D. but also by neglect and lack of attachment and trauma.

So a lot of missed opportunities, and that was one of the very sad things about this case, many sad things about this case, tragic things, but so many missed opportunities when people should have been paying attention. And at age 9, Kevin Walling is noting here that this child is running the streets while his mother is prostituting. Now, typically this would be cause for CPS to get involved and eventually precipitate placement out of the home. Didn't happen in this case. Age 10, more facilities are getting involved and seeing this child and his problems. And now there's an F.A.S. diagnosis in the JPS records, and nobody is paying attention to the diagnosis and nobody is paying attention to the environmental adversity. Here's a CPS worker, and at age 10, apparently CPS was involved briefly for neglect, but the case is closed at age 10. There are no CPS records this early, by the way. This came from the JPS records. So CPS was in and out real quickly and closed the case without any intervention or recommendation, so left the child with his mother, essentially.

And JPS, knowing, hears the ¶ hears Mark tell them that his mom is going to bars all night and him sell drugs, sell drugs, a 10-year-old, and there's no known report, not to CPS, there's no documented report to CPS, and he's discharged home to his mother, even given this information.

Age 11, Dr. Burns saw him. Santa Fe counseling saw him for disruptive behavior; and because 20 he was disruptive, he was discharged. He was also not attending treatment, and evidently they expected - it appears from the way they phrased **\*58** the discharge note, they expected him at that age to get himself to treatment.

But so, and then CPS was pulled in again. And this is ¶ this appears to be age 14 down at the bottom there. I don't know what date is - 12 rather. And this is after he started getting in trouble with the police.

NELSON_00062

Juvenile probation got involved at that point. This is an interesting part of the record. The principal contacted the probation officer, and the input from the MHMR counselor quashed the concern. This principal was concerned about this child, but the MHMR counselor, who apparently didn't want ¶who was trying to keep the family intact at that point and was trying to work with the mom to get her treatment and maintain the family unit, apparently did not want CPS involved and so he told her that ¶ he told the probation officer that he thought the principal's concerns were biased. So nothing happened. Missed opportunity.

Age 12 to 15, more missed opportunities. I won't go through each one of these, but CPS, MHMR still involved, school district, Buckner, and CPS again down at the bottom.

Age 15, Azleway, he was there shortly, few months. All these odd behaviors in a cluster like this, choking self, sexually inappropriate behavior, all this chaotic behavior that he's displaying, and still no one is noticing that there's a problem here. He's not medicated, by the way, while he's at Azleway. CPS is involved again. Choices sees him for a month. He runs away and ends up at Desert Hills. So lots of people, lots of agencies involved.

Age 16, he's at Desert Hills for less than a year, about nine months as I recall. CPS continues their involvement. They were awarded conservatorship in - I think it was age 13, if I recall correctly, by the court. So at that point they had, essentially, custody of Mark Soliz.

There is supposedly a psychological, another psychological evaluation by Dr. Jones at age 16, and there's no record of it. And Contreras finally at age - right before he's 17. And CPS continues up until the 18th birthday when these cases are usually closed on kids. And by that time, Mr. Soliz had run  **\*59**  away from the group home, he had run away from a family placement, and he was essentially on his own, a runaway, runaway status, and the case was closed.

So, back to my original chart. My job is to assess the lifelong behavior to see if the behavior is consistent with Fetal Alcohol Spectrum Disorder. And in this case, there is evidence across the life span of significant impairment in his adaptive behavior. And there is evidence throughout the records of secondary disabilities and an adverse environment and no interventions that are evidence-based and targeted specifically for the F.A.S.D. other than the structured environment when he was at Buckner.

So, to finish up here, this man had - was born with a brain damage, more brain damage from the adverse environment in childhood, and no interventions. And in all my years of experience, I have never seen a more tragic case, not only for Mr. Soliz and all the people he's come into contact with over the course of his life, but for the victim in this case, particularly for the victim in this case. So much could have been done. So many people saw the problems along the way. And no one did enough. No one¶ very few people did anything and no one certainly did enough; didn't do what needed to be done." [Vol 55, pg. 225, ln.4 topg. 229. ln. 16]

Appellant rested his portion of the punishment phase of the trial after Dr. Brown testified. [Vol 55, pg. 281].

### D. CRUEL AND UNUSUAL PUNISHMENT - APPLICATION OF THE LAW TO THE FACTS;

Appellant filed a Motion To Preclude The Death Penalty As a Sentencing Option Reduced Mental Capacity and Functioning Resulting from Fetal Alcohol Syndrome is Comparable to that of Intellectual and Developmental Disabilities (Mental Retardation). (C.R. 662). In this motion Appellant requested the Court to **\*60** find that the death penalty was not an option in his case because of the prohibition against cruel and unusual punishment since he is a victim of Fetal Alcohol Syndrome. (C.R. 662). After the punishment portion of the trial, Appellant asked the Court to grant this motion. The Court overruled this request. [Vol. 56, pg. 61, ln. 5 to pg. 62, ln. 8].

NELSON_00063

The prohibitions embodied within the Eighth and Fourteenth Amendment to the United States Constitution include the prohibition against the infliction of a Cruel and Unusual punishment. Article 1, Section 13 of the Texas Constitution provides even greater protection in that this section bars the infliction of a "cruel or unusual punishment" (emphasis added). The protections afforded by the United States Constitution provide a floor of protections. Those protections provided by the Texas Constitution cannot be less. *Heitman* v. State, 815 S.W.2nd 681 (Tex.Crim.App. 1991). This is also true of the guarantees contained in the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. U. S. Const. Amend. V; U. S. Const. Amend. VI; U. S., Const. Amend. XIV; Tex. Const. Art. § 13.

As a result of this exposure to alcohol while in his mother's womb, Mr. Soliz, through no choice of his own, suffers from brain damage resulting in a condition that is known as Fetal Alcohol Spectrum Disorder (FASD). This **\*61** permanent brain damage impairs the cognitive ability of Mr. Soliz, which means that his brain does not work properly in the following areas:
(a) Executive functioning skills, including planning, sensory processing, decision making, and response inhibition.

(b) Self-regulation or emotional modulation in high-stress situations.

(c) Adaptive functioning, including communication, daily living, and social skills.

Mr. Soliz does not have an I.Q. that would be associated with a person diagnosed as having intellectual and developmental disabilities or mental retardation. However, the damage to his brain caused by the alcohol to which he was exposed in the womb has damaged his brain and "executive functioning" to the same extent as one who is intellectually and developmentally disabled. According to the literature the IQ/functional disparity found in Mr. Soliz is typical for individuals with Fetal Alcohol Spectrum Disorders. Streissguth, A. P., Barr, H. M., Kogan, J. & Bookstein, F. L. (1996). *Understanding The Occurrence of Secondary Disabilities in Clients with Fetal Alcohol Syndrome ( FAS) and Fetal Alcohol Effects ( FAE).*

Specifically, despite Mr. Soliz's full-scale IQ score of Mark A. Soliz, there are significant indicators he suffers from Fetal Alcohol Spectrum Disorder and that his brain is damaged by exposure to alcohol ingested by his mother while Mr. Soliz was in the womb. His brain functions at the same level as an individual with mild **\*62** intellectual and developmental disabilities or mild mental retardation. The indicators of condition are:

Mr. Soliz's brain and executive functioning is as impaired as is a person with mild mental retardation. In fact FASD is the third most common identifiable cause of intellectual and developmental disabilities or mental retardation in the United States. Larry Burd. et al. Journal of Psychiatry & Law 39/Spring 2011. FASD can be a cause of intellectual and developmental disabilities. but it can also cause sufficient damage to the frontal cortex of the brain such that the person is just as impaired.

As is shown below. the United States Supreme Court has exempted a person with mild mental retardation from state sponsored execution. For those same reasons as the mentally retarded are exempted the law should exempt the person whose brain is damaged by exposure to fetal alcohol. Failure to do so is a violation of the Fifth, Sixth. Eighth and Fourteenth Amendments to the United States Constitution and Article 1, Sections 10, 13 and 19 of the Texas Constitution.

**Offenders Diagnosed With Fetal Alcohol Syndrome Should Not Be Subject To The Death Penalty Because The Retributive and Deterrent Justifications For The Punishment Are Not Met By Allowing Death Sentences For Such Individuals.**

NELSON_00064

In *Atkins* v. *Virginia*, the Supreme Court determined that sentencing mentally retarded offenders to death serves neither the retributive nor the deterrent **\*63** purpose of punishment. As to retribution, mental retardation was found to lessen the culpability of a defendant for the crimes committed. The court cited specific deficiencies which rendered these offenders less culpable, including the "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." While these impairments do not negate responsibility for their actions, they reduce the blameworthiness of the offender. Thus, according to the court, mentally retarded offenders cannot be within the realm of the "most deserving" of execution, and are therefore categorically excluded.

Similarly, the impairments resulting from mental retardation which diminish culpability severely reduce any deterrent effect the death penalty might have on this class of individuals. The court in *Atkins* found that mentally retarded offenders are unable to engage in the same type of premeditation and decisionmaking which other criminals are capable. For that reason, such offenders are much less likely to consider consequences and control their conduct in response to the threat of death. Thus, the deterrence purpose of the death penalty is not furthered by applying it to offenders who are mentally retarded.

Fetal Alcohol Spectrum Disorder also impairs an individual's cognitive **\*64** abilities in a manner which makes him less culpable for his criminal behaviors and less susceptible to the deterrent effects of the threat of punishment. "The behavioral profile of children with FASD includes ...deficient social interactions (eg, lack of awareness of consequences of behavior and poor judgment)" *A Practical Clinical Approach to Diagnosis of Fetal Alcohol Spectrum Disorders: Clarification of the 1996 Institute of Medicine Criteria*, Pediatrics Vol. 115 No. 1 January 1, 2005 pp. 39 -47. Among the diagnostic criteria recognized by physicians as indicative of FASD is damage to the Central Nervous System. Studies have shown that prenatal alcohol exposure affects frontal lobe development, thereby impairing executive functioning. The frontal lobe is where executive functioning is controlled by dopamine sensitive neurons associated with attention span, short term memory, thinking ahead and drive. The frontal lobe acts to inhibit a person's impulsive behavior. The frontal lobe does not fully develop in humans until the mid-20s. Thus, in the early 20s, frontal lobe neurons associated with judgment, planning and foresight are not fully formed. This part of the brain is not fully developed in healthy adults until the, the, mid-20s. "Executive function" is an umbrella term for brain functions such as planning, working memory, inhibition, mental flexibility, as well as the initiation and monitoring of action.' Fetal Alcohol Spectrum Disorder CD. Chambers Department of Pediatrics and **\*65** Family and Preventive Medicine, School of Medicine, University of California, San Diego, La Jolla, CA, USA doi:10.1016/B978-012564370-2/50030-l. Because of this damage afflicted individuals lack the skills necessary for forming the type of intent which would make their culpability reach a level warranting a death sentence. Like the set of skills cited by the *Atkins* court, the specific functioning deficits include planning, considering consequence, learning from previous mistakes, processing sensory/environmental information, considering outcomes and making decisions based on consequences, and response inhibition. All of the skill cited by the *Atkins* court are impaired in FASD to the same degree that is seen in individuals with mild mental retardation. In particular, the literature specifically notes that one of the most prevalent problems among FASD afflicted individuals is impulsivity, which prevents them deviating from their course of action once it has begun.

The deficits cited above clearly detract from an offender's level of culpability based on his/her lack of complete control over the decision to commit the crime, the acceleration and the progression of the crime once the first steps have been taken toward committing it. As with intellectual and developmental disabilities, the same brain dysfunction is relevant to the deterrent affect that the death penalty has on potential offenders. FASD causes people to lose their **\*66** capacity for self-regulation in high-stress situations, such as those that would occur preceding and during a capital crime. Similar to individuals with mental retardation, the person with FASD becomes focused solely on their primary objective, without the mental capacity to engage in the cause-and-effect thinking or consideration of consequences that would halt a nondisabled person's behavior.

In *Atkins*, the court found that the apparent reluctance of juries across states to execute offenders classified as mentally retarded was indicative of a national consensus and widespread opinion that such people are undeserving of the death penalty. However, FASD has not had the same opportunity to be understood and appreciated by the public that mental retardation has had. There are a limited number of court cases in which FAS has been introduced, and only a small subset of that number involves capital crimes. A mental retardation diagnosis requires an IQ below a certain level, and the public has been trained to correlate cognitive and functional deficiencies with this lower IQ. However, the general public lacks a similar understanding of the impact of FAS on one's behavior. Only in the last decade have experts even engaged in creating standardized methods of assessing and diagnosing FASD in individuals.

The recent acknowledgment and management of FASD in children and juveniles, however, is one indicator of the progressive recognition of FASD as a **\*67** serious medical condition that can lead people down a path of criminal behavior. In Colorado, Minnesota, and Ohio, programs have been implemented to identify juvenile offenders who suffer from FASD. Those who screen positive for FASD are then provided with specialized guidance throughout the court process to compensate for their functional deficiencies (e.g. helping the juveniles to remember court dates). They are also given support and aid for their reintegration into school systems, ideally resulting in greater success and lower recidivism rates.

**THE DEATH PENALTY AS APPLIED TO OFFENDERS WITH FASD IS AN EXCESSIVE PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT BECAUSE SUCH OFFENDERS' DIMINISHED CAPACITIES PREVENT THEM FROM ADEQUATELY PRESENTING A DEFENSE.**

In addition to finding that executing mentally retarded offenders does not fulfill the goals of the death penalty punishment, the Supreme Court in *Atkins* found a second justification in the potential risk that a death sentence may be unjustly imposed based on an offender's inability to adequately participate in his defense. Possible sources of problems within the legal system included false confessions, inability to provide mitigating evidence, failure to adequately help counsel in their defense, and poor presentation as a remorseful witness. As a result, the court determined that mentally retarded offenders are particularly subject to wrongful execution. Furthermore, mental retardation, while presented as **\*68** a mitigating factor, could be turned by the jury into an aggravator as a sign of future dangerousness, leaving defense counsel with an impossible choice of how to present its case.

**Unfair Vulnerability in the Legal Process**

Researchers have recognized several aspects of the legal process in which an arrested individual with FASD may unknowingly or unintentionally incriminate themselves. FASD causes people to be "suggestible, prone to waiving their rights, and inclined to acquiesce with authority figures," making them especially susceptible to making false confessions. Additionally, they may be less able to assist counsel in their defense since their ability to process information and understand the legal system is likely to be impaired. FASD can cause deficiencies in communication skills, including both expressive and receptive language capabilities, comprehending court proceedings and helpfully interacting with lawyers may be particularly difficult. Other relevant problematic effects include distractibility, memory impairments (e.g. failure to remember instructions from lawyers and details of events), and vulnerability to exploitation by interrogators or other adverse parties. Such a condition may prevent an accused from testifying in his own behalf because of how easily he could become confused and mislead while on the stand

**\*69** These deficiencies parallel the problems recognized in *Atkins* which are considered to compromise the fair treatment of mentally retarded offenders in the legal process. The ramifications are potentially even more prejudicial in cases of individuals with FASD because jurors might not understand the severe intellectual disabilities from which these defendants suffer. The lack of the same outward manifestations of the cognitive deficits that may exist for mentally retarded offenders could lead juries to believe that a defendant diagnosed with FASD is operating at a normal intellectual

NELSON_00066

level. For that reason, individuals with FASD are subject to particularly high risks of prejudicial treatment in the criminal justice system.

**Allowing the death penalty for offenders with FASD while precluding it for the mentally retarded violates Equal Protection.**

Equal Protection requires defendants whose cases are similar to be treated alike by the judicial system. Because FASD creates the same types of cognitive deficits as mental retardation, and thus reduces the culpability of afflicted defendants in the same manner and to the same degree, equal protection requires the same protections from the death penalty for those afflicted with FASD as is afforded to the mentally retarded. According to experts, a significant proportion of persons afflicted with FASD also qualify as mentally retarded with FASD being the cause of the impairment. The only reason FASD does not automatically **\*70** qualify a defendant as legally mentally retarded is because the offender's IQ score might not fall below the legal requirement for retardation, even though adaptive functioning is as impaired in FASD as in mental retardation/intellectual disability. It is recognized in the literature that individuals with FASD whose IQ scores fall in the borderline range function the same as mentally retarded individuals in society and are typically viewed as mentally retarded. Therefore it is unconstitutional to allow the death penalty for people diagnosed with FASD when their behavioral and cognitive capacities are acknowledged as equivalent to the capacities of those with mental retardation.

Although a person with FASD may have an IQ score that does not fall below the legal requirement for retardation, they may suffer with other limitations of FASD such as impairment in adaptive behavior. Stressguth, et. al., Infra. For example, one study found that every person with FASD had such impairments that were not within the 'insignificant' range. "Due to the potentially misleading nature of IQ scores in people with FASD, the states that have set an IQ cut-off point within their definition of mental retardation will have left some individuals exposed to capital punishment despite a legitimate intellectual disability". Christopher Fanning, 'Defining Intellectual Disability: Fetal Alcohol Spectrum Disorders and Capital Punishment' Rutgers Law Record (2010-201 l). Error!

**\*71 Bookmark not defined.**

*Hall v. Texas* exemplifies the variance that can exist among multiple IQ tests. In *Hall*, the offender's claim of mental retardation was rejected by the court. However, multiple IQ tests had been administered, both by doctors for the state and for the defense, and these tests yielded results ranging from the mid-60's to low-80's. It has even been recognized by some judges as well as in the DSM-IV that a full-scale IQ test might not be reliable in determining intellectual functioning. In one California case, a judge actually relied on the low verbal IQ score of a defendant in his ruling that the defendant was mentally retarded, finding the verbal score to be a better indicator. *Hall v. Texas*, 225 SW3d 524 (Tex. Crim. App. 2007). The California Supreme Court has even refused to establish a cutoff IQ score for hearing death penalty exemption claims under *Atkins* saying that retardation is a "question of fact...not measured according to a fixed intelligence score or a specific...behaviour deficiency, but rather constitutes an assessment of the individual's overall capacity".

Aside from the reliability issue, it has been recognized by experts that, while those impaired with FASD do tend to score higher on IQ tests, their scores on adaptive behavior or functioning tests are lower than their IQ scores. As one study showed, adaptive skills as measured by the Vineland Adaptive Behavior **\*72** Scale (VABS) and other adaptive behavior tests tend to resemble the IQ score, whether the subject is of normal intelligence or mentally retarded. However, in individuals with any form of FASD, there is a downward slope from IQ to academic performance to adaptive functioning. Therefore, while IQ may debatably serve as a relatively accurate representation (and perhaps more objective, despite the biases of the test-givers) of intelligence in other individuals, it is misleading when it comes to FASD. The vast majority of cases involving rejections of mental retardation claims for individuals with FASD, in fact, hinge on IQ tests and the failure of the offender to fall below the bar of retardation. Therefore it violates equal protection to execute persons with

FASD because they admittedly have the same limited capabilities to function in society, but just happen to fare better on standardized IQ tests than mentally retarded individuals.

The execution of one who suffers from FASD violates the dignity of man generally and this Court, specifically. The execution of one whose personal culpability is diminished by Fetal Alcohol Spectrum Disorder is just as excessive and offensive as executing one whose personal culpability is reduced by mental retardation.

### E. CRUEL AND UNUSUAL PUNISHMENT - CONCLUSION

This Court has the right and the duty to determine whether executing **\*73** Appellant when he suffers from severe Fetal Alcohol Spectrum Disorder would be a denial of due process. It is uncontroverted that Appellant suffers from severe Fetal Alcohol Spectrum Disorder and that this disorder has affected his entire life and entire lifelong decision making process. In fact, the State did not even contradict this. This Court has the obligation to uphold due process and thus to ensure that Mr. Soliz is not subjected to the death sentence.

### \*74 POINT OF ERROR 11 - RESTATED

SPECIAL ISSUE NO. THREE OF ARTICLE 37.071 IS UNCONSTITUTIONALLY VAGUE AND INDEFINITE, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.

### POINT OF ERROR 12 - RESTATED

SPECIAL ISSUE NO. THREE OF ARTICLE 37.071 IS UNCONSTITUTIONALLY VAGUE AND INDEFINITE, IN VIOLATION OF APPELLANT'S RIGHTS UNDER ARTICLE I, SECTION 19 OF THE TEXAS CONSTITUTION.

### A. ARGUMENTS AND AUTHORITIES ARTICLE 37.071 UNCONSTITUTIONALLY VAGUE

Appellant was denied due process of law in violation of the Fourteenth Amendment to the U.S. Constitution, and Article I, Section 19 of the Texas Constitution, because the jury was not given a definition of the term "mitigating circumstances" to be used in the punishment phase. U.S. CONST. Amend. XIV; Tex. Const. Art. I § 19. This failure renders Article 37.071 of the Texas Code of Criminal Procedure unconstitutionally vague and indefinite in violation of Appellant's constitutional rights. In this case, as a result of the term not being defined for the jury, the jury was unable to properly consider whether circumstances in mitigation of the offense should have resulted in a life sentence for Appellant, rather than the imposition of the death sentence.

**\*75** This Court has held repeatedly that in a death penalty case, the trial court need not define the terms used in the special issues because the jury is presumed to understand them without instruction. *Feldman* v. *State*, 71 S.W.3d 738 (Tex. Crim. App. 2002); *Ladd* v. *State*, 3 S.W.3d 547, 572-73 (Tex. Crim. App. 1999). Appellant invites the Court to revisit this issue. The record in this case clearly rebuts that presumption, and reflects the jury's confusion on what properly constitutes "mitigating evidence" in Appellant's case.

In multiple Pretrial Motions Appellant asked the Court to declare Article 37.071 of the Texas Code of Criminal Procedure unconstitutional because it impermissibly restricted the jury's consideration only to those circumstances which the jurors "might regard as reducing the Defendant's moral blameworthiness." The trial court overruled Defendant's Motions. The court erred in overruling these Motions.

### *76 POINT OF ERROR 13 - RESTATED

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DECLARE THE "10-12" RULE UNCONSTITUTIONAL ON THE GROUNDS THAT IT CREATES AN IMPERMISSIBLE RISK OF ARBITRARY IMPOSITION OF THE DEATH PENALTY. (C. R. 201, 427).

### ARGUMENT AND AUTHORITIES

Appellant argued in his motions filed at Clerk's Record 201 and 427, among others, that that the "10-12 Rule" unconstitutionally prevents a single juror from giving effect to his or her belief that a mitigating factor militates against the imposition of the death penalty.

Texas Code of Criminal Procedure, Article 37.071, Sec. 2 (d)(2) requires the trial court to charge the jury that it may not answer any issue submitted under subsection (b) "yes" unless it agrees unanimously, and it may not answer any issue "no" unless ten or more jurors agree. In the event the jury is unable to answer either the future danger or parties' question, Article 37.071, Sec. 2 (g), the court shall sentence the defendant to confinement for life imprisonment without parole Tex. Code Crim. Proc. Art. 37.071(2009).

In capital cases, the Supreme Court is committed to ensuring that there is sufficient process to "guarantee, as much as is humanly possible, that the sentence was not imposed out of whim ... or mistake. *77 *Eddings* v. *Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring) (overrule on other grounds). The Texas death penalty statute affirmatively creates confusion in the minds of the jurors. Jurors are first told that the jury as a whole "shall" answer "yes" or "no" to each issue presented; they are subsequently told that ten or more jurors must be in agreement to give one set of answers and that they must be unanimous in order to give another. This necessarily raises the question of what happens in the event that the jury, despite being instructed that it must answer each question, is unable to get the minimum number of votes required to give either answer. The statute clearly provides that in the event of a non-answer, the defendant is to receive that which is substantively identical to that which he or she would have received had there been a verdict in favor of life, and thus the law itself exhibits no confusion with regard to the situation presented. However, not only does the statute fail to do all that is humanly possible to ensure that decisions regarding life and death are not made as a result of that manufactured confusion; it actively prohibits any clarification of the confusion by preventing jurors from being informed at any point of the effect of a non-answer.

Death penalty cases are required to be subjected to greater constitutional protections than those applied to non-death penalty cases ("death is different"). *Eddings* v. *Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978); *78 *Simmons* v. *South Carolina*, 512 U.S. 154 (1994); see also *Miller v. Alabama*, U.S. (No. 10-9646; June 25, 2012); *Graham* v. *Florida*, U.S. (No. 08-7412; May 17, 2010); *Kennedy v. Louisiana*, 554 U.S. 407 (2008); Baze v. Rees, 553 U.S. 35 (2008); see also *Jimenez* v. *State*, 32 S.W.3d 233 (Tex. Crim. App. 2000); *Ex parte Tucker*, 973 S.W.2d 950 (Tex. Crim. App. 1998); *Morris* v. *State*, 940 S.W.2d 610 (Tex. Crim. App. 1996); *Anderson* v. *State*, 932 S.W.3d 502 (Tex. Crim. App. 1996).

The result of misinforming jurors and forcing them to deliberate without knowledge of what happens in the event of a non-answer is that they are presented with a false dilemma. Jurors are given general instructions that they must answer either "yes" or "no" to the issues before them, and specific instructions that define the minimum number of votes required to give each of these answers. Because they are told that a death sentence follows from one set of answers, and a life sentence follows from another, a reasonable juror might conclude that the only way to get either of these punishments is to answer the questions posed to them. See *California* v. *Brown*, 479 U.S. 538, 541 (1987) (quoting *Francis* v. *Franklin*, *All* U.S. 316 (1985) (holding that the constitutional sufficiency of capital sentencing instructions is determined by "what

NELSON_00069

a reasonable juror could have understood the charge as meaning"). This leaves jurors free to speculate as to what would occur **\*79** should they be unable to provide an answer to the issues. While it is possible that jurors might correctly guess that the failure to agree will result in a life sentence, it is perhaps more likely that they will conclude that a non-answer will lead to a lesser sentence, a costly retrial or resentencing proceeding, or absolute freedom for the defendant. Given that each of the jurors has already found the defendant guilty of a capital offense, none of those options would look desirable to a juror who honestly believes that a life sentence is warranted. Jurors are left to deliberate with the false belief that if they are unable to gain unanimity for a death sentence or ten or more votes for a life sentence, an altogether third option will result. In *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994), the Supreme Court prohibited just this sort of unfairness, holding that "[t]he State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole."

In *Scales* v. *State*, 380 S.W.3d 780 (Tex. Crim. App. 2012), a non-death penalty case, the Court dealt with a request from the jury foreman that a juror, who allegedly would not participate in the deliberations, be removed. The trial court, after hearing from the foreman, indicated intent to remove the juror and seat an alternate. The defendant requested the trial court question the juror but the court **\*80** refused. Instead, the court questioned the foreman again and, after finding him credible, removed the juror of whose complaint was made and replaced her with an alternate.

The Court of Appeals reversed and remanded. *Scales* v. *State*, No. 01-08-0932-CR (Tex. App. - Houston [1st], December 20, 2010) (not designated for publication), slip op. at 7. After the State filed a petition for discretionary review, the Court of Appeals withdrew its original opinion and, pursuant to Rule 50, Tex. R. App. Pro., issued another opinion. The second opinion reached the same result as the first. *Scales* v. *State*, No. 01-08-0932-CR (Tex. App. - Houston [1st] April 14, 2011) (not designated for publication). The Court granted the State's petition for discretionary review from the second opinion.

The trial court in *Scales* had found the juror to be disabled, necessitating a study of the requirements of Article 36.29, C.Cr.P., relating to a disabled juror. According to the foreman's testimony before the trial court, the juror in question had taken into account the facts and law and had made up her mind, refusing to talk about "her side" of the case or take into account others' views.

The Court characterized the evidence relating to the jury's deliberations as:
The foreman twice testified as to what "we" did in a context that indicates that "we" is the eleven jurors other than Collins. The foreman's statement that both reasons named by the trial court applied, combined with his statement that "[s]he will not talk **\*81** about the facts of the case as we perceived during testimony," at least tends to show that Collins's perceptions about the evidence were not shared by the other eleven jurors, that she did not agree with the other eleven that the contents of the read backs were "fact," that she had made a decision about what the evidence proved, and that her refusal to deliberate was actually a refusal to change her mind. That possibility was not explored before the trial court removed Collins from the jury. We find that the trial court had insufficient information from which to determine that Collins was not able to perform her duties as a juror. The trial court erred when it replaced Collins with an alternate without ascertaining Collins's reasons for "not deliberating." Scales, slip op. at 9-10 (footnote omitted).

The Court recognized that the trial court's action in replacing the hold-out juror affected the defendant's substantial right to a unanimous jury and thus, the error had a substantial and injurious effect or influence in determining the jury's verdict, and was, therefore, reversible error. *Scales*, slip op. at 10. This recognition, that error committed during jury deliberations, including pressures put on those members of the jury who are holding out against an even overwhelming majority, implicates substantial and constitutionally based rights, and can be error, cannot be ignored in the instant case.

The Court wrote, "We find that the trial court had insufficient information from which to determine that Collins was not able to perform her duties as a juror." In doing so, the Court set a standard for trial courts to follow when dealing with

potential interference with individual jurors by other members of the jury. The **\*82** standard, informed and required by the Constitution, applies in non-death penalty cases, and is required to assure the defendant's Constitutional rights were protected. That the protections accorded in the defendant in *Scales* must be accorded to those facing the death penalty, as a matter of constitutional imperative, cannot be seriously argued. The procedure found to be required by the substantial rights implicated in *Scales* must be considered by this Court in addressing this claim.

The Court's opinion in *Scales*, supra, demonstrates that death penalty cases in Texas are treated in the exact opposite manner, with the "10-12 Rule" operating to deny death penalty defendants the review mandated by *Scales* in non-death penalty cases. As such, the 10-12 Rule violates the Constitution of the United States, as well as the Supreme Court's "death is different" directives. Consequently, the "10-12 Rule" cannot stand.

Death penalty cases are required to be subjected to greater constitutional protections than those applied to non-death penalty cases ("death is different"). *Eddings*, supra; *Lockett*, supra; *Simmons*, supra. It is clear now that, as it pertains to jury deliberations and instructions, Texas defendants charged with capital murder are afforded lesser protections than are required by the Constitution of the United, States and applied to non-death penalty defendants.

### *83 POINT OF ERROR 14 - RESTATED

THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT IF A SINGLE JUROR "HOLDS OUT" FOR LIFE, THE APPELLANT WOULD RECEIVE A SENTENCE OF LIFE IMPRISONMENT BY OPERATION OF LAW. (2 C. **R**. 182, 265, and 427).

### *ARGUMENT AND AUTHORITIES*

The trial court overruled Appellants motion to declare Code of Criminal Procedure Article 37.071, Section 2 (a) unconstitutional. (2 R. R. 54-55) Article 37.071, Section 2 (a) specifically states that no one may inform the jury of the result of their inability to agree on the answer to any of the special issues submitted to them. The effect of denying the requested instruction was the high risk that the jurors were misled about their role in the sentencing process and about the true operation of the law, in violation of the due process guarantees of our federal and state, constitutions.

A number of other jurisdictions have addressed this very issue and found a constitutional violation under similar circumstances. See, e.g., *State* v. *Williams*, 392 So.2d 619, 631 (La. 1980) (on rehearing). In *Williams* the Court stated: In the present case the jurors were not fully informed of the consequences of their votes and the penalties which could result in each eventuality ....Instead, the members of the sentencing body were left to speculate as to what outcome would **\*84** be in the event there was no unanimity. Under these circumstances, individual jurors could rationally surmise that in the event of a disagreement a new hearing, and perhaps a new trial, before another jury would be required. *Williams*, 392 So.2d at 631 (emphasis added).

Such a risk of speculation and confusion was properly held to be a constitutional violation by the Louisiana Supreme Court. Id. See also *State* v. *Ramseur*, 524 A.2d 188, 284 (N.J. 1987), and *Kubat* v. *Thieret*, 867 F.2d 531, 369-73 (7th Cir.), cert. denied, 493 U.S. 874 (1989). As the Court stated in *Kubat*:

*Kubat's* jurors were never told that he would not be sentenced to death. ... [T]here is a substantial possibility that one or more of *Kubat's* jurors might have been precluded from granting mercy to *Kubat* because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously. 867 F.2d at 373. See also *Andres* v. *United States*, 333 U.S. 740, 752 (1948) (federal capital case addressing identical claim and ordering a new trial).

This provision of Texas' capital punishment scheme violates the Eighth and Fourteenth Amendment in two ways: First, this prohibition violates the principle underlying *Caldwell* v. *Mississippi*, 472 U.S. 240, 320 (1985). As the Supreme Court stated in *Duggar* v. *Adams*, 489 U.S. 401, 407 (1989), a *Caldwell* violation occurs when jurors are "improperly [informed of] the role assigned to the jury by **\*85** local law." Jurors in Texas are not told than even one holdout juror results in an automatic life sentence.

Second, the failure to grant the requested charge violated the Eighth Amendment principle announced in *Mills v. Maryland*, 486 U.S. 367 (1988) - that a death sentence is unconstitutional if individual jurors are led to believe that their votes in favor of a life sentence are meaningless unless a certain number of other jurors are persuaded to vote along with the juror (in the case of Texas, at least nine other jurors, for a total often).

Because of the constitutional nature of the violation, this Court should not feel it possible to conclude, under the beyond a reasonable doubt standard, that the error did not influence the jurors answers to the special issues.

### \*86 POINT OF ERROR 15 - RESTATED

ART 37.071 OF THE TEX. CODE CRIM. PROC. IS UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE. (C. **R**. 269, 302, 308, 338 and 427).

### ARGUMENT AND AUTHORITIES

The trial court overruled Appellant's motions to preclude the death penalty as a sentencing option and to declare Article 37.071 unconstitutional for shifting the burden of proof on mitigation to the defendant. (C. R. 269, 302, 308, 338 and 427).The trial court also overruled Appellant's motion to declare Article 37.071 unconstitutional because it places the mitigation burden of proof on the defendant. (C. R. 269, 302, 308, 338 and 427). Tex. Code Crim. Proc. Art. 37.071 §§ 2 (e) and (f) require a jury which has convicted a defendant of capital murder, in a case in which the State is seeking the death penalty, to be charged as follows:

(e) (1) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue: Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed....

(f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:

**\*87** (1) shall answer the issue "yes" or "no";

(2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree;

(3) need not agree on what particular evidence supports an affirmative finding on the issue; and

(4) shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

NELSON_00072

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

This statue is unconstitutional because it impermissibly shifts the burden of proof on mitigation to the defendant. The statute requires the jury to consider, along with mitigating evidence, the "moral culpability of the defendant," having just found the defendant guilty of the offense, beyond a reasonable doubt. The statute then demands that the defense produce "sufficient" mitigation (while considering this same "moral culpability") to warrant a sentence of life imprisonment. The mitigating evidence must be "sufficient" to reduce the defendant's moral culpability or blameworthiness as already established in the juror's minds. In death penalty deliberations, "moral culpability" is not evidence; it is a finding that the jury has already made. The statute places an unfair, undue and unconstitutional emphasis on that finding. The defendant, if he is to save his own life, must offer evidence that is somehow greater than the finding of moral culpability beyond a reasonable doubt.

Aside from shifting the burden of proof to the defendant, the statute provides no other guidance to the jury that is called upon to make this life and death **\*88** decision. As a result, the death penalty is imposed in a wanton haphazard manner in violation of the Defendant's rights to due process and protection from cruel and unusual punishment.

This impermissible shift of the burden to the defense is made more unconscionable by the language of Tex. Code Crim. Proc. Art. 37.071 (2)(f) which provides that the jury shall not answer the mitigation issue "yes" (resulting in a life sentence) unless ten or more jurors agree. The defense, according to the instructions to the jury, must then offer "sufficient" mitigating evidence to not only overcome his "moral culpability" as already established in the eyes of the jury, but ten of those jurors must be convinced of the sufficiency of that evidence.

Under the "due course of the law" provision of the Texas Constitution, Article 1 § 10, the citizens of this state are guaranteed that any punishment for an offense will be in accordance with the law. *McFarlane* v. *State*, 254 S.W.2d 136 (Tex. Crim. App. 1953). When the burden of proof is shifted to the defendant, the State's burden has essentially been reduced. See e.g., *Cobarrubio* v. *State*, 675 S.W.2d 749 (Tex. Crim. App. 1983) overruled in part, *Lawrence v. State*, 700 S.W.2d 208 (Tex. Crim. App. 1985), and *Elliott* v. *State*, 858 S.W.2d 478, 487-88 (Tex. Crim. App. 1993). This punishment, based on a reduced burden, violates Texas law and federal constitutional due process guarantees.

**\*89** Moreover, the effect of the statutory scheme is to require the defendant not merely to assume a burden of proving mitigation, but to demonstrate mitigation sufficient to outweigh the jury's pre-existing affirmative finding, beyond reasonable doubt, of the aggravating factor of future dangerousness. Appellant is aware of the existence of adverse authority in this matter, see, e.g., *Threadgill* v. *State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004); *Kansas v. Marsh*, 126 S.Ct. 2516 (2006) (ruling no violation where defendant required to prove mitigating circumstances sufficiently substantial to call for leniency), but nonetheless contend that these issues merit the Court's reconsideration.

Pursuant to Tex. R. App. P. 44.2(a), if there is constitutional error, the appellate court must reverse unless it determines beyond a reasonable doubt that the error did not contribute to the conviction and violates the due process clause of the United States Constitution. U.S. Const. Amend. XIV.

### **\*90 *POINT OF ERROR 16 - RESTATED***

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO PRECLUDE THE IMPOSITION OF THE DEATH PENALTY ON GROUNDS THAT THE INDICTMENT FAILED TO CONTAIN ANY ALLEGATIONS REGARDING THE PUNISHMENT SPECIAL ISSUE. (C. R. 388).

### *ARGUMENT AND AUTHORITIES*

The trial court also overruled Appellant's motion to declare Article 37.071 unconstitutional contending in part that the indictment was constitutionally defective because it did not allege aggravating factors or future dangerousness. (2

NELSON_00073

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

C. R. 312-317) (2 R. R. 55-56) Defense counsel requested that the State be precluded from seeking the death penalty against appellant, because the indictment did not allege the existence of the statutory special issues and the supporting facts necessary to impose a death sentence in violation of appellant's Sixth Amendment right to trial by jury. (2 C. R. 266-271). *Ring v. Arizona* teaches that capital defendants, no less than noncapital defendants, are entitled under Sixth Amendment to a jury determination of any fact on which a legislature has conditioned an increase in the defendant's maximum punishment. *Ring* v. *Arizona*, 122 S. Ct. 2428 (2002). Since the facts which were relied on in order to seek death against Appellant were not contained in the indictment, and the statutory special issues, as stated elsewhere in this brief, were totally undefined for the jury, there **\*91** cannot in any way have been a meaningful jury verdict in this case in the sense that *Ring* requires.

Appellant is aware of the existence of adverse authority from this Court addressing this issue. See, e.g., *Perry* v. *State*, 158 S.W.3d 438 (Tex. Crim. App. 2004); *Woods v. State*, 152 S.W.3d 121 (Tex. Crim. App. 2004); *Rayford v. State*, 125 S.W.3d 521, 533 (Tex. Crim. App. 2003), but nonetheless contends that these issues merit the Court's reconsideration. *Boyce* v. *State*, No. 04-04-00267-CR (Tex. App. ¶ San Antonio, July 13, 2005); 2005 Tex. App. LEXIS 5395 (mem. op.) (Stone, J. concurring) (noting this Court had not yet addressed the *Apprendi/Blakeley* requirement that every fact legally essential to punishment be charged in indictment and proved to a jury).

### *\*92 POINT OF ERROR 17 - RESTATED*

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE APPLICATION OF TEXAS' DEATH PENALTY SCHEME BECAUSE IT HAS BEEN ARBITRARILY IMPOSED IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS. (C. R. 193 and 302).

### *ARGUMENT AND AUTHORITIES*

The trial court overruled Appellant's multiple motions to preclude the death penalty as a sentencing option on Eighth Amendment grounds. In view of the many different capital sentencing schemes that have been in operation in Texas in the *post-Furman* era, the Texas death penalty has been arbitrarily imposed and; thus, is unconstitutional under the Eighth and Fourteenth Amendments.

Of the many hundreds of persons sentenced to death in Texas since the "modern" capital sentencing statute was enacted, the vast majority were sentenced under jury instructions that simply tracked the unadorned "special issues" contained in the original version Tex. Code Crim. Proc. Art. 37.071 (b) (1989). See generally P.M. McClung, Jury Charges For Texas Criminal Practice 75-78 (rev. ed. 1981). After the landmark decision in *Penry* v. *Lynaugh*, 492 U.S. 302 (1989) (overruled in part on other grounds), however, the consistency in Texas capital sentencing instructions quickly disappeared, both as a result of legislative action and unsupervised judicial improvising by the trial courts. See generally Peggy M. **\*93** Tobolowsky, *What Hath Penry Wrought?: Mitigating Circumstances and the Texas Death Penalty*, 19 Amer. J. Crim. L. 345 (1992). In 1991, the Texas Legislature enacted an amended, post-Penry version of Article 37.071, which modified the "special issue" format.

Roughly speaking, the various types of Texas capital sentencing instructions in the *post-Furman* era can be broken down into seven different categories.

In numerous cases, the United States Supreme Court has stated that it is "unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." *Spaziano v. Florida*, 468 U.S. 447, 464 (1984) (citing cases). The Court has stated, however, that within a single state, there must be consistency in the treatment of capital defendants who are subject to the death penalty. Id. at 460 ("If a state has determined that death should be an available punishment

NELSON_00074

for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not.")

The above discussion of the various sentencing schemes concurrently in operation in Texas, "a distinct system," *Gregg*, 428 U.S. at 195, amply demonstrate that the present Texas death penalty system is being implemented in an "arbitrary" manner. At least seven categories of similarly situated capital defendants have **\*94** been treated disparately. *Fetterly v. Paskett*, 997 F.2d 1295 (9th Cir. 1993), presents an analogous situation to the instant case. In that case, the Ninth Circuit condemned an instance of "*Furman* arbitrariness" within a single state's capital sentencing system. The Court's reasoning is cogent and should be applied to Texas' experience.

The bottom line is that Texas courts and the state Legislature, without any discernible rational basis, have haphazardly turned Texas' capital sentencing scheme into a patchwork quilt. Because similarly situated Texas capital defendants - including Appellant - have been unjustifiably sentenced to death under radically different sentencing schemes, this Court must vacate Defendant's death sentence.

The decision to which defendant is to be subjected to the death penalty prosecution varies from county to county in Texas. As a result, there are likely two hundred and fifty-four (254) different methods used to determine which cases shall be prosecuted as capital cases. Often the decision can turn on the county's willingness to fund the defense, the race of status of the defendant, or the age, sex, race or status of the victim in the community.

The right to life is fundamental. *Furman* v. *Georgia*, 408 U.S. 238, 259 (1972). The failure of the State to set forth uniform and specific standards to **\*95** determine against whom a death sentence will be sought renders the penalty of death one that is wantonly and freakishly implied and that is prohibited by the Eight Amendment to the United States Constitution.

The need for non-arbitrary standards in the application of the death penalty outweighs any benefits of unbounded prosecutorial discretion.

### **\*96** *POINT OF ERROR 18 - RESTATED*

THE LETHAL INJECTION PROTOCOL - AS IT IS CURRENTLY ADMINISTERED IN TEXAS - PRODUCES UNNECESSARY PAIN, TORTURE, AND LINGERING DEATH, AND VIOLATES THE EIGHTH AMENDMENT.(C.R. 496).

The Eighth Amendment's proscription against cruel and unusual punishment forbids the infliction of unnecessary pain in the execution of a sentence of death. *Louisiana ex rel., Francis* v. *Resweber*, 329 U.S. 459, 463 (1947) (opinion of *Reed, J.*); *Fierro* v. *Gomez*, 865 F. Supp. 1387, 1413 (N.D. Cal. 1994) (execution by lethal gas in California held unconstitutional where evidence indicated "death by this method is not instantaneous. Death is not extremely rapid or within a matter of seconds. Rather ... inmates are likely to be conscious for anywhere from fifteen seconds to one minute from the time that the gas strikes their face" and "during this period of consciousness, the condemned inmate is likely to suffer intense physical pain" from "air hunger"; "symptoms of air hunger include intense chest pains ... acute anxiety, and struggling to breath"), aff'd, 77 F.3d 301, 308 (9th Cir. 1996), vacated on other grounds, 519 U.S. 918 (1996). Further, "[p]unishments are cruel when they involve ... a lingering death." In *re Kemmler*, 136 U.S. 436, 447 (1890). A punishment is particularly constitutionally offensive if it involves the foreseeable infliction of suffering. **\*97** *Furman* v. *Georgia*, 408 U.S. 238, 273 (1973), citing *Resweber*, supra (had failed execution been intentional and not unforeseen, punishment would have been, like torture, "so degrading and indecent as to amount to a refusal to accord the criminal human status").

It is not only foreseeable, it is predictable that death by lethal injection as it is currently practiced in Texas - using a paralytic agent in combination with a sedative - will produce unnecessary pain, torture, and lingering death. Evidence has existed for at least fifty years that the "drugs used in lethal injections pose a substantial threat of torturous pain to

NELSON_00075

persons being executed." *Chaney* v. *Heckler*, 718 F.2d 1174 (D.C. Cir. 1983), overturned on other grounds, *Heckler* v. *Chaney*, 470 U.S. 821 (1985) (citing Royal Commission On Capital Punishment, 1949-1953 Report (1953)). The Court of Appeals found that:

Appellants have presented substantial and uncontroverted evidence to support their claim that execution by lethal injection poses a serious risk of cruel, protracted death. See Royal Commission On Capital Punishment, 1949_1953 Report (1953), Exhibit 1 to Letter to the Secretary, supra, JA 34_40. Even a slight error in dosage or administration can leave a prisoner conscious but paralyzed while dying, a sentient witness of his or her own slow, lingering asphyxiation. Id. at 1191.

Further, the Defendants admit that the Texas lethal injection protocol has not changed since it was first used in 1982. Judge Denies Stays of Three Executions, HOUSTON CHRONICLE, Dec. 9, 2003, at A29 (quoting a TDCJ official who acknowledges that no changes have been made to the procedure in place since **\*98** 1982).

What has changed over the last two decades, however, is that numerous states, most recently the State of Texas, have enacted statutes regulating the euthanasia of animals which preclude using the same combination of drugs currently administered to human beings during executions. If evolving standards of decency, as reflected by legislative action and professional association of veterinarians, preclude the use of these particular drugs when killing a dog or a cat, then certainly those same standards of decency would require a more humane, readily available version of the lethal injection for human beings as well. "'The basic concept underlying the Eighth Amendment is nothing less than the dignity of man .... The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'" *Atkins* v. *Virginia*, 311-312 (2002) (quoting *Trop* v. *Dulles*, 356 U.S. 86, 100-101(1958)).

**A. The combination of chemicals used to execute inmates in Texas creates a strong probability of unnecessary suffering and torture.**

The lethal injection protocol used by the State of Texas executes inmates by poisoning them with a lethal combination of three chemical substances: Sodium Thiopental, or Sodium Pentothal (an ultrashort-acting barbiturate); Pancuronium Bromide, or Pavulon (a curare-derived agent which paralyzes all skeletal or voluntary muscles, but which has no effect whatsoever on awareness, cognition or **\*99** sensation); and potassium chloride (an extraordinarily painful chemical which activates the nerve fibers lining the person's veins and which can interfere with the rhythmic contractions of the heart and cause cardiac arrest). While each of these chemicals individually creates concern about their use in the execution process, in combination they cannot pass constitutional muster. Far from producing a rapid and sustained loss of consciousness and humane death, this particular combination of chemicals often causes the inmate to consciously suffer an excruciatingly painful and protracted death.

**1. Sodium Thiopental**

Sodium thiopental, or sodium pentothal, is a short-acting barbiturate which is ordinarily used to render a surgical patient unconscious for mere minutes, only in the induction phase of anesthesia, specifically so that the patient may re-awaken and breathe on their own power if any complications arise in inserting a breathing tube pre-surgery. Because of its brief duration, sodium thiopental may not provide a sedative effect throughout the entire execution process. Dr. Dennis Geiser, the chairman of the Department of Large Animal Clinical Sciences at the College of Veterinary Medicine at the University of Tennessee, recently explained:

> Sodium thiopental is not a proper anesthetic for use in lethal injection. Indeed, the American Veterinary Medical Association standards for euthanasia indicate that the ideal barbituric acid derivative for animal euthanasia should be potent, long acting, **\*100** stable in solution, and

NELSON_00076

> inexpensive. Sodium pentobarbital (not sodium thiopental) best fits these criteria. Sodium thiopental is a potent barbituric acid derivative but very short acting with one therapeutic dose.

(Affidavit of Dr. Dennis Geiser, in the case of *Texas* v. *Jesus Flores*, No. 877,994A).

Due to the chemical combination used in the Texas execution process, there is also a probability that the sedative effect of the sodium thiopental is neutralized by the second chemical, pancuronium bromide. As Dr. Mark Heath, Assistant Professor of Clinical Anesthesia at Columbia University states:

> Sodium thiopental is an ultra short-acting barbiturate. It would not be used to maintain a patient in a surgical plane of anesthesia for purposes of performing surgical procedures. It is unnecessary, and risky, to use a short-acting anesthesia in the execution procedure. If the solution of sodium thiopental comes into contact with another chemical, such as pancuronium bromide, the mixture of the two will cause the sodium thiopental immediately to precipitate or crystallize. These factors are significant in the risk of the inmate not being properly anesthetized, especially since no-one checks that the inmate is unconscious before the second drug is administered.

(Affidavit of Dr. Heath, in the case of *Texas* v. *Jesus Flores*, No. 877,994A).

Concerns about using sodium thiopental are heightened by the lack of medical personnel, the lack of proper monitoring of the inmate during the process and the lack of inmate-specific dosing of the barbiturate. According to Dr. Geiser:

> [T]he dosage of thiopental sodium must be measured with some **\*101** degree of precision, and the administration of the proper amount of the dosage will depend on the concentration of the drug and the size and condition of the subject. Additionally, the drug must be administered properly so that the full amount of the dosage will directly enter the subject's blood stream at the proper rate. If the dosage is not correct, or if the drug is not properly administered, then it will not adequately anaesthetize the subject, and the subject may experience the untoward effects of the neuromuscular blocking agent...

Affidavit of Dr. Dennis Geiser, in the case *of Abu-Ali Abdur' Rahman* v. *Bell*, 226 F.3d 696 (6th Cir. 2000), cert. granted on other grounds, 122 S.Ct. 1463 (U.S. April 8, 2002) (No. 01-9094).(emphasis supplied).

Moreover, drug manufacturers warn that without careful medical supervision of dosage and administration, sedatives can cause "paradoxical excitement" and can heighten sensitivity to pain. See Physicians Desk Reference, 50th Ed. (1996) at 438-440. Manufacturers warn against administration by intravenous injection unless a patient is unconscious or out of control. Id.

**2. Pancuronium Bromide**

The second chemical involved in the lethal injection process, pancuronium bromide, or Pavulon, is a derivative of curare that acts as a neuromuscular blocking agent. If, as is probable in the Texas execution process, the sedative effect of the sodium thiopental is ineffective or neutralized, the pancuronium bromide would serve only to mask the excruciating pain of the condemned inmate.

Pancuronium bromide makes the patient look serene because of its paralytic **\*102** effect on the muscles. The face muscles cannot move or contract to show pain and suffering. It therefore provides a 'chemical veil' over the proceedings. By completely paralyzing the inmate, pancuronium bromide masks the normal physical parameters that

NELSON_00077

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

an anesthesiologist or surgeon would rely upon to determine if a patient is completely unconscious and within a proper surgical plane of anesthesia. Because pancuronium bromide is an invisible chemical veil and not a physical veil like a blanket or hood that is easily identifiable, the use of pancuronium bromide in lethal injection creates a double veil. It disguises the fact that there is a disguise over the process.

In Abdur' Rahman v. Bell, Dr. Geiser asserted that "while Pavulon paralyzes skeletal muscles, including the diaphragm, it has no effect on consciousness or the perception of pain or suffering. Administration of Pavulon is "like being tied to a tree, having darts thrown at you, and feeling the pain without any ability to respond." Affidavit of Dr. Dennis Geiser, in the case *of Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d 696 (6th Cir. 2000), cert, granted on other grounds, 122 S.Ct. 1463 (U.S. April 8, 2002) (No. 01-9094) (emphasis added). This assertion is corroborated by the experience of eye surgery patient, Carol Weihrer. During Ms. Weihrer's surgery the sedative she received was ineffectual and Ms. Weihrer was conscious of the entire surgery. Due to the administration of a neuromuscular **\*103** blocking agent like pancuronium bromide, however, she was unable to indicate her consciousness to doctors:

> I experienced what has come to be known as Anesthesia Awareness, in which I was able to think lucidly, hear, perceive and feel everything that was going on during the surgery, but I was unable to move. It burnt like the fires of hell. It was the most terrifying, torturous experience you can imagine. The experience was worse than death.

(Affidavit of Carol Weihrer, in the case of *Texas v. Jesus Flores*, No. 877,994A). In short, the second chemical, pancuronium bromide, or Pavulon, in the lethal injection protocol serves no purpose other than to guarantee that the condemned inmate will be forced into a total chemical straightjacket and gag while he consciously experiences the potassium chloride ravaging his internal organs. Persons viewing the lethal injection procedure and the public will never realize that a cruel fraud is being perpetrated upon them: instead of witnessing an inmate quiet and motionless while being "put to sleep," they are in fact witnessing the cover-up of a deliberate act of excruciating torture for which only the inmate is fully conscious.

### 3. Potassium Chloride

Finally, the use of potassium chloride itself raises important Eighth Amendment concerns. James J. Ramsey, a certified perfusionist and currently the Program Director in the Program in Cardiovascular Perfusion at Vanderbilt **\*104** Medical Center, Nashville, Tennessee, gave a lengthy statement in Abdur Rahman's case regarding the use of potassium chloride in lethal injections. Perfusion involves the study of medicine related to the artificial circulation technologies, including but not limited to the operation of the heart-lung machine, a medical device commonly used during open-heart surgeries of all kinds. The arena involving the chemical arrest of the heart lies uniquely within the practice of the clinical perfusionist.

Regarding the administration and efficacy of potassium chloride in the lethal injection context, Ramsey stated that:

> It is my understanding that during the performance of lethal injection as carried out during the death penalty, potassium (and other agents) are administered intravenously to the defendant. Such administration is, in my professional opinion based upon my knowledge, training, and experience, and within a reasonable degree of medical certainty, entirely inadequate in order to achieve reasonable cardiac standstill. Since the agents are introduced intravenously, there will occur an immediate dilution of the solution, weakening any potential effect it may have. By illustration an 80 kilogram person would have a blood volume of approximately 5.5 to 6 liters. An administration of 100 milli-equivalents of potassium intravenously to the 80 kilogram person would result in a blood concentration of only 16.6 meq/L. Such a dose is according to scientific literature... and as evidenced in my practice, inadequate to achieve cardiac standstill.

NELSON_00078

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

Furthermore, it must be remembered that [in contrast to the administration of potassium chloride in the surgical context] such administration is:

**\*105** (1) NOT DIRECTED INTO THE CORONARY ARTERIES;

(2) DIRECTED ONLY IN AN ANTEGRADE FASHION; AND

(3) IS AT MORMOTHERMIA (37 degrees Celsius, NOT at five degrees Celsius).

Without reasonable data regarding any one person's anatomic and pathologic state as to their myocardial function prior to administration of the potassium, there can be no reasonable certainty that the potassium solution intended to arrest the heart would be distributed in a fashion that would arrest the heart. Thus, the very orchestrated and methodical methods used in surgery should not be thought of as optimizing the arrest of the heart, but should be considered to be necessary as the only reasonable means of ensuring that the heart is arrested. If the heart could be arrested by intravenous objections, cardiac surgery today would be a very different animal-science and research tell us that mere intravenous injection of potassium is not sufficient.

> Additionally, in my professional opinion and within a reasonable degree of medical certainty, barring an effective cardiac arrest, it is entirely possible that a lethal injection as I understand it will serve ONLY to arrest the function of the pulmonary system, thereby causing a state of ischemia to the entire body (no oxygen delivery), which, in turn, will ultimately arrest the heart as well (with no oxygen delivery to it.) As a result, the defendant is simply suffocated due to lack of oxygen.

Affidavit of James J. Ramsey, in the case of *Abu-Ali Abdur' Rahman* v. *Bell*, 226 F.3d 696 (6th Cir. 2000), cert, granted, on other grounds, **\*106** 122 S.Ct. 1463 (U.S. April 8, 2002) (No. 01-9094) (emphasis supplied).

B. The danger of lethal injection creating unnecessary suffering and torture is greatly increased by the lack of physician involvement in the execution process.

The risk of inflicting severe and unnecessary pain and suffering upon Appellant in the lethal injection process is particularly grave in Texas because the meager procedures and protocols designed by TDCJ fail to include safeguards regarding the manner in which the execution is to be carried out, fail to establish the minimum qualifications and expertise required of the personnel performing the critical tasks in the lethal injection procedure, and fail to establish appropriate criteria and standards that these personnel must rely upon in exercising their discretion during the lethal injection procedures. For instance, TDCJ execution protocols do not explain what to do in case an IV port cannot be established. The experience of other states teaches that, in such a case, a medically trained person must perform a "cut down" to expose a deeply buried vein, or perform an infraclavicular catheterization, or other invasive medical procedure to facilitate the subsequent lethal injection such as an attempt to establish a port through the carotid enclosure in the neck. In Texas, the physician's services are limited to his or her pronouncing death.

**\*107** There are no directions and no standards for the necessary training, education, or expertise of the personnel who will be exercising this critical discretion and performing these tasks and duties. TDCJ guidelines totally fail to articulate the criteria or standards that such personnel must rely upon in exercising this discretion. The consequences of this failure will likely result in the unnecessary and wanton infliction of severe pain and suffering.

Perhaps most importantly, there are no apparent answers to critical questions governing a number of crucial tasks and procedures in the lethal injection procedure such as:

NELSON_00079

(a) the minimum qualifications and expertise required for the different personnel performing the tasks involved in the lethal injection procedure after the catheter is inserted;

(b) the methods for obtaining, storing, mixing, and appropriately labeling the drugs, the minimum qualifications and expertise required for the person who will be determining the concentration and dosage of each drug to give, and the criteria that shall be used in exercising this discretion;

(c) the manner in which the IV tubing, three-way valve, saline solution and other apparatus shall be modified or fixed in the event it is malfunctioning during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

(d) the manner in which the heart monitoring system shall be modified or fixed in the event it is malfunctioning during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

 *108  (e) the manner in which the IV catheters shall be inserted into the condemned prisoner, the minimum qualifications and expertise required of the person who is given the responsibility and discretion to decide when efforts at inserting the IV catheters should be abandoned and the cut down procedure begun, and the criteria that shall be used in exercising this discretion;

(f) the manner in which the condition of the condemned prisoner will be monitored to confirm that proceeding to the next procedure would not inflict severe and unnecessary pain and suffering on the condemned prisoner;

(g) the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering on the condemned prisoner, and the criteria that shall be used in exercising this discretion; and,

(h) the minimum qualifications and expertise required of the person who is given the responsibility and discretion to insure that appropriate procedures are followed in response to unanticipated problems or events arising during the lethal injection procedure, and the criteria that shall be used in exercising this discretion.

This disturbing lack of outlined medical procedure and personnel in Texas contributes in part to the numerous execution errors in Texas. See e.g. Deborah Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us*, 63 Ohio St. L.J. 1ll (February 2002) (quoting Fred Leuchter, "the highly controversial and later-discredited creator of much, if not most, of the execution equipment in this country," as admitting that "'about eighty percent' of the lethal injections in Texas "have had one problem or another.").

 *109  Some of the previous errors in Texas executions include:
1. Stephen Peter Morin ¶ March 13, 1985 - "Technicians" punctured him repeatedly in both arms and legs for 45 minutes before they found a suitable vein.

2. Randy Woolls - August 20, 1986 - A drug addict, Woolls had to help the executioner technicians find a good vein for the execution.

3. Elliot Johnson - June 24, 1987 - Executioners struggled for 35 minutes to insert the catheter into his veins.

NELSON_00080

Mark Anthony SOLIZ, Appellant, v. THE STATE OF..., 2013 WL 5758241...

4. Raymond Landry ¶ December 13, 1988 - Pronounced dead 40 minutes after being strapped to the execution gurney and 24 minutes after the drugs first started flowing into his arms. Two minutes into the killing, the syringe came out of Landry's vein, spraying the deadly chemicals across the room toward the witnesses. The execution team had to reinsert the catheter into the vein. The curtain was drawn for 14 minutes so witnesses could not see the intermission.

5. Stephen McCoy ¶ May 24, 1989 - Had such a violent physical reaction to the drugs (heaving chest, gasping, choking, etc.) that one of the witnesses (male) fainted, crashing into and knocking over another witness. Houston attorney Karen Zellars, who represented McCoy and witnessed the execution, thought that the fainting would catalyze a chain reaction. The Texas Attorney General admitted the inmate "seemed to have a somewhat stronger reaction," adding "The drugs might have been administered in a heavier dose or more rapidly."

6. Billy Wayne White - April 23, 1992 - It took 47 minutes for authorities to find a suitable vein, and White eventually had to help.

7. Justin Lee May - May 7, 1992 - May had an unusually violent reaction to the lethal drugs. According to Robert *110 Wernsman, a reporter for the Item (Huntsville), Mr. May "gasped, coughed and reared against his heavy leather restraints, coughing once again before his body froze ..." Associated Press reporter Michael Graczyk wrote, "He went into coughing spasms, groaned and gasped, lifted his head from the death chamber gurney and would have arched his back if he had not been belted down. After he stopped breathing his eyes and mouth remained open."

8. Joseph Cannon - April 22, 1998 - After his final statement, the execution commenced. A vein in Cannon's arm collapsed and the needle popped out. Seeing this, Cannon lay back, closed his eyes, and exclaimed to the witnesses, "It's come undone." Officials then pulled a curtain to block the view of witnesses, reopening it fifteen minutes later when a weeping Cannon made a second final statement and execution process resumed.

**C. Euthanasia Practices that Include the Use of a Sedative in Conjunction with a Neuromuscular Blocking Agent Violate Evolving Standards of Decency.**

Recent legislative changes regarding pet euthanasia cast serious doubt as to whether the Texas execution protocol passes constitutional muster. Since 1981, at least nineteen states, including Texas, have passed laws that preclude the use of a sedative in conjunction with a neuromuscular blocking agent. Moreover, in the year 2000, the leading professional association of veterinarians promulgated guidelines for euthanasia that preclude the practice. Those guidelines specifically state that "[a] combination of pentobarbital with a neuromuscular blocking agent is not an acceptable euthanasia agent." Appendix 5 (2000 Report of the American *111 Veterinary Medical Association Panel on Euthanasia, 218 Journal of the American Veterinary Medical Association, 669, 681 (2001) at 680. A euthanasia practice widely considered unfit for a dog is certainly unfit for humans as well, especially in light of the fact that the State may easily accomplish the same result with a more humane combination of chemicals. Given the consistency in the statutory regulation of euthanasia, the method currently practiced by the State of Texas is outside the bounds of evolving standards of decency.

Texas recently passed legislation mandating inhumane methods of euthanizing animals which precludes the use of neuromuscular blocking agents such as pancuronium bromide. Tex. Health & Safety Code. § 821.052(a), (b) (2003) (specifically prescribing the methods of euthanasia for cats and dogs in the custody of animal shelters and requiring that shelters euthanize all other animals "only in accordance with the applicable methods, recommendations, and procedures set forth in the 2000 Report of the American Veterinary Medical Association Panel on Euthanasia ...."). With this legislation, Texas has joined numerous states with laws recognizing that use of these chemicals would be inhumane in the euthanasia of dogs and cats. See Florida, Fla. Stat. §§ 828.058 and 828.065 (enacted in 1984); Georgia, Ga. Code Ann. § 4-11-5.1 (1990); Maine, Me. Rev. Stat. Ann., Tit. 17, § 1044 (1987); Maryland, Md. Code Ann., Criminal Law, § 10-611

NELSON_00081