antisocial personality disorder are not psychopaths."[213] Hare pointed out that "literature relating the PCL-R to treatment outcome and to the risk for recidivism and violence may have little or no relevance for an individual with a diagnosis of antisocial personality disorder."[214]

In addition to the issue of a given clinician's competence, another important concern raised by Hare involves the potential for inaccurate, biased ratings in applied forensic settings, because of "the assessment biases [the clinician] may have."[215] Hare considers this a serious matter, "particularly in jurisdictions ... where it is not uncommon for prosecutors and defense lawyers to seek out and retain 'the right expert.'"[216] Although Hare asserts that the scoring criteria are "quite explicit,"[217] he has observed that "experts hired by the defense always seem to come up with considerably lower PCL-R ratings than do experts who work for the prosecution."[218] This is understandably "of considerable concern" to Hare "because a PCL-R rating carries more serious implications for the individual and for the public than do most psychological assessments."[219]

A growing literature has also raised concerns that the PCL-R is less reliable in field (rather than research) settings,[220] due in part to the potential for evaluator bias in PCL-R rating scores.[221] While studies

---

213. *Id.*
214. *Id.*
215. *Id.* at 113.
216. *Id.*
217. *Id.*
218. *Id.*
219. *Id.*
220. *Reliability* and *validity* are critical characteristics of any assessment procedure. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590 n.9. Reliability refers to the extent to which the same PCL-R scores are obtained for a particular individual, regardless of who administers the instrument; the expectation is that independent evaluators will obtain the same or similar results. *Id.* Validity refers to the ability of the measuring instrument (for example, the PCL-R) to actually measure the property (for example, psychopathy) it is supposed to measure. *See id.*; Dave DeMatteo & John F. Edens, *The Role and Relevance of the Psychopathy Checklist-Revised in Court: A Case Law Survey of U.S. Courts (1991-2004)*, 12 PSYCHOL. PUB. POL'Y & L. 214, 214 (2006); Salekin et al., *supra* note 155, at 204-05.

221. *See, e.g.*, Marcus T. Boccaccini et al., *Do Some Evaluators Report Consistently Higher or Lower PCL-R Scores than Others?: Findings from a Statewide Sample of Sexually Violent Predator Evaluations*, 14 PSYCHOL. PUB. POL'Y & L. 262, 262 (2008); Edens et al., *Inter-Rater Reliability*, *supra* note 181, at 114; Daniel C. Murrie et al., *Does Interrater (Dis)agreement on Psychopathy Checklist Scores in Sexually Violent Predator Trials Suggest Partisan Allegiance in Forensic Evaluations?*, 32 LAW & HUM. BEHAV. 352, 352 (2008) [hereinafter Murrie et al., *Interrater*]; Daniel C. Murrie et al., *Field Validity of the Psychopathy Checklist-Revised in Sex Offender Risk Assessment*, 24 PSYCHOL. ASSESSMENT 524, 524 (2012) [hereinafter Murrie et al., *Field Validity*]. These results raise critical, provocative questions about the use of the PCL-R in extremely high-stakes adversarial legal proceedings such as capital cases. Together, these studies clearly suggest the need for caution and further investigation. *See* John Edens et al., *Taking Psychopathy Measures*

NELSON_01367

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

show strong interrater agreement for PCL-R scores in well-designed research settings, conditions in real world settings differ significantly.[222] While "forensic psychologists have traditionally assumed that results from well-designed studies generalize to field settings[,] . . . recent research suggest[s] this assumption may not be safe."[223] Taken together, these findings raise serious questions about the reliability of the PCL-R in adversarial legal proceedings.

"[R]ecent field reliability research suggests that some evaluators assign consistently higher PCL-R scores than others . . . ."[224] Evaluator bias appears to be attributable to at least two independent sources of error.[225] Several studies suggest that individual differences in evaluators may account for some of the variability in PCL-R scores in forensic proceedings.[226] In addition, some PCL-R items are clearly more subjective than others.[227] Although general concerns have been raised about the bias in PCL-R ratings in real-world cases, the inferential personality items (Factor 1), thought to be most central to psychopathy, appear to be particularly susceptible.[228] Possible explanations include differences in raters' own subjective thresholds for Factor 1 items (reflecting interpersonal/affective traits) and differences in how

---

*"Out of the Lab" and into the Legal System: Some Practical Concerns, in* HANDBOOK OF PSYCHOPATHY AND THE LAW 250 (Kent A. Kiehl & Walter P. Sinnott-Armstrong eds., 2013); *see also* Cailey S. Miller et al., *Reliability of Risk Assessment Measures Used in Sexually Violent Predator Proceedings, in* PSYCHOLOGICAL ASSESSMENT 944, 944 (2012).

222. Murrie et al., *Interrater, supra* note 221, at 354. For example, most reliability values in the PCL-R literature reflect protocols in which two or more clinicians witness the same interview and review the same collateral materials. *Id.* at 353. In applied (adversarial) forensic settings, interviews are more often conducted at different points in time, and evaluators may review different materials. *Id.*

223. Murrie et al., *Field Validity, supra* note 221, at 525.

224. *Id.* (citing Boccaccini et al., *supra* note 221, at 263).

225. Boccaccini et al., *supra* note 221, at 276-77; Murrie et al., *Interrater, supra* note 221, at 357-58; Daniel C. Murrie et al., *Rater (Dis)agreement on Risk Assessment Measures in Sexually Violent Predator Proceedings: Evidence of Adversarial Allegiance in Forensic Evaluation?*, 15 PSYCHOL. PUB. POL'Y & L. 19, 24 (2009) [hereinafter Murrie et al., *Rater (Dis)agreement*]; *see also* Edens et al., *Inter-Rater Reliability, supra* note 181, at 116.

226. Boccaccini et al., *supra* note 221, at 263-64, 276. In this study, researchers found that over thirty percent of the variability in PCL-R scores was attributable to differences among evaluators, regardless of which side of the case they worked on. *Id.* at 276.

227. Studies have consistently demonstrated that there is more subjectivity and room for disagreement on items related to the interpersonal items of the PCL-R (considered more indicative of traditional notions of psychopathy) than on historical items (traditionally associated with antisocial behavior). *See* Miller et al., *supra* note 221, at 950; *see also* Terrence W. Campbell, *The Validity of the Psychopathy Checklist-Revised in Adversarial Proceedings*, 6 J. FORENSIC PSYCHOL. PRAC. 43, 45-47 (2006); Edens et al., *Inter-Rater Reliability, supra* note 181, at 107; Murrie et al., *Interrater, supra* note 221, at 360.

228. Edens et al., *Inter-Rater Reliability, supra* note 181, at 109.

**NELSON_01368**

evaluators might evoke different levels of Factor 1 traits due to their own interviewing styles.[229]

A second source of potential PCL-R scoring bias is partisan adversarial allegiance; that is, the tendency for forensic evaluators to reach opinions that support the party who retained them. "For decades, observers have complained – although usually through anecdotes and impressions rather than empirical data – of bias or partisanship by expert witnesses."[230] These concerns are validated by recent evidence of systematic differences in PCL-R rating scores, with scores skewed in the direction supporting the party who retained the evaluator.[231] Similar concerns have been raised by the National Research Council ("NRC") about the reliability of commonly accepted forensic science techniques,[232] and this new evidence of bias in the use of the PCL-R raises specific questions about forensic psychology—an area not addressed in the NRC report.[233]

Evidence of the potential for individual and partisan allegiance bias, and the lack of field reliability of PCL-R application in forensic proceedings, have serious implications for scientifically competent and ethical forensic practice. This raises additional questions about the PCL-R's evidentiary value in highly adversarial capital litigation proceedings.[234] Researchers in this area have concluded that, "as the

---

229. *Id.* at 116. In further support of individual bias, an exploratory study found that raters' PCL-R scoring tendencies related to their own personality traits. Audrey K. Miller et al., *On Individual Differences in Person Perception: Raters' Personality Traits Relate to Their Psychopathy Checklist-Revised Scoring Tendencies*, 18 ASSESSMENT 253, 259 (2011).

230. Murrie et al., *Rater (Dis)agreement, supra* note 225, at 46.

231. *See* Murrie et al., *Interrater, supra* note 221, at 355; Murrie et al., *Rater (Dis)agreement, supra* note 225, at 23. The strongest evidence for partisan adversarial allegiance derives from a recent study that showed a clear pattern of bias in PCL-R scores *in an experimental design.* Daniel C. Murrie et al., *Are Forensic Experts Biased by the Side that Retained Them?*, 24 PSYCH. SCI. 1889, 1890-91, 1893, 1895 (2013) [hereinafter Murrie et al., *Are Forensic Experts Biased*]. This study assessed potential adversarial allegiance and addressed the question of whether forensic experts are biased by the side that retained them. *Id.* The study adds critical and important information to the literature discussed, as the study design involved a random assignment of experts trained in use of two risk assessment instruments (including the PCL-R) to either the defense or the prosecution. *Id.* Partisan adversarial allegiance was found, even in this instance that did not involve real-world settings (e.g., actual retention by the prosecution or defense). *Id.* This study adds further weight to earlier studies based on naturalistic designs, and increases concerns about the objectivity of forensic experts when using instruments such as the PCL-R. *See id.*

232. NATIONAL RESEARCH COUNCIL, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD 184-85 (2009).

233. Murrie et al., *Are Forensic Experts Biased, supra* note 231, at 1895.

234. As an important side note, another potential bias involves the threat to academic freedom in resolving disputes about the PCL-R. This was addressed recently by prominent psychologists Norman Poythress and John Petrila. *See* Norman Poythress & John P Petrila, *PCL-R Psychopathy: Threats to Sue, Peer Review, and Potential Implications for Science and Law. A Commentary*, 9 INT'L J. FORENSIC MENTAL HEALTH 3, 4, 9 (2010). These forensic experts discussed the

NELSON_01369

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

amount of variance attributable to evaluators approaches the amount of variance attributable to the offender, any score or opinion from the evaluator becomes less useful and fails to serve the purpose for which evaluators serve in court: to provide nonbiasing assistance to the trier of fact."[235]

### 2. Psychopathy: Ethical Controversies

The use of forensic evidence about psychopathy to persuade judges or juries to execute a defendant raises serious ethical concerns. These include the prejudicial nature of the construct itself, the equation of psychopathy with "wickedness" and "evil," and the implication that psychopathic individuals are subhuman. Consider, for example, Cleckley's assertions in his influential book on psychopathy:

> We are dealing here not with a complete man at all but with something that suggests a subtly constructed reflex machine which can mimic the human personality perfectly.... So perfect is this reproduction of a whole and normal man that *no one who examines him in a clinical setting can point out in scientific or objective terms why, or how, he is not real.* And yet we eventually come to know or feel we know that reality, in the sense of full, healthy experiencing of life, is not here.[236]

Similar, dehumanizing language was used more recently by Doctor Reid Meloy, who has written extensively about psychopathy:

> [T]he psychodynamics of the psychopath bring us closer to what we see as [his] evil .... It is phylogenetically a prey-predator dynamic, *often viscerally or tactilely felt by the psychiatrist as an acute autonomic fear response in the presence of the patient ... the hair standing up on the neck, goosebumps, or the more inexplicable "creepy" or "uneasy" feeling. These are atavistic reactions that may signal real danger and should never be ignored ....*[237]

---

implications of a recent threat of litigation against the authors of an article that questioned the role of criminal behavior in the construct of psychopathy. *Id.* The editor of the scientific journal that accepted the article for publication (following the peer-review process) was also threatened with litigation. *Id.* Poythress and Petrila cautioned that "litigation threats can have chilling effects on academic freedom." *Id.* Litigation threats, uncommon in the mental health field, have the potential to negatively affect the greatly valued process of peer review as a means of ensuring academic integrity and scientific reliability and validity. *Id.* at 4, 7, 9.

235. Boccaccini et al., *supra* note 221, at 277.

236. ERROL MORRIS, A WILDERNESS OF ERROR: THE TRIALS OF JEFFREY MACDONALD 368-70 (2012) (emphasis added) (citing HERVEY CLECKLEY, THE MASK OF SANITY (5th ed. 1976)).

237. J. Reid Meloy, *The Psychology of Wickedness: Psychopathy and Sadism*, 27 PSYCHIATRIC ANNALS 630, 631 (1997) (emphasis added) (footnotes omitted). Both of these statements present an alarmingly subjective, dehumanizing portrayal of the "psychopath" as non-human, which has been

**NELSON_01370**

Wayland and O'Brien: Deconstructing Antisocial Personality Disorder and Psychopathy: A

The use of such inflammatory language, cloaked as medical science, inevitably stigmatizes capital defendants and prejudices capital jurors and fact finders.[238] Because of the PCL-R's susceptibility to producing unreliable results in the hands of biased examiners, ethical concerns are growing about its unreliability and misuse of the PCL-R in forensic contexts.

### 3.  Psychopathy Evidence More Prejudicial than Probative

The PCL-R and the construct of psychopathy have only recently been introduced into the sentencing phase of capital murder trials.[239] Such evidence has quickly taken hold in capital litigation to support expert testimony offered by the prosecution that a defendant will be a continuing threat to society if he is not executed.[240] Accumulating evidence suggests that, when juries perceive capital defendants to present a risk of future dangerousness, they are more likely to return a

---

contradicted by a number of studies indicating that there is no evidence the concept represents a discrete category of individuals. It is noteworthy that Meloy and Cleckley agree that it is difficult to assess clearly whether an individual is a psychopath, except in some "atavistic" or gut-level recognition of this "reality." *See id.* The subjective nature of Meloy's methodology was instrumental in the Colorado homicide conviction of Timothy Lee Masters, who was ultimately proven completely innocent. Miles Moffeit, *Release Likely Today as Missteps Surface*, DENVER POST, Jan. 22, 2008, http://www.denverpost.com/ci_8039377. Without interviewing Masters, but based on interpretation of violent images depicted in Masters's artwork and writings, Meloy testified that the "defendant perceived himself as a warrior character without empathy or feeling who engaged, through fictional narratives and pictures, in a variety of killings." State v. Masters, 33 P.3d 1191, 1196 (Colo. App. 2001). The Colorado Supreme Court found that Meloy's testimony was crucial to Masters's conviction. No physical evidence linked him to the crime, and "Dr. Meloy's testimony provided an explanation for the seemingly inexplicable." Masters v. State, 58 P.3d 979, 991 (Colo. 2002) (en banc). Without it, "lay jurors would be tremendously disadvantaged in attempting to understand Defendant's motivation for killing [Peggy] Hettrick." *Id.* at 992. Based on exonerating DNA tests, and other evidence developed with the assistance of police detectives who always had reservations about his guilt, Masters was released from prison on the motion of prosecuting attorneys in 2008. Moffeit, *supra.*

238.  *See, e.g.*, Lloyd et al., *supra* note 184, at 324. Caleb D. Lloyd and his colleagues state: Concerns have been raised that expert testimony provided in trial courts, especially testimony in regards to psychopathy, may promote unfounded prejudice or inflate weakly supported research findings to bias criminal justice decision makers . . . minimally, professional integrity requires a measure of caution when considering emotionally charged diagnoses in the courts or applying standardized instruments to situations for which these instruments were not originally intended . . . . *Id.*

239.  John F. Edens et al., *Psychopathy and the Death Penalty: Can the Psychopathy Checklist-Revised Identify Offenders Who Represent "A Continuing Threat to Society,"* 29 J. PSYCHIATRY & L. 433, 434, 439 (2001) [hereinafter Edens et al., *Psychopathy and the Death Penalty*]; *see also* Cunningham, *supra* note 77, at 828, 829-30; Cunningham & Goldstein, *supra* note 3, at 425.

240.  *See, e.g.*, Bersoff, *supra* note 77, at 571; Cunningham & Reidy, *supra* note 17, at 333; DeMatteo & Edens, *supra* note 220, at 215, 218; Edens et al., *Impact of Mental Health Evidence, supra* note 77, at 616-18; Edens et al., *Psychopathy and the Death Penalty, supra* note 239, at 436-37, 439; Edens et al., *Predictions, supra* note 77, at 77.

NELSON_01371

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

death sentence.[241] The label "psychopath" has a profound effect on lay persons' views of capital defendants, because it tends to obscure and overwhelm other relevant mental health evidence.[242] This may explain the increasing use of such evidence by the prosecution.[243]

Given the prejudicial effect of expert testimony that the defendant is a psychopath who may kill again, mental health researchers recognize that it "has arguably become one of the most controversial types of evidence admitted."[244] Due to the "limited probative value of the PCL-R in capital cases and the prejudicial nature of the effects noted in this study,"[245] Edens and his colleagues "recommend that forensic examiners avoid using it in capital trials."[246] They also argue for ethical guidelines limiting the use of psychopathy evidence:

> Although the courts have typically allowed experts considerable latitude regarding what constitutes admissible evidence in these cases, this by no mean obviates experts' ethical responsibility to "use assessment instruments whose validity and reliability have been established for use with the members of the population tested" or the need to "take reasonable steps to avoid harming their

---

241. John H. Blume et al., *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 CORNELL L. REV. 397, 404 (2001); Mark Constanzo & Sally Costanzo, *Jury Decision Making in the Capital Penalty Phase: Legal Assumptions, Empirical Findings, and a Research Agenda*, 16 LAW & HUM. BEHAV. 185, 196 (1992); Edens et al., *Impact of Mental Health Evidence, supra* note 77, at 616, 618; John F. Edens & Jennifer Cox, *Examining the Prevalence, Role and Impact of Evidence Regarding Antisocial Personality, Sociopathy and Psychopathy in Capital Cases: A Survey of Defense Team Members*, 30 BEHAV. SCI. & L. 239, 242, 247 (2012).

242. *See* DeMatteo & Edens, *supra* note 220, at 232; Edens et al., *Impact of Mental Health Evidence, supra* note 77, at 607; John F. Edens et al., *Psychopathic Traits Predict Attitudes Toward a Juvenile Capital Murderer*, 21 BEHAV. SCI. & L. 807, 822-24 (2003). As stated by Lloyd and his colleagues:

> Pejorative labeling and adverse effects are accomplished through experts' selective presentation of the concept of psychopathy or exaggeration of its implications. . . . [E]ven when psychopathy is correctly applied, research supports the conclusion that perceptions of dangerousness are heightened beyond an experts' indicated risk level when a diagnostic label is given.

Lloyd et al., *supra* note 184, at 325.

243. DeMatteo & Edens, *supra* note 220, at 232.

244. Edens et al., *Impact of Mental Health Evidence, supra* note 77, at 605 (citing Cunningham & Reidy, *supra* note 17, at 336-37); Charles P. Ewing, *"Dr. Death" and the Case for an Ethical Ban on Psychiatric and Psychological Predictions of Dangerousness in Capital Sentencing Proceedings*, 8 AM. J.L. & MED. 407, 412-13, 415 (1983); *see also* Brief for the American Psychological Association & the Missouri Psychological Association as Amicus Curiae Supporting Respondent at 20, Roper v. Simmons, 543 U.S. 551 (2005) (No. 03-633).

245. Edens et al., *Impact of Mental Health Evidence, supra* note 77, at 603. This study examined the effects of data about psychopathy on layperson attitudes; test subjects reviewed a capital murder case where results of the defendant's psychological examination were experimentally manipulated. *Id.*

246. *Id.*

---

**NELSON_01372**

clients/patients . . . and others with whom they work, and to minimize harm where it is foreseeable and unavoidable. Given the minimally probative nature of PCL-R data . . . combined with the likelihood that it would have a prejudicial impact, it is difficult to postulate a scenario in which these two ethical standards would not be in jeopardy if it were introduced . . . ."[247]

It is for these reasons that both the American Psychiatric Association and the American Psychological Association have opposed the use of such evidence in in capital cases.[248]

In sum, serious ethical questions have been raised about whether the PCL-R provides any probative value in capital sentencing procedures.[249] The PCL-R stigmatizes defendants because of its associated label of "psychopath" and the morally damning judgment implicit in many of PCL-R items. "[I]t seems impossible to reconcile the glaring inaccuracy of the prediction made by prosecution experts . . . with the assertion that death sentences have not been meted out in a capricious manner."[250] In fact, when laypersons attribute psychopathic traits to capital defendants, this strongly predicts their support for decisions to execute them.[251]

### 4. No Intelligent Design: Conceptual Drift Towards "Evil" and "Wickedness"

An ethical debate of particular relevance to capital litigation is whether the mental health field should weigh in on "wickedness" and "evil," which are not clinical constructs (for example, neither are they contained anywhere in the DSM, nor are psychiatrists or psychologists trained to assess or identify these moral characterizations). While the introduction of moral and religious overtones into forensic testimony has

---

247. *Id.* at 619.

248. Edens & Cox, *supra* note 241, at 241; *see also* Brief of Amicus Curiae American Psychological Ass'n in Support of Defendant-Appellant at 9-12, United States v. Fields, No. 04-50393 (5th Cir. Apr. 2, 2007).

249. Edens & Cox, *supra* note 241, at 242-43; *see also* Bersoff, *supra* note 77, at 572 (enumerating six concerns); Cunningham & Goldstein, *supra* note 3, at 424, 426; Edens, *Misuses*, *supra* note 190, at 1085, 1087, 1089 (presenting two case examples); Edens et al., *Impact of Mental Health Evidence*, *supra* note 77, at 605-06. The PCL-R also is likely to have a highly prejudicial effect on perceptions of the defendant. Brief for the American Psychological Ass'n & the Missouri Psychological Ass'n as Amicus Curiae Supporting Respondent at 23-24, Roper v. Simmons, 543 U.S. 551 (2005) (No. 03-633).

250. Edens et al., *Predictions*, *supra* note 77, at 77. Hare, the developer of the PCL-R, has serious concerns about and has disavowed numerous ways in which his instrument has been misused. *See supra* text accompanying notes 206-19.

251. John F. Edens et al., *No Sympathy for the Devil: Attributing Psychopathic Traits to Capital Murderers Also Predicts Support for Executing Them*, 4 PERSONALITY DISORDERS: THEORY, RES. & TREATMENT 175, 175-76 (2012).

NELSON_01373

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

been questioned, "[i]nterest in evil is growing. The psychological and psychiatric literature reflects steadily increasing attention to the concept of evil over the past two decades."[252]

One prominent advocate of the view that "evil" and similar terms (for example, "depravity") are within the purview of psychiatric assessment is Welner, a psychiatrist who testifies frequently for the government in death penalty cases.[253] His position is that "legal relevance demands that evil be defined and standardized" because, "[i]n 39 American states, and in federal jurisdictions, statutes allow for judges and juries to enhance penalties for convicted offenders if they decide the crime committed was 'heinous,' 'atrocious,' 'depraved,' 'wanton,' or otherwise exceptional."[254] Welner explains that the purpose of introducing "evil" as a forensic concept in criminal cases is to neutralize evidence of the background and character of the accused, which in his personal opinion has no place in capital decision-making:[255]

> Without standardized direction, jury decisions on whether a crime is depraved are all too often *contaminated by details about the "who" of a crime* (i.e. a person's checkered background or, alternatively virtuous qualities that render a jury unable to fathom how such a privileged person could so dramatically offend), as opposed to focusing on *"what" the defendant actually did.*[256]

Welner contends that, "mingling the 'what' of a crime" with mitigating circumstances "undercuts an unbiased, equal justice."[257] He argues that standardizing depravity (evil) is needed to "insulate [jurors] from emotional manipulation, courtroom theatrics, *and the introduction of factors that should not play a role in sentencing.*"[258] Of course, the factor that Welner seeks to neutralize is the Eighth Amendment's "need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual."[259]

Welner's advocacy of the use of depravity or evil to focus solely on the "what" of the crime, rather than the "who" of the defendant, is particularly misguided in light of the constitutional demand that the

---

252. Knoll, *supra* note 56, at 105 ("Medline and PubMed searches using the phrases 'the concept of evil in forensic psychiatry' and 'evil and psychiatry' revealed significantly more relevant publications beginning in the early to mid 1990s than before this period.").

253. *See Michael Welner, M.D.*, FORENSIC PANEL, http://www.forensicpanel.com/about/out_experts/expert/20835.html (last visited Feb. 16, 2014).

254. Welner, *supra* note 57, at 417.

255. *See generally id.*

256. *Id.* at 417 (emphasis added).

257. *Id.* at 418.

258. *Id.* at 418 (emphasis added).

259. Lockett v. Ohio, 438 U.S. 586, 605 (1978).

**NELSON_01374**

sentencer consider the uniqueness of each individual in weighing the death penalty, which is reserved only for "a narrow category" of the most culpable offenders who commit the worst of crimes.[260] Indeed, the very factors which Welner insists on writing out of the capital sentencing equation—"a person's checkered background or, alternatively virtuous qualities ... [or] race, orientation, and socioeconomic factors"[261]—are "relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background ... may be less culpable than defendants who have no such excuse."[262] The Eighth Amendment condemns any procedure that "treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death."[263] Therefore, the Supreme Court requires that a capital sentencer be permitted to consider, "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."[264] Welner's admission that evidence about psychopathy is intentionally designed to obscure constitutionally mandated mitigating evidence provides a compelling ethical argument for excluding it altogether.

Contrary to Welner, psychiatrist Doctor Robert Simon articulates the view that "evil" is not within the purview of the science of psychiatry:

> Forensic psychiatrists are ethically required to adhere to the principles of honesty and striving for objectivity in providing opinions and testimony. Evil, however, is a concept too knotted in ambiguity for the application of these principles. The proper métier of the forensic psychiatrist is psychological and clinical. Psychiatrists are medically trained in the scientific method, not in the diagnosis and treatment of evil. They observe cause and effect in human behavior. When a concept is beyond scientific investigation, it is the province of the philosopher and theologian. Introducing the concept of evil into forensic psychiatry hopelessly complicates an already difficult task.

---

260. Atkins v. Virginia, 536 U.S. 304, 319 (2002).

261. *See also* Welner, *supra* note 57, at 417.

262. Wiggins v. Smith, 539 U.S. 510, 535 (2003) (quoting Penry v. Lynaugh, 492 U.S. 302, 319 (1989)).

263. Woodson v. North Carolina, 428 U.S. 280, 304 (1976).

264. Lockett v. Ohio, 438 U.S. 586, 604 (1978) (emphasis omitted).

NELSON_01375

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

The determination that a particular behavior is or is not evil is a judgment that is heavily influenced by context and subjectivity.[265]

Simon argues persuasively that "[t]he Gordian knot of evil cannot be untied by forensic psychiatry. It is unreasonable to expect forensic psychiatrists to provide credible testimony about evil."[266] He explains, "[l]ay people are just as qualified to identify these individuals as evil," and forensic psychiatrists and psychologists have "an important, but limited consulting role when advising the courts about psychological matters. We are not and should not be asked to offer professional opinions about evil. It's the law's final moral judgment of guilt upon individuals whom society brands as evildoers."[267]

Opponents of using psychiatry to measure evil point out that it is "an entirely subjective concept created by humans."[268] They argue that "[s]ince evil is a subjective moral concept with inextricable ties to religious thought, it cannot be measured by psychiatric science."[269] Further, "attempts by behavioral science to define evil as though it were an objective and quantifiable concept are inherently flawed."[270] To give "evil" quasi-scientific status in the psychiatric study of human behavior would harm patients and impede advancement in the identification and treatment of mental disorders:

> The term evil is very unlikely to escape religious and unscientific biases that reach back over the millennia. Any attempt to study violent or deviant behavior under this rubric will be fraught with bias and moralistic judgments. Embracing the term evil as though it were a legitimate scientific concept will contribute to the stigma of mental illness, diminish the credibility of forensic psychiatry, and corrupt forensic treatment efforts.[271]

To conclude otherwise would threaten the neutrality and objectivity that are essential ingredients of ethical and psychiatrically valid forensic mental health evaluations:

---

265.  Robert I. Simon, *Should Forensic Psychiatrists Testify About Evil?*, 31 J. AM. ACAD. PSYCHIATRY & L. 413, 414 (2003) (footnote omitted). In a private communication with Robert I. Simon, Daniel W. Shuman, Professor of Law at Southern Methodist University, wrote: "As to relevance, no legal standard with which I am familiar turns on depravity – to what is this relevant in the forensic world?" *Id.* at 413.

266.  *Id.* at 416.

267.  *Id.*

268.  Knoll, *supra* note 56, at 105.

269.  *Id.* Knoll explains that, "evil can never be scientifically defined because it is an illusory moral concept, it does not exist in nature, and its origins and connotations are inextricably linked to religion and mythology." *Id.* at 114.

270.  *Id.* at 105.

271.  *Id.* at 114.

NELSON_01376

Thus, psychiatry already has a tradition of at least attempting to avoid moralistic bias by focusing on concepts such as violence, aggression, or sexual disorders. Terms with value-laden or pejorative connotations are either limited or avoided. The use of such terms is a tradition that places value on the struggle for neutrality and objectivity. Forensic psychiatrists, as expert witnesses, subscribe to the principle in ethics of striving for objectivity. Forensic clinical psychiatrists, who must follow general ethics guidelines for psychiatry, are instructed to avoid any policy that "excludes, segregates or demeans the dignity" of a patient. When treating offenders, psychiatrists must strike a balance between neutrality and beneficence, regardless of how heinous a crime the patient may have committed.[272]

Finally, introducing "evil" into capital sentencing under the guise of medical science will only increase concerns about the arbitrary and capricious infliction of the death penalty:

[I]t is not difficult to imagine a scenario in which the results of a legal adjudication of evil include discrimination against poor or disadvantaged individuals. . . .

There are strong emotional and psychological forces at play during capital trials that are potentially biasing. It is well known that much more than legal fact is communicated in the courtroom, and that this "much more" has a direct and powerful effect on a jury's punishment decision. For example, it has been found that a defendant's appearance significantly influences whether jurors impose the death sentence. If jurors are unable to discount the physical appearance of a defendant in their deliberations, what is the likelihood that they will remain objective when a word steeped in religious morality is introduced by "experts" as a scientific construct?[273]

In sum, evidence that the defendant has ASPD or psychopathy, and that he will therefore be dangerous in the future, fails the most basic tests of scientific knowledge.[274] The myriad scientific, reliability, and ethical concerns about labeling a person antisocial, psychopathic, and evil cloaked as psychiatric findings should result in this evidence being excluded from the highly-charged adversarial atmosphere of capital trials. Thirty years ago, the Supreme Court rejected a challenge to the

---

272.  *Id.* at 112 (citation omitted) (footnote omitted).

273.  *Id.* at 110 (footnote omitted).

274.  "[S]cientists typically distinguish between 'validity' (does the principle support what it purports to show?) and 'reliability' (does application of the principle produce consistent results?)." Daubert v. Merrill Dow Pharmaceutical, Inc., 509 U.S. 579, 590 n.9 (1993). "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Id.* at 593.

NELSON_01377

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

use of psychiatric testimony in the penalty phase of a death penalty case that the defendant would pose a future danger if not executed.[275] The Court found that, "[t]he suggestion that no psychiatrist's testimony may be presented with respect to a defendant's future dangerousness is somewhat like asking us to disinvent the wheel."[276] As Edens and his colleagues suggest, perhaps the time has come to do so.[277]

## IV. LEGAL GUIDELINES AND MENTAL HEALTH ASSESSMENTS: AVOIDING FATAL MISTAKES

This Part will discuss the "long recognized . . . critical interrelation between expert psychiatric assistance and minimally effective assistance of counsel."[278] Prevailing standards governing the performance of defense counsel in the post-*Furman*[279] era of capital punishment require the capital defense team's active participation and guidance in the assessment of the client's behavior, background, and mental health.[280] Performance standards have never contemplated that defense counsel would be a passive observer in processes and decisions that could determine his or her client's fate. To the contrary, a capital defendant "requires the guiding hand of counsel at every step in the proceedings against him."[281] In the context of a potential death sentence, assessment of the client's mental condition is a critical stage of the proceeding in which the guiding hand of counsel is absolutely essential under the Constitution.[282] To illustrate our point, we will discuss competent mental health assessments and cases that illustrate the importance of counsel's involvement to assure that the client does not fall victim to unreliable findings of ASPD and psychopathy.

---

275. Barefoot v. Estelle, 463 U.S. 880, 883-85, 887, 903 (1983).

276. *Id.* at 896.

277. Edens et al., *Predictions*, *supra* note 77, at 76-77.

278. Blake v. Kemp, 758 F.2d 523, 531 (11th Cir. 1985) (quoting United States v. Edwards, 488 F.2d 1154, 1163 (5th Cir. 1974)).

279. Furman v. Georgia, 408 U.S. 238 (1972).

280. ABA GUIDELINES, *supra* note 18, Guideline 1.1 cmt., at 926-27.

281. Powell v. Alabama, 287 U.S. 45, 69 (1932).

282. "It is central to [the Sixth Amendment] principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." Estelle v. Smith, 451 U.S. 454, 470 (1981) (quoting United States v. Wade, 388 U.S. 218, 226-27 (1967)).

**NELSON_01378**

Wayland and O'Brien: Deconstructing Antisocial Personality Disorder and Psychopathy: A

## A. "Defense Fail"

Justice Ruth Bader Ginsburg observed that "[p]eople who are well represented at trial do not get the death penalty."[283] Her observation holds true a dozen years later, as evidenced by many noteworthy examples in recent memory, including Olympic Park Bomber Eric Rudolph, Unabomber Ted Kaczynski, Atlanta courthouse escapee Brian Nichols, accused September 11th co-conspirator Zacharias Moussaoui, Beltway Sniper Lee Boyd Malvo, and Jared Lee Loughner, the shooter of Congresswoman Gabrielle "Gabby" Giffords and others in Tucson, Arizona. These defendants have three things in common: each was convicted of highly publicized capital crimes that had resulted in the deaths of multiple people; Each had a tragic history of mental illness that played a key role in persuading jurors, judges, or even prosecutors to reject the death penalty; and each was represented by a team of lawyers, investigators, and mitigation specialists who performed consistently with the ABA Guidelines.[284] Experience bears testament to Justice William Brennan's observation that "[t]he evidence is conclusive that death is not the ordinary punishment for any crime."[285]

Without representation consistent with the ABA and Supplementary Guidelines, the outcome of these cases would be different. Evidence supporting Justice Ginsburg's observation is easy to find. Columbia Law Professor James Liebman conducted an exhaustive survey of modern death penalty cases and found that more than two-thirds of death sentences are set aside because of prejudicial error, and that the most common error is ineffective assistance of defense counsel.[286] The vast majority of these cases ended in a more favorable disposition for the defendant after remand.[287] Our research reflects that

---

283. *Justice Backs Death Penalty Freeze*, CBS NEWS (Feb. 11, 2009, 9:27 PM), http://www.cbsnews.com/2100-508_162-284850.html.

284. *See* James Ball, *Ariz. Shooter Gets 7 Life Terms*, WASH. POST, Nov. 9, 2012, at A3; Shaila Dewan, *Olympics Bomber Offers an Apology at Sentencing*, N.Y. TIMES, Aug. 23, 2005, at A15; William Glaberson, *Kaczynski Avoids a Death Sentence with Guilty Plea*, N.Y. TIMES, Jan. 23, 1998, at A1; Jerry Markon & Timothy Dwyer, *Jurors Reject Death Penalty for Moussaoui*, WASH. POST, May 4, 2006, at A1; *Sniper Malvo Sentenced to Life Without Parole*, CNN, May 5, 2004, http://www.cnn.com/2004/LAW/03/10/sniper.malvo.

285. Furman v. Georgia, 408 U.S. 238, 291 (1972) (Brennan, J., concurring).

286. A comprehensive study of capital cases in America between 1973 and 1995 found that sixty-eight percent of all death sentences were set aside by appellate, post-conviction, or habeas corpus courts due to serious error. James S. Liebman et al., *Capital Attrition: Error Rates in Capital Cases, 1973-1995*, 78 TEX. L. REV. 1839, 1849-50 (2000).

287. Following appellate or post-conviction rulings finding serious error in capital cases, eighty-two percent of defendants "were found on retrial not to have deserved the death penalty, including [seven percent] . . . who were cleared of the capital offense." *Id.* at 1852 (emphasis omitted).

NELSON_01379

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

capital clients are at an increased risk of being diagnosed with ASPD or psychopathy if they are represented by trial, appellate, or post-conviction defense teams who fail to comply with the ABA and Supplementary Guidelines. This failure contributes significantly to the arbitrary pattern of death sentences and executions in the United States.

The Supreme Court's decision in *Rompilla v. Beard*[288] illustrates how defense counsel's deficient performance heightens the risk of a death sentence by facilitating an erroneous forensic opinion that the client is antisocial or psychopathic.[289] Instead of retaining a qualified mitigation specialist, trial counsel relied on a staff investigator to help investigate and develop mitigation evidence in addition to performing traditional guilt-or-innocence investigative functions.[290] Consequently, the defense team was understaffed and, contrary to prevailing performance standards, no team member was "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments."[291] Inevitably, as a result of this failure, critical information was misinterpreted or overlooked.[292]

A qualified mitigation specialist would have brought to Ronald Rompilla's defense team "clinical and information-gathering skills and training that most lawyers simply do not have."[293] These specialized skills include "the training and ability to obtain, understand and analyze all documentary and anecdotal information relevant to the client's life history,"[294] and the ability to conduct multiple, culturally competent, "in-person, face-to-face, one-on-one interviews with the client, the client's

---

288. 545 U.S. 374 (2005).

289. *See id.*

290. Ronald Rompilla's three-person defense team consisted of two public defenders and "an investigator in the public defender's office." *Id.* at 398 (Kennedy, J., dissenting). This is inconsistent with the ABA Guidelines, which provide that "[t]he defense team should consist of *no fewer than* two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist." ABA GUIDELINES, *supra* note 18, Guideline 4.1(A)(1), at 952 (emphasis added).

291. ABA GUIDELINES, *supra* note 18, Guideline 4.1(A)(2), at 952; *see also id.* Guideline 10.4(C)(2)(a), at 1000 (providing that counsel should select a team that includes "*at least* one mitigation specialist and one fact investigator" (emphasis added)). More recently, the Supplementary Guidelines provided useful context to this requirement:

> At least one member of the team must have specialized training in identifying, documenting and interpreting symptoms of mental and behavioral impairment, including cognitive deficits, mental illness, developmental disability, neurological deficits; long-term consequences of deprivation, neglect and maltreatment during developmental years; social, cultural, historical, political, religious, racial, environmental and ethnic influences on behavior; effects of substance abuse and the presence, severity and consequences of exposure to trauma.

SUPPLEMENTARY GUIDELINES, *supra* note 19, Guideline 5.1(E), at 683.

292. *See Rompilla*, 545 U.S. at 378-80, 382-83.

293. ABA GUIDELINES, *supra* note 18, Guideline 4.1 cmt., at 959.

294. SUPPLEMENTARY GUIDELINES, *supra* note 19, Guideline 5.1(B), at 682.

NELSON_01380

family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death."[295] As illustrated in further detail below, this is no small undertaking, but it is critically important to fair and reliable decisions by everyone involved in the litigation of a capital case.[296] Counsel's decision to proceed to trial without a fully qualified defense team practically guaranteed unreliable results, putting Rompilla at a high risk of being wrongly labeled antisocial or psychopathic.[297] Nor was this oversight overcome by retaining three mental health examiners to evaluate Rompilla; without the benefit of a thorough life history examination, all three experts concluded that Rompilla had ASPD.[298]

Rompilla's trial counsel were found ineffective after a team of post-conviction lawyers, functioning consistently with the ABA and Supplementary Guidelines, uncovered persuasive evidence of developmental disability, possible schizophrenia, fetal alcohol syndrome, and chronic childhood trauma severe enough to cause related disabilities in adulthood; this new picture of Rompilla was so compelling and humanizing that virtually no weight was given to the ASPD diagnoses assessed by the misinformed pretrial examiners.[299] It is

---

295. *Id.* Guideline 10.11(C), at 689. The team must also "endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding." *Id.*

296. See O'Brien, *supra* note 74, at 707, 709-12, for a more in-depth discussion of the prevailing investigation standards described in the ABA Guidelines and commentary.

297. *See generally* Dudley & Leonard, *supra* note 74. Typical criminal case investigators are ill-suited for mitigation work because they simply lack the necessary skills and abilities. William M. Bowen, Jr., *A Former Alabama Appellate Judge's Perspective on the Mitigation Function in Capital Cases*, 36 HOFSTRA L. REV. 805, 817 (2008).

298. *See* Rompilla v. Beard, 545 U.S. 374, 379-80 (2005); *see also* Bowen, *supra* note 297, at 817 (observing that, unlike a mitigation specialist, a psychologist will not "drop in on families, or track down and interview witnesses").

299. *Rompilla*, 545 U.S. at 390-91. The trial team's limited investigation failed to uncover evidence that:

> Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags.

*Id.* at 391-92.

NELSON_01381

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

not difficult to find in virtually every capital punishment jurisdiction in America similar cases in which a thorough post-conviction investigation trumped pretrial diagnoses of ASPD that were based on shallow and superficial social history investigations.[300] *Rompilla* and similar cases illustrate differential explanations for allegedly antisocial or psychopathic behaviors.

### B. Merging Mental Health and Legal Standards—The Role of Counsel

In this Subpart, we discuss counsel's obligation to participate actively in the investigation of his or her client's background and mental health. Our starting point is the recognition that counsel is obliged to acquire the specialized knowledge necessary to defend his or her client.[301] In capital cases, mental health problems are so common among defendants that "[i]t must be assumed that the client is emotionally and intellectually impaired."[302] Just as a lawyer specializing in the defense of drunk drivers must become familiar with the biological processes of intoxication and the design and functional limits of breathalyzer technology, a capital defense attorney must become knowledgeable about mental health. This includes becoming familiar with the mental health standards and procedures for conducting forensic and clinical evaluations.

The starting point for this discussion is that capital litigators understand that graphs or charts produced by psychometric testing do little to humanize the client:

> A problem with much expert testimony is that it is so focused on test score numbers and their psychometric properties, or diagnostic criteria and categorization, that the individual being evaluated sometimes gets forgotten. This often results in "expert battles" about cut-offs or comorbidity, diminishing the credibility of all the participants in the courtroom, but more significantly, failing to bring into focus the significant ways in which the symptoms of a person's mental illness shaped his/her life experiences, altered his/her options,

---

300. *See, e.g.*, Ferrell v. Hall, 640 F.3d 1199, 1203, 1211-12 (11th Cir. 2011); Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1346-47 (11th Cir. 2011); Walbey v. Quarterman, 309 F. App'x 795, 796-97, 803-04 (5th Cir. 2009); *see also* O'Brien, *supra* note 74, at 700 n.25 (collecting cases).

301. MODEL RULES OF PROF'L CONDUCT R. 1.1 (2013) ("A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.").

302. ABA GUIDELINES, *supra* note 18, Guideline 10.5 cmt., at 1007 (quoting Rick Kammen & Lee Norton, *Plea Agreements: Working with Capital Defendants*, ADVOCATE, Mar. 2000, at 31, 31). More recently, the U.S. Department of Justice reports that over half of the prisoners in the United States suffer some form of mental disease. JAMES & GLAZE, *supra* note 139, at 1.

**NELSON_01382**

Wayland and O'Brien: Deconstructing Antisocial Personality Disorder and Psychopathy: A

choices, and decisions, and brought that person into the courtroom as a subject of testimony.[303]

Psychometric testing in general, and the PCL-R in particular, are unreliable substitutes for a thorough life history investigation into the witnesses and documents that uncover the client's life history and stories that reveal his intrinsic humanity and redeeming qualities that coexist with his mental and emotional impairments.[304]

The mental health field provides important, but often overlooked, criteria for the interpretation of data. Counsel must be aware of the difference between objective behavior (facts or symptoms) and subjective interpretations of that behavior (conclusions or diagnoses). The DSM-5 cautions that, before drawing a conclusion from a person's behavior, many different factors—including his or her social, cultural, and ethnic background—must be taken into account.[305] Competent evaluation requires a thorough patient history, including a family history going back at least three generations.[306] Assessing DSM-5 diagnostic criteria for personality disorders requires evaluation of long-term functioning,[307] and performance standards recognize that it is necessary to conduct multiple interviews over a span of time.[308] Before a behavior

---

303. Woods et al., *supra* note 74, at 433.

304. *Id.*; *see* Dudley & Leonard, *supra* note 74, at 973, 975; *see also* Wilson v. Trammell, 706 F.3d 1286, 1290-94 (10th Cir. 2013) (finding that the trial and post-conviction counsel placed primary reliance on whether a pretrial examiner misinterpreted personality test results which arguably established that the client suffered from schizophrenia). *Wilson* devolved into an argument over what diagnostic label most accurately fit the client, and the courts were not moved to find that he was prejudiced by defense counsel's performance. *Wilson*, 706 F.3d at 1288. This contrasts sharply with cases in which trial counsel were similarly deficient, but the post-conviction investigation focused on the client's life story, not the interpretation of psychometric testing or diagnostic labels. *See, e.g.*, Rompilla v. Beard, 545 U.S. 374, 378 (2005); Wiggins v. Smith, 539 U.S. 510, 514, 535 (2003); *Ferrell*, 640 F.3d at 1203; *Cooper*, 646 F.3d at 1342; *Walbey*, 309 F. App'x at 801.

305. DSM-5, *supra* note 24, at 662.

306. Dudley & Leonard, *supra* note 74, at 966-67; *see also* Lee Norton, *Capital Cases: Mitigation Investigations*, CHAMPION, May 1992, at 43, 44; Daniel J. Wattendorf & Donald W. Hadley, *Family History: The Three-Generation Pedigree*, 72 AM. FAM. PHYSICIAN 441, 447 (2005).

307. DSM-5, *supra* note 24, at 647. Professors of psychiatry train students to "map out the longitudinal course of their patient's illness; this helps pin down the course and give the student a better understanding of the patient." NANCY C. ANDREASEN & DONALD W. BLACK, INTRODUCTORY TEXTBOOK OF PSYCHIATRY 291 (3d ed. 2001).

308. *See* Deana Dorman Logan, *Learning to Observe Signs of Mental Impairment*, *reprinted in* MENTAL HEALTH AND EXPERTS MANUAL ch.19, at 19-1 to 19-6 (8th ed. 2005) (explaining that a subject's symptoms may not be stable over time, so that multiple interviews are necessary for the defense team to fulfill its duty as the observational caretaker of the client's condition); *see also* BENJAMIN JAMES SADOCK & VIRGINIA ALCOTT SADOCK, KAPLAN & SADOCK'S SYNOPSIS OF PSYCHIATRY 6 (9th ed. 2003). Benjamin and Virginia Sadock recommend:

> Psychiatric patients may not be able to tolerate a traditional interview format, especially in the acute stages of a disorder. For instance, a patient suffering from increased

NELSON_01383

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

or characteristic of the defendant can be attributed to a personality disorder, multiple alternative factors must be considered and ruled out.[309] Even Cleckley, the influential proponent of the modern construct of psychopathy, argues strongly for differential diagnosis.[310]

As noted above, by definition the diagnostic criteria for any personality disorder must involve traits and behavior that deviate markedly from the expectations of the client's culture.[311] Behavior relied upon to support a personality disorder should not be confused with "the expression of habits, customs, or religious and political values professed by the individual's culture of origin."[312] Therefore, a thorough understanding of the cultural influences in the client's life is essential to an accurate mental health assessment.[313]

Environmental and situational factors must also be considered. The DSM-5 cautions that if a constellation of observed behaviors is better accounted for by another mental disorder, is due to the direct physiological effects of a substance (for example, drug, medication, or toxin exposure), or is caused by a general medical condition (for example, head trauma), a personality disorder should not be diagnosed.[314] A personality disorder diagnosis must also be distinguished from behaviors that emerge in response to situational stressors or more transient mental states, (for example, mood or anxiety

---

agitation or depression may not be able to sit for 30 to 45 minutes of discussion or questioning. In such cases, physicians must be prepared to conduct multiple brief interactions over time, for as long as the patient is able, then stopping and returning when the patient appears able to tolerate more.
SADOCK & SADOCK, *supra*, at 6. Mitigation specialist Russell Stetler points out that multiple interviews will be necessary simply because "[i]nvestigating the capital client's biography is a sensitive, complex, and cyclical process." Russell Stetler, *Capital Cases*, CHAMPION, Jan.–Feb. 1999, at 35, 38. Thus, if a person has already been interviewed, and new documents or information suggest a new area of inquiry for that individual, it will be necessary to interview that person again. Norton, *supra* note 306, at 45.

309.  The discussion that follows points to a number of directives in the DSM-5 that certain factors be considered or ruled out prior to assessing a personality disorder diagnosis. *See infra* text accompanying notes 323-82; *see also* DSM-5, *supra* note 24, at 662-63. As noted above, the DSM has been criticized for giving inadequate guidance on the interpretation of symptoms and application of diagnostic criteria. *See supra* notes 113-37 and accompanying text. Although these problems still persist, the ensuing discussion reveals that the context provided by a thorough life history investigation is essential to the proper interpretation of diagnostic criteria and procedures.

310.  *See* Freedman, *Premature Reliance*, *supra* note 160, at 59. In Cleckley's view, conditions such as "mental deficiency or organic brain damage, schizophrenia, psychosis, cyclothymia or paranoia, manic depression, anxiety disorder, or criminality precluded a finding of psychopathy . . . [this] has been quietly forgotten by those who claim his tradition as the theoretical framework in which to assess psychopathy." *Id.*

311.  DSM-5, *supra* note 24, at 645.

312.  *Id.* at 648.

313.  *See generally* Holdman & Seeds, *supra* note 105.

314.  DSM-5, *supra* note 24, at 648, 662.

NELSON_01384

disorders, substance intoxication)[315] or are associated with acculturation after immigration.[316] When personality changes emerge and persist after an individual has been exposed to extreme stress, a diagnosis of posttraumatic stress disorder ("PTSD") should be considered.[317] When an individual has a substance-related disorder, the DSM-5 cautions that it is important not to make a personality disorder diagnosis based solely on behaviors that are consequences of substance intoxication or withdrawal, or that are associated with activities in the service of sustaining a dependency.[318]

A thorough life history investigation is also important to an accurate mental health assessment and differential diagnosis because behavior does not qualify for a personality disorder (or ASPD) diagnosis if it is "part of a protective survival strategy."[319] For example, a child at risk of violence in the home may run away, become truant from school, habitually lie, or engage in other behavior to evade severe maltreatment. Children in impoverished environments may steal food simply to have enough to eat. As noted above, the DSM-IV-TR diagnosis of ASPD requires the existence of conduct disorder prior to age eighteen.[320] In addition, symptoms cannot be attributed to ASPD if the client's behavior occurred exclusively during the course of schizophrenia or a manic

---

315.  *Id.* at 647.

316.  *Id.* at 648.

317.  *Id.* at 649.

318.  *Id.* The differential diagnosis of alcohol use disorder and personality disorder is clear when considering the DSM-5 text language for the former, which includes:

> Social and job performance may also suffer either from the aftereffects of drinking or from actual intoxication at school or on the job; child care or household responsibilities may be neglected; and alcohol absences may occur from school or work. The individual may use alcohol in physically hazardous circumstances (e.g. driving an automobile, swimming, operating machinery while intoxicated). Finally, individuals with an alcohol use disorder may continue to consume alcohol despite knowledge that continued consumption poses significant physical (e.g., blackouts, liver disease), psychological (e.g., depression), social or interpersonal problems (e.g., violent arguments with spouse while intoxicated, child abuse).

*Id.* at 492-99. A thorough life history investigation can also avoid the problem of "diagnostic overshadowing, which refers to diagnostic errors that result from mistakenly attributing signs and symptoms of one disorder or condition to another." Kathleen Wayland, *The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations*, 36 HOFSTRA L. REV. 923, 942 n.81 (2008) (internal quotation marks omitted). This is especially important because of the "extremely high prevalence of comorbid substance abuse disorders in the highly traumatized population of capitally charged defendants." *Id.* Without a thorough investigation for trauma history or signs and symptoms of major mental disorders such as schizophrenia or bipolar disorder, "[d]iagnostic overshadowing often results in the failure to identify the presence of co-occurring mental disorders." *Id.*

319.  DSM-5, *supra* note 24, at 662.

320.  DSM-IV-TR, *supra* note 24, at 702.

NELSON_01385

Case 4:16-cv-00904-A   Document 29-7   Filed 12/22/16   Page 20 of 50   PageID 3322

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

episode.[321] Thus, ASPD cannot be diagnosed if the "enduring pattern" of antisocial behavior occurs only during the course of several other serious Axis I disorders.[322]

With these caveats in mind, we will revisit the seven DSM-IV-TR diagnostic criteria for ASPD, and provide a brief discussion with examples of some of the many alternative explanations that could account for the client's behavior. Apropos to this discussion is a caution about the danger of "the subjectivity involved in making a diagnosis which may be based purely on subjective guesswork and interpretations in worst-case scenarios,"[323] issues that we illustrate below.

> 1. "Failure to conform to social norms with respect to lawful behaviors, as indicated by repeatedly performing acts that are grounds for arrest."[324]

Prior conviction and arrest records are not uncommon among capital defendants, and many examiners will consider this criterion satisfied based solely on a piece of paper summarizing the client's criminal history in a most bare-bones manner. This criterion is inherently flawed, represents circular reasoning, and relates to ethical concerns discussed above; that is, inherent in the criterion is an assumption that "failure to conform to social norms" is by definition an example of antisocial behavior.[325] However, there are a host of reasons why clients may fail to conform to social norms and repeatedly perform acts that are grounds for arrest, or are seemingly violations of pro-social expectations for behavior. Civil rights protesters, such as Rosa Parks and Reverend Doctor Martin Luther King, arguably brought themselves within this criterion through repeated acts of civil disobedience,[326] yet no one would seriously contend that these were antisocial acts.

Among the population of homicide defendants, there are equally valid reasons that an arrest record is not indicative of a personality disorder. For example, a client with limited intellectual functioning may not have the capacity to understand or comply with what society defines as pro-social behavior.[327] Clients with neurodevelopmental disabilities—

---

321. *Id.* at 688.

322. *See id.* at 688-89.

323. Bendelow, *supra* note 138, at 546.

324. DSM-5, *supra* note 24, at 659.

325. *Id.*

326. *See id.* at 663.

327. "The mentally retarded person might accompany perpetrators or actually commit a crime on impulse or without weighing the consequences of the act; when stopped by the police he might be unable to focus on the alleged crime or appreciate the gravity of his arrest . . . ." James Ellis & Ruth Luckasson, *Mentally Retarded Criminal Defendants*, 53 GEO. WASH. L. REV. 414, 429 (1985).

**NELSON_01386**

for example, individuals on the autism spectrum—are often severely impaired in their ability to understand or appreciate social interactions and cues.[328] Traumatized clients may engage in acts that ostensibly fail to conform to social norms, which represent coping attempts to survive perceived or actual threats to life. In general, persons with severe mental illness are simply more likely to be arrested for a multitude of complex reasons that are unrelated to defects in their personalities.[329] By failing to consider and distinguish these and other potential underlying explanations that contextualize reasons for specific behaviors, mental health evaluators may effectively imply intent to violate social norms where no such intent exists.

It would also be inappropriate to find that this diagnostic criterion is satisfied if the client's arrest records are the product of factors external to the client. Factors related to race, ethnicity, and class may also explain what appears to be "failure to conform to social norms."[330] For example, we frequently see clients who have records of multiple arrests, and, after a proper mitigation investigation, learn that they have been targeted at young ages by law enforcement in their local jurisdictions and subjected to racial profiling and discriminatory charging practices.[331] Black and Hispanic youths are arrested four times more often than Caucasian youths, and are far more likely to be prosecuted as adults than Caucasian youths who engage in the same conduct.[332] Similarly, adolescent girls are far more likely than boys to be arrested and punished harshly for running away from home, even though they are more likely than boys to be fleeing sexual abuse in the home.[333] It is also possible that the client may be innocent of an offense listed on his criminal record,[334] or a prior

---

328.  *See* Joseph Jankovic et al., *Tourette's Syndrome and the Law*, 18 J. NEUROPSYCHIATRY & CLINICAL NEUROSCIENCE 86, 90 (2006) (noting that individuals with Tourette's syndrome with behavioral symptoms of comorbid disorders have a significantly higher risk of becoming involved in the criminal justice system).

329.  *See* Linda A. Teplin, *Criminalizing Mental Disorder: The Comparative Arrest Rate of the Mentally Ill*, 39 AM. PSYCHOL. 794, 800-01 (1984) (suggesting that mentally ill persons undergo criminalization with adverse public policy consequences).

330.  DSM-IV-TR, *supra* note 24, at 706.

331.  "Studies of racial profiling have shown that police do, in fact, exercise their discretion on whom to stop and search in the drug war in a highly discriminatory manner." ALEXANDER, *supra* note 135, at 133 (citing DAVID A. HARRIS, PROFILES IN INJUSTICE: WHY RACIAL PROFILING CANNOT WORK 59 (The New Press 2002)).

332.  HOWARD N. SNYDER, OFFICE OF JUV. JUST. & DELINQUENCY PREVENTION, JUV. JUST. BULL., JUVENILE ARRESTS 2000, at 10 (2002), *available at* https://www.ncjrs.gov/pdffiles1/ojjdp/191729.pdf; Samuel R. Gross et al., *Exonerations in the United States 1989 Through 2003*, 95 J. CRIM. L. & CRIMINOLOGY 523, 549-50 (2005).

333.  *See* Alecia Humphrey, *The Criminalization of Survival Attempts: Locking Up Female Runaways and Other Status Offenders*, 15 HASTINGS WOMEN'S L.J. 165, 173-77 (2004).

334.  *See, e.g.*, Harlow v. Murphy, No. 05-CV-039-B, 2008 U.S. Dist. LEXIS 124288, at *49-

NELSON_01387

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

conviction may be otherwise invalid.[335] Thus, the proper application of this diagnostic criterion is impossible without the benefit of a thorough life history investigation of the client and the community in which he lives.

Investigation of the circumstances of each of the client's arrests is also critically important. Some clients have falsely confessed to crimes for a multitude of reasons, including the desire to protect others (for example, to protect a sibling or other loved one).[336] Others have been subjected to coercive interrogation procedures, to which highly suggestible, gullible, developmentally delayed, traumatized, and youthful clients are very vulnerable.[337] Even more common examples from our decades of experience in capital work are de facto consequences of the pervasive effects of poverty (for example, "stealing" food to stave off hunger, breaking into a building to obtain necessary shelter or clothing, and similar such arrests stemming from the effects of poverty, homelessness, mental illness, or substance-related disorders). We have seen many instances where prosecutors or government experts have labeled defendants "antisocial," ignoring the fact that they had acted in a protective mode, and "stole" to provide for family members, rather than personal gain or profit.[338]

2. "Deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure."[339]

This criterion, if applied without attention to context, constitutes highly subjective language and may give rise to what often amounts to

---

50 (D. Wyo. Feb. 15, 2008) (finding counsel ineffective for failing to investigate his client's prior murder conviction and produce evidence that "forensic evidence surrounding the homicide did not point to [the defendant]" and, in fact, implicated two other boys in the homicide).

335.   *See, e.g.*, Johnson v. Mississippi, 486 U.S. 578, 590 (1988) (setting aside a death sentence because defendant's prior conviction, which had been used as an aggravating circumstance, was subsequently reversed).

336.   Stuart P. Green, *Uncovering the Cover-Up Crimes*, 42 AM. CRIM. L. REV. 9, 16 n.23 (2005).

337.   *See* GISLI H. GUDJONSSON, THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK 408-09 (2003) (noting that verbally impaired individuals are more likely to confess to crimes they did not commit in response to modern interrogation methods); *see also* Roger Kurlan et al., *Non-obscene Complex Socially Inappropriate Behavior in Tourette's Syndrome*, 8 J. NEUROPSYCHIATRY & CLINICAL NEUROSCIENCES 311, 312 (1996) (providing an example of a patient with Tourette's syndrome who spontaneously gave a false confession to police who came to his door to investigate a homicide in the neighborhood).

338.   *See* Michael N. Burt, *The Importance of Storytelling at all Stages of a Capital Case*, 77 UMKC L. REV. 877, 898-900, 909-10 (2009) (describing the life story of capital defendant Alan Quinones—whose parents were so mentally ill and poor that he, as a young man, managed to feed his family by selling drugs—and explaining that his jury unanimously rejected the death penalty).

339.   DSM-5, *supra* note 24, at 659.

**NELSON_01388**

speculation about possible motivations for actions. Many mental health symptoms, in the absence of context, may be interpreted as "lying." Delusions, for example, are fixed false beliefs,[340] but a delusional client's expression of false beliefs is likely to be interpreted as a lie. Dissociative symptoms prevent a client from recalling information, so the client's attempt to fill gaps in memory may produce unintentionally false statements of fact.[341] Mood symptoms, such as grandiosity, may distort the client's perception of self and others.[342] Victims of extreme or chronic trauma, including abuse victims, may make statements that are inconsistent with reality for the purpose of self-protection.[343] As a coping strategy of chronic abuse, victims often learn to "lie" as part of a protective survival strategy.[344] Other factors which may explain a client's false statements include psychotic symptoms—where a client's statements represent the fact that they are out of touch with reality[345]—or symptoms of brain dysfunction—such as memory impairments—where clients may confabulate to mask severe impairments.[346]

In addition to the symptoms of mental illness that might explain a client's perception or expression of facts divergent from reality, other factors may also motivate clients to "lie" in order to protect themselves from the social stigma or shame and embarrassment associated with their condition. In *Rompilla*, for example, the client told counsel that his childhood was "normal . . . save for quitting school in the ninth grade," and he repeatedly sent his lawyers on false leads.[347] He also denied that his parents abused him.[348] Yet, post-conviction counsel's investigation produced a large body of evidence establishing that Rompilla was raised in an impoverished and abusive home, and that he was the victim of extreme neglect and maltreatment.[349] Social service records established,

---

340. Wayland, *supra* note 318, at 942 n.83.

341. DSM-IV-TR, *supra* note 24, at 520.

342. As noted in the DSM-5 description of a manic episode, "[i]nflated self-esteem is typically present, ranging from uncritical self-confidence to marked grandiosity, and may reach delusional proportions." DSM-5, *supra* note 24, at 128. "The expansive mood, excessive optimism, grandiosity, and poor judgment often lead to reckless involvement in activities such as spending sprees, giving away possessions, reckless driving, foolish business investments, and sexual promiscuity that is unusual for the individual, even though these activities are likely to have disastrous consequences . . . ." *Id.* at 129. Without proper context, an examiner might subjectively and mistakenly interpret such behavior as deceitful, and the DSM-5 provides little specific guidance in this regard.

343. Wayland, *supra* note 318, at 944-45.

344. *Id.* at 947.

345. *See* Logan, *supra* note 308, at 19-4.

346. *See id.*

347. Rompilla v. Beard, 545 U.S. 374, 381 (2005).

348. Rompilla v. Horn, 355 F.3d 233, 243 (3d Cir. 2004).

349. *Rompilla*, 545 U.S. at 391-92.

NELSON_01389

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

among other things, that Rompilla's father beat him with "hands, fists, leather straps, belts and sticks," and "locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled."[350] It is not difficult to imagine a number of reasons that Rompilla "lied" to his lawyers, even when telling the truth would have produced life-saving mitigating evidence.[351] Counsel should be alert to the possibility that a client's expression of false information is simply an attempt to minimize, normalize, or deny mental illness or a tragically painful history.[352] Of course, Rompilla's borderline mental retardation may also explain his failure to provide accurate and correct information about his upbringing.[353]

### 3. "Impulsivity or failure to plan ahead."[354]

Unless contextualized, a determination that these symptoms are examples of antisocial behavior is often subjective and speculative. Many other possible explanations for these symptoms must be considered and ruled out in order to make an accurate determination. For example, a client with a history of traumatic brain injury or attention deficit hyperactivity disorder ("ADHD") may not have the ability to plan and will often act impulsively.[355] Further, "there is abundant evidence that [clients with intellectual disabilities] often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders."[356] A client with PTSD might display hyperarousal responses to traumatic triggers that are immediate and seemingly inexplicable if the context is not understood,[357] or may be displaying behaviors that reflect a foreshortened sense of future, a symptom frequently seen in highly traumatized individuals.[358] "Impulsivity and failure to plan ahead" may also be explained by the

---

350.  *Id.* at 392.

351.  Wayland, *supra* note 318, at 942 n.82.

352.  John H. Blume & Pamela Blume Leonard, *Capital Cases: Principles of Developing and Presenting Mental Health Evidence in Criminal Cases*, CHAMPION, Nov. 2000, at 63, 64.

353.  *See* ROBERT B. EDGERTON, THE CLOAK OF COMPETENCE: REVISED AND UPDATED 134 (1993).

354.  DSM-5, *supra* note 24, at 659.

355.  Impulsivity is one of the core symptom categories of ADHD, which is categorized as a neurodevelopmental disorder in the DSM-5. DSM-5, *supra* note 24, at 59-60; *see also* AM. PSYCHIATRIC ASS'N, HIGHLIGHTS OF CHANGES FROM DSM-IV-TR TO DSM-5, at 2 (2013), *available at* http://www.psychiatry.org/dsm5.

356.  Atkins v. Virginia, 536 U.S. 304, 318 (2002).

357.  For example, PTSD symptoms may include self-destructive and impulsive behavior, impaired affect modulation, and difficulty completing tasks. DSM-5, *supra* note 24, at 271-72.

358.  A sense of foreshortened future may be expressed in an inability to sustain expectations of a career, marriage, children, or normal life span. *Id.* at 277.

NELSON_01390

hopelessness, despair, and self-destructive behaviors that may be seen in individuals with severe depression.[359] Highly impulsive behavior, which may be interpreted as "failure to plan ahead," is often seen in individuals with bipolar disorder, and only a contextualized understanding can help to make this distinction.[360] An individual with diffuse brain injury, or deficits in frontal or temporal lobe functioning, may also appear to be impulsive and fail to plan for future events. Finally, simply being youthful is associated with impulsive behavior and failure to plan ahead.[361]

4. "Irritability and aggressiveness, as indicated by repeated physical fights or assaults."[362]

Context is critically important to understanding the origins of what may be called "irritability and aggression."[363] Such behaviors may reflect the hyperarousal component of traumatic stress responses,[364] and are often classic symptoms of brain dysfunction, particularly frontal and temporal lobe problems, or classic expressions of mood symptoms as seen in depressive, bipolar, and related disorders.[365] Irritability and aggressiveness can also result from exposure to environmental toxins, such as chemicals, lead or other heavy metals.[366] In addition, evidence of

---

359. *Id.* at 659. For individuals suffering from a major depressive disorder, "[l]oss of interest of pleasure is nearly always present, at least to some degree." *Id.* at 163. This may be expressed as significant withdrawal from many life activities. *Id.*

360. *Id.* at 659. A classic symptom of a manic episode, "increase in goal-directed activity," is often manifested by poor judgment leading to imprudent involvement in activities that may have painful consequences without regard for apparent risks. *Id.* at 124. Impairment may be severe enough to require intervention to protect an individual from the negative consequences of actions resulting from poor judgment. *Id.* at 129.

361. "[A] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." Roper v. Simmons, 543 U.S. 551, 569 (2005).

362. DSM-5, *supra* note 24, at 659.

363. *Id.* at 660.

364. This is a core symptom category of PTSD that results in symptoms such as difficulty falling asleep, "exaggerated startle response," "hypervigilance," difficulty concentrating, or "irritable behavior and angry outbursts." *Id.* at 272.

365. The DSM-5 indicates that many individuals suffering from mood disorders "report or exhibit increased irritability (e.g., persistent anger, a tendency to respond to events with angry outbursts or blaming others, an exaggerated sense of frustration over minor matters)." *See id.* at 163.

366. *See, e.g.*, David C. Bellinger, *The Protean Toxicities of Lead: New Chapters in a Familiar Story*, 8 INT'L J. ENVTL. RES. PUB. HEALTH 2593, 2593 (2011) (discussing "health endpoints associated with greater early-life lead exposure in children, including [ADHD], conduct disorder, aggression and delinquency"); R.M. Bowler et al., *Neuropsychiatric Effects of Manganese on Mood*, 20 NEUROTOXICOLOGY 367, 367 (1999) (discussing fifteen studies in which "[a]dverse mood effects of overexposure to Manganese (Mn) . . . report an association of Mn exposure with adverse effects in six dimensions of mood: 1) anxiety, nervousness, irritability; 2) psychotic experiences; 3)

NELSON_01391

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

"irritability and aggression" used to diagnosis a client with ASPD is often nothing more than a reflection of the cruel reality of life on the streets for many people living in poverty, in dangerous communities, or in the dangerous environments of the jails and prison in this country.[367] Within that cultural context, aggression might be a necessary part of survival, and does not constitute behavior that "deviates markedly from the expectations of the individual's culture."[368]

   5.  "Reckless disregard for safety of self or others."[369]

   Behaviors that appear risky may be better explained by conditions other than ASPD. Such behaviors may reflect the impulsivity seen in clients with attentional problems or deficits in executive functioning. Rash behavior would also be consistent with the dysregulated affect and behavior often seen in people exposed to complex and chronic histories of psychological trauma, or the lack of insight, called "anosognosia," that is sometimes seen in individuals with psychotic or mood disorders.[370] Youth with ADHD also often have poor insight into their actions and are poor reporters of their condition.[371] What is often labeled as "reckless disregard for safety," and therefore considered a symptom of ASPD, might also reflect an inability to accurately perceive one's environment.[372] This can occur in individuals with psychotic disorders, mood disorders, or untreated substance abuse disorders.[373] It also may be a manifestation of the adaptive deficits of an individual with intellectual

---

emotional disturbance; 4) fatigue, lack of vigor, sleep disturbance; 5) impulsive/compulsive behavior; 6) aggression hostility").

   367.  *See* DSM-5, *supra* note 24, at 59-60.

   368.  *Id.* at 645; *see, e.g.*, Harlow v. Murphy, No. 05-CV-039-B, 2008 U.S. Dist. LEXIS 124288, at *47 (D. Wyo. Feb. 15, 2008) (explaining that the successful habeas corpus presentation focused on the culture and environment of a maximum security prison and strongly "supported a defense theme that [defendant] is not a dangerous person, but he was in a dangerous place").

   369.  DSM-5, *supra* note 24, at 659.

   370.  *See* NATIONAL ALLIANCE ON MENTAL ILLNESS, NAMI COMMENTS IN THE APA's DRAFT REVISION OF THE DSM-V: ANOSOGNOSIA 1, *available at* http://www.nami.org/Content/ ContentGroups/Policy/Issues_Spotlights/DSM5/Anosognosia_Paper_4_13_2010.pdf (noting that "anosognosia" is not referenced in the DSM-5). "Lack of insight is common in schizophrenia. A patient may not believe that he or she is ill or abnormal in any way." ANDREASEN & BLACK, *supra* note 307, at 221 (emphasis omitted).

   371.  Russel A. Barkley et al., *Adolescents with ADHD: Patterns of Behavioral Adjustment, Academic Functioning, and Treatment Utilization*, 30 J. AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 752, 732-61 (1991).

   372.  DSM-5, *supra* note 24, at 659.

   373.  For example, extremely impaired judgment, disregard for safety, and engagement in risky behaviors are frequently seen in individuals with mood and/or substance abuse disorders. *See id.* "Research has shown that more than 90% of suicide completers had a major psychiatric illness and that half were clinically depressed at the time of the act . . . ." ANDREASEN & BLACK, *supra* note 307, at 555.

**NELSON_01392**

Wayland and O'Brien: Deconstructing Antisocial Personality Disorder and Psychopathy: A

2013]                 *PREJUDICIAL PSYCHIATRIC LABELS*                 581

or developmental disabilities, or simply the immaturity of a youthful offender.[374] In these cases, understanding the context is critical; yet, so often it is this context which is lost in how a client's behavior is interpreted by the prosecution, jurors, courts, and—unfortunately, all too often—the defense.

> 6. "Consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations."[375]

Once again, the language of this criterion is highly subjective. Without context, it is impossible to make a reliable and valid determination that the criterion of consistent irresponsibility is indicative of antisocial behavior. Consider just a few examples: someone who has the deficits in adaptive behavior seen in individuals with intellectual or developmental disabilities, or who is impaired by mood or psychotic symptoms, or by the consequences of severe trauma exposure, may well have difficulties meeting the tasks of daily life; difficulties functioning in occupational settings; and, consequently, difficulties meeting financial, occupational, or social obligations.[376] Quite frankly, impairments such as these, and many other supposed symptoms of ASPD, are highly consistent with the severe impairments in daily functioning that are often present in individuals with various Axis I mental disorders, particularly when these disorders are undiagnosed or untreated.[377] Individuals suffering from chronic poverty, underemployment, racial discrimination, and lack of socially sanctioned occupational opportunities are also likely to be described by the consistent irresponsibility criterion for reasons that have nothing to do with antisocial behavior.

---

374. The Supreme Court has established that children are "constitutionally different from adults for purposes of sentencing" because they have a "'lack of maturity and underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking." Miller v. Alabama, 132 S. Ct. 2455, 2464 (2012) (quoting Roper v. Simmons, 543 U.S. 551, 569 (2005)).

375. DSM-5, *supra* note 24, at 659.

376. A person with developmental disabilities, for example, has "significant limitations on an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales." Ellis & Luckasson, *supra* note 327, at 422 (quoting AM. ASSOC. ON MENTAL DEFICIENCY, CLASSIFICATION IN MENTAL RETARDATION 11 (Herbert J. Grossman ed., 1983)).

377. DSM-5, *supra* note 24, at 662-63.

NELSON_01393

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

582                 *HOFSTRA LAW REVIEW*                 [Vol. 42:519

   7.  "Lack of remorse, as indicated by being indifferent to or
       rationalizing having hurt, mistreated, or stolen from another."[378]

    A finding that the client lacks remorse is almost always based on an
observation that he or she does not display emotion that would be
expected in a particular situation, or by a client's failure to voice his or
her remorse for a crime or crimes that have occurred and the impact on
the victims of those crimes. Failure to display emotional responses that
we are societally conditioned to expect, however, is itself often a
hallmark feature of a range of mental disorders and other severely
disabling conditions.[379] For example, psychic numbing is a hallmark
symptom of PTSD.[380] Flat affect is often seen in severe mental disorders
such as mood disorders (for example, major depression) or psychotic
disorders (for example, schizophrenia).[381] Absence of emotional
expression may be seen in people with severe brain dysfunction, people
with neurodevelopmental disabilities—such as autism spectrum
disorders—and in people who are inappropriately medicated or
overmedicated.[382] Absence of emotional expression may reflect cultural
norms, for example, individuals from cultures where emotional stoicism
is a reflection of loyalty to one's culture and family, and is a sign of
pride and decency—rather than a lack of remorse.[383] In addition,
someone who has faced a lifetime of racism might not be willing to
share his or her emotions with authority figures such as representatives

---

   378.  *Id.* at 659.

   379.  Incongruent emotion is commonly misinterpreted in capital clients; counsel must
understand that it is a common symptom of mental impairment. Logan, *supra* note 308, at 19-5.

   380.  DSM-5, *supra* note 24, at 271-72, 275. Psychic numbing is "described as a diminished
responsiveness to the external world." Norah C. Feeny et al., *Exploring the Roles of Emotional
Numbing, Depression, and Dissociation in PTSD*, 13 J. TRAUMATIC STRESS 489, 489 (2000).

   381.  DSM-5, *supra* note 24, at 101, 163. For example, "affective flattening" is a common
negative symptom of schizophrenia; social withdrawal and lack of interest or pleasure is one of the
key manifestations of how a major depressive episode might be expressed. *See* ANDREASEN &
BLACK, *supra* note 307, at 219-20.

   382.  DSM-5, *supra* note 24, at 50, 53. The influence of medications can be so pronounced that
the Supreme Court has found that the Due Process Clause is implicated by the involuntary
administration of medication to a defendant in a criminal case. *See* Riggins v. Nevada, 504 U.S.
127, 143 (1992) (Kennedy, J., concurring). "By administering medication, the State may be creating
a prejudicial negative demeanor in the defendant -- making him look nervous and restless, for
example, or so calm or sedated as to appear bored, cold, unfeeling, and unresponsive. . . . That such
effects may be subtle does not make them any less real or potentially influential." *Id.*

   383.  Cultural differences can interfere with the reliability of medical and mental health
assessments of the client. *See* DSM-IV-TR, *supra* note 24, at xxxiv. Because culture defines the
"'spectrum of 'normal behaviors' as well as thresholds of tolerance for diverse 'abnormalities,'"
unfamiliarity "with the nuances of an individual's cultural frame of reference may incorrectly judge
as psychopathology those normal variations in behavior, belief, or experience that are particular to
the individual's culture." SADOCK & SADOCK, *supra* note 307, at 168-69; *see* DSM-IV-TR, *supra*
note 24, at xxxiv.

**NELSON_01394**

Wayland and O'Brien: Deconstructing Antisocial Personality Disorder and Psychopathy: A

of law enforcement, or show emotion in a courtroom filled with predominantly majority culture judges, jurors, and spectators.[384] Finally, absence of the expression of remorse may reflect the fact that an individual has been falsely charged or falsely convicted of a crime.[385]

### C. Additional Problems with Psychopathy

A similar contextualized analysis is relevant in assessing conclusions that an individual is a psychopath. Such determinations are most often based on the scores from the PCL-R's twenty-item checklist, which, "unfortunately, often lead to misdiagnosis of bipolar patients" because of "the overlap of symptoms of mania and hypomania with the criteria used by Hare to diagnose psychopathy."[386] All clinicians recognize that "during manic or hypomanic episodes, many individuals commit antisocial acts, violent and non-violent."[387]

Three items from the PCL-R commonly attributed to capital defendants are representative of the problem: "[g]libness/superficial charm," "[p]arasitic lifestyle," and "[l]ack of realistic, long-term goals."[388] Willem H. J. Martens notes that Hare does not define "[g]libness/superficial charm" precisely, and asks how it can be "measured in an objective and reliable way": "How does the investigator know if the charm of a particular patient is superficial enough to be pathological?"[389] Martens points out that these characteristics:

> can contribute substantially to academic, vocational and even social success and status and these features are rather common and widely accepted as necessary tools for surviving in this complicated modern

384. ABA GUIDELINES, *supra* note 18, Guideline 10.11(F)(2), at 1055-56 ("Counsel should consider . . . [e]xpert and lay witnesses . . . to provide . . . cultural or other insights into the client's mental and/or emotional state and life history."); *see also id.* Guideline 4.1 cmt., at 957 (noting that "it might well be appropriate for counsel to retain an expert from an out-of-state university familiar with the cultural context by which the defendant was shaped"); *id.* Guideline 10.5 cmt., at 1007-08 ("There will also often be significant cultural and/or language barriers between the client and his lawyers. In many cases, a mitigation specialist, social worker or other mental health expert can help identify and overcome these barriers, and assist counsel in establishing a rapport with the client."); *id.* Guideline 10.7 cmt., at 1026 ("[C]ounsel must learn about the client's culture.").

385. Since 1973, 142 people have been released from death row based on new evidence establishing innocence. *Innocence and the Death Penalty*, DEATH PENALTY INFO. CENTER, http://www.deathpenaltyinfo.org/innocence-and-death-penalty (last updated Feb. 11, 2013).

386. Lewis, *Adult Antisocial Behavior*, *supra* note 34, at 2260. "Among the manic traits that Hare lists as psychopathic are glibness, superficial charm, grandiosity and exaggerated sense of self-worth, need for stimulation, conning and manipulative behavior, promiscuous sexual behavior, impulsivity, irresponsibility, poor behavioral controls, early behavioral problems, and lack of realistic long-term goals." *Id.*

387. *Id.*

388. Martens, *supra* note 189, at 457-58.

389. *Id.* at 457.

NELSON_01395

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

world. Why should such socially accepted traits (almost every president in the modern world needs and shows such charm and glibness) be rated as pathological?[390]

It is difficult to imagine objective criteria for distinguishing a person who is glib and superficially charming for manipulation purposes from one who is socially fluent and genuinely charming—assuming that there actually is any difference at all. Martens raises similar issues with the "parasitic lifestyle" criterion, explaining:

> Dependence on others . . . might not be a matter of free choice. A parasitic (severely prejudicial term) lifestyle suggests a harmful planning of misuse of other persons. This is not the case in most of the psychopaths we studied. Those who demonstrated a "parasitic lifestyle" are not able to cope with the world, because of their emotional suffering and social-emotional and moral incapacities and they believe that they can only survive in this way. For example, some patients were unable to keep jobs despite their good intentions because of social interaction problems and the consequences of other diagnostic features which are frequently neurobiologically determined.[391]

Finally, Martens is critical of the "[l]ack of realistic, long-term goals" criterion.[392] He asks, "[w]hat are realistic long-term goals?"[393] Martens points out: "In the eyes of normal people many brilliant scientists and artists (until they became famous or recognized) did not have realistic goals."[394] Again, without the context of a complete life history investigation, an examiner might find this criterion met in the case of a client who is exhibiting hallmark features of PTSD, which may often include a foreshortened sense of his or her future stemming from "negative alterations in cognitions and mood associated with the traumatic event(s),"[395] including but not limited to:

> Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g. "I am bad," "No one can be trusted," "The world is completely dangerous," "My whole nervous system is permanently ruined").

---

390. *Id.*

391. *Id.* at 458 (citations omitted). While this discussion takes as a given that individuals labeled "psychopaths" are indeed so, please see the above discussion contextualizing individual criteria of ASPD for a more thorough discussion of alternative explanations for what is supposedly a "parasitic lifestyle," including intellectual disabilities, executive dysfunction, post traumatic stress symptoms, and symptoms of severe mood or psychotic disorders. *See supra* text accompanying notes 323-82.

392. Martens, *supra* note 189, at 458.

393. *Id.*

394. *Id.*

395. DSM-5, *supra* note 24, at 271.

NELSON_01396

> Persistent, distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame himself/herself or others.
>
> Persistent negative emotional state (e.g., fear, horror, anger, guilt, or shame).
>
> Feelings of detachment or estrangement from others.
>
> Persistent inability to experience positive emotions (e.g., inability to experience happiness, satisfaction, or loving feelings).[396]

Indeed, given the life circumstances of many capital defendants, and the pervasiveness of mental and emotional disabilities that are common among our clients, it is difficult to imagine long-term life goals that would be realistic.

Just as with the criteria for diagnosing ASPD, in the absence of meaningful context, the PCL-R checklist often amounts to subjective and demeaning value judgments that are prone to mistaken interpretation. This is particularly the case when assessments are not culturally competent and lack critical context derived from a thorough life history investigation. What is the objective distinction between narcissism and grandiosity, and how can it be drawn reliably in the absence of a thorough life history? When is lying "pathological," and when is it a learned survival strategy? How can a clinician know that a capital defendant lacks remorse, guilt, or empathy, or whether his lack of emotion is better explained by the psychic numbing of PTSD, or flattened affect that accompanies schizophrenia or dementia? Because of the serious consequences of such a mistake in any setting, clinical or forensic, "the psychiatrist given the task of evaluating an offender, especially an offender deemed obnoxious or troublesome, must take care not to write off such an offender as simply psychopathic or antisocial."[397] In each individual case, the difference between telling the client's life story and allowing him or her to fall victim to an unreliable dehumanizing "psychopath" stereotype is simply understanding the difference between objective fact (for example, absence from school) and the subjective interpretation of that fact (for example, truancy, a symptom of conduct disorder).[398] The goal of effective capital representation is to search diligently for the humanizing and mitigating explanation for the client's behavior and demeanor (for example, the client skipped school to protect his sister from their abusive father). "A careful history regarding mood and behaviors, as well as a detailed

---

396. *Id.* at 272.
397. Lewis, *Adult Antisocial Behavior*, *supra* note 34, at 2260.
398. Bendelow, *supra* note 138, at 546.

NELSON_01397

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

family history, will enable the conscientious psychiatrist to determine to what extent, if any, a mood disorder or some other potentially remediable psychiatric disorder may underlie the antisocial behaviors that brought the individual into conflict with the law."[399] It is for this reason that the standards of capital defense practice, as described in the ABA and Supplementary Guidelines, require the defense team to thoroughly investigate the client's life story, and to do so with the assistance of a mitigation specialist who is "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments."[400]

## V. CONCLUSION

In summary, there are enormous contextual problems that plague mental health evaluations and prosecutorial characterizations of individuals who are capitally charged and convicted, and who are often inappropriately labeled as antisocial or psychopathic. The motivation for, and recognition of, the need to contextualize is easily lost, in part because capital defendants are overwhelmingly impoverished and disproportionately minorities; and often have multigenerational family histories of racial discrimination and disenfranchisement.[401] The best antidote to the influence of prejudicial psychiatric labels is a compelling mitigating narrative based on a thorough life history investigation which uncovers humanizing conditions and events in the client's life that demonstrate his human complexity, including the mental, emotional, or developmental impairments which he has struggled to overcome.[402] A thorough and methodical ABA and Supplementary Guidelines-based approach to investigating a client's life history will protect the client from the dehumanizing inferences that flow from being labeled antisocial.

---

399. Lewis, *Adult Antisocial Behavior*, *supra* note 34, at 2260.

400. ABA GUIDELINES, *supra* note 18, Guideline 4.1(A)(2), at 952; *see also id.* Guideline 10.4(C)(2)(b), at 1000.

401. *Id.* Guideline 10.5 cmt., at 1007; Haney, *The Social Context*, *supra* note 43, at 562-63, 579.

402. *See* Haney, *The Social Context*, *supra* note 43, at 559 (examining the life histories of capital defendants "leads us to conclusions about the causes of crime and the culpability of capital offenders that are very much at odds with the stereotypes created and nourished by the system of capital punishment that prevails in our society"). For decisions overturning death sentences that had been based in part on diagnoses of ASPD, where post-conviction investigations provided substantial evidence contextualizing and humanizing defendants' life histories, see, for example, Rompilla v. Beard, 545 U.S. 374, 391-93 (2005); Stankewitz v. Wong, 698 F.3d 1163, 1164-65 (9th Cir. 2012); Blystone v. Horn, 664 F.3d 397, 426-27 (3d Cir. 2011); Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1345-47 (11th Cir. 2011); Goodwin v. Johnson, 632 F.3d 301, 319-21, 324, 326 (11th Cir. 2011).

**NELSON_01398**

Haney suggests that the system of capital punishment thrives on procedures that dehumanize the defendant, resulting in "jurors' relative inability to perceive capital defendants as enough like themselves to readily feel any of their pains, to appreciate the true nature of the struggles they have faced, or to genuinely understand how and why their lives have taken very different courses from the jurors' own."[403] Through the inappropriate use of controversial constructs, such as ASPD and psychopathy, prosecutors "demoniz[e] the perpetrators of violence [and] facilitate their extermination at the hands of the state."[404] Haney explains that this "is why 'humanizing' capital clients is so important in penalty trials."[405]

Put simply, every capital defendant possesses "the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind."[406] Justice Sandra Day O'Connor acknowledged that the process of understanding defendants' disadvantaged backgrounds or their emotional or mental impairments is essential to the constitutionally-required "moral inquiry into the culpability of the defendant."[407] This Eighth Amendment requirement triggers a Sixth Amendment duty, on the part of defense attorneys, to assist jurors with this inquiry by developing mitigation evidence through a detailed, socio-historical analysis of the capital defendant's life.[408] Therefore, "[t]he

---

403. Craig Haney, *Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation and the Empathic Divide*, 53 DEPAUL L. REV. 1557, 1558 (2004) [hereinafter Haney, *Condemning the Other*].

404. Haney, *The Social Context*, *supra* note 43, at 548.

405. Haney, *Condemning the Other*, *supra* note 403, at 1558, 1581. Ninth Circuit Court of Appeals Judge Alex Kozinski recently derided the importance of humanizing capital clients, suggesting that it "may be the wrong tactic in some cases because experienced lawyers conclude that the jury simply won't buy it." Pinholster v. Ayers, 590 F.3d 651, 692 (9th Cir. 2009) (Kozinski, J., dissenting), *rev'd sub nom* Cullen v. Pinholster, 131 S. Ct. 1388 (2011). To support his view that trial counsel's minimal investigation and pursuit of a "family sympathy defense" was good enough, Judge Kozinski relied on two California cases, *State v. Cooper*, 809 P.2d 865 (Cal. 1991), and *In re Visciotti*, 926 P.2d 987 (Cal. 1996), for the proposition that a "family sympathy defense" was consistent with prevailing standards of performance in capital cases. *Pinholster*, 590 F.3d at 707. Both of those cases ended in death sentences: in *Cooper*, the jury was expressly *not* permitted to consider family sympathy evidence. 809 P.2d at 908-09. In *In re Visciotti*, the trial attorney had never before handled a capital trial, and could point to no case in which a family sympathy defense had succeeded. 926 P.2d at 993. Such anecdotal failures do not evidence a standard of performance. *See* Russell Stetler & W. Bradley Wendel, *The ABA Guidelines and the Norms of Capital Defense Representation*, 41 HOFSTRA L. REV. 635, 677-79 (2013). Further, scrutiny of the complete record in *Pinholster* makes our point; based on trial counsel's superficial and shallow pretrial investigation, the defense psychologist diagnosed him as a psychopath. *See* 590 F.3d at 659-61. A more thorough life history investigation produced evidence that the defendant was severely beaten by his stepfather as a child, and had epileptic seizures, brain damage, and bipolar disorder. *Id.*

406. Woodson v. North Carolina, 428 U.S. 280, 304 (1976).

407. California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring).

408. *See* Wiggins v. Smith, 539 U.S. 510, 519-23, 536 (2003).

NELSON_01399

*Hofstra Law Review, Vol. 42, Iss. 2 [2013], Art. 6*

588                    *HOFSTRA LAW REVIEW*                    [Vol. 42:519

social history of the defendant has become the primary vehicle with which to correct the misinformed and badly skewed vision of the capital jury."[409]

The ABA and Supplementary Guidelines establish current and long-established standards of death penalty practice. They provide a necessary road map with which to enhance the fairness and reliability of capital sentencing proceedings in numerous ways that are important to protecting the client from misleading, incomplete, and damaging assessments. The ABA and Supplementary Guidelines help capital defense teams explain to judges and funding authorities why more time and resources are necessary to properly defend the client, particularly when it comes to investigation of the client's life history. They also specify necessary qualifications of capital defense team members, including the admonition that at least one member of the team be qualified, by training or experience, to identify symptoms and characteristics of mental and emotional impairment. If trial counsel fails to assemble a team with the necessary skills, resources, and time, the ABA and Supplementary Guidelines provide a template for post-conviction counsel to challenge substandard work. It is the authors' experience that the client's humanity is established, and the fallacies of the ASPD rubric are exposed, when capital defense teams comply with the ABA and Supplementary Guidelines to conduct a thorough investigation of the client's life history.

---

409. Haney, *The Social Context, supra* note 43, 559-60.

**NELSON_01400**

**157**

VA » Health Care » PTSD: National Center for PTSD » Professional » The Relationship Between PTSD and Suicide

# PTSD: National Center for PTSD

## The Relationship Between PTSD and Suicide

William Hudenko, PhD, Beeta Homaifar, PhD, and Hal Wortzel, MD

This fact sheet explores the relation between PTSD and suicide and provides information that helps with understanding suicide.

### To help prevent suicide

Know about the suicide warning signs and the National Suicide Prevention Lifeline: 1-800-273-TALK (1-800-273-8255). To be routed to the Veterans Crisis Line, dial 1 after being connected.

While helping a suicidal person can be a difficult process, remember that the assistance you provide could save someone's life. If you think someone may be suicidal, you should directly ask him or her. Contrary to popular belief, asking someone if they are suicidal will not put the idea in their head.

Often the most difficult part of obtaining treatment is the initial call to a mental health professional. It is usually easier for a suicidal individual to accept professional help if they have assistance with this part of the process. For help making referrals see Where to Get Help.

### How common is suicide?

It is challenging to determine an exact number of suicides. Many times, suicides are not reported and it can be very difficult to determine whether or not a particular individual's death was intentional. For a suicide to be recognized, examiners must be able to say that the deceased meant to die. Other factors that contribute to the difficulty are differences among states as to who is mandated to report a death, as well as changes over time in the coding of mortality data (1).

Data from the National Vital Statistics System, a collaboration between the National Center for Health Statistics of the U.S. Department of Health and Human Services and each US state, provides the best estimate of suicides (2). Overall, men have significantly higher rates of suicide than women. This is true whether or not they are Veterans (3). For comparison:

- From 1999-2010, the suicide rate in the US population among males was 19.4 per 100,000, compared to 4.9 per 100,000 in females.

- Based on the most recent data available, in fiscal year 2009, the suicide rate among male Veteran VA users was 38.3 per 100,000, compared to 12.8 per 100,000 in females.

### Does trauma increase an individual's suicide risk?

A body of research indicates that there is a correlation between many types of trauma and suicidal behaviors. For example, there is evidence that traumatic events such as childhood abuse may increase a person's suicide risk (4,5). A history of military sexual trauma (MST) also increases the risk for suicide and intentional self-harm, suggesting a need to screen for suicide risk in this population (6).

### Importance of combat exposure in Veterans

NELSON_01401

Though considerable research has examined the relation between combat or war trauma and suicide, the relationship is not entirely clear. Some studies have shown a relationship while others have not (1). There is strong evidence, though, that among Veterans who experienced combat trauma, the highest relative suicide risk is observed in those who were wounded multiple times and/or hospitalized for a wound (7). This suggests that the intensity of the combat trauma, and the number of times it occurred, may influence suicide risk in Veterans. This study assessed only combat trauma, not a diagnosis of PTSD, as a factor in the suicidal behavior.

## Does PTSD increase an individual's suicide risk?

Considerable debate exists about the reason for the heightened risk of suicide in trauma survivors. Whereas some studies suggest that suicide risk is higher among those who experienced trauma due to the symptoms of PTSD (8-10), others claim that suicide risk is higher in these individuals because of related psychiatric conditions (11,12). However, a study analyzing data from the National Comorbidity Survey, a nationally representative sample, showed that PTSD alone out of six anxiety diagnoses was significantly associated with suicidal ideation or attempts (13). While the study also found an association between suicidal behaviors and both mood disorders and antisocial personality disorder, the findings pointed to a robust relationship between PTSD and suicide after controlling for comorbid disorders. A later study using the Canadian Community Health Survey data also found that respondents with PTSD were at higher risk for suicide attempts after controlling for physical illness and other mental disorders (14).

Some studies that point to PTSD as a precipitating factor of suicide suggest that high levels of intrusive memories can predict the relative risk of suicide (9). Anger and impulsivity have also been shown to predict suicide risk in those with PTSD (15). Further, some cognitive styles of coping such as using suppression to deal with stress may be additionally predictive of suicide risk in individuals with PTSD (9).

## PTSD and suicide risk in Veterans

Other research looking specifically at combat-related PTSD in Vietnam era Veterans suggests that the most significant predictor of both suicide attempts and preoccupation with suicide is combat-related guilt (16). Many Veterans experience highly intrusive thoughts and extreme guilt about acts committed during times of war. These thoughts can often overpower the emotional coping capacities of Veterans.

With respect to OIF/OEF Veterans, PTSD has been found to be a risk factor for suicidal ideation (17). Subthreshold PTSD also carries risk. A recent study found that among OIF/OEF Veterans, those with subthreshold PTSD were 3 times more likely to report hopelessness or suicidal ideation than those without PTSD (18).

## Can PTSD treatment help?

Current practice guidelines for treatment of PTSD indicate that trauma-focused therapies are not recommended for individuals with "significant suicidality" (19,20). Because "suicidality" is a vague term and there is no guidance for what significant suicidality means, we interpret this recommendation to pertain to actively suicidal patients, or those in an acute clinical emergency for whom suicidality should be addressed without delay. Providers must therefore use clinical judgment prior to initiating and throughout trauma-focused therapy.

Individuals with PTSD who present with intermittent but manageable suicidal thoughts may benefit from trauma-focused therapy. Two effective treatments for PTSD, Cognitive Processing Therapy (CPT) and prolonged exposure (PE) have been shown to reduce suicidal ideation. A recent study that randomized women who experienced rape into CPT or PE treatment found that reductions in PTSD symptoms were associated with decreases in suicidal ideation throughout treatment. The reductions were maintained over a 5-10 year follow-up period. The effect of PTSD treatment on suicidal ideation was greater for women who completed CPT (21). Further research is needed to provide additional evidence in other populations.

Suicide as a traumatic event

NELSON_01402

Researchers have also examined exposure to suicide as a traumatic event. Studies show that trauma from exposure to suicide can contribute to PTSD. In particular, adults and adolescents are more likely to develop PTSD as a result of exposure to suicide if one or more of the following conditions are true: if they witness the suicide, if they are very connected with the person who dies, or if they have a history of psychiatric illness (22-24). Studies also show that traumatic grief is more likely to arise after exposure to traumatic death such as suicide (25,26). Traumatic grief refers to a syndrome in which individuals experience functional impairment, a decline in physical health, and suicidal ideation. These symptoms occur independently of other conditions such as depression and anxiety.

VA developed fact sheets to share with family members of Veterans who have made a suicide attempt. Products include guides for talking about a suicide attempt with children and are available in Spanish. Although these resources were created with military families in mind, the material includes resources and information that may be useful for civilians as well.

## References

1. Knox, K.L. (2008). Epidemiology of the relationship between traumatic experience and suicidal behaviors. *PTSD Research Quarterly*, 19(4). www.ptsd.va.gov/professional/newsletters/research-quarterly/V19N4.pdf (PDF)

2. Statement of the Honorable James B. Peake, MD, Secretary of Veterans Affairs, Before the Committee on Veterans' Affairs, United States House of Representatives, May 6, 2008. Accessed December 10, 2009: www.va.gov/OCA/testimony/hvac/08050600.asp

3. Kemp, J. & Bossarte, R. (2012). Suicide Data Report, 2012. (Report prepared for the U.S. Department of Veterans Affairs) Available from www.va.gov/opa/docs/Suicide-Data-Report-2012-final.pdf (PDF)

4. Afifi, T.O., Enns, M.W., Cox, B.J., Asmundson, G.J.G., Stein, M.B., & Sareen, J. (2008). Population attributable fractions of psychiatric disorders and suicide ideation and attempts associated with adverse childhood experiences. *American Journal of Public Health, 98*, 946-952. doi: 10.2105/AJPH.2007.120253

5. Ystgaard, M., Hestetun, I., Loeb, M., & Mehlum, L. (2004). Is there a specific relationship between childhood sexual and physical abuse and repeated suicidal behavior? *Child Abuse and Neglect, 28*, 863-875.

6. Kimerling, R., Gima, K., Smith, M. W., Street, A., & Frayne, S. (2007). The Veterans Health Administration and military sexual trauma. *American Journal of Public Health, 97*, 2160-2166. doi: 10.2105/AJPH.2006.092999

7. Bullman, T. A., & Kang, H. K. (1995). A study of suicide among Vietnam Veterans. *Federal Practitioner, 12(3)*, 9-13.

8. Ferrada-Noli, M., Asberg, M., Ormstad, K., Lundin, T., & Sundbom, E. (1998). Suicidal behavior after severe trauma. Part 1: PTSD diagnoses, psychiatric comorbidity and assessment of suicidal behavior. *Journal of Traumatic Stress, 11*, 103-112.

9. Amir, M., Kaplan, Z., Efroni, R., & Kotler, M. (1999). Suicide risk and coping styles in posttraumatic stress disorder patients. *Psychotherapy and Psychosomatics, 68*, 76-81. doi: 10.1159/000012316

10. Thompson, M. E., Kaslow, N. J., Kingree, J. B., Puett, R., Thompson, N. J., & Meadows, L. (1999). Partner abuse and posttraumatic stress disorder as risk factors for suicide attempts in a sample of low-income, inner-city women. *Journal of Traumatic Stress, 12*, 59-72. doi: 10.1023/A:1024742215337

NELSON_01403

11. Fontana, A., & Rosenheck, R. (1995) Attempted suicide among Vietnam Veterans: A model of etiology in a community sample. *American Journal of Psychiatry, 152*, 102-109.

12. Robison, B. K. (2002). Suicide risk in Vietnam Veterans with posttraumatic stress disorder. Unpublished Doctoral Dissertation, Pepperdine University.

13. Sareen, J., Houlahan, T., Cox, B., & Asmundson, G. J. G. (2005). Anxiety disorders associated with suicidal ideation and suicide attempts in the National Comorbidity Survey. *Journal of Nervous and Mental Disease. 193*, 450-454. doi: 10.1097/01.nmd.0000168263.89652.6b

14. Sareen, J., Cox, B.J., Stein, M.B., Afifi, T.O., Fleet, C., & Asmundson, G.J.G. (2007). Physical and mental comorbidity, disability, and suicidal behavior associated with posttraumatic stress disorder in a large community sample. *Psychosomatic Medicine. 69*, 242-248. doi: 10.1097/PSY.0b013e31803146d8

15. Kotler, M., Iancu, I., Efroni, R., & Amir, M. (2001). Anger, impulsivity, social support, and suicide risk in patients with posttraumatic stress disorder. *Journal of Nervous & Mental Disease, 189*, 162-167. doi: 10.1097/00005053-200103000-00004

16. Hendin, H., & Haas, A. P. (1991). Suicide and guilt as manifestations of PTSD in Vietnam combat veterans. *American Journal of Psychiatry, 148*, 586-591.

17. Jakupcak, M., Cook, J., Imel, Z., Rosenheck, R., & McFall, M. (2009). PTSD as a Risk Factor for Suicidal Ideation in Iraq and Afghanistan War Veterans. *Journal of Traumatic Stress, 22*, 303-306. doi: 10.1002/jts.20423

18. Jakupcak, M., Hoerster, K. D., Varra, A., Vannoy, S., Felker, B., & Hunt, S. (2011). Hopelessness and Suicidal Ideation in Iraq and Afghanistan War Veterans Reporting Subthreshold and Threshold PTSD, *Journal of Nervous and Mental Disease, 199*, 272-275. doi: 10.1097/NMD.0b013e3182124604

19. VA/DoD Clinical Practice Guideline: Management of Post-traumatic Stress, 2010: Guideline Summary. Washington, DC: Department of Veterans Affairs; 2010. Retrieved from: http://www.healthquality.va.gov/Post_Traumatic_Stress_Disorder_PTSD.asp

20. Foa, E. B., Keane, T. M., Friedman, M. J., Cohen, J. A., Effective Treatments for PTSD: Practice Guidelines for the International Society for Traumatic Stress Studies. New York: Guilford; 2009.

21. Gradus, J. L., Sucak, M. K., Wisco, B. E., Marx, B. P., & Resick, P. A. (Article in press.). Treatment of posttraumatic stress disorder reduces suicidal ideation. *Depression and Anxiety*. doi: 10.1002/da.22117

22. Andress, V. R., & Corey, D. M. (1978). Survivor-victims: Who discovers or witnesses suicide? *Psychological Reports, 42*, 759-764. doi: 10.2466/pr0.1978.42.3.759

23. Brent, D. A., Perper, J. A., Moritz, G., Friend, A., Schweers, J., Allman, C., McQuiston, L., Boylan, M. B., Roth, C., & Balach, L. (1993b). Adolescent witnesses to a peer suicide. *Journal of the American Academy of Child and Adolescent Psychiatry, 32*, 1184-1188. doi: 10.1097/00004583-199311000-00011

24. Brent, D. A., Perper, J. A., Moritz, G., Liotus, L., Richardson, D., Canobbio, R., Schweers, J., & Roth, C. (1995). Posttraumatic stress disorder in peers of adolescent suicide victims: Predisposing factors

and phenomenology. *Journal of the American Academy of Child and Adolescent Psychiatry, 34*, 209-215. doi: 10.1097/00004583-199502000-00016

25. Melhem, N. M., Day, N., Shear, M. K., Day, R., Reynolds, C. F., & Brent, D. A. (2004). Traumatic grief among adolescents exposed to a peer's suicide. *American Journal of Psychiatry, 161*, 1411-1416. doi: 10.1176/appi.ajp.161.8.1411

26. Prigerson, H. G., Shear, M. K., Jacobs, S. C., Reynolds, C. F. I., Maciejewsk, P. K., Davidson, J. R., Rosenheck, R., Pilkonis, P. A., Wortman, C. B., Williams, J. B., Widiger, T. A., Frank, E., Kupfer, D. J., & Zisook, S. (1999). Consensus criteria for traumatic grief: A preliminary empirical test. *British Journal of Psychiatry, 174*, 67-73. doi: 10.1192/bjp.174.1.67

*Date this content was last updated is at the bottom of the page.*

**The National Center for PTSD does not provide direct clinical care, individual referrals or benefits information.**

**For help please see:**
Where to Get Help for PTSD or
Get Help with VA PTSD Care, Benefits, or Claims

**For Web site help:** Web Policies

PTSD Information Voice Mail:
(802) 296-6300
Contact Us: ncptsd@va.gov
Also see: VA Mental Health

**Connect with us**



158

STATE OF GEORGIA )
                 )
COUNTY OF CLAYTON )

### DECLARATION OF DAR-RELL WASHINGTON

My name is Dar-Rell Washington. I am over the age of 18 and otherwise competent to give this declaration.

1.     I live in Atlanta, Georgia.

I am married to Christopher Washington ("Christy"), who is Steven Nelson's maternal cousin. Christy is the daughter of Donald James and Linda Whelchel.

Kathy James and I both used to work at American Airlines in Texas. At one point, Kathy went to get her son, Steven Nelson, from a juvenile detention center in Oklahoma when Steven was fourteen or fifteen years old. Prior to this, Kathy had never mentioned that she had children even though it was very common for everyone to talk about their kids at work. I was surprised to find out about Steven, and I thought it was really odd Kathy hadn't mentioned him or her other children.

I later met Steven myself, through my wife, Christy.

Steven struck me as a good kid with potential, although he was never given guidance. He was neglected. I think he was bored and lacking direction. I always felt bad for him and tried to make time for him. He stayed with my wife and me for a brief period of time. I could tell that Steven was craving a father figure, but had none.

*D W*
*he was neglected*

1.     When Steven and Kathy moved to Texas, Kathy didn't give Steven the attention he deserved because she was always working — sometimes 2 and 3 jobs at a time. During this time when Steven needed his mother the most, she wasn't there for him. Steven was a young man all bottled up but trying to come into his own. He had to look outside his home for attention, and got in with a bad crowd as a result of that. Steven clearly wanted more than anything to fit in and tried to please people so he would be accepted.

Steven started getting into trouble soon after he got to Texas and fell in with the wrong sort of people.

I believe Steven was pressured by people he was around to steal things. I think this was why Steven stole a car from Donnie, Christy's father, in Ada, Oklahoma. I don't think Steven was a terrible person for doing that, just desperate and scared.

After Steven stole his uncle's car, I believe that his family was extremely angry at him, and that they wrote him off. They didn't understand what he was going through.

Steven was put in juvenile detention in Texas not long after that. At that time, Christy and I moved away from Texas. By the time we moved back, Steven was nineteen or twenty years old.

*D W*

Initials

NELSON_01406

Steven has done some things that make me wonder whether he has mental health problems. Once, when Steven was fourteen or fifteen, I was lifting weights with my brother, and I saw Steven looking in the bathroom mirror talking to himself.

Another instance that made me suspect Steven had mental problems was years later when Steven was nineteen or twenty. Christy and I had just moved back to Texas. I saw Steven walking down the street, and gave him a ride. I barely recognized Steven. He looked completely zoned out, like he was in la la land. Steven was just somewhere else mentally.

Had I been asked, I would have been able and willing to testify to the information contained in this statement.

My name is Dar-Rell Washington, my date of birth is _____ 8 1 ____ and my address is 639 Garden Walk Blvd., Atlanta, Georgia 30349. I have read all 14 paragraphs of the above statement and I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on the 12 day of October, 2016.

_____
Dar-Rell Washington

# 159

## Psychological Evaluation of Steven Nelson -- Preliminary Report

**Dates of Evaluation**: 10/3/16 and 10/4/16

**Evaluation Conducted By**: Bekh Bradley, Ph.D., Clinical Psychologist

### Referral Question

I was contacted by current counsel for Mr. Steven Nelson (D.O.B.: ▮▮/87) and asked to identify and evaluate familial, social, educational, psychological, institutional and other factors that influenced development, behavior and functioning across the course of his life. In particular, I was asked to determine whether he was exposed to violence, maltreatment and/or trauma as a child and adolescent and, if so, to assess the degree of exposure to violence, maltreatment and trauma and to evaluate any effects on of this exposure on his subsequent psychological and behavioral functioning.

### Executive Summary

I found that Steven Nelson has suffered extreme childhood trauma and adversity, which has likely resulted in unrecognized and untreated trauma-related symptoms including symptoms of posttraumatic stress disorder (PTSD). Steven also exhibits characteristics of dissociative behavior, bipolar and/or other mood disorders (such as major depression) that are present at increased rates among individuals who experienced childhood trauma. It is my opinion that a failure to take into the account the influence of early trauma/adversity and PTSD is likely to have led to an inappropriate assessment of Steven as having antisocial personality disorder

In my time with Steven, and my extensive review of records from his childhood, I found that Steven experienced:

- *Physical child abuse* at the hands of his mother, his step-father, and at least one of his mother's boyfriends;
- *Sexual abuse* by one of his mother's friends with whom Steven would be left alone;
- *Emotional abuse* by his mother, who would regularly demean him, and his absentee father, who would consistently break promises to spend time with him;
- *Emotional and physical neglect* from a home in which he was often left alone at a young age, intermittent hunger and lack of basic child care and frequent moves;
- *Exposure to violence* in his home, including numerous fights between his mother and her various romantic partners, and exposure to violence against him and his siblings; and
- *Other trauma*, including the effects of spending most of developmental years in state custody, exposure to violence in juvenile correctional facilities, the effects of being born into a family with a history of mental illness and criminal behavior, and the trauma associated with his racial/ethnic background.

1

NELSON_01408

Psychological Evaluation of Steven Nelson -- Preliminary Report

## Assessments Conducted and Materials Reviewed

I conducted two clinical interviews of Mr. Steven Nelson (on 10/3/16 and 10/4/16). The assessments were conducted at the Polunsky Unit of the Texas Department of Criminal Justice. Across the course of these two clinical interviews I spent approximately 8.5 hours assessing Steven. Additionally, I reviewed records documenting his psychosocial history including school records, medical records, law enforcement and institutional records, court records and sworn statements from his family members and other lay witnesses.

## Clinical Interview with Mr. Nelson

At the time of the clinical interview, Steven was dressed in prison issued clothing. I informed him that I had been asked to evaluate him by his legal counsel. He was aware that for this reason information gained in my evaluation would not be confidential. He agreed to the assessment. During the assessment, Steven appeared alert and actively responded to all of my questions over the course of the two-day evaluation. During the evaluation he was noticeably vigilant to his environment - frequently looking at the door and the window, and monitoring the people and the noises in the environment. At times he became distracted from the interview because of his attention to other factors in the environment. However, he was able to redirect his attention to the interview once he had determined the source of the noise or activity that was drawing his attention. There were some points in the interview when he didn't want to talk about some topics and he would look away from me or be delayed in his response. In some cases he would tell me that he didn't want to continue to discuss a specific topic.

## Overview of Steven's Social/Familial Background and Childhood/Adolescent Development

Steven was born on ███/87 in Ada, Oklahoma. His family racial/ethnic background is both African American and American Indian. Specifically, his family has ties to both the Choctaw and Chickasaw Nations. Steven has a Certificate of Citizenship in the Chickasaw Nation and he received health care services via the Chickasaw Nation. He has an older half brother (Timothy James, D.O.B.: ███/79), an older sister (Kitza (Toni) Nelson, D.O.B.: ███/81) and two younger half siblings (Demarcus Nelson and Porsche Nelson). Steven and his older half brother have the same mother while he and his younger half siblings have the same father. Steven's older brother, Timothy, did not reside with his mother and siblings when he was young, rather he lived with his mother's extended family. The reasons for this are not entirely clear but may have been related to the fact that his mother became pregnant with Timothy when she was a teenager and that Timothy's father was White. When Steven first met Timothy while visiting his extended family, he was not aware that Timothy was his older brother. Eventually, Timothy moved in with Steven, his mother, and his half-sister Kitza. Steven's older sister, Kitza (who changed her name from Toni) became deaf at a young age. She was sent to a boarding school for deaf children. For this reason, she would only be home with Steven on weekends or during summers. Despite this, she and Steven formed a close bond. Steven was the member of the family who learned to communicate with Kitza using sign language and would serve as an interpreter for her when she was home.

2

NELSON_01409

Over the course of Steven's childhood he moved numerous times. He remembers living in many different houses/apartments. It appears that he rarely remained at one residence for much longer than a year or two. In addition, throughout Steven's childhood, his mother lived with multiple men, including his father, his stepfather, Romero, and several others. Some of his most positive memories of his childhood were of time spent with his grandparents, aunts, uncles, and cousins who "lived in the country." He recalls playing with his cousins in the summer.

Steven lived with his biological father and his older sister in his early childhood, while his older half brother lived with their maternal grandparents. Steven has little memory of his father living with him and his mother but he does recall being told about their physical and verbal altercations from his sister. Steven's most salient memories related to his biological father are with respect to his absence. Steven remembers that his father spent almost "no time" with him. He recalls several times during his early childhood when he called his father and asked him to come and "get me." He notes that his reasons for contacting his father were twofold: because he wanted to spend time with his father and because he wanted to "get away" from his mother. He remembers that some of the "saddest" times in his childhood were when he would be expecting his father to "come get me." He recalls waiting "all day" multiple times. He specifically remembers a time that he waited outside of his house with a "red, Care Bear suitcase." He recalls feeling sad and crying "when I was little" and his father wouldn't come for him. He notes that he learned not to become so upset about this as he grew older and that he "tried not to care." He reported that his father became "almost like a stranger not my dad." When asked if his efforts not to care about his father's absence worked, he said "sort of."

When asked to identify positive male role models in his life, Steven reported a close relationship with his maternal grandfather, who died when he was young. He also reported some positive aspects of his relationships with his mother's brothers, particularly "Abram." Steven described some positive aspects of his relationship with his stepfather, Romero. He recalls doing some positive activities with him (e.g., fishing and hunting). While there were some positive aspects of this relationship, Romero physically harmed him. While Steven described these "punishments" as "not as bad as my mother," he does note that some of these punishments were at the "demand" of his mother. Steven recalls fighting including "shouting," "yelling," "cursing" between his mother and Romero," and times when his mother would "try to push or hit" Romero. For a period of time during Steven's childhood, Romero was incarcerated and his mother would leave Steven to visit Romero. Steven also reported that his mother had multiple "boyfriends" some of whom lived with them. He reported that his mother allowed one of them, Jimmy, "to whoop me." He notes that Jimmy "hit hard," and that when Jimmy was living with them, he tried to spend as little time at home as possible. Another of his mother's boyfriends, Gerome, was in college at the time his mother was dating him. Steven notes that Gerome was "20" and "she was 40." He describes that his mother would "do stuff for [Gerome] but not for us" such as "feed him" and "buy things for him but not us." Thus, Steven did not have a consistent and positive male role model during his childhood and adolescent

3

NELSON_01410

Psychological Evaluation of Steven Nelson -- Preliminary Report

development. In addition, some of the male role models in Steven's life when he was growing up were verbally and/or physically aggressive towards Steven and his mother.

When asked about his relationship with his mother, Steven reported that she could be nurturing "sometimes," noting that she would buy things for him and for his sister including shirts and shoes. He also reported that she maintained some employment during his childhood: "she had jobs." He also noted that she "got us things at our birthdays or at Christmas, sometimes." Steven also reported as a positive aspect of his relationship with his mother that "she left me alone to do a lot of things," such as riding his bike, going outside or going around the neighborhood. When I asked if he thought this had really been a good thing for him, he noted that "at the time I thought so" but that when he thinks about it now he realizes that it was "not really so good." Steven reported that his mother liked "to party" and that, between work and "going out," she often left him alone without supervision, requiring him to take care of himself (e.g., cook for self) unless his sister was home to care of him or he sought assistance from his grandmother or an aunt or uncle, if possible. He reported that his mother would frequently become angry with him, often yelling at him, and frequently punishing him physically. Steven acknowledges that there were times when the violence was in response to bad behavior. However, he reports that there were other times when he could not understand why his mother abusive towards him or times when the punishment was disproportionate to the event. Although Steven was not inclined to describe his mother's behavior as "abuse," based on his description and the description provided by his sister, it was clear that Steven was physically and emotional abused during his childhood (see below). When Steven was approximately twelve years old, his mother moved from Ada, Oklahoma, to Texas. He did not move with her. During this time, he appears to have lived in multiple locations including with his older brother, Timothy, and possibly with his father or other relatives. None of these living arrangements appears to have been stable. At this point in his life, he had already become involved in the legal system (see below). It appears that there were two times when he was mandated by the court to stay at a youth shelter in Ada, Oklahoma, and was ultimately being placed in the custody of the Oklahoma Department of Youth Services (DYS). After he was released from DYS, he eventually joined his mother in Texas and attended at least part of a year of middle school in Texas. Ultimately, however, he was placed in the custody of the Texas Youth Services (TYS) where he primarily remained between the ages of 14 and 18.

### Steven's School/Academic Functioning in Childhood/Adolescence

From a young age, Steven's school experience and academic functioning was marked by behavioral and psychological problems manifested in the classroom, as well as inconsistent academic performance that included variability in grades, and academic achievement levels that were consistently below what would be expected from a child with his level of intelligence/aptitude. In both elementary school and middle school intelligence testing indicated low average to average aptitude with discrepancy in abilities marked by higher scores on the performance scales of the assessment as compared to the verbal component of the assessment. On multiple instances his academic achievement testing indicated below average achievement for his age. In 1994, his achievement scores ranged between the 8th and 36th percentile. In 1995, they ranged between the 18th and 36th percentile. In 2000, his academic achievement scores ranged between the 1st percentile

4

and the 18th percentile. The assessment conducted in 2000 found a need for remediation in both math and reading and found that "Steven may do better on mechanical, artistic or creative tasks than standard school subjects. The long-term focus should be on guidance to develop interests consistent with his strengths, and not solely traditional academic achievement." There are inconsistent records of Steven's grades, but the available data suggest that his grades were highly variable with some periods of good performance including As and Bs and other times when he made poor grades and failed tests. It seems that, at least in elementary school, his performance was improved when he was on a steady and adequate dose of his stimulant medication (prescribed for ADHD). He appears to have attended multiple schools for both elementary and middle school, likely due to the numerous family moves. As Steven became older, he began to miss school because of family instability and legal problems. A record written by his juvenile probation officer, Ronnie Meeks, indicated that Steven missed much of his second semester of 6th grade because of legal problems and his mother's move to Texas. However, it also appears that he was able to stabilize to some degree while in a residential program. Steven's records in September 2000. note that he would be enrolled in "special ed. 7th grade classes with modification and support," noting weaknesses in multiple areas including spelling, written language, and interpersonal skills. This note indicates, that Steven seems to be showing some accountability for his actions and is 'following simple instructions better.'". Records indicate that Steven enrolled in the 8th Grade in Texas and appeared to be doing well at first, including possibly playing football. Records of his grades from that time reflect mixed academic performance. He began to have trouble at school and was sent to an alternative school. Of note, when a Texas juvenile caseworker assessed him, she indicated that Steven's mother reported that she was unaware of his problems in school, but she did report other behavioral problems such as Steven taking her car without permission.

There are several indications in his record that Steven was enrolled in "special education" or "learning disabled" classes in both elementary and middle school. School records from elementary school indicate multiple attempts for the school to communicate with the mother, with limited responsiveness from her. In August 1995, a note addressed to "parents" indicated, "I have sent 2 notes plus one behavior report. As of yet I have received no response." Behaviors reported in notes sent to parents include aggression and anger towards other children and teachers, failure to follow directions, and disrespectful behaviors. The notes also indicate some positive aspects of Steven. For example: "Steven is a very sweet boy when he chooses to be, however today was a very difficult day." The records also show several notes from the teachers to Steven's counselors, written in 1994. One reads, "I am Steven's L.D. [learning disabled] teacher. Steven is a very delightful child and I care about him a lot. I have been concerned about the behavior change that has taken place in the last few weeks. He has become moody, angry, and at times violent towards others and myself." The note also indicates "because of the way he [is] expressing his anger, I am having to use the "time out room." It ends, "please give me any suggestions you may have as to how I can better serve Steven. He's really a super young man and I want to do all that I can." Another note written in January of that same school year reports that Steven's behavior had "grown steadily worse" and "he has become extremely moody, disrespectful and violent within the classroom" and also that "Steven's mood can change from pleasant to violent within a matter of minutes.

NELSON_01412

Psychological Evaluation of Steven Nelson -- Preliminary Report

If I ask him to complete a task or activity, he often throws his pencil, destroys the work or kicks and hits the wall. But in minutes he may be eagerly working on something else." The note indicates that his behavior is disruptive to the classroom and that she has had to remove him from the classroom to maintain safety. It also appears that his elementary school teachers attempted to refer him to a classroom for "severely emotionally disturbed children." However, it does not appear that his referral was approved. In fifth and sixth grade, Steven began to have involvement with the legal system.

Steven's report of his education and experience of school includes memories of having behavioral problems in school noting that he "got in trouble" and "fought with teachers and kids." He recalls that "sometimes" he was "pretty good" at school, but that this was not always the case. He reports he could perform better in school "when I could focus." When asked about his variability in focus, he noted that one factor that contributed to his performance was "what was going on at home," and another was whether or not he was given his medications consistently. With respect to medications for ADHD, he also says, "its hard to remember." He does recall that his mother didn't always keep him on his medications, in part because she thought that it might have contributed to some of his problems with sleep. When asked about how events at his home impacted his school performance, Steven described school as a "mixed blessing" in that it was good because he was away from his mother but bad because when he got into trouble at school, he would be disciplined by his mother when he came home. He does recall being in a "special classroom" in elementary school, "one filled with kids like me." In these classrooms he was not allowed to get away with "as much stuff" because they "watch you more." He also reports that they could "make you" sit down and "hold you" and that there was a room he was placed in with "carpet on the walls" that was "kind of like a closet" which he was sent to when he unable to control his emotions. He would remain in this time-out room until he calmed down. He remembers going to this room often, "way more than one time." He reports that at first when he was placed in this room he was "scared," but that with time he "got used to it." He reports that "when mom was home" she would help him with his homework. When I asked him how she helped him he said, "she told me to do it before I could play" but that she did not explain his homework to him or assist him in completion of his homework. She also did not check his work for accuracy and he acknowledges that there were times when he would complete his homework quickly, but not necessarily accurately, in order to play, stating that "I just did it fast to go out and play."

He reports that as he became older his education was more disrupted by his legal problems and time spent in juvenile corrections facilities. He reports there were classes in these facilities but that "there was a lot going on." He reports that he wanted to graduate from high school but was not able to. The reviewed records are unclear about his final educational status with some places indicating that he earned his high school degree (often reported by Steven) and others indicating that he completed a GED. It appears that some of Steven's memories of middle school and his attempts to attend high school are a little more wishful than realistic. He reports that he played football in middle school in Texas. The records indicate that he may have been on the team at one point but that he did not remain in school for long before being sent to an alternative juvenile facility. It is most likely that his academics/behavioral/legal problems would have prohibited him from remaining on the football team. Steven's friend and the

6