Psychological Evaluation of Steven Nelson -- Preliminary Report

younger brother of his mother's lover, Greg Burns, reports an odd instance of Steven attempting to attend high school at age 18: "I remember that after Steven was just out of juvenile detention, Steven came to live with me. For at least 6 weeks, he attended Lamar High School even though he was not enrolled. Steven would ride the bus to and from the high school. I even think he pretended to be on the football team . . . He seemed to be trying to be a normal teenager because he never had that opportunity."

## Mental Health Symptoms and Treatment During Childhood, Adolescence and Young Adulthood

Steven began having behavioral and mental health problems at a young age. He was seen by the mental health providers at the Chickasaw Nation Health System beginning at age six. The record indicates that he was referred by a teacher at school because of behavioral problems ("climbing the walls" and "Steven shows aggressiveness and wants to control but can't"). The record also noted that he had set three fires, one at age three and a half, one at five years old and one closer to the age of six. Notes also indicate that he was suspended from school that year around the same time that he was referred to treatment. His initial diagnosis was Attention Deficit Hyperactivity Disorder (ADHD). In 1993, when Steven was six, his mother completed a Child Behavior Checklist (CBCL). When this was scored it showed that he had above average problems with "externalizing" behaviors including both "delinquent" and "aggressive behavior." Steven was also above average in a domain of problems referred to as "thought problems."

Steven was seen for treatment between 1993 and 1996. Many of the referrals came from the school because of increased behavioral problems, often requesting an increased dose of stimulant medication or change in timing of the stimulant medication. Over the course of the treatment a number of diagnoses were given to Steven including ADHD, enuresis (bedwetting), oppositional defiant disorder (ODD), impulse control disorder and depression. Other problems noted included fighting at school, stealing, and being in special education classes or "LD" (learning disabled classes). One note mentions possible diagnoses of kleptomania or conduct disorder. He does not appear to have demonstrated in the counseling sessions the same aggressive or uncontrolled behavior reported frequently by his teachers. Steven, at a young age was prescribed several classes of psychotropic medications including stimulants, clonidine—which is a centrally-acting Alpha adrenergic receptor agonist used as a second or third line treatment for ADHD and, in some cases used to decrease irritability or anxiety—and mood stabilizers/anticonvulsants, which have been used in the treatment of bipolar disorder and in the treatment of irritable, aggressive, and impulsive behaviors. Steven also was engaged in play therapy and an effort was made to engage his mother in family treatment. However, the records indicate that his mother was not consistently involved in his treatment. One record from 1995 indicates that "mother has had many stops and starts in terms of being involved with patient's treatment" and another from September of that year states, "referral from school for placement in seriously emotionally disturbed classroom, further review indicates diagnosis of depression, police encounter for shoplifting, many missed appointments and mom's admission that the child needs more supervision and more of her involvement in his treatment. But she has missed 2 appts since that time, misses a total of 10 appointments since June 95."

7

Psychological Evaluation of Steven Nelson -- Preliminary Report

Other aspects of the record indicate problems at home.  For example, inconsistent administration of medications such that at one point the treatment program began directly delivering the medications to the school rather than sending it to the home.  In 1994 a note mentions that Steven was being seen for a follow up visit and "reports problems at school."  However, he was not able to explain his behavior at school, "pt states 'I don't know what's wrong."  This note also reports that Steven stated "he only wants to stay at school not home.'"  At the end of this record the clinician recommends weekly therapy and parenting skills.  On 05/31/95 the note states "patient here today with mom for f/u appointment.  1 hour late, mom stated she could not find him, "pt expressed concern re: getting a 'whipping' when he gets home for not being where he was supposed to be.  Mom reports medications for bedwetting not helping but no longer punishing him for betwetting."  This note also indicates, "patient appeared depressed, head down, chin on chest, poor eye contact, little verbalization."  Early that month (05/11/95) a note indicated that Steven's mom reported that she didn't know that she needed to attend appointments, if her son was "doing better."  The note indicates that when the clinician informed the mother that the school had recently reported problems at school, including aggression and disruptive behavior, "mom reports she was not aware of school problems."  On this date Steven was described as playing "nicely" and as a "quiet boy" who appeared "mildly depressed."  In 1995 a treatment note indicated, "particularly notable in review of records is mom's inconsistency of reports."  This note highlights that in 1993 one assessment completed by mom reported multiple problems while another completed at school did "not report[] any symptoms."

There were several other psychiatric assessments completed in Steven's childhood/early adolescence.  In 1994 and 1995 Steven was assessed, based on a referral from his teachers, for placement in a "seriously emotionally disturbed classroom."  As part of this assessment, two of his teachers completed a standardized measure of behavior and emotional problems.  His scores on these measures indicated that he had significant problems in multiple domains including learning, interpersonal relationships, inappropriate behaviors, unhappiness/depression, and physical symptoms and fears.  Some critical items rated at high levels by both teachers were "exhibits extreme mood changes", "becomes over excited",  "indicates that no one likes him/her and no one cares about him/her", "is overly critical of self in school related performance abilities, personal appearance, etc. (e.g. says he/she cannot perform activities, is dumb stupid, ugly, etc.)", and "is pessimistic (thinks nothing will turn out right)".  One of two teachers indicated that he had "threatened to hurt himself or commit suicide either verbally or through written representations of hurting self and committing suicide" and one of two teachers reported that more than one time per week Steven "indicated concerns regarding problems or situations in the home or is unable to deal with classroom requirements because of out-of-school situations."  Of note, a parent-rating form completed by Steven's mother at this same time, indicates that Steven was within normal rage for his age on three of the scales rated by his mother (social responsibility, self-care, and personal independence).  This is another instance of discrepancy between school and maternal reporting, as well as another example of inconsistency in the mother's own reporting of Steven's behaviors.

8

As part of this referral, a psychiatrist completed an evaluation of Steven. The evaluation indicates that he met 13 of 18 criteria for Attention Deficit with Hyperactivity and all of the criteria for ODD. The report expresses some concern about the development of Conduct Disorder noting that these symptoms don't meet criteria for a diagnosis but "certainly they add justification for the investment of substantial resources in the treatment of this child before he becomes a major threat to society." The report indicates that Steven continued to suffer from enuresis, which was being controlled by his pediatrician. Lastly, the report states, "there has been a question of whether this patient suffers depression" but notes that it would not be indicated to add a medication for the treatment of depression because Steven is already taking three medications. The report concludes that the "the big problems at this time cannot be fixed by pills," and that Steven's problems "can only be fixed by consistent and firm behavior management, lots of affection and building the patient's self-esteem and motivation to love and cooperate with others. Behavior modification must lean heavily on positive rewards, especially social ones like praise and encouragement and minimize punishment since that reinforces the patient's fear that he is hopelessly bad and that there is no use trying to get any better, or the racist fear that everybody is against him, anyway, and no matter how hard he might try, nothing he ever does will be good enough to be appreciated."

Another assessment, dated 11/01/96, appears to have been completed as part of an evaluation for "disability." This psychological assessment indicates some social problems:, saying that "he assures me that he has friends but says that he does not need to have any and then confirms that he trusts his friend but later modifies it to say that he trusts his mother." He reports that after school he 'rollerblades until it gets dark.'" However, after talking with Steven's mother, the psychologist determines that "this is mostly fabrication." The report indicates that he demonstrated some restlessness in the meeting, and that he reports that if he loses his temper, "I tear things up." The mother reports that Steven gets kicked off the bus frequently, and that he hit a girl with a "bicycle chain." She also reported that Steven has trouble sleeping, including trouble falling asleep and "has dreams because she can hear him talking." The report indicates that Steven's mother reported that Steven attends counseling "every other week," and the psychologist expressed the opinion that this level of frequency is "markedly inadequate in view of the severity of his difficulties." The report concludes that Steven suffers from "impulse control disorder," ODD, with a note that hyper-activity disorder was a possible diagnosis. It gives an Axis II diagnosis of "anti-social tendencies" and reports that Steven has "frequent social difficulties." The report concludes that, "Steven may be acting in conformity with a stereotype of aggressive toughness. Undeniably he has a serious social and academic disorder, in the form of over aggressiveness [sic] and assaultiveness. Reports of manipulative lying suggest that he is not in a solid, trusting relationship with anyone. He has significant difficulties but he is by no means disabled. He is educable. With appropriate psychotherapy and parent counseling efforts, we should expect significant improvement."

The State of Oklahoma Department of Juvenile Affairs conducted a diagnostic evaluation of Steven in May of 2000. This report indicates that although Steven admitted to the offenses with which he had been charged, he minimized his school and behavioral problems, reporting that he had done well in school until 5th grade and that he had begun to have problems when his mother had moved to Fort Worth, Texas when he was

Psychological Evaluation of Steven Nelson -- Preliminary Report

"bored." He also denied any problems at home. He reported that his mother used lectures, privilege withdrawal, and grounding when he had disciplinary problems. He denied any abuse or any early childhood problems. He did report that he was allowed to "go anywhere without supervision, go out after dark by himself, use the telephone when he wants to, buy his own clothes, have a friend spend the night and spend the night at a friend's house." On an assessment of cognitive style, Steven was identified as having a profile consistent with people who "like to use a systemized approach to problems and discount the need or regard for affections and feelings" and who may be lacking in ability to analyze and structure thought patterns. He also is identified as having a style marked by "being overly tense and controlled one moment and hyperactive the next, and then retreat into contemplation, fantasy and daydream whenever they are apprehended in a failure." He was also identified as having a style consistent with repeated conflicts, impulsivity and with behavior that "ranges from antisocial behavior to suicide attempts." His testing was consistent with "dynamics of family discord and unhappiness," as well as being vulnerable to "identity diffusion" and having social immaturity and maladjustment. His self-image was seen as immature and defensively optimistic. "He says that academically he is far superior and satisfied with himself. He insists that his family and his relationship to family is superior to peers. All of this is seen as denial and repressive defense mechanism to keep him from facing the unfortunate experiences in his life and failures. This has included rejection by close family members, such as his mother who has not attended him well. He admits that he is not satisfied with his self image. His overall dispositional profile is marked by impulsivity but also "needy" indicating that "his stealing is usually the type of needy individuals that don't use the product once it is stolen. It represents intrinsic worth or barter for affection with peers." He is noted for having immaturity, chronic and frequent antisocial behavior, a tendency to follow others, deceit, manipulativeness and socially inappropriate behavior adding that "there are long standing dynamics of lack of support in his family, and this present stage of indifference by the mother has definitely had its impact." It also notes that "due to his neediness and lack of serious persistent aggression, he should readily respond to a supportive environment" and that "Steven has been largely unsupervised and supported by family structures. His acting out behavior has become a repetitive basis. There is a concern that he needs supervision and guidance as well as correction." The report concludes with diagnoses of Conduct Disorder, early adolescent onset, Elements of Early Childhood Neglect and a possible impulse control disorder. On DSM Axis II he is identified as having features of dependency and narcissism in early adolescence (normal). He is identified as having multiple stressors including early childhood neglect, detachment of maternal support, lack of bonding, absence of father and recent psychological abandonment by mother." The report concludes that Steven distrusts others and "may be suffering attachment disorder related problems. He has an almost compulsive kleptomania, which further indicates his strong dependency needs and unmet fulfillment of basic emotional elements."

In 2002, the Texas Youth Commission ("TYC")—a juvenile detention facility—completed an assessment of Steven. In this assessment he reports some of his prior problems in school as well some prior legal charges. Steven also reports prior counseling and having taken "Ritalin." However, he minimizes other factors in his history including problems managing his temper and the number of times he has fought with others. His

10

testing from this evaluation also indicates that he is making a concerted effort to present himself in an overly positive manner. Of note he reports (in contrast to available data) that "I have never felt sad about anything," that "no one has ever criticized or punished me." and "I am always well behaved in school."

From age 14 to 18, Steven continued to demonstrate and report behavioral problems and psychological symptoms. At TYC, he continued to demonstrate aggressive and impulsive behaviors. He hid from staff, climbing in the space above ceiling tiles. He had some incidents of pushing/attacking staff. Some of these were more severe (choking a staff member who was attempting to handcuff him), while others were less severe including cursing, throwing milk at a staff member, and pouring water on the head of other staff members. At one point he was placed in a 90-day behavioral management program after a fight with another youth. Other behaviors included talking loudly, banging (tables, walls), running around, dancing and singing. In addition, medical records indicate several incidents in which he made suicidal statements or reported suicidal behaviors. At one point he was described as acting out aggressively while in security. At this time he was described as "angry, agitated and tearful." In 2004, at approximately seventeen years of age, there was an incident in which it was reported that Steven did not eat for eat for two days, after which he drank half a bottle of Windex. Although follow up notes report that this incident was an effort to get attention rather than a suicide attempt, a separate follow up note to this incident states, "there is data to indicate that he has two previous attempts of suicide," and that "he thinks of death often, at least once a week. He reported that if he was feeling depressed and not at TYC, he would shoot himself in the head." He is described as depressed but not suicidal, and he is marked "medium" for "mental health requirements," which reflects the presence of a "psychiatric diagnosis with moderate symptoms and moderate to serious impairment in adaptive functioning at least partially attributable to mental disorder." Later that year, Steven was taken to the hospital after a suspected "drug overdose," but he later indicated that he was "faking." In 2006, records indicate that he reported having trouble sleeping, depression, and poor appetite. When asked to "rank" problems that he wanted to address, he indicated "mood disorders" and "bipolar disorder with antisocial traits."

In addition to the behavioral problems and mental health symptoms identified in his record, Steven reported some childhood and adolescent psychological symptoms. He reported sadness and crying as a child and adolescent. He mostly associates these emotions with his father not being involved in his life, particularly when his father would "make promises and not keep them." He also reported that he experienced sadness when he was at juvenile detention facilities and his mother and other family members did not visit him. He also reported worrying frequently about getting into trouble with his mother. Steven reported feelings of depression and worthlessness related to not having the skills or ability to get a job when he was released from TYC. He reported similar feelings when he was younger, along with worries about how his mother would be gone from home, or would physically and verbally punish him. He described feeling "confused" noting that he loved his mother and wanted her attention so he didn't understand why she was angry. He wondered what he "did wrong" that caused his mother not to like him. He reported that he would feel "nervous" when he was at home, alternately worrying that his mother would be there and be angry with him. At other times he worried that she would "leave me alone." As he grew older he reported that he

11

was "more angry than sad or scared." He reported having memories and thoughts about his mom assaulting him or yelling at him while he was at school and when he would try to go to sleep at night. He also reported bad dreams and nightmares as a child. He reported that after he entered juvenile detention, he began to have similar worries and thoughts about fights and getting hurt by others (including other youth and staff). He was able to describe the physical feeling of being "nervous" (tightness in chest, faster heart beat), and reported that he tends to feel more nervous in "open spaces" and that, beginning as a child, he learned to "hide" when he was scared or nervous. He reported that he learned as a child that he could calm himself down by going into a closet in his bedroom. He couldn't really describe why this helped him but that he liked being in a space with "walls near me."

Steven described that as he got older he felt less sad and worried and more "angry." He also reported trying to not have too many hopes or dreams about the future. He did not have many friends, though he did describe confiding in a few of his cousins. He reported that he tried to not have positive/hopeful thoughts and feelings or close relationships out of a fear of being disappointed or "messing up" and because he didn't "trust" anyone. Instead, Steven was more focused on trying to live "in my imagination" and doing things in the moment without much thought about future consequences.

When asked about how he escaped into his imagination as a child, he reported that he had an imaginary friend, 'Rico.' He reported that the first time "Rico" was present was at his grandfather's funeral when he heard "Rico's voice" talking to him in a reassuring way, saying "its going to be Ok." He reported that over the course of his childhood and adolescence, Rico was present. He noted "it's hard to describe" and that this clinician likely "wouldn't understand." He stated that "Rico" was "there with me" indicating that he could see him and that he "looked like me, like a twin." He stated that he knew that others couldn't see "Rico" and that he would have conversations with him. He reported that until "I got older," Rico talked out loud to him. But, when he observed that this drew attention and questions, he learned to "talk to Rico in my mind." He reported that later, when he was scared or felt threatened or "needed help," "Rico" would help him and encourage him to change his behavior and emotions. Asked for an example he stated, "with Rico, I wouldn't be scared to fight" if "I needed too." Steven does not conceptualize Rico as real, or as a separate "personality, noting that "he's me but he's not." Steven reported periods of time in his life that lacks any memory, "like when I got some of these tattoos" and that he thinks that Rico "was with me and helping me." Asked about "Tank," he reported that Tank was a nickname that he used. He said Tank was not an imaginary friend in childhood but a name he took on for himself. He identified this nickname with being "tough" and "not being disrespected."

Steven's records from time spent in jail and prison as an adult indicate that he continued to experience behavioral and psychological problems. His records from 2008, around the age of 21, indicate that he experienced depressed mood and reported thoughts of suicide. He reported problems sleeping, nothing that he sometimes gets no more than one hour of sleep at night. When reporting these symptoms, he also reported needing to have his psychiatric medications refilled. In October of 2008, he reported hearing voices in his head and seeing "dead bodies" hanging from the ceiling of his pod. He reported suicidal ideation again in 2009, but also indicated that he was reporting suicide because

12

NELSON_01419

he was having problems with the officers in his area and he was "acting out." In 2010, he referred himself to mental health stating that he needed to be restarted on his medications for "depression," "not sleeping" and "talking to myself." He reported that medications helped him to remain calm and to prevent him from fighting. He reported asking himself questions and answering himself. He also reported decreased appetite and expressed concern about weight loss. He also reported problems with forgetting things. He demonstrated impulsive and aggressive behaviors. He reported that when he assaulted an officer he "blacked out" and did not remember what had occurred. He also reported hearing a voice that is the person he "turns into" when he fights. In 2011 he reported problems sleeping when not on medication. He also reported being depressed, "stressed out" and hearing voices.

When he participated in a 90-day treatment program in 2010, Steven completed a battery of standardized assessments. One of these was an assessment for PTSD symptoms. Based on Steven's score on this instrument, he appears to screen positive for a diagnosis of PTSD. His total score on the measure was consistent with notably high level of PTSD symptoms. However, this diagnosis does not seem to have been explored further or included in his treatment plan.

### Steven's Involvement in the Juvenile Justice and Legal System During Childhood, Adolescence and Young Adulthood

As early as eight years old, Steven's behavioral and disciplinary problems extended beyond school to involvement with the legal system. At age eight he was seen shoplifting at a convenience store. Police gave him a warning and his mother was encouraged to supervise him more closely. When asked about this in counseling, the notes indicated that Steven appeared embarrassed and was not able to explain his behavior other than stating that he needed scissors. At age nine, juvenile authorities became involved with Steven after he reportedly hit a girl with a "bike chain." Charges were not pressed. At age 9 or 10, Steven and a friend stole bikes but charges were not pressed. In May of 1997 at age 11 he faced charges related to a break in at a local house. At this time, Steven was placed in a youth shelter and prosecution was deferred. In the following year, he was implicated in multiple similar incidents of breaking into houses and stealing items including jewelry, coins, roller blades and a radio controlled car. All of these charges were in Oklahoma. He was referred to several programs designed to allow him to remain in the community. There was moderate engagement in these programs. It appears that his mother completed required parenting classes and Steven engaged in a community based "military mentoring program." The records do indicate a delay in enrollment because he needed a physical examination. The records subsequently note inconsistent attendance although he completed the program. Steven continued to have problems breaking into homes and stealing. Ultimately the court took custody of Steven. During this time, Steven's mother moved to Fort Worth, Texas, and Steven remained in Ada, Oklahoma, in the care of his older half-brother with some possible, but minimal, assistance from his father. During this time, it appears that Steven was living on the streets, possibly staying with his half-brother and/or friends but also staying in houses that he broke into. In one case, he was seen entering an apartment and police found a shirt, pants, a sheet, and a backpack. In another instance he was seen leaving a house in the morning carrying a basket with clothes. The owner found clothes in the

house and reported that it appeared Steven had taken a bath and a shower. It also seems that he drank milk and ate ice cream at this house.

By the time Steven turned 13, he was charged with multiple crimes and was removed from his mother's custody and placed in a juvenile facility. He spent 40 days at a detention center and was placed in a program at the Youth Habilitation Center ("YHC") for approximately seven months. The problems identified in his treatment plan were poor impulse control, poor decision making skills, poor awareness and insight, easily influenced by negative peers and immature behavior. During this time he had behavioral problems and did not make progress as expected. By the end of his time in the program, however, Steven was showing improvement. Based on this, the facility requested two extensions of his stay. At the time the first extension, the request noted "he still has several treatment issues such as anger management, history of defiance, poor decision making and impulse control, that should be addressed before he is released from our program." This extension was granted and goals included improving his relationship with his mother, including family therapy. Notes did not indicate that family therapy occurred. Instead multiple notes suggested that because his mother was living in Texas, she visited and called infrequently. The request for the second extension notes, "while he has shown improvement, he still has issues that should be addressed before discharge" and "as he is just now making progress, it is imperative that he follow though in a structured setting to fully gain success." The second extension was denied, and Steven was released to the custody of his mother.

Steven then moved to Texas and began middle school. His parole was transferred to Texas by interstate pact. Notes indicate that his mother reported to his Oklahoma probation officer that Steven was doing well at home and at school. However, this does not seem to have been the case.

Beginning in December of 2001, Steven became involved in the Texas juvenile justice system after being charged with two counts of burglary. According to a probation report, in one instance Steven allegedly entered an apartment and removed a motorcycle jacket and keys. In another instance he entered an apartment and removed a video game console, noting that "his school notebook was found at the scene." Associated with these charges, a prior referral for "assault with a deadly weapon" was opened. This was related to an incident at his middle school in which Steven had "brandished what was later discovered to be a cap gun and threatened a victim with it." A report written by a probation officer in 2001 indicates that the then 14-year-old Steven was adjudicated a delinquent on two counts of burglary. Reports by the probation office indicate that "Steven is a friendly, cooperative young man, but he can't seem to stay out of trouble. The only reason Steven can give for his behavior is that he gets bored and just acts without thinking about the consequences. Steven does well in the detention setting." Steven is placed in the custody of Texas Youth Commission ("TYC") where he remains until age 18. During this time, Steven demonstrates erratic behavior including multiple behavioral "incidents" (>400). However, it also appears that Steven had some periods of relative success during which he completed academic and behavioral programs. At age 18, he was released on parole status to live with his mother, but within a short period of time his parole was revoked and he spent most of the next two years in Texas jails for various offenses, including thefts. In 2009, Steven received a two-year sentence for

NELSON_01421

Psychological Evaluation of Steven Nelson -- Preliminary Report

burglary. Following his release, Steven was arrested for aggravated assault. Steven was sent to an intermediate sanction facility and completed a 90-day program. He successfully completed this program, which was focused on substance abuse and anger management. He was released in 2011 and shortly thereafter was arrested for the instant offense. He has remained incarcerated since that time. Throughout his imprisonment, Steven has been prescribed multiple classes of psychotropic medications including mood stabilizers (e.g., Depakote), atypical antipsychotics (e.g., Seroquel), and tricyclic antidepressants.

Although substance abuse and addiction does not play a significant role in Steven's diagnosis, he reports that he began drinking at home at an early age and continued to drink whenever he was able to access alcohol left in the house by his mother. He reports limited use of marijuana in adolescence. The fact that substance use did not appear to play a significant role for Steven may be attributed in part to more restricted access to alcohol and illegal drugs in the juvenile justice system. However, he may consumed alcohol, used marijuana and taken benzodiazepines during the times in which he was not incarcerated. In early adulthood, some of his records refer to alcohol and substance use. Steven does report that he intermittently was able to drink wine made in jail or prison, but he denies that this caused him significant problems. Drug use became more significant for Steven in the time period leading up to the events for which he is currently incarcerated. Around the time of the crime for which he was convicted, Steven's substance abuse included the use of PCP and ecstasy.

### Steven's Exposure to Violence, Maltreatment and Trauma During Childhood and Adolescence

**Physical Abuse**: Steven experienced physical abuse over the course of his childhood at the hands of his mother. He reported that he "never" knew when he would "get into trouble" and that, at times, there was not a "good reason." He reported that he was hit with belts, paddles, switches, cords and other objects. He noted that there would often be "marks" that lasted "for a while." He reported that this would happen more days than not and sometimes more than one time per day. He noted that as he grew older, "she hit me harder", describing an incident in which he was hit by the plug-end of a three pronged extension cord in a way that "left marks." He also reported physical abuse at the hands of one of his mother's boyfriends. Statements made by his sister, Kitza (Toni), support his accounts of his mother's physical abuse. She reported that she would see slashes and cuts on his legs and that her mother hit Steven frequently and often not for clear reasons, "she just thought he was bad." Kitza also described seeing the paddle that his mother used to hit Steven, noting that Kathy would write the dates of beatings with the paddle on the paddle itself. There is also reference to him being afraid of "whippings" in his counseling notes. Although he did not refer to what happened to him as "abuse," the level and frequency of physical punishment he experienced while growing up clearly constituted severe physical abuse.

**Emotional Abuse**: Steven experience emotional abuse by his mother. He specifically reported that she yelled at him frequently, including cursing at him and insulting him. He reported that she made statements such as, "you dumb shit," "I can't stand your ass," and "you make me sick." At least one teacher confirmed this type of verbal abuse, stating she tried to talk to his mother about it, but that she ignored her advice. In addition to this, she

15

would often spend money on herself rather than her children. Steven describes that at one time she dated a man who was in college and that would buy things for him but not for Steven or his sister. Kitza reports that her mother would use the money from Kitza's social security check to buy herself things, even when she and Steven lacked: "she was very selfish and prioritized her needs and wants over the basic things that Steven and I needed as kids."

**Emotional and Physical Neglect**: Steven experienced emotional and physical neglect as a child. At a young age his mother left him alone at home when she was out with friends, "men" or "partying." This sometimes happened for several days or more at a time and there were times during which he didn't have enough food and had to learn to cook for himself. Steven reported that, at times, he suffered from hunger, such that he would steal food and provided an example stealing food from a sorority at the local college where his mother worked. He described that his sister would take care of him when she was at home on weekends. His mother failed to adequately supervise Steven, even when mental health and juvenile justice officials told her he needed more supervision. She also didn't participate in his counseling sessions, even when requested. This neglect was referenced in his mental health notes and evaluations and described by multiple family members, including his sister, Kitza. She states, "When I came home from school on the weekends, I took care of Steven because our mother would leave us home alone. I would go home most weekends, but if there was an event, I would stay at school." She also stated that her mother would often go to clubs or her friends' houses leaving her and Steven at home alone, "even though we were both very young." She also reported "when I was at school during the week, our mother would often leave Steven home alone. He was too young to be home alone and would often leave the house without an adult." Kitza described that when she came home on weekends she would "always change Steven's bed sheets because he would wet the bed frequently."

**Sexual Abuse**: Steven reported sexual abuse as a child. He noted in the interview that he had not previously told anyone about this instance of abuse. It is not uncommon for individuals who have experienced sexual abuse in childhood to keep this information to themselves over many years. This may be related to a feeling shame or embarrassment or a fear of being blamed. This may also be related to the fact they may never have been asked directly about their experiences. For example, people like Steven may answer "no" to a question about having been sexually abused but yes to a more specific question about being sexually touched by an adult in childhood.

Steven reported being sexually molested by a female friend of his mother who lived with them when he was growing up. He is not certain exactly what age he was, possibly "8 or 9, maybe 10." He reported that the abuse started with her asking him to get on her lap while she was in a chair. He stated that at these times "she would touch me." When I asked more about this, he clarified that she touched his genitals. He recalled that the abuse developed over time and that when his mother was away, she would take him into the bedroom and they "touched" and that she got him to "rub up against her." He reported that she put her mouth on his genitals. He noted that it "didn't really feel forced," and that "I wasn't old enough to do anything." When I asked for more information about this statement he clarified that he was not old enough to have sexual intercourse. He stated

that he didn't tell his mother about this and described that he "kind of liked the attention," and that he "liked having a secret from my mom." I asked him about any other sexual contact from any other adults including his mom's friends and boyfriends. This question was followed by a long silence followed a response of "no." I asked again because of his hesitation and he stated that he didn't "want to talk about this." He also reported observing sexual behavior when he was in juvenile facilities but added, "it was consensual."

**Witnessing Family Violence**: Steven witnessed family violence growing up. Specifically he witnessed his father being violent with his mother when he was very young. He reported seeing his mother attempt to push or hit his stepfather. Kitza reports her father had a "terrible temper" and that "he and our mother would frequently fight and scream at each other. Our father would often be drunk during these fights." She also reports that her mother would "grab and use knives." She reports a "worst fight," stating that "Steven heard them fighting that night and left our bedroom, I followed him." In this fight, her mother stabbed her father "in the genital area" and that there was "blood everywhere" and emergency vehicles came to the house. She reported that after the fights, Steven would be scared and would have bad dreams and wet the bed. She would try to clean the sheets "before our mother got home." She describes times when she couldn't clean fully because the mattress was soaked with urine. "It smelled like the urine had been there for a week. He needed a new mattress and [our mother] never replaced it."

**Witnessing Other Violence, Sexual Activity and Drug and Alcohol Use**: When Steven was young, he witnessed his mother in fights with other adults. He recalls that she kept "big knives" in the car and house. He recalls a fight he witnessed between his mother and another woman that occurred at the car wash." He saw his mother and this woman hitting one another and his mother told him to get her knife from the car, "but I didn't know where it was." Steven also reported witnessing his mother physically assault his sister. Steven and his sister often were at home when their mother was having parties at the house. Kitza reports, "I often didn't want to leave the room because our mother would be partying. While I couldn't hear it, Steven would tell me what was going on by signing, 'play' to me." After the parties there would be cigarette butts, marijuana, beer cans and bottles and "other alcohol" strewn about the house. Kitza believes that Steven may have set fires because of lighters that were left out after a party and noted, "he could get into anything she left out."

**Other Trauma Exposure**: Steven reports other types of trauma exposure in his life including being in fights and witnessing fights while in juvenile detention, ,and having fear that he or others would be badly hurt. He also reports being in a motorcycle accident in young adulthood.

**Family History of Mental Illness/Substance Use and Criminal Behavior**: Steven's family has a history of mental illness and substance abuse. Although her medical records are not available, and therefore a precise diagnosis is not available, statements from multiple family members indicate the Steven's mother suffers from a significant mental illness, which has led to her psychiatric hospitalization. Further, Steven's father struggled with alcohol and substance abuse (marijuana), which led to multiple arrests and

NELSON_01424

has contributed to him engaging in violent behavior. The same appears to be true Steven's half-brother Timothy.

**Clinical Observations**

During his childhood, adolescence, and transition to adulthood, Steven was exposed to a remarkably high level of adverse life events and traumas. These include but are not limited to: a) being born into a family with parents who suffer from substance use disorders and mental illness and criminal behaviors; b) experiencing intermittent hunger and possible insufficient nutrition; c) repeated exposure to severe violence directed against sister; d) severe and ongoing physical and emotional abuse; e) experiencing child sexual abuse; f) experiencing severe and ongoing neglect in childhood; g) frequent moves and associated changes in school across the course of his childhood and adolescence; h) witnessing his mother fighting with other adults; i) being in fights and witnessing fights while in juvenile correctional facilities; j) spending a significant majority of his adolescence and early adulthood in juvenile corrections facilities and jails.

Each type of exposure to adversity and trauma alone leads to increased risk for the development of cognitive, emotional, and behavioral problems. Further, because there is a dose-response relationship between the number of types of trauma and adversity to which an individual is exposed during development, and the risk for developing psychological problems, the combination of Steven's multiple exposures to trauma made the likelihood that he would develop adverse psychological consequences extremely high.

Steven was exposed to abuse and neglect that took place his own home and at the hands of adults who were supposed to be his caregivers. Relationships with parents or other caregivers, as well as the predictability and stability of our early environments, is the foundation upon which people develop their core beliefs about themselves, others, and relationships. Strong and secure attachment relationships and stable early environments are the foundation for the development of the ability to control emotions and emotional responses particularly in the face of stress later in life. As a result, the lack of a secure attachment to his mother or other caregiver as a child would have placed Steven at an increased risk for the development of psychological and behavioral problems.

Exposure to high levels of trauma and adversity during childhood and adolescence, particularly trauma that occurs as a result of the harmful actions of caregivers, significantly increases the risk for developing a wide range of psychological symptoms as well as risk for developing more severe psychological problems. Steven, like many individuals who experience frequent and severe adversity in childhood, has suffered from clinically significant symptoms of multiple psychological disorders and behavioral problems beginning very early in childhood. These include aggression and impulsivity, problems forming close relationships and trusting others, symptoms of anxiety, depressed mood, posttraumatic stress disorder (PTSD), mood instability and impulsivity, attention deficit and hyperactivity related problems, dissociative symptoms, symptoms of thought disorder and psychosis and substance use symptoms.

We don't fully understand the mechanisms through which childhood and adolescent exposure to trauma and adversity confer increased risk for such a broad range

18

NELSON_01425

of negative psychological and behavioral outcomes. We do know that that traumatic and adverse experiences and circumstances exert a deleterious impact on the developing brain and negatively disrupt of psychosocial development and functioning. These developmental processes which are disrupted by trauma and adversity can be thought of as the scaffolding on which key cognitive, emotional and behavioral skills are built, such that developmental processes that occur in earlier in life are the foundations for later development. These skills include (but are not limited to) increased capacity for logical and cause-and-effect thinking; the development of more mature and effective problem-solving skills; increased capacity for abstract reasoning; improved ability to monitor and interpret information present in our environments; improved ability to learn from, and adapt to, the information present in our environments; increased ability to more accurately identify our own emotions and the emotions of others; and increased ability to regulate emotions and control impulsive behaviors. In the case of Steven, the stress, trauma and adversity he experienced across the course of his development interfered with the advancement of these skills.

Although, many of Steven's psychological and behavioral problems were identified early in childhood, my review of the available records and my assessment of Steven indicate that the impact of his exposure to trauma, abuse and neglect were not fully identified by mental health providers who treated him during his childhood, adolescence and early adulthood. Steven demonstrated significant symptoms associated with trauma including symptoms of PTSD and dissociation, which were not identified or treated. These symptoms include becoming emotionally numb or cut-off from one's emotions as well as attempting to "disconnect" thoughts, emotions and experiences that are distressing, such that an individual feels or seems to be in "another world" or they begin to feel "unreal."

Although Steven was diagnosed with "externalizing" disorders such as oppositional defiant disorder and impulse control disorder and attention deficit hyperactivity disorder, it appears that he may have also suffered from a mood disorder. Steven suffered from depression, but he also displayed symptoms of mood liability (changing moods), irritability/anger, going long periods of time with little sleep and some psychotic/thought-disordered symptoms. These symptoms may reflect an underlying bipolar disorder or another type of mood disorder such as major depression with psychotic features. Steven was treated with—and seemed to demonstrate some response to—classes of medications used to treat mood disorders and psychotic symptoms. Additional assessment is needed to determine if Steven has suffered from a mood disorder and the exact nature of that mood disorder. Specifically, I recommend a psychiatric assessment.

The role of early trauma and childhood abuse and associated symptoms and problems, including but not limited to symptoms of PTSD, were not adequately identified, diagnosed or treated in Steven. Because of this, I believe that some of his behaviors and symptoms may have been inappropriately attributed to externalizing disorders such as conduct disorder. In addition, I believe that failure to consider the role of trauma and PTSD in Steven's case may have led to the inappropriate attribution of such traits as being "antisocial" or "sociopathic." For example, even though PTSD is usually thought of as an "internalizing disorder," research on children and adolescents

19

NELSON_01426

with PTSD secondary to childhood abuse and neglect has demonstrated that they are also at increased risk for externalizing symptoms including aggressive and impulsive behaviors. In addition, behaviors such as running away from home or a tendency to present with "flat affect" (lack of demonstration of a full range if emotional reactions), which may be strongly influenced by exposure to trauma and neglect, can be misattributed to antisocial characteristics. It is my expert opinion that this occurred in the case of Steven. I recommend additional trauma focused assessment, further investigation into his familial mental health history, as well a psychiatric assessment to address this issue.

There are several other factors pertinent to Steven that I believe need additional investigation and assessment. One of these is the impact of spending the majority of his adolescence and young adulthood in juvenile corrections environments or in prisons and jails. Being in these environments during important developmental stages, when individuals typically develop key skills and capacities for successful transition to adulthood, has been demonstrated to negatively impact psychological development and impair ability to establish independent and adaptive functioning as an adult. Further, it has been demonstrated that many environment characteristics common in correction environments can exacerbate symptoms similar to those found in traumatized individuals who already suffer from PTSD (e.g., hypervigilance and overreaction to potential threats). In addition, Steven has a complex ethnic/cultural background, which included being both American Indian and African American. It is likely that this background, including exposure to racism and discrimination, impacted Steven's development and behavior. Oklahoma, including the areas in which Steven and his parents and grandparents were raised, has a long history of racial discrimination as it relates to both the American Indian nations and the African American community. For example, Tulsa was the site of a race riot in 1921 in which hundreds of African Americans were killed and an entire Black community was burned to the ground. These events would have impacted Black communities across Oklahoma, and are likely to have been significant impacts African Americans who lived in or near Tulsa. There are multiple additional incidents of racism and discrimination that occurred in Oklahoma, including in and around Ada, over the last century. Further complicating the case of Steven, is the fact that the two American Indian tribes with which he and his family were connected have a history of owning slaves. There is a speficific cultural indentification and cultural factors including discrimination that impact indivudals of mixed African American and Indian heritage.

It is my professional opinion that Steven's behaviors and actions across the course of his life, cannot be accurately and fully understood without taking into account the information and knowledge presented above.

## Recommendations For Additional Assessment

I recommend both additional trauma-focused assessment and review of records as well as a psychiatric assessment to address this issue. Specifically, this includes:

- Collection of multigenerational familial mental health information;
- Further investigation of Steven's cultural/ethnic background;
- Expert evaluation on the effects of life-long detention on Steven's ability to function;

NELSON_01427

Psychological Evaluation of Steven Nelson -- Preliminary Report

- Psychiatric assessment for bipolar disorder and/or other mood disorders; and
- Additional trauma assessment incorporating the aforementioned data.

**Available Sources:**
At the time of Steven's trial, all of the information set forth in this declaration regarding the impact of violence, abuse, and trauma were well known to mental health professionals and well documented in available social and behavioral literature including, but not limited to, the materials listed below:

Briere, & Runtz (1990). Differential adult symptomatology associated with three types of child abuse histories, Child Abuse & Neglect.

Briere, J. (1992). Child Abuse Trauma: Theory and Treatment of the Lasting Effects.

Bryer, et al. (1987). Childhood sexual and physical abuse as factors in adult psychiatric illness. The American Journal of Psychiatry.

De Bellis, et al. (1999). Developmental traumatology part I: Biological stress systems. Biological Psychiatry.

De Bellis et al. (1999). Developmental traumatology part II: brain development. Biological Psychiatry.

Dodge, Bates & Petit (1990). Mechanisms in the cycle of violence. Science.

Egeland, Sroufe & Erickson, (1984). The developmental consequences of different patterns of maltreatment, International Journal of Child Abuse.

Egeland, & Farber (1984). Infant-mother attachment: Factors related to its development and changes over time, Child Development.

Felitti, et al. (1998). Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults. American Journal of Preventive Medicine.

Farrington (1989). Early predictors of adolescent aggression and adult violence, Violence and Victims .

Garbarino, (1995). The American war zone: What children can tell us about living with violence. Journal of Developmental & Behavioral Pediatrics.

Graham-Bermann & Levendosky (1998). Traumatic stress symptoms in children of battered women. Journal of Interpersonal Violence.

Herman (1992). Trauma and Recovery.

Kashani, Anasseril, Dandoy & Holcomb (1992). Family violence: Impact on children, Journal of the American Academy of Child & Adolescent Psychiatry.

Keve (1974). Prison Life and Human Worth.

Levenson, (1975). Multidimensional locus of control in prison inmates, Journal of Applied Social Psychology.

Malinosky-Rummell & Hansen (1993). Long-term consequences of childhood physical abuse. Psychological Bulletin.

**NELSON_01428**

Psychological Evaluation of Steven Nelson -- Preliminary Report

Masten & Garmezy (1985). Risk, vulnerability and protective factors in developmental psychopathology, in F. Lahey & A Kazdin (Eds.) Advances in Clinical Child Psychology.

Mazza, & Reynolds (1999). Exposure to violence in young inner-city adolescents: Relationships with suicidal ideation, depression, and PTSD symptomatology. Journal of Abnormal Child Psychology.

McCorkle. (1992). Personal precautions to violence in prison, Criminal Justice and Behavior.

McLeod (1993). Poverty, parenting, and children's mental health. American Sociological Review.

Saigh, Yasik, Oberfield, Halamandaris, & McHugh (2002). An analysis of the internalizing and externalizing behaviors of traumatized urban youth with and without PTSD. Journal of Abnormal Psychology.

Taylor, A. (1961). Social Isolation and Imprisonment, Psychiatry.

Widom (1989). Child abuse, neglect, and adult behavior: Research design and findings on criminality, violence, and child abuse, American Journal of Orthopsychiatry.

NELSON_01429

# 160

STATE OF TEXAS          )
                        )
COUNTY OF TARRANT   )

### DECLARATION OF HENRY C. HACKBUSCH III

1.   My name is HENRY C. HACKBUSCH III. I am over the age of 18 and otherwise competent to give this declaration.

2.   I served as a juror in the 2012 capital murder trial of Steven Lawayne Nelson.

3.   I had served as a juror previously, in an armed robbery trial. It was ages ago.

4.   In the Steven Nelson trial, the belt was compelling because it was really unique. It had these studs that went around it.

5.   I guess the most dramatic moment of the trial was the transgendered woman, who testified for the defense and was supposedly with Mr. Nelson at the time.

6.   The most horrific and brutal part of the trial was when we heard about Steven beating the church secretary within an inch of her life. She came to the sentencing, but I guess she's can't remember anything.

8.   The jury was pretty much all-white. More women than men I think. I don't think it matters, though. To me, I don't care who I'm deliberating with or what they look like.

9.   Steven Nelson seemed like an absolute psychopath. He didn't really show any emotion during the trial and I don't know why – maybe he was coached. He mostly kept his hands under the table but I could tell that he was handcuffed. I didn't see him walk around or write anything.

10.   Steven Nelson was accompanied by police at all times. I can't remember the exact number. I think two officers sat with him, and one stood by us in the jury box. They were just eyeballing him the whole time. I think because he was just a complete nut.

11.   I noticed news vans outside the court. It didn't bother me.

My name is Henry C. Hackbusch III, my date of birth is ▉▉▉62 and my address is
201 ROBERTS DRIVE            . I have read all X paragraphs of the above statement and
I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on the 19 day of September, 2016.

HENRY C. HACKBUSCH III

# 161

NO. 1232507

| THE STATE OF TEXAS | )( | IN THE CRIMINAL DISTRICT |
| | )( | |
| | )( | |
| VS. | )( | COURT NUMBER FOUR |
| | )( | |
| | )( | |
| STEVEN NELSON | )( | TARRANT COUNTY, TEXAS |

**ORDER**

The Court, having reviewed the interim bill for Antoinette McGarrahan, Ph.D., and finding

the defendant is indigent, ORDERS the Tarrant County Auditor's Office to pay the bill of

Antoinette McGarrahan, Ph.D., as indicated on the bill, for the referenced case in the amount of

$3,360.00.

The Court further orders that the itemization of this bill be sealed in the clerk's records.

The payment should be sent to:

Antoinette McGarrahan, Ph.D.
12820 Hillcrest Road, #C125,
Dallas, Texas   75230, (972)726-9100

SIGNED AND ENTERED this _____ day of _____, 2012.


_____
PRESIDING JUDGE

Antoinette R.  McGarrahan, Ph.D.
12820 Hillcrest Road
Suite C-125
Dallas, TX 75230
972-726-9100 Office
972-726-9101 Fax

| Invoice Date | Invoice # |
|---|---|
| 1/20/2012 | 276 |

Bill To

Bill Ray, P.C.
512 Main Street, Ste. 308
Fort Worth, TX 76102

Case Information

Case: Nelson, Steve
Cause #:1232507
Referral Source: Bill Ray

| Service Date | Service Description | Time (Hours) | Rate | Amount |
|---|---|---|---|---|
| 10/26/2011 | Initial consultation with attorney | 0.25 | 200.00 | 50.00 |
| 11/11/2011 | Record review | 2 | 200.00 | 400.00 |
| 11/14/2011 | Record review | 1 | 200.00 | 200.00 |
| 11/28/2011 | Preparation for evaluation | 0.5 | 200.00 | 100.00 |
| 11/30/2011 | Travel time to Fort Worth from Dallas for evaluation and return | 2 | 200.00 | 400.00 |
| 11/30/2011 | Parking (receipt attached) | | 10.00 | 10.00 |
| 11/30/2011 | Neuropsychological evaluation | 6 | 200.00 | 1,200.00 |
| 11/30/2011 | Scoring test data | 0.5 | 200.00 | 100.00 |
| 12/1/2011 | Scoring test data | 2 | 200.00 | 400.00 |
| 12/1/2011 | Record review | 0.5 | 200.00 | 100.00 |
| 12/5/2011 | Data verification | 1.75 | 200.00 | 350.00 |
| 12/9/2011 | Consultation with attorney | 0.25 | 200.00 | 50.00 |

Tax ID# 472925647

**Total** $3,360.00

NELSON_01432

```
                STANDARD PARKING
               200 TAYLOR PLAZA LOT
                 FORT WORTH TEXAS

Fee Computer Number:                          1
Cashier:                          PENA Id #107
Transaction Number:                      113307
Entered:                       11/30/2011 08:48
Exited:                        11/30/2011 14:43
Ticket #16569                       Dispenser #1
Lot:                                     Lot 5
Area:                                   Area 1
Rate:                                VarRate 1
Parking Fee:                            $ 10.00
Total Fee:                              $ 10.00
Cash:                                   $ 10.00
Total Paid:                             $ 10.00
                 THANK YOU
               HAVE A NICE DAY
```

NELSON_01433

# 162

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

NO. 1232507

APR 3 0 2012

TIME 8:55 am
BY _____ DEPUTY

THE STATE OF TEXAS )( IN THE CRIMINAL DISTRICT
)(
)(
VS. )( COURT NUMBER FOUR
)(
)(
STEVEN LAWAYNE NELSON )( TARRANT COUNTY, TEXAS

## MOTION TO APPOINT EXPERT
### (FILED UNDER SEAL)

TO THE HONORABLE JUDGE OF CRIMINAL DISTRICT COURT NUMBER FOUR:

COMES NOW, the Defendant, by and through his counsel of record, William H. "Bill"

Ray, and files this Motion to Appoint an Expert for purposes of examination and testimony in

this case, and would show the Court the following:

1.      The Defendant is charged with the offense of Capital Murder.

2.      The State is seeking the death penalty in this case.  As such, future dangerousness,

mitigation, and the mental state of the Defendant are potentially at issue.

3.      The Defendant requests that the Court appoint Wm. Barry Norman, Ph.D., 4800 Overton

Plaza, Ste. 320, Fort Worth, Texas   76109, (817)731-0888,  (817) 443-0413-Fax, an expert in

the field of forensic and clinical psychology to evaluate the Defendant and other evidence in this

case and report to Counsel for the Defendant the results of that examination, and testify, if

necessary.

4.      The Defendant requests that this appointment and the information obtained be covered

and protected by Rule 503 of the Texas Rules of Criminal Evidence.

5.      The Defendant requests that this appointment be kept under seal in the clerk's office.

A CERTIFIED COPY
ATTEST: 4-30-12
THOMAS A. WILDER
DISTRICT CLERK
TARRANT COUNTY TEXAS
BY: _____
DEPUTY
Page 1 of 2

**NELSON_01434**

PRAYER

WHEREFORE, Premises considered, the Defendant Prays that the Court Appoint Wm.

Barry Norman, Ph.D. for the above stated reasons, and further that the Court compensate him at

the rate of $250.00 per hour, with an initial authorization of $3,500.00.

RESPECTFULLY SUBMITTED,

_____
WILLIAM H. "BILL" RAY
BAR NO. 16608700
ATTORNEY FOR DEFENDANT

LAW OFFICE OF WILLIAM H. "BILL" RAY, P.C.
512 MAIN STREET, STE. 308
FORT WORTH, TEXAS  76102
(817) 698-9090
(817) 698-9092

page 2 of 2

NELSON_01435

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

APR 3 0 2012

NO. 1232507

TIME 8:55 a.m.
BY _____ DEPUTY

| | | |
|---|---|---|
| THE STATE OF TEXAS | )( | IN THE CRIMINAL DISTRICT |
| | )( | |
| | )( | |
| VS. | )( | COURT NUMBER FOUR |
| | )( | |
| | )( | A CERTIFIED COPY |
| STEVEN LAWAYNE NELSON | )( | TARRANT COUNTY, TEXAS |

ATTEST: 4 30 12
THOMAS A. WILDER
DISTRICT CLERK
TARRANT COUNTY, TEXAS
BY: _____ DEPUTY

<u>ORDER ON DEFENDANT'S MOTION TO APPOINT EXPERT</u>

Came upon to be heard the foregoing Motion to Appoint an Expert, submitted by the

Defendant in this case. The Court finds said Motion to be meritorious and orders the same to be

granted.

Accordingly, it is ordered that Wm. Barry Norman, Ph.D., 4800 Overton Plaza, Ste. 320,

Fort Worth, Texas   76109, (817)731-0888, (817) 443-0413-Fax, is appointed and said

appointment and the findings to be considered privileged communications as contemplated by

Texas Rule of Criminal Evidence 503.

All reports of said examination shall remain confidential and under the protections of

Texas Rule of Criminal Evidence 503 until otherwise ordered by the Court.

Dr. Norman shall have the Court's specific permission to enter and interview the

Defendant in the Tarrant County Jail.

Dr. Womack shall be compensated at an hourly rate of $250.00 per hour, plus reasonable

expenses. The Court requires that expenses exceeding $ 3500.00 be submitted for re-approval.

SO ORDERED.

DATE: 4 30 12

_____
PRESIDING JUDGE
CRIMINAL DISTRICT COURT NUMBER FOUR

**NELSON_01436**

# 163

THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JUL 2 0 2011

TIME _____ 8:53am

BY _____ M.R. _____ DEPUTY

NO. 1232507

| | | |
|---|---|---|
| THE STATE OF TEXAS | )( | IN THE CRIMINAL DISTRICT |
| | )( | |
| VS. | )( | COURT NUMBER FOUR |
| | )( | |
| STEVEN LAWAYNE NELSON | )( | TARRANT COUNTY, TEXAS |

## EX PARTE MOTION TO APPOINT EXPERT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the Defendant, by and through his counsel of record, William H. "Bill"

Ray, and files this Motion to Appoint an Expert for purposes of examination and testimony in

this case, and would show the Court the following:

1.     The Defendant has been charged with Capital Murder.

2.     The Defendant requests that the Court appoint Antoinette McGarrahan, Ph.D., 12820

Hillcrest Road, #C125, Dallas, Texas  75230, (972)726-9100, an expert in the field of forensic

and clinical psychology to evaluate the Defendant and other evidence in this case and report to

Counsel for the Defendant the results of that examination, and testify, if necessary.

3.     The Defendant requests that this appointment and the information obtained be covered

and protected by Rule 503 of the Texas Rules of Criminal Evidence, and that the Court order this

motion to be sealed.

## PRAYER

WHEREFORE, Premises considered, the Defendant Prays that the Court Appoint Dr.

McGarrahan for the above stated reasons, and further that the Court authorize compensation at

the rate of $200.00 per hour plus expenses.

NELSON_01437

RESPECTFULLY SUBMITTED,


WILLIAM H. "BILL" RAY
BAR NO. 16608700
ATTORNEY FOR DEFENDANT

LAW OFFICE OF WILLIAM H. "BILL" RAY, P.C.
512 MAIN STREET, STE. 308
FORT WORTH, TEXAS  76102
(817) 698-9090
(817) 698-9092, FAX

NELSON_01438

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

NO. 1232507

JUL 2 0 2011

TIME 8:53AM

| THE STATE OF TEXAS | )( | IN THE CRIMINAL DISTRICT |
| | )( | BY _____ DEPUTY |
| VS. | )( | COURT NUMBER FOUR |
| | )( | |
| STEVEN LAWAYNE NELSON | )( | TARRANT COUNTY, TEXAS |

### ORDER ON DEFENDANT'S MOTION TO APPOINT EXPERT

Came upon to be heard the foregoing Motion to Appoint an Expert, submitted by the

Defendant in this case. The Court finds said Motion to be meritorious and orders the same to be

granted.  THIS ORDER SHALL REMAIN SEALED UNTIL FURTHER COURT ORDER.

Accordingly, it is ordered that Antoinette McGarrahan, Ph.D., 12820 Hillcrest Road,

#C125, Dallas, Texas  75230, (972)726-9100, an expert in the field of forensic and clinical

psychology is appointed as an expert in this case, said appointment and the findings to be

considered privileged communications as contemplated by Texas Rule of Criminal Evidence

503.

All reports of said examination shall remain confidential and under the protections of

Texas Rule of Criminal Evidence 503 until otherwise ordered by the Court.

Dr. McGarrahan shall have the Court's specific permission to enter and interview the

Defendant in the Tarrant County Jail.

Dr. McGarrahan shall be compensated at an hourly rate of $200.00 per hour, plus

reasonable expenses.  The Court requires that expenses exceeding $5000.00 be submitted for re-

approval.

SO ORDERED.

DATE: 7/20/11                            _Mike Thomas_
                                          PRESIDING JUDGE

A CERTIFIED COPY
ATTEST: _July 20 2011_
        THOMAS A. WILDER
        DISTRICT CLERK
        TARRANT COUNTY, TEXAS
BY: _Martha Casper_
        DEPUTY

NELSON_01439

**164**

# WILLIAM H. "BILL" RAY, P.C.
## ATTORNEY AT LAW
### 512 MAIN STREET, STE. 308
### FORT WORTH, TEXAS   76102

**(817)698-9090**                                      **FAX (817)698-9092**

July 26, 2011

Dr. Antoinette McGarrahan, Ph.D.
12820 Hillcrest Road
Suite C125
Dallas, Texas 75230

Re:    State of Texas v. Steven Nelson, Case No. 1232507

Dear Dr. McGarrahan,

        I would like to thank you for accepting the appointment in this case.  As we
discussed, there are several psychiatric records that we do not have yet, so your
schedule should work fine with our progress in that regard.
        The persons you will be working with on this case are:

Stephen Gordon - Co Counsel, 2101 Moneda Street, Fort Worth, Texas 76117
817-877-0610-Office, 817-877-5610-Fax, 817-229-0276-Cell
sgordon@stevegordonandassociates.com

Stan Keeton - Private Investigator -Wells Investigations
3505 Airport Freeway, Fort Worth, Texas  76111
817-219-0540 - Cell
stan7406@hotmail.com

Mary Burdette - Mitigation Specialist
4824 Great Divide Drive, Fort Worth, TX 76137
817-707-0858 - Cell, 817-479-7025-Fax
mary.burdette13@yahoo.com

NELSON_01440

My cell number is 817-927-7456. If you will email me your email, I will forward documents as we they become available. My email is bill@billraylawyer.com.
Thank you.

Sincerely,

William H. "Bill" Ray

cc: Steven Nelson, Steve Gordon, Mary Burdette, and Stan Keeton

# 165

# WILLIAM H. "BILL" RAY, P.C.
## ATTORNEY AT LAW
### 512 MAIN STREET, STE. 308
### FORT WORTH, TEXAS  76102

**(817)698-9090**                                    **FAX (817)698-9092**

October 5, 2011

Dr. Antoinette McGarrahan, Ph.D.
12820 Hillcrest Road
Suite C125
Dallas, Texas 75230

Re:    State of Texas v. Steven Nelson, Case No. 1232507

Dear Dr. McGarrahan,

The State has informed us that they will be seeking the death penalty in Mr. Nelson's case.

I have enclosed a copy of his statement on DVD, and a large portion of the file on a CD.  I have also enclosed a hard copy of the Mitigation Report by Mary Burdette.  We are getting some medical records, but they are from the Chickasaw Indian Nation in Oklahoma and are not too helpful.

His father is in jail in Ada, Oklahoma.  His mother works for American Airlines here in Fort Worth.  Her number is 817-449-9944.

Thank you.

Sincerely,

William H. "Bill" Ray

cc: Steve Gordon, Mary Burdette, and Stan Keeton

NELSON_01442

# 166

**Suzanne Williams**

| | |
|---|---|
| **From:** | Antoinette McGarrahan <armcgarrahan@sbcglobal.net> |
| **Sent:** | Tuesday, October 18, 2011 1:49 PM |
| **To:** | Bill Ray |
| **Subject:** | SN eval |

Bill,
I received the initial packet of information that you sent on Mr. Nelson. Please call me at your convenience so that I can clarify the type of evaluation that you are looking for and to schedule the evaluation. Thanks. Toni

Antoinette R. McGarrahan, Ph.D.
12820 Hillcrest Road, Suite C-125
Dallas, TX 75230
Office 972-726-9100
Fax 972-726-9101

NELSON_01443

# 167

 *Trinity Mitigation*

Mary Burdette, M.S.S.W.
Mitigation Specialist
4824 Great Divide Drive
Fort Worth, TX 76137
Ph. 817.707.0858
Fax 817.479.7025
mary.burdette13@yahoo.com

December 7, 2011

Mr. William H. Ray
Attorney at Law
512 Main Street, Suite 308
Fort Worth, TX 76102

Re:     Steven Lawayne Nelson
        Cause No. 1232507
        District Court Number Four

## INVOICE

For Mitigation Consultant Services by Mary Burdette, MSSW, Mitigation Specialist.  Please make check payable to "Mary Burdette."          Thank you.

| **INTERIM Billing for Steven Lawayne Nelson** | | **BALANCE DUE: $ 4,556.25** | | |
| Date | Description | Hours @ $75/hr. | Expenses | Total Due |
|---|---|---|---|---|
| 04/20/2011 | Media research & review | 1.25 | | |
| 04/25/2011 | Prepare for client interview; prepare release for signature | 1.00 | | |
| 04/26/2011 | Client Interview @ jail (Belknap Unit) | 2.25 | | |
| 04/29/2011 | Prepare client interview memo | 4.00 | | |
| 05/02/2011 | Finalize client memo; atty communication | 1.00 | | |
| 07/18/2011 | Review expert information/credentials | 1.75 | | |
| 10/07/2011 | Open files; initiate work product; atty communication; set up interview w/collateral | 6.00 | | |
| 10/11/2011 | Interview w/collateral | 4.00 | | |
| 10/13/2011 | TC w/collateral re: records; review documents | 2.50 | | |
| 10/13/2011 | Defense Team meeting | 1.50 | | |
| 11/9/2011 | Review video | 2.00 | | |
| 11/10/2011 | Scan photos; prepare collateral's memo; update work product | 4.00 | | |
| 11/11/2011 | Defense team meeting | 1.50 | | |
| 11/13/2011 | Document Review/records | 2.50 | | |
| 11/14/2011 | Update work product | 4.00 | | |
| 11/17/2011 | Met w/collaterals & information gathering | 12.00 | | |
| 11/18/2011 | Met w/collaterals & information gathering | 9.50 | | |
| 11/21/2011 | Download, label & transmit photos | 1.00 | | |
| **TOTAL** | | 60.75 hrs @ $75/hr | | $4,556.25 |

NELSON_01444

**168**

# *Trinity Mitigation*

## ATTORNEY/CLIENT PRIVILEGED – WORK PRODUCT

### MEMORANDUM

To:         Bill Ray & Steve Gordon
            Attorneys for the Defense

From:       Mary Burdette, Mitigation Specialist

Date:       November 17, 2011

Re:         Steven Lewayne Nelson

| Interview: | Timothy James |
| Address: | 207 W Tower Rd |
|  | Ada, OK |
| Phone: | (580) 272-8571 |

**Relevance**:      Steven's older maternal half-brother.

**Circumstances of Interview:**
When Steve, Bill, Stan and I arrived in OK, we contacted Tim and he met us at a restaurant in Ada. We visited for some time and then Tim accompanied us as he showed us various houses, schools etc. relating to Steven's early years.

**Interview:**
Tim's bio father is Joe Pierce. His father and mother never married and he has had no relationship with his bio dad. He states he believes he has other children. His father is white. Tim lived with his grandparents [Tempie & Clarence James] until he was about 14 in Tuskahoma, OK. He is 8 years older than his brother, Steven, who has a different father (as does his sister, Kitza, whose father is also Tony Nelson).

He recalls Steven as 'troubled' – often getting into trouble because he was 'hard-headed'. He believes Steven was 5 or 6 when he had migraine headaches and first saw a psychiatrist. He was told by his mother that Steven had seizures after being sick with high fever.

He recalls that Steven caught fire to a couple of houses and one burned completely to the ground. He had a habit of playing with matches.

He recalls that Steven was 'locked up' at about age 14 due to drugs. Tim admits that he [Tim] also got a DUI when he was about 20 yrs old. Tim moved out at age 17 so he only lived in the same house with Steven for about 3 yrs (when Steven was between 7 & 10 or so).

**NELSON_01445**

NELSON  Timothy James Interview
Nov 17, 2011
Page 2 of 2

He claims their mom was a 'good mom' – and was affectionate.  His sister is deaf and she lived most of the time at the deaf school.

He recalls Steven would get into trouble (such as drinking rubbing alcohol found under the sink) and mostly would do his own thing.  Steven wouldn't admit things but would feel bad and be sorry about what he had done. He'd sometimes break down in tears.  He sometimes seemed depressed and kept to himself.

Tim recalls that Tony (Nelson) had a volatile relationship with Kathy.  He recalls once, she stabbed him.  He does not believe Tony ever paid child support.  He later married a lady they knew.  He recalls that Steven felt bad that his dad did not seem to want to spend time with him.

Kathy's second husband was Romero Fernando who also hit her.  Romero was a 'player' and has fathered 11 or 12 kids.

He recalls that Steven would sometimes have a 'blank stare'.  He believes he may have been an outpatient at Millwood in Arlington but does not have a specific memory.

After Kathy and Steven moved to Texas, he would talk to Steven by phone.  He felt he was getting involved with the wrong sort of people.

Tim doesn't recall Steven drinking or doing drugs in Ada.  He does recall times Steven would call and ask him to pick him up.  He'd find himself somewhere and did not remember how he got there.  He feels Steven was frustrated and did not know what was wrong with him.

Once Steven stole a car from his uncle (Donald James) and blew up the motor.  Steven was 13 or 14 yrs old.

He also recalls Steven stole a motorcycle in Texas and drove up to Ada.  He was about 14.  Tim believed he was involved in some gang activity and selling cars & bikes to a chop shop in TX.

Tim feels that Steven was very disturbed by his dad's lack of interest in him.  He believes that is '80%' of the reason for Steven's problems. He 'took it [his father's abandonment] hard.'

Tim is concerned about his mother and her reaction when she learns the State is seeking the death penalty.

# 169

Interview                                    Tarrant co jail

Name: Steven nelson          Date: 11 30 11      Location: Contact interview

Date of Birth: ██████ 87  24 yo    (R)          Time: 9:15 – 2:30 P.m.

_____

✓ **PURPOSE OF EVALUATION:** NP eval

ted suited.
cuffed @ feet
hands free of restraints

✓ **FAMILY HISTORY:**    Ada, OK. born   raised there until
   Born:                                   2000.
                          20 mo got [?] American Airlines.

**Parents:**

bio fa = Tony nelson

mo raised most of x.
mo/fa never married bf/gf.
growing up saw fa off + on – still in Ada.
saw him ∅ so often.
mo married stepfa – before born (he raised me)
divorced in 99 or 98. died in '06 [?] TX.
some contact ō him up until his death
mo alive – in Arlington some contact .mostly mail &
mo on own. ∅ violence blw      on phone.

stepfa
Romero Louie

**Siblings:**                    Romero & mo.
ōder bio sis. Kitsa (Toni). got along very well ~6-7 yrs. ōder.
ōder 1/2 bro -Timothy. -stayed ō mat gma.
fa side = 3 1/2 sibs. ∅ contact

just had baby – lives in arlington. contact some but ∅ connect
                                      ō bio.

✓ **Family History (Legal/Medical/Substance Abuse/Psychiatric):**

∅.          ∅.        ∅

1

**ADULT LIVING CHRONOLOGY:**

2

NELSON_01448

## DEVELOPMENTAL HISTORY:

**Prenatal:**

DK

**Birth:**

DK.

mo - AA
supv.
engineer.
stepfa
construction.

**Developmental Milestones:**

WNL

◯ deprived cord.

**Abuse/Neglect:** physical - butts, extension cord, paddle.
by mo. switch too. whoopings all x . ◯CPS .
emot/verbal - all x    ◯ hosp x.
by mo.    just whelps.

neglect - mo leave for weekend
to go out to clubs . stepfa ◯
there. started ~ 6 or 7 . be there
for days alone. sister can't fix
me.

you make me sick, im tired of y.m. you make me
look bad, put me x. started ~ 6 or 7.
stepfa s.f. stood up for me. he whooped too but mo
got out of control.

OK school for deaf . ✓
w-
swit mute,
deaf, to school
goes to school
all his week,
come home on
weekends.

DK why
deaf . ✓
mute
born deaf,
mute
I14S
Independently

sexual - ◯.

**Bedwet/Fireset/Cruelty/Running Away from Home/Vandalism:**

started ~ 11 or    BB gun
12.    started ~
to friends    8 or 9.
house.    shoot car
stay gone    windows.
day or 2.    house
5-6x total.    windows.

gangs.
joined @ 14
Tre File
Seven
jumped in
x 4 guys
stopped
~ 2009
just tired
of it .
just stopped.

I    8.
started
~ 6 or 7.
set house on
fire.
burned ∨.
trying to set
it on fire. 20
getting whoopings all x.
news in mo room. set
bed on fire . e.t. on fire
fire dept came.
trash cans, grass, paper.
used to set other house on fire.

3

**EDUCATIONAL HISTORY:** ✓

**Last Grade Completed/GED:**

11th ∅ GED. in TYC. • failed
tried x 2 - math. soc.
studies.

**Why dropped out:**

TYC x 4½ yrs.
most credits there.

**Special Ed/Held Back:** — 1st gr. beh issues.

1st gr - 6th    Hayes Elem, Ada    1st - 2nd
Beh. Mod.    Washington Elem Ada 3-4th
spec beh. disordered.    Willard Elem Ada
5 - 6th.

**Grades:**

A's B's.

Bedford Jr. High 7th
McClain middle school
FW. 7th.
Shagelford Arlington.
8th - 8th

S.t.

**Problems in School (Truancy/Fighting/Suspension/Expulsion/Alternative):**

agitated real fast    |    |    ∅.    | 1x to
impatient    fights alot.    yes.    alternative.
yes. beh probs.
1st gr    talk back to
locked teacher    teachers.
in closet.

**Relationships with Peers/Teachers:** —

good.    good s.t.    boy scouts
if made me    younger
mad its our c̄.    football jr hi.
high school

TYC -
football
basketball
track

4

NELSON_01450

**WORK HISTORY:** ✓

    Last job: ✓   Q working @ x Fo.

             never really had a job.

    Previous jobs:    worked in ~~late~~ '07

                x 3-4 mo in Lousville, KY

                to sit in hotel for Kroger

                while machine workers

                on strike.

                ⓈⒹ disability

    Longest job:

    Relationship with co-workers/supervisors:

    Ever fired/why?

**MILITARY HISTORY:** ✓

    Branch:

    Rank:

    Discharge Status:    ∅

    Job:

5

NELSON_01451

**MEDICAL HISTORY:**

**Current Health Status:**

asthma x all life. inhaler prn. valley view hosp.

**History of Major Illnesses/Head Injuries:** glass door fell on me ~ 6 or 7 stitches. Ø LOC.
skin graft on foot Ⓛ '05.
10 II. scar Ⓡ forehead.
officers got into it. fought. officer kept hitting me on head · slammed me head flat to floor. 10/4/11. red suited.

April '05 poured acid stuff on feet · let it sit there.
'05 hosp couple mo - started getting 'phase c' ~
UTMB Galveston TX - Ø making progress - phases. planned to go to hosp · make phase c there · then go home.

**Hospitalizations:** Ø.

**Current Medications:**

inhaler

6

**PSYCHIATRIC HISTORY:**  ✓

   **Hospitalizations:**

Ø.

TYC. counseling anger management.

**Current Treatment:**

trileptal  x3mo.  -Dr. Wu.  ¢t.

DK mgs'  not working. still bipolar ↑-↓.
mood stabilzer.

08 - Atenil?
sleep med
have sleep
d/o.

**Previous Treatment:**

little Depakote, ritalin

first saw MHI prof as kid - Add
1x W - talking to 461. - put me on ritalin

P ritalin- tried depakote.
Ø worc.

last yr. on depakote in
jail.

1st - 4th gr.
just stopped taking
it. Øworking.
still hyperactive.
still probs.

Ø freeworld MHMR tx 2° locked up most x.  ADHD.

7