IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

MAR 2 9 2017

CLERK, U.S. DISTRICT COURT
By _____
          Deputy

STEVEN LAWAYNE NELSON,              §
                                    §
          Petitioner,               §
                                    §
VS.                                 §   NO. 4:16-CV-904-A
                                    §
LORIE DAVIS, Director,              §
Texas Department of Criminal        §
Justice, Correctional               §
Institutions Division,              §
                                    §
          Respondent.               §

MEMORANDUM OPINION AND ORDER

Came on for consideration the amended petition[1] of Steven
Lawayne Nelson ("petitioner") for a writ of habeas corpus
pursuant to the authority of 28 U.S.C. § 2254. Having considered
the amended petition, the response of respondent, Lorie Davis,
Director, Texas Department of Criminal Justice, Correctional
Institutions Division, the reply, the state court trial,
appellate, and habeas records, and applicable authorities, the
court finds that the relief sought by the petition should be
denied.

---

[1]The original petition for writ of habeas corpus was filed October 17, 2016. Doc. 12. (The "Doc.
__" reference is to the number of the item on the docket in this action.) The court granted in part a joint
motion for modification of the court's scheduling order to allow the filing of an amended petition. Doc.
18, as corrected by Doc. 19.

I.

<u>Background and Procedural History</u>

Petitioner was charged by an indictment filed May 26, 2011, with intentionally causing the death of Clinton Dobson by suffocating him with a plastic bag during the course of committing or attempting to commit the offense of robbery of, or burglary of a building of, Dobson. 1 CR[2] 12. Bill Ray ("Ray") and Steve Gordon ("Gordon") were appointed to represent petitioner at trial. 1 CR 28-29. By order signed April 13, 2011, the trial court granted petitioner's motion for appointment of mitigation specialist and appointed Mary Burdette to assist counsel in their preparation for trial. 1 CR 38. In addition, by order signed April 13, 2011, the court granted petitioner's motion to appoint an investigator and appointed Wells Investigation to assist counsel. 1 CR 39. On several occasions, the trial court approved payment of additional funds for the work of the mitigation specialist and investigator. 1 CR 201-04, 217-20; 2 CR 236-38, 367-68. And, the court granted petitioner's motions for appointment of an expert and additional funds to conduct DNA testing. 2 CR 332-38. Counsel also retained a forensic

---

[2]The "__ CR __" reference is to the volume and page of the clerk's record in the underlying state criminal case.

psychologist to assist at trial. 43 RR[3] 237-38; 2 CR 234

(approving interim payment).

The trial of petitioner commenced October 1, 2012. 32 RR 1,

15. On October 8, 2012, the jury returned its verdict at the

guilt/innocence stage of his trial, finding petitioner guilty of

the offense of capital murder, as charged in the indictment. 2 CR

401; 37 RR 32-34. The punishment phase of the trial commenced

October 8, 2012. 38 RR 7. On October 16, 2012, the jury

unanimously found, in response to special issues in the form

prescribed by article 37.071 of the Texas Code of Criminal

Procedure, (1) beyond a reasonable doubt that there was a

probability that petitioner would commit criminal acts of

violence that would constitute a continuing threat to society,

(2) petitioner actually caused the death of Dobson or did not

actually cause the death but intended to kill him or another or

anticipated that a human life would be taken, and (3) that it

could not find that, taking into consideration all of the

evidence, including the circumstances of the offense,

petitioner's character and background, and the personal moral

culpability of petitioner, there was a sufficient mitigating

circumstance or circumstances to warrant a sentence of life

imprisonment without parole rather than a death sentence be

---

[3]The "__ RR __" reference is to the volume and page of the reporter's record in the underlying
state criminal case.

imposed. 2 CR 417-19; 44 RR 32-33. On October 16, 2012, the trial

judge signed a capital judgment imposing a death penalty on

petitioner. 2 CR 424-26.

The trial court appointed David Pearson to represent

petitioner on his direct appeal to the Texas Court of Criminal

Appeals. 2 CR 431. By its opinion delivered April 15, 2015, the

Texas Court of Criminal Appeals affirmed the trial court's

capital judgment imposing the death sentence on petitioner.

Nelson v. State, No. AP-76,924, 2015 WL 1757144 (Tex. Crim. App.

Apr. 15, 2015). Petitioner then unsuccessfully petitioned the

United States Supreme Court for a writ of certiorari. Nelson v.

Texas, 136 S. Ct. 357 (2015).

On October 16, 2012, the trial court appointed John Stickels

("Stickels") to represent petitioner in the filing of his state

petition for writ of habeas corpus. 1 CHR[4] 127. While his direct

appeal was pending, petitioner, acting through Stickels, filed

his state application for writ of habeas corpus, raising

seventeen grounds for relief. 1 CHR 2. Pertinent here, Stickels

raised a claim of ineffectiveness of trial counsel for having

failed to adequately investigate and present mitigation evidence,

citing Wiggins v. Smith, 539 U.S. 510 (2003), and Lewis v.

Dretke, 355 F.3d 364 (5th Cir. 2003), among other authorities. 1

---

[4]The "__ CHR __" reference is to the volume and page number of the clerk's habeas record in the
underlying criminal case.

CHR at 7, 49-59. The court ordered trial counsel to file
affidavits to address, among other things, the contention that
they had failed to thoroughly investigate petitioner's mitigation
evidence and formulate a consistent and effective mitigation
strategy. 1 CHR at 139. Having considered those affidavits and
the State's response, the trial court adopted the State's
proposed findings of fact and conclusions of law, recommending
that the Texas Court of Criminal Appeals deny the relief sought.
2 CHR 352. Based on those findings and conclusions, as well as
its own review of the record, the Texas Court of Criminal Appeals
denied petitioner's requested relief. Ex parte Nelson, No. WR-
82,814-01, 2015 WL 6689512 (Tex. Crim. App. Oct. 14, 2015).

II.

Evidence

On appeal, the Texas Court of Criminal Appeals summarized
the evidence at the guilt/innocence phase of the trial as
follows:

A.   Discovery of the Victims

Members of NorthPointe Baptist Church described the
events surrounding the discovery of Clint Dobson and
Judy Elliot. Church member Dale Harwell had plans to
meet Dobson for lunch. When Dobson did not arrive at
the appointed time, Harwell tried unsuccessfully to
contact him. Debra Jenkins went to NorthPointe at
around 12:40, where she saw Dobson's and Elliot's cars
in the parking lot. Jenkins rang the doorbell and
called the church office but received no answer, so she
left after about five minutes. She returned fifteen
minutes later, and Elliot's car, a Galant, was no

longer in the parking lot. At 1:00 p.m., another church
member, Suzanne Richards arrived for a meeting with
Dobson. His car was in the parking lot, but Elliot's
was not. Richards waited for half of an hour, ringing
the doorbell, calling, and texting Dobson.

Meanwhile, Clint Dobson's wife, Laura, called Jake
Turner, the part-time music minister, because she had
been unable to reach her husband by phone. Turner
agreed to go to the church, and he called Judy Elliot's
husband, John, who promptly drove to the church. John
entered the church using his passcode and called out
Dobson's name. John saw Dobson's office in disarray and
saw a severely beaten woman lying on the ground. He did
not immediately notice Dobson lying on the other side
of the desk. John called the police.

Arlington police officer Jesse Parrish responded to the
call. He noticed signs of a struggle, including blood
and what appeared to be a grip plate of a pistol.
Elliot was lying on her back with her hands bound
behind her. John recognized his wife by her clothing.
Parrish found Dobson lying face-up with his hands bound
behind his back. A bloody plastic bag was covering his
head and sucked into his mouth. Upon lifting the
plastic bag off his head, Parrish knew that Dobson was
dead.

Elliot was taken to the hospital in critical condition.
She had a heart attack while there and neither the
physicians nor John believed she would survive. She had
traumatic injuries to her face, head, arms, legs, and
back and internal bleeding in her brain. She was in the
hospital for two weeks and underwent five months of
therapy and rehabilitation. A permanent fixture of
mesh, screws, and other metal holds her face together.
At the time of trial, Elliot still had physical and
mental impairments from the attack.

Doctor Nizam Peerwani, medical examiner for Tarrant
County, testified that the manner of Dobson's death was
homicide. Dobson's injuries indicated a violent
altercation during which he attempted to shield himself
from blows from an object such as the butt of a
firearm. Two wounds to his forehead appeared to be from
the computer monitor stand in the office. According to
Dr. Peerwani, the injuries indicated that Dobson was

standing when he was first struck in the head and that
he was struck in the back of his head as he fell. After
he had fallen to the ground and lost consciousness, his
hands were tied behind his back, and the bag was placed
over his head. With the bag over his head, he
suffocated and died.

## B   [Petitioner's] Actions after the Murder

[Petitioner] texted Whitley Daniels at 1:24 p.m., and
Daniels told him to bring her a cigar. After stopping
at his apartment, [petitioner] drove Elliot's car to a
Tire King store, where a customer bought Dobson's
laptop and case out of the trunk of the Galant. At
around 2:00 p.m., [petitioner] drove to a Tetco
convenience store, where he used Elliot's credit card
to buy gas, a drink, and a cigar. Anthony "AG" Springs'
girlfriend brought AG to the Tetco. When [petitioner]
tried to buy gas for her car, the card was declined.
[Petitioner] and AG drove in Elliot's car to the
apartment of Claude "Twist" Jefferson and Jefferson's
aunt Brittany Bursey.

Daniels testified that [petitioner] and AG arrived at
her house with the cigar some time after 3:00 p.m.
[Petitioner] and AG soon left, but [petitioner]
returned alone fifteen or twenty minutes later.
[Petitioner] asked Daniels to go to the mall and use
her identification with the credit cards. She declined
to do so, and [petitioner] left.

[Petitioner] went to The Parks at Arlington mall. Using
Elliot's credit cards at Sheikh Shoes, he purchased a
t-shirt featuring the Sesame Street character Oscar the
Grouch, and Air Max shoes. He also used the cards to
buy costume jewelry at Jewelry Hut and Silver Gallery.
[Petitioner] later returned to Sheikh Shoes with two
companions, but a second attempt to use the credit card
was not approved.

[Petitioner] returned to Bursey's apartment that
evening with AG and Twist. [Petitioner] was wearing the
shirt, jewelry, and shoes that he had bought with
Elliot's cards. While taking pills and smoking, he told
Bursey that he had stolen the Galant from a pastor.
[Petitioner] left Bursey's apartment the next morning.

7

The next day, [petitioner] sent a series of text
messages. One asked to see the recipient because "[i]t
might be the last time." Another said, "Say, I might
need to come up there to stay. I did some shit the
other day, Cuz." A third said, "I fucked up bad, Cuz,
real bad."

Tracey Nixon, who had dated [petitioner] off and on,
picked him up the day after the murder at a gas station
on Brown Boulevard. [Petitioner] wore the t-shirt and
some of the jewelry that he had bought with Elliot's
cards. After going to a Dallas nightclub, [petitioner]
spent the night with Nixon, who returned [petitioner]
to Brown Boulevard the next morning.

### C.   Investigation and Arrest

Officers obtained an arrest warrant and arrested
[petitioner] at Nixon's apartment on March 5. At the
time of his arrest, [petitioner] was wearing the tennis
shoes and some of the jewelry he brought [sic] with
Elliot's stolen credit cards. He was also wearing a
black belt with metal studs. The shoes, belt, phone,
and jewelry were seized during [petitioner's] jail
book-in.

Officers seized other items from [petitioner's]
apartment pursuant to a search warrant. They recovered
a pair of black and green Nike Air Jordan tennis shoes
that appeared to match a bloody shoe print at
NorthPointe, the New Orleans Saints jersey seen on the
mall surveillance videos, a gold chain necklace, a pair
of men's silver earrings with diamond-like stones, a
Nike Air Max shoe box, a Sheikh Shoes shopping bag, a
Sesame Street price tag, a Jimmy Jazz business card,
and receipts dated March 3 from several of the stores.
Officers found Dobson's identification cards, insurance
cards, and credit cards in Elliot's car.

DNA from Dobson and from Elliot was discovered in a
stain on [petitioner's] shoe. [Petitioner's]
fingerprints were lifted from the wrist rest on
Dobson's desk, from receipts, and from some of the
items from the mall.

A trace-evidence analyst detected similarities between
[petitioner's] shoe and a bloody shoe print on an

envelope in Dobson's office. [Petitioner's] belt
appeared to be missing studs, and similar studs were
recovered from the office. According to a firearms
expert, the plastic grip found in Dobson's office came
from a 15XT Daisy air gun, which is a CO2-charged
semiautomatic BB gun modeled on a Colt firearm. The
jury saw a BB gun manufactured from the same master
mold and heard from a text message read into the record
that [petitioner] was seeking to buy a gun just days
before the killing.

### D.  Defense Testimony

[Petitioner] testified on his own behalf. According to
him, from about 11:30 p.m. on March 2, until 6:00 or
7:00 a.m. on March 3, he and three companions were
looking for people to rob. They had firearms.
[Petitioner] went home for a while in the morning but
later joined up with AG and Twist. [Petitioner] claimed
that he waited outside the church while AG and Twist
went in. Twentyfive minutes later, he went inside and
saw the victims on the ground. They were bleeding from
the backs of their heads, but they were still alive.
[Petitioner] then took the laptop and case. According
to [petitioner], AG gave him keys and credit cards.
[Petitioner] waited in Elliot's car for a while and
then returned to Dobson's office. By that time, the man
was dead. [Petitioner] could not stand the smell, so he
returned to Elliot's car. He drove the group to his
apartment, retrieved a CD and his New Orleans Saints
jersey, and continued to Bursey's apartment, where they
smoked marijuana. [Petitioner] then left Bursey's
apartment in Elliot's car.

[Petitioner] testified that he knew people were inside
the church and that he agreed to rob them. He claimed
that he did not intend to hurt anyone and had no part
in what happened inside of the church. He also
acknowledged making the purchases at Tetco and buying
items at the mall.

[Petitioner] testified to having several prior
convictions.

Nelson, 2015 WL 1757144, at *1-3.

With regard to the punishment phase of the trial, the Court of Criminal Appeals summarized the evidence as follows:

[Petitioner] began getting into trouble with Oklahoma juvenile authorities when he was six years old. His juvenile career included property crimes, burglaries, and thefts. Despite efforts by Oklahoma authorities to place him in counseling and on probation, [petitioner] was incarcerated in that state at a young age because he continued to commit felonies. According to Ronnie Meeks, an Oklahoma Juvenile Affairs employee who worked with [petitioner], this was "quite alarming."

[Petitioner] was sent to a detention center in Oklahoma for high-risk juveniles. On one occasion, while Meeks was driving [petitioner] to the facility for diagnostic services, [petitioner] fled from Meeks' pickup truck. He was apprehended a few minutes later. At the facility, [petitioner] was disruptive and tried to escape. After a few weeks, [petitioner] was sent to a group home in Norman, Oklahoma, for counseling. There, [petitioner] did not fare well. He was disruptive and did not try to make any improvements.

When Meeks needed cooperation from [petitioner's] mother, she was available. [Petitioner] never appeared to Meeks to be in need of anything; his mother appeared to be providing enough.

Meeks testified that, in addition to being uncooperative with the efforts in Oklahoma to provide services and to rehabilitate [petitioner], [petitioner] never exhibited any remorse about any of his actions.

. . .

[Petitioner] was also involved in the Texas juvenile justice system through the Tarrant County probation office. Mary Kelleher, of that office, first had contact with [petitioner] in April 2000, when he was thirteen years old. The police referred [petitioner] to her for having committed aggravated assault with a deadly weapon. Kelleher worked with [petitioner] during a time when he was pulling fire alarms, was truant, and was declining in school performance. In December 2001, the police department again referred [petitioner] to

Kelleher for multiple charges, including burglaries of
a habitation, criminal trespass of a habitation, and
unauthorized use of a motor vehicle. After the
department was notified that [petitioner] was a
runaway, the juvenile court detained him until all of
the charges were disposed.

The Tarrant County juvenile court adjudicated
[petitioner], then fourteen years old, for burglary of
a habitation and unauthorized use of a motor vehicle.
He was committed to the Texas Youth Commission ("TYC")
for an indeterminate period. According to Kelleher, it
is unusual for a juvenile to be committed to TYC for
property crimes at that age, but [petitioner's] history
made him a rare case.

Kelleher testified that [petitioner] had family support
from his mother but none from his father.
[Petitioner's] mother was neither abusive nor
neglectful. According to [petitioner's] mother, his two
siblings went to college and did not get into trouble.
[Petitioner] indicated to Kelleher that he knew his
actions were wrong, but he acted out of impulse and
boredom, without an exact reason.

[Petitioner] was a "chronic serious offender." While in
TYC, [petitioner] had four of the highest-level
disciplinary hearings and was repeatedly placed in the
behavior-management plan. [Petitioner] was originally
sent to TYC for nine months, but he spent over three
and a half years confined because of his infractions.
This sentence for a burglary adjudication was an
extraordinarily lengthy time to spend in TYC. He
eventually made parole, had his parole revoked, and
returned to TYC.

[Petitioner] was paroled from TYC a second time. On his
second parole, when [petitioner] was twenty years old,
he again did not comply with the terms, even after
counseling. His parole officer issued a directive to
apprehend [petitioner] for these violations, but he
"aged out" of the juvenile system before he could be
picked up, allowing him to remain unapprehended.

. . .

In 2005, [petitioner], then eighteen years old, was
stopped while driving a stolen car. The officer who
arrested him concluded that [petitioner] was "a
compulsive liar."

Video evidence and testimony from November 30, 2007,
showed [petitioner] in a Wal-Mart stock room posing as
an associate from a different store. [Petitioner] put a
laptop computer down his pants and then walked to the
exit. The following week, [petitioner] was apprehended
at a separate Arlington Wal-Mart for putting on new
boots off the shelf and leaving the store without
paying.

After being released from state jail in 2010,
[petitioner] assaulted his live-in girlfriend, Sarina
Daniels. When Sarina ran outside after an argument,
[petitioner] caught her and dragged her inside. When
she tried to call 9-1-1, he broke her telephone.
[Petitioner] bound Sarina with duct tape and tried to
have her stand on a trash bag so her blood would not
get on the carpet. He held a knife to her throat while
holding her by the hair and made her apologize for
talking to another man while [petitioner] was
incarcerated. [Petitioner] pulled the knife away and
told Sarina that he was not going to kill her. He then
grabbed her by the throat, pushed her onto a dresser,
and said, "But if you do it again, then I will."
[Petitioner] then choked Sarina. Sarina filed charges,
and [petitioner] was arrested.

For this aggravated assault with a deadly weapon,
[petitioner] was placed on probation and sent to a
ninety-day program at the Intermediate Sanctions
Facility ("ISF") in Burnet. Sherry Price, a Dallas
County probation officer, told [petitioner] to report
as soon as he was released from the program, which
[petitioner] failed to do. After [petitioner] failed to
report as directed, Price told him to report to her on
March 3. He did not report, and hours later, he killed
Clint Dobson.

. . .

[Petitioner] was classified as an assaultive inmate in
the Tarrant County Jail while awaiting trial. For a
time, he was in restrictive housing, but he

12

nevertheless committed numerous serious disciplinary
infractions. Among other things, [petitioner] broke a
telephone in the visitation booth and then threatened
the responding officer. After one altercation with a
guard, it took three officers to subdue [petitioner].
One officer's foot was fractured. In another incident,
[petitioner] refused to return to his cell. Three
officers tried to escort him to his cell, but
[petitioner] stood in his cell door to prevent it
shutting. When officer Kent Williams reached in to
slide the door shut, [petitioner] grabbed him, struck
him in the face, pulled him into his cell, and threw
him on the desk and into a wall.

[Petitioner] was also combative with other inmates and,
on at least one occasion, was complicit in arranging
for a bag filled with feces and urine to be placed in
another inmate's cell. After [petitioner] was assigned
to a tank for problematic inmates, he broke the lights
in his cell.

On February 22, 2012, [petitioner] broke multiple fire-
sprinkler heads and flooded the day room. The jury saw
photographs and video of this, including [petitioner]
dancing in the water. Six officers restrained him.
Breaking the sprinkler heads triggered the fire alarm
in the whole jail.

. . .

On March 19, 2012, while [petitioner] was in the
Tarrant County jail awaiting trial in this case, he
killed Jonathon Holden, a mentally challenged inmate.
According to a fellow inmate who witnessed the
incident, Holden had angered inmates when he mentioned
"the N word under his voice." [Petitioner] was in the
day room of the holding area, and he talked Holden into
faking a suicide attempt to cause Holden to be moved to
a different part of the jail. Holden came to the cell
bars, and [petitioner] looped a blanket around Holden's
neck. [Petitioner] tightened the blanket by bracing his
feet on the bars and pulling with both hands on the
blanket. Holden's back was against the bars and he was
being pulled up almost off his feet. It took four
minutes for Holden to die. Afterwards, [petitioner] did
a "celebration dance" in the style of Chuck Berry,
"where he hops on one foot and plays the guitar."

13

[Petitioner] used a broom stick, which he had
previously used to poke another mentally challenged
inmate in the eye, as a guitar.

. . .

Following Holden's death, [petitioner] was assigned to
a single-man, self-contained cell for dangerous and
violent inmates. On April 22, 2012, officers found
contraband, such as a broom handle and extra rolls of
toilet tissue, in [petitioner's] cell. In May 2012, a
search of [petitioner's] cell yielded a bag of
prescription drugs.

On July 20, 2012, a few weeks before trial,
[petitioner] damaged jail property in a two-hourlong
incident, of which the jury saw security footage and
heard testimony. While in a segregation cell,
[petitioner] blocked the window with wet toilet paper.
He then flooded his cell. Ultimately, the officers had
to use pepper spray to subdue [petitioner]. Officers in
protective gear restrained [petitioner] and took him to
the decontamination shower. During this time,
[petitioner] rapped and sang. While his own cell was
decontaminated, [petitioner] flooded the toilet in the
holdover cell. He brandished a shank made from a
plastic spoon. When he was being returned to his cell,
[petitioner] fought and threatened the officers. They
ultimately placed him in a restraint chair, a process
that took eight officers. This disturbance took about
seventy percent of the jail's manpower. Sergeant Kevin
Chambliss, who testified about the incident, had to
request back-up personnel from another facility.

On August 23, 2012, on a day of voir dire proceedings,
[petitioner] cracked one of the jail's windows and
chipped off paint with his belly chain while in the
jail gym. He showed no remorse. [Petitioner's]
dangerous activity continued after the guilt phase of
trial. After the jury's verdict was read, while
[petitioner] was in a holdover cell, he ripped the stun
cuff off of his leg. Again, he showed no remorse.
During trial, while [petitioner] was being escorted
from the jail to the courtroom, he tried to move his
cuffs from behind his back multiple times. During the
punishment phase, officers found three razor blades

14

inside letters addressed to [petitioner], along with
other contraband items.

. . .

[Petitioner's] prior convictions comprised failure to
identify, unauthorized use of a motor vehicle, burglary
of a building, and numerous thefts.

. . .

The defense put on a forensic psychologist, Doctor
Antoinette McGarrahan. She testified that, although
[petitioner] had no current learning disability or
cognitive impairment, he had a past history of learning
disabilities. Dr. McGarrahan explained that, when, as a
three-year old, [petitioner] set fire to his mother's
bed with intent to cause harm, it was essentially a cry
for attention and security. She believed that there was
"something significantly wrong with [petitioner's]
brain being wired in a different way, being predisposed
to this severe aggressive and violence from a very
early age." She testified that, by the time
[petitioner] was six years old, he had had at least
three EEGs, meaning that people were already "looking
to the brain for an explanation" of his behavior. The
test results did not indicate a seizure disorder, but
Dr. McGarrahan said that they did not rule out
[petitioner] having one. Risk factors present in
[petitioner's] life included having ADHD, a mother who
worked two jobs, an absent father, verbal abuse, and
witnessing domestic violence.

[Petitioner] spoke about two alter egos, "Tank" and
"Rico." Dr. McGarrahan did not believe that
[petitioner] had a dissociative-identity disorder;
rather, these alter egos were a way to avoid taking
responsibility for his actions.

Dr. McGarrahan acknowledged on cross-examination that
[petitioner] likes violence and has a thrill for
violence and that it is emotionally pleasing to him.
She said he is "criminally versatile," and she agreed
that characteristics of antisocial personality disorder
describe him. According to her, people with antisocial
personality disorder have trouble following the rules
of society and repeatedly engage in behavior that is

grounds for arrest. They are consistently and
persistently irresponsible and impulsive; they tend to
lie, steal, and cheat. [Petitioner] has many
characteristics of a psychopath--including a grandiose
sense of self, a lack of empathy, and a failure to take
responsibility. Generally, such a person prefers to
lie, cheat, and steal to get by.

Nelson, 2015 WL 1757144, at *4-8.

### III.

### Claims for Relief

Petitioner asserts five grounds for relief, each with

multiple sub-parts. The grounds are stated as follows:

I.   MR. NELSON WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF
     COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS
     WHEN DEFENSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE,
     PREPARE, AND LITIGATE SENTENCING

II.  DEFENSE COUNSEL'S FAILURE TO OBJECT TO VIOLATIONS OF
     OF MR. NELSON'S FAIR TRIAL RIGHTS AND OTHERWISE SECURE
     A FAIR TRIAL ENVIRONMENT CONSTITUTES INEFFECTIVE
     ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH
     AMENDMENTS

III. MR. NELSON'S CONVICTION AND SENTENCE VIOLATE THE
     FOURTEENTH AMENDMENT BECAUSE THE PROSECUTION USED RACE TO
     SELECT THE JURY

IV.  DEFENSE COUNSEL'S FAILURE TO LITIGATE THE THIRD STEP
     OF THE *BATSON* CLAIM CONSTITUTES INEFFECTIVE ASSISTANCE
     OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS

V.   MR. NELSON WAS DEPRIVED OF DUE PROCESS, IN VIOLATION
     OF *NAPUE V. ILLINOIS* AND *GIGLIO V. UNITED STATES*, WHEN
     THE STATE KNOWINGLY PRESENTED FALSE TESTIMONY DURING
     THE SENTENCING PHASE

Doc. 25 at i-iii.

IV.

Applicable Legal Standards

A.   General Standards

In pertinent part, 28 U.S.C. § 2254 provides that the only

ground for relief thereunder is that the petitioner "is in

custody in violation of the Constitution or laws or treaties of

the United States."  28 U.S.C. § 2254(a).  A petition brought

under § 2254

> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings
> unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to,
> > or involved an unreasonable application of,
> > clearly established Federal law, as determined by
> > the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an
> > unreasonable determination of the facts in light
> > of the evidence presented in the State court
> > proceeding.

28 U.S.C. § 2254(d).

A decision is contrary to clearly established federal law if

the state court arrives at a conclusion opposite to that reached

by the Supreme Court of the United States on a question of law or

if the state court decides a case differently than the Supreme

Court has on a set of materially indistinguishable facts.

Williams v. Taylor, 529 U.S. 362, 405-06 (2000); see also Hill v.

Johnson, 210 F.3d 481, 485 (5th Cir. 2000).  A state court

decision will be an unreasonable application of clearly

17

established federal law if it correctly identifies the applicable rule but applies it unreasonably to the facts of the case. ~~Williams, 529 U.S. at 407-08.~~

In a § 2254 proceeding such as this, "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). A federal court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied. Townsend v. Sain, 372 U.S. 293, 315 (1963)[5]; Catalan v. Cockrell, 315 F.3d 491, 493 n.3 (5th Cir. 2002).

---

[5]The standards of Townsend v. Sain have been incorporated into 28 U.S.C. § 2254(d). Harris v. Oliver, 645 F.2d 327, 330 n.2 (5th Cir. Unit B May 1981).

B.   Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, petitioner must show that (1) counsel's performance fell below an objective standard of reasonableness, i.e., that his counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed to petitioner by the Sixth Amendment, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. Strickland v. Washington, 466 U.S. 668, 687 (1984). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. at 697; see also United States v. Stewart, 207 F.3d 750, 751 (5th Cir. 2000). "The likelihood of a different result must be substantial, not just conceivable," Harrington v. Richter, 562 U.S. 86, 112 (2011), and petitioner must prove that counsel's errors "*so undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Cullen v. Pinholster, 563 U.S. 170, 189 (2011) (quoting Strickland, 466 U.S. at 686). Judicial scrutiny of this type of claim must be highly deferential and the petitioner must overcome a strong presumption that his counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689. "A fair assessment of attorney

performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. Simply making conclusory allegations of deficient performance and prejudice is not sufficient to meet the Strickland test. Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000). It is not enough to show that some, or even most, defense lawyers would have handled the case differently. Green v. Lynaugh, 868 F.2d 176, 178 (5th Cir. 1989).

Where a petitioner's ineffective assistance claims have been reviewed on their merits and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the standards set forth in Strickland. See Bell v. Cone, 535 U.S. 685, 698-99 (2002); Santellan v. Cockrell, 271 F.3d 190, 198 (5th Cir. 2001).

V.

Analysis

A.   Assistance of Counsel at Sentencing

In his first ground, petitioner contends that he did not receive effective assistance of counsel because his counsel failed to adequately investigate, prepare, and litigate sentencing. Specifically, he says his counsel failed to present

evidence (1) of petitioner's diminished role in the crime, (2) that Holden's death was a suicide, and (3) of petitioner's background and mental health. At the end of a lengthy recitation of "evidence" that was not presented and is not in the state records, petitioner makes the conclusory allegation that this ground is procedurally defaulted but excused under Martinez v. Ryan, 566 U.S. 1, 132 S. Ct. 1309 (2012), and Trevino v. Thaler, 133 S. Ct. 1911 (2013), because his habeas counsel, Stickels, "failed to raise this substantial IAC claim." Doc. 25 at 66. That is, "Stickels failed to investigate anything; reprinted irrelevant portions of appellate briefing from other clients' cases, and generally failed to litigate with the standard of care expected of state post-conviction counsel in capital cases." Id.

Martinez and Trevino hold that a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel at trial if the petitioner had no counsel in the state habeas proceeding or his state habeas counsel was ineffective. Trevino, 133 S. Ct. at 1921. Thus, the issue is whether Stickels provided ineffective assistance at the habeas stage of the proceedings.

Where alleged prejudice arises from the deficiency of habeas counsel in failing to point out the deficiency of trial counsel, the petitioner must demonstrate the constitutional inadequacy of both his habeas and trial counsel. Sells v. Stephens, 536 F.

App'x 483, 492 (5th Cir. 2013). That is, petitioner must show
that both his trial and habeas counsels' representation fell
below an objective standard of reasonableness. Id. at 493
(quoting Strickland, 466 U.S. at 688). And, petitioner must show
that there is a reasonable probability that, absent the errors,
the jury would have concluded that the balance of aggravating and
mitigating circumstances did not warrant death. Id. (quoting
Strickland, 466 U.S. at 695).

    In an attempt to meet his burden, as stated, petitioner
offers nothing but conclusory allegations that Stickels'
representation was deficient. That Stickels may have copied
portions of the state habeas petition from other work he had done
does not establish that his representation of petitioner in
regard to the first ground of the state habeas petition, urging
ineffective assistance of trial counsel, fell below an
objectively reasonable standard. See Sells, 536 F. App'x at 494-
95 (length of brief and number of claims asserted in no way
establish unreasonableness). That the facts alleged were not as
specific as they might have been did not prevent the trial court
from considering whether trial counsel's performance fell below
an objectively reasonable standard in investigating and
presenting mitigation evidence. The trial court did perform that
analysis and determined that Ray and Gordon provided effective

assistance to petitioner. 2 CHR 300-37, 352; <u>Ex parte Nelson</u>,

2015 WL 6689512.

~~Petitioner now wishes to expand upon his claim of~~

ineffective assistance of trial counsel to include numerous other

supposed lapses by them. But, having already asserted that claim,

he does not now get another bite at the apple. Clearly, <u>Martinez</u>,

as made applicable here through <u>Trevino</u>, applies only where the

issue of ineffective assistance of trial counsel was not raised

in the state court because the petitioner did not have counsel or

his habeas counsel failed to raise the issue. <u>Martinez</u>, 566 U.S.

at 5 ("petitioner's postconviction counsel did not raise the

ineffective-assistance claim in the first collateral proceeding,

and, indeed, filed a statement that, after reviewing the case,

she found no meritorious claims helpful to petitioner"), 16

(referring to the "limited circumstances" to which the case

applies). The Fifth Circuit agrees. <u>Escamilla v. Stephens</u>, 749

F.3d 380, 394-95 (5th Cir. 2014)("once a claim is considered and

denied on the merits by the state habeas court, <u>Martinez</u> is

inapplicable, and may not function as an exception to

<u>Pinholster</u>'s rule that bars a federal habeas court from

considering evidence not presented to the state habeas court").

See <u>Clark v. Davis</u>, No. 14-70034, 2017 WL 955257, at * 9 (5th

Cir. Mar. 10, 2017)(discussing new mitigation evidence and noting

that the court need not decide whether petitioner presented a new

claim because, to the extent he did, "any such claim would be
time-barred under 28 U.S.C. § 2244(d)").

     Petitioner argues that the new evidence he presents
fundamentally alters the ineffective assistance claim such that
this court should consider matters that were not before the state
courts. The court does not agree. Clearly, the claim presented by
state habeas counsel was ineffective assistance of trial counsel
with regard to mitigation evidence. Petitioner wants the court to
consider additional evidence in support of that claim. Merely
putting a claim in a stronger evidentiary posture does not make
it a new claim. Escamilla, 749 F.3d at 395. Nor can petitioner
obtain de novo review of claim that has been exhausted by piling
on extraneous matters and alleging that he is presenting a new
claim under Martinez. Allowing such would completely undermine
the purpose of habeas review.

     Even if petitioner's conclusory allegations were sufficient
to entitle him to review of the "new" ineffective assistance of
counsel claim he now purports to assert, he could not prevail.
Petitioner's own evidence regarding the work of his habeas
attorney belies the contention that Stickels failed to properly
investigate and raise the alleged ineffective assistance of trial
counsel. See, e.g., Doc. 26 at 32 (Stickels obtained appointment
of a mitigation investigator), 213-18 (mitigation investigator
notes that mitigation specialist at trial was experienced and

well-qualified, procurement of records and interviews of
witnesses were exhaustive, and defense strategy was to provide
reasonable doubt that petitioner killed Holden and to focus on
numerous developmental problems and circumstances of petitioner),
206 (mitigation investigator reviewed files and consulted with
experts), 207-12 (Stickels conferred with trial court mitigation
specialist, trial counsel, and mitigation investigator, as well
as reviewed files and visited petitioner four times). As stated,
petitioner's habeas counsel, Stickels, raised the issue of
ineffectiveness of trial counsel in failing to investigate and
present mitigating evidence. 1 CHR 3, 49-58. The trial court
ordered trial counsel to submit affidavits to address the alleged
deficiencies, 1 CHR 139-41, which they did. 1 CHR 142-66. The
trial court made extensive findings of fact and conclusions of
law with regard to the alleged ineffective assistance claim. 2
CHR 301-15. In particular, the trial court found that Ray and
Gordon complied with prevailing professional norms, including ABA
Guidelines, in conducting a thorough mitigation investigation and
presenting the best mitigation case they could in light of the
witnesses and evidence available to them. Id. Petitioner has not
shown that the state courts' analysis of this claim was contrary
to, or an unreasonable application of, the standards of
Strickland. Harrington v. Richter, 562 U.S. 86, 100-01 (2011).

Petitioner now attacks the manner in which trial counsel chose to proceed. The record reflects that Ray and Gordon fully investigated petitioner's background and sought out mitigation witnesses. They cannot be faulted because petitioner himself, family members, and others were not forthcoming or did not want to cooperate or even misled them. Moreover, they were entitled to rely on the reasonable evaluations and opinions of the expert they hired.[6] Segundo v. Davis, 831 F.3d 345, 352 (5th Cir. 2016); Turner v. Epps, 412 F. App'x 696, 704 (5th Cir. 2011). It is not the duty of federal courts to examine the relative qualifications of experts hired and experts that might have been hired. Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014).

Finally, there is no reason to believe, and petitioner has not established, that even had trial counsel done all of the things petitioner alleges should have been done, there is a substantial likelihood that the result of the proceedings would have been different. Petitioner ignores the fact that he was the only perpetrator to be directly linked to the scene of the murder. DNA from Dobson and Elliot was found on petitioner's shoes[7]; petitioner's fingerprints were found on a wrist rest on

---

[6]Petitioner does not argue that the expert who testified at trial was not competent or qualified to evaluate him. Rather, his complaint is that his trial counsel failed to direct the expert so that her testimony was more favorable to him.

[7]Blood was found on the tops of the shoes, not merely the soles, undermining petitioner's contention that he merely happened upon the scene after the horrific beatings had already taken place.

Dobson's desk; petitioner's shoe print was found in Dobson's office; studs found in Dobson's office[8] matched a studded belt petitioner was wearing when he was arrested. Shortly after the murder of Dobson, petitioner drove Elliot's car to a Tire King where he sold Dobson's laptop and attempted to sell Dobson's iPhone.[9] Petitioner used Elliot's credit cards to buy gas, a drink and a cigar. He met Springs at the gas station. Springs and Jefferson were at the Parks Mall with petitioner where petitioner used Elliot's credit cards to buy jewelry, a t-shirt, and shoes. Nelson, 2015 WL 1757144, at *2-3.

Dobson was the pastor of NorthPointe Baptist Church, where Elliot was his secretary. The murder took place in the pastor's office and the scene was horrific. Dobson and Elliot had each been beaten, their hands tied behind their backs, and were lying face up on the floor. Elliot's husband did not recognize her, she had been beaten so badly. The medical examiner said that Dobson had first been struck in the head while he was standing and struck again as he fell. After he had fallen to the ground and lost consciousness, he was bound, and a plastic bag placed over his head. With the bag over his head, Dobson suffocated and died. Elliot was taken to the hospital in critical condition and suffered a heart attack while there. She had traumatic injuries

---

[8]Actually, one of the studs was found on Dobson's left leg. 32 RR 186.

[9]33 RR 94.

to her face, head, arms, legs, and back, and internal bleeding in

her brain. She was in the hospital for two weeks and underwent

five weeks of therapy and rehabilitation. A permanent fixture of

mesh, screws, and other metal holds her face together. At the

time of trial, she still had physical and mental impairments from

the attack. Id. at *1-2.

In addition to the evidence recited by the Texas Court of

Criminal Appeals with regard to the sentencing phase of the

trial, supra, the court notes the following: During his time in

Oklahoma, petitioner never exhibited any remorse for what he had

done. 39 RR 14. Mid-career, when he was thirteen or fourteen,

petitioner admitted to a probation officer that he knew his

actions were wrong, but he acted out of impulse and boredom,

without an exact reason. 38 RR 14. While participating in a

cognitive treatment program as an adult, petitioner identified

his three main thinking errors as "power thrust, uniqueness, and

criminal addictive excitement." 41 RR 18. These terms were

defined as follows:

> Q. So what is power thrust? When do we use that?
> A. Power thrust is someone that wants to be in control,
> someone that's a leader, someone that uses anger,
> manipulation, threats to--to gain that power. If you
> lose that power, you're going to do anything that you
> can to regain that power regardless of the
> consequences. It's kind of like, you know, if you do
> something to me, I'm going to do something back.
> Q. And you mentioned also the criminally addictive
> behavior?
> A. Criminally addictive excitement is someone that
> likes to have fun and excitement. It's--they get

respect for their irresponsible and reckless behavior.
It's someone that's like a sprinter, not a, you know, a
long distance runner. Someone that's easily led into
criminal activity unless you're the leader yourself, an
instant gratification type.
Q. And you also mentioned uniqueness?
A. Uniqueness is you think you're better than everybody
else. You think you're special, you think you're
different. You think the rules don't apply to you. And
you always want to stay on the top, start at the top.

41 RR 18-19.

Petitioner alleges that his trial counsel were ineffective
in failing to investigate and establish his diminished role in
the murder.[10] However, petitioner's own testimony established his
guilt as a party to the crime. The matters that petitioner says
his counsel should have raised are but red herrings and the jury
would have seen them as such.

There was no DNA evidence or other evidence linking Springs
to the murder.[11] The mother of Springs' child and one of her
friends each testified that Springs was with them in Venus,
Texas, the night before the murder until they met petitioner at
the gas station after the murder. Cell phone records showed that
Springs' phone had been used in Venus numerous times during that
period and that the phone began to travel at 1:23 p.m. on the day
of the murder. The phone was quiet for a number of hours, but

---

[10]Petitioner overlooks the cross-examination by his attorneys that raised questions about Springs
knowledge of events at the church. See, e.g., 35 RR 136-38.

[11]Springs voluntarily gave a DNA sample to police. 34 RR 153. None of his fingerprints were
found inside the church. 34 RR 253-54.

that is consistent with testimony that Springs was sleeping. The phone records did not confirm petitioner's allegation that Springs had been with him the night before the murder and had used the phone at another location.[12] A number of Springs' fingerprints were found in and on Elliot's car and Springs had her car keys and Dobson's iPhone. 34 RR 163-64, 166-67. After police obtained his phone records, Springs was cleared of the capital murder offense. 34 RR 181.

Petitioner says his counsel should have presented evidence that Springs had bruising on his arms four days after the murder. The evidence to which he refers is not part of the state court record and is not properly authenticated, even assuming the court could consider it. The court further notes that the same police report upon which he relies contains a number of false statements made during the course of the investigation, including petitioner's own statements, which contradict his testimony at trial. Doc. 26 at 297-325.

Petitioner next says that his counsel should have learned from Tracey Nixon that she overheard telephone conversations between petitioner and Springs implicating Springs in the murder. Of course, petitioner was a party to the calls and could have told his counsel about them. And, Nixon could have told

_____

[12]Given the number of calls made on Springs' phone, petitioner's suggestion that Springs was out all night with petitioner and never used the phone is implausible.

petitioner's counsel about the calls when she spoke with him the week before trial. 34 RR 64. Clearly, Nixon's testimony at trial was designed to help petitioner, 34 RR 67 (petitioner would not have worn the studded belt), so there would have been no reason to withhold any favorable information.

Petitioner next says that his counsel failed to adequately present evidence that Springs was in possession of valuable property of the victims. That Springs ultimately wound up with Dobson's iPhone and Elliot's keys is inconsequential. Video and testimony at trial established that petitioner drove Elliot's car to a Tire King almost immediately after the murder where he sold Dobson's laptop and attempted to sell the iPhone. Even if the evidence had any meaning, petitioner has not shown that he had witnesses willing and able to testify competently to these facts.

Petitioner says that his counsel failed to investigate and prepare to address the testimony of the alibi witnesses for Springs or even interview Springs, who was not indicted "for reasons still unknown." Doc. 25 at 24. Of course, the testimony at trial was that Springs was cleared by his telephone records. 34 RR 181. But, in any event, petitioner does not have any evidence to support these contentions. And, the court notes that the witnesses petitioner says should have been called to testify, Cotter and Cobb, are apparently the ones who first advised police that petitioner was involved in the murder.

Further, with regard to petitioner's involvement in the murder, petitioner says his counsel failed to adequately investigate Jefferson's substantial involvement in the crime. Again, there is no evidence to support this contention. It appears that petitioner may not have decided until he testified at trial to implicate Jefferson. One of petitioner's own exhibits reflects that petitioner only identified Springs and himself as having been involved. Doc. 26 at 312-13.

Petitioner next addresses the testimony regarding Holden's death, arguing that his counsel should have established that it was a suicide. In particular, he says his attorneys should have done a better job of cross-examining inmate Seely, who testified that he saw petitioner kill Holden, and of establishing that Holden was suicidal. Also, they should have moved to exclude testimony of Dr. White, who performed the autopsy on Holden.[13] The record belies petitioner's allegations. The jury clearly understood that everyone in the tank where Holden was killed was considered dangerous. See, e.g., 40 RR 47-48, 84, 86. At the time of trial, Seely was a convicted felon, serving a two-year sentence for family assault. 40 RR 7. Petitioner's counsel established that to get a felony conviction for family assault, Seely must have previously beaten someone. 40 RR 41-42. He also

---

[13]In a footnote, petitioner argues that his counsel did not adequately question how his DNA could have been transferred to Holden's fingernails. The argument is wholly conclusory and speculative.

had other convictions and was up for parole, certainly giving him
reason to testify favorably to the State. 40 RR 42-44. The
evidence also established that an officer had checked on Holden
when a call was made that he might want to hurt himself and
Holden denied any such intent.[14] 40 RR 72-75. Petitioner's
counsel established that the officer who first discovered Holden
thought he had committed suicide. 40 RR 111. In examining Dr.
White, counsel emphasized for the jury that Holden's injuries
were very nonspecific and that the homicide conclusion was
reached based on the sheriff's report. 40 RR 144-45, 149.
Further, Holden could have leaned into the blanket to kill
himself. 40 RR 146. Petitioner's counsel presented the testimony
of John Plunkett, a board-certified pathologist, who testified
that there was nothing to support Seely's testimony that
petitioner had pulled Holden up against the bars of the cell to
choke him. 43 RR 30-32. And, Holden must have been an active
participant in his own death. 43 RR 35-36.

In sum, petitioner has no legitimate complaint about his
counsel's presentation in regard to Holden's death. He has not
shown that, in light of all the circumstances, his counsel's
omissions were outside the wide range of professionally competent
assistance. <u>Strickland</u>, 466 U.S. at 690.

---

[14]Had Holden been suicidal, he would not have been in that facility. 40 RR 103; 43 RR 23-25.

Finally, petitioner contends that his counsel failed to reasonably investigate, develop, and present evidence about his background and mental health. Unlike the contentions regarding his counsel's failure to establish his minimal role in the offense and the failure to show that Holden's death was a suicide, this contention was the subject of the first ground of the state habeas petition and, as stated previously, petitioner cannot now rely on new evidence to plow this ground again. Pinholster, 563 U.S. at 181-82.

The record makes abundantly clear that petitioner has no redeeming qualities. His trial counsel searched exhaustively for mitigating evidence and found very few people who were willing to testify on petitioner's behalf. Those who did gave no indication that petitioner suffered a traumatic childhood full of abuse. Petitioner's sister testified that their mother spanked him, 43 RR 228-29, not that she abused him, as petitioner now contends. And, the relatives petitioner now relies on to establish his version of events say that, although his mother had a temper, it was not with her children, to whom she acted more like a friend. Doc. 29 at 1475. Petitioner complains that his counsel "dumped thousands of pages of documents" on their expert,[15] but does not cite to any evidence in those thousands of pages to support his

---

[15]One of petitioner's complaints is that counsel failed to provide "direction or assignment" and gave the expert "nothing to generate a roadmap," Doc. 25 at 38, as though counsel should have told the expert what conclusions to reach.

claim of horrific childhood abuse. Doc. 25 at 37. Instead, he
wants the court to believe his statements to Dr. McGarrahan that
he suffered abuse, Doc. 25 at 36, but disbelieve his statements
to her that he never harmed himself. Doc. 25 at 38. His real
complaint is that Dr. McGarrahan independently reviewed the
records and interviewed petitioner, disbelieving much of what he
told her.[16] And, based on "the devastating extent of
[petitioner's] abandonment and deprivation," Doc. 25 at 43, which
is supported by the record, counsel decided that the best
mitigating evidence was that petitioner's brain was so changed by
events beyond his control that he did not deserve the death
penalty.[17] That was a decision counsel were entitled to make.
Pinholster, 563 U.S. at 197 (experienced lawyers may conclude
that the jury simply won't buy a particular trial tactic);
Strickland, 466 U.S. at 689.

    Even assuming petitioner could meet the first part of the
Strickland test, and he cannot, he cannot show that there is a
reasonable probability that, but for the ineffective assistance
of his counsel, the jury would have concluded that the balance of

---

[16]Petitioner notes that his trial counsel hired a second expert in the field of forensic and clinical psychology, but dismissed him after meeting with him twice. Doc. 25 at 35, n. 25. (This allegation is made in support of the contention that trial counsel did not explore any alternative experts.) A logical "explanation" for the dismissal would be that the second expert did not have as favorable an opinion about petitioner as Dr. McGarrahan.

[17]Petitioner now wants to argue that his criminality is attributable to trauma, Doc. 25 at 41, overlooking that Dr. McGarrahan testified that emotional unavailability and neglect were worse psychologically than physical abuse. 43 RR 244.

aggravating and mitigating circumstances did not warrant death.[18]
466 U.S. at 695. Petitioner's future dangerousness was
established beyond a reasonable doubt given the overwhelming
evidence of his participation in the murder and conduct
thereafter. That petitioner's new expert would have attributed
his behavior to PTSD or any other cause does not establish that
petitioner is not a continuing danger to society. Likewise, there
is no question that petitioner intended to cause Dobson's death
or knew he would be killed. Petitioner's testimony to the
contrary was simply incredible and the evidence at trial
established that petitioner was present during the beatings of
Dobson and Elliot. As in Santellan, 271 F.3d at 198, there is not
a reasonable probability that the jury would have answered the
mitigation special issue differently. Petitioner's new expert
points out, just as Dr. McGarrahan did, that "traumatic and
adverse experiences and circumstances exert a deleterious impact
on the developing brain and negatively disrupt [] psychosocial
development and functioning." Doc. 25 at 65. In other words,
petitioner's new expert agrees that petitioner's brain did not
develop as it should have and he is the way he is, whatever the
cause. As his trial counsel noted, "if that's not mitigating,

---

[18]With regard to this part of the test, the court notes that petitioner's proffered juror declarations are not appropriate for consideration. Young v. Davis, 835 F.3d 520, 528-29 (5th Cir. 2016); Summers v. Dretke, 431 F.3d 861, 873 (5th Cir. 2005). But, they do not show a reasonable probability of a different outcome in any event.

there is no mitigation in a death penalty case." 44 RR 23. The
jury was not persuaded and petitioner has not shown that a new
~~theory of cause would make any difference.~~

B.   Failure to Secure a Fair Trial Environment

In his second ground, petitioner urges that his counsel's
failure to object to violations of his fair-trial rights and
otherwise secure a fair trial environment constituted ineffective
assistance of counsel. Specifically, he complains that counsel
failed to diligently seek a change of venue and failed to object
to his shackling and wearing of a stun cuff. Once again,
petitioner attempts to gain de novo review by pairing an
exhausted with an unexhausted claim and arguing in a conclusory
fashion that he was prejudiced.

The Sixth Amendment guarantees a criminal defendant to a
speedy and public trial by an impartial jury. The failure to
provide such a trial is a denial of due process. Irvin v. Dowd,
366 U.S. 717, 722 (1961). However, the Constitution does not
require that jurors be completely ignorant of the facts and
issues to be tried. Dobbert v. Florida, 432 U.S. 282, 302 (1977).

As was the case in Dobbert, petitioner's argument that
extensive media coverage[19] denied him a fair trial rests almost
entirely upon the quantum of publicity the events received. 432

---

[19]The articles to which petitioner refers were published after the trial began. Doc. 25 at 68, n. 39 & 40.  He does not make any attempt to substantiate the claim that the publicity in his case in any manner compares to that in Sheppard v Maxwell, 384 U.S. 333 (1966), upon which he relies.

U.S. at 303. Petitioner does not cite to specific portions of the record, in particular the voir dire examination, that would require a finding of constitutional unfairness as to the method of jury selection or the character of the jurors actually selected. Id. He makes no attempt to show that his case has anything in common with those where the Supreme Court has approved a presumption of juror prejudice. For instance, he includes no discussion of size and characteristics of the community in which the crime occurred or any detail about the news stories, e.g., that they contained any confession by petitioner or other blatantly prejudicial information of a type that readers or viewers could not reasonably be expected to shut from sight. Skilling v. United States, 561 U.S. 358, 382-83 (2010). As the Fifth Circuit has noted, the rule of presumed prejudice is applicable only in the most unusual cases. Busby v. Dretke, 359 F.3d 708, 725 (5th Cir. 2004). This is not one of them and petitioner has made no attempt to show that it is.

The record reflects that petitioner's trial counsel filed a motion for change of venue. 2 CR 305-10. The State filed a response, 2 CR 320-23, and the court carried the motion. 6 RR 50. The motion was re-urged as part of a motion for mistrial, 2 CR 369, but was apparently not pursued thereafter. Nothing in the record would have supported the granting of the motion and counsel cannot be faulted for having failed to pursue a losing

38

motion. See Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994);

Koch v. Puckett, 907 F.2d 524, 527 (5th Cir. 1990).

The second part of this claim is that counsel should have

objected to petitioner's being shackled and wearing a stun cuff

during his trial. Petitioner falsely says that this claim is

unexhausted. Doc. 25 at 72. It was raised as claim for relief

number ten by habeas counsel. 1 CHR 90-91. The trial court made

extensive fact findings and conclusions of law as to the claim, 2

CHR 323-27, and the Court of Criminal Appeals denied relief. Ex

parte Nelson, 2015 WL 6689512. Yet, in his reply, petitioner

continues to maintain that the claim is unexhausted. Doc 54 at

19. And, he makes the conclusory allegation that even if

exhausted, the state court's decision would be contrary to

Supreme Court precedent, id., ignoring the fact findings that

support the use of additional security at trial. Petitioner in

effect argues that the trial judge was required to specifically

state, "I am 'exercising [my] discretion to take into account

security concerns,'" or words to that effect, relying on Deck v.

Missouri, 544 U.S. 622, 633-34 (2005). Doc. 54 at 20. However,

the defendant in Deck specifically and repeatedly objected to

being shackled. That was not the case here.

The court's attention has not been drawn to any case

requiring the trial court to make gratuitous fact findings as to

a matter about which no complaint has been made. Based on the

record, and in particular, the habeas findings and conclusions,

counsel were reasonable in their determination not to complain

about the additional security measures. Petitioner has not shown

that this ruling was unreasonable. And, even if counsel should

have complained more vigorously, this is the exceptional case

where the record itself makes clear that there were indisputably

good reasons for shackling. See Deck, 544 U.S. at 635.

C.    Batson Claims

In his third ground, petitioner alleges that he was

sentenced to death by an all-white jury from which the State

systematically struck nonwhite prospective jurors. He seeks

relief under Batson v. Kentucky, 476 U.S. 79 (1986). In Batson,

the Court set forth a three-step process for determining when a

strike is discriminatory:

> First, a defendant must make a prima facie showing that
> a peremptory challenge has been exercised on the basis
> of race; second, if that showing has been made, the
> prosecution must offer a race-neutral basis for
> striking the juror in question; and third, in light of
> the parties' submissions, the trial court must
> determine whether the defendant has shown purposeful
> discrimination.

Foster v. Chatman, 136 S. Ct. 1737, 1747 (2016)(quoting Snyder v.

Louisiana, 552 U.S. 472, 476-77 (2008)). The trial court has a

pivotal role in evaluating Batson claims since the third step

involves an evaluation of the prosecutor's credibility. Batson,

476 U.S. at 98 n. 21. The best evidence of discriminatory intent

often will be the demeanor of the attorney who exercises the

40

challenge. <u>Hernandez v. New York</u>, 500 U.S. 352, 365 (1991). In

addition, the demeanor of jurors, for example their nervousness

~~or inattention, may determine whether a proffered reason for~~

striking a juror is mere pretext. <u>Snyder</u>, 552 U.S. at 477. Thus,

the trial court's rulings must be sustained unless clearly

erroneous. <u>Id.</u> And, on federal habeas review, state court

decisions are to be given the benefit of the doubt. <u>Felkner v.

Jackson</u>, 562 U.S. 594, 598 (2011). The ultimate burden of

persuasion regarding racial motivation rests with, and never

shifts from, the opponent of the strike. <u>Purkett v. Elem</u>, 514

U.S. 765, 768 (1995).

Petitioner raised his <u>Batson</u> challenge on direct appeal:

In appellant's fifth point of error, he claims that the
trial court violated the Equal Protection Clause by
overruling his *Batson* objections to the State's
peremptory strikes of two minority venire members.

A *Batson* challenge involves three steps: (1) there must
be a prima facie showing that a venire member was
peremptorily excluded on the basis of race; (2) the
striking party must then tender a race-neutral reason
for the strike; and (3) if a race-neutral reason is
tendered, the trial court must then determine whether
the objecting party has proved purposeful
discrimination. The trial court's ruling on a *Batson*
challenge is sustained on appeal unless it is clearly
erroneous. This highly deferential standard is employed
because the trial court is in the best position to
determine whether the State's justification is actually
race-neutral. A defendant's failure to offer rebuttal
to a prosecutor's race-neutral explanation can be fatal
to defendant's claim.

Appellant raised a *Batson* challenge regarding five
venire members. The trial court found that he had made
a *prima facie* case, so the burden shifted to the State

41

to tender race-neutral explanations. The State noted
which black and Hispanic minority members were struck
by the defense, then proffered explanations for the
five challenged venire members: Venire member Spivey
slept during instructions from the bench and denied
arrests that the State was aware of, claimed that he
did not want to serve on the trial because he did not
believe appellant would get a fair trial, explained
that he did not want to sit around on jury service
without being paid overtime, and indicated that he had
trouble sitting in judgment of other people. Venire
member Lee-Moses indicated that she was not in favor of
the death penalty regardless of the facts or
circumstances of the case. She also would have problems
with a "circumstantial case," and she believed the
death penalty had been used unfairly in the past.
Venire member Southichack indicated that she has a
problem judging. She was not in favor of the death
penalty, and she did not believe it should ever be
invoked. She seemed to the prosecutors to have
difficulty with the legal issues related to the special
issues. She also said she would have trouble answering
question number two "yes" if she believed appellant was
not the trigger person. Venire member Hooper Golightly
belonged to a church that was opposed to the death
penalty, and she did not disagree with that position.
She was not in favor of the death penalty, and she
thought it should never be invoked. Venire member Mays
served on a trial that resulted in a mistrial. She
thought the death penalty should never be invoked, and
it was not on the top of her list for a possible
punishment.

The trial court found that the State "offered
reasonable, race-neutral reasons" for its peremptory
strikes against the challenged members. Appellant then
pointed out that three of the members that the State
exercised peremptory strikes on were not challenged for
cause, and said "the record speaks for itself."

Appellant failed to rebut the State's race-neutral
reasons for its strikes, and the record supports the
trial court's determination that the State did not
engage in purposeful discrimination. His fifth point of
error is overruled.

Nelson, 2015 WL 1757144, at *10-11 (footnotes omitted).

Petitioner argues that he is entitled to merits review of his Batson claim because the state court decision "involved an unreasonable application of clearly established federal law" in that the court did not engage in a comparative juror analysis. Doc. 25 at 88. However, there is no evidence to support this contention. Clearly, petitioner requested a comparative juror analysis on direct appeal. Appellant's Opening Brief at 71 (citing Young v. State, 848 S.W.2d 203 (Tex. App.--Dallas 1992, pet. ref'd)). And, the Court of Criminal Appeals determined that the record supported the trial court's ruling that the State did not engage in purposeful discrimination. Nelson, 2015 WL 1757144, at *11. There is no requirement that there be a state court opinion explaining the court's reasoning. Richter, 562 U.S. at 98.

Even if petitioner could show that the state court failed to engage in a comparative juror analysis, and he cannot, petitioner has admitted that he failed to carry his burden at the third step of the Batson analysis. Doc. 25 at 74. The conclusion that there was no purposeful discrimination cannot have been erroneous.[20]

Finally, and in an abundance of caution, the court has considered petitioner's comparative analysis and finds that

---

[20]Petitioner also asserts that the opinion of the Court of Criminal Appeals was based on an unreasonable determination of the facts. However, he concedes that Fifth Circuit law forecloses this argument. Doc. 54 at 21, n.15.

petitioner would not be entitled to relief on his <u>Batson</u> ground

in any event. His statistical analysis, assuming it is proper,[21]

~~merely raises the issue of discrimination at the first step of~~

the analysis and does not overcome the race-neutral explanations

of the State. Of further note is that the facts of this case are

wholly unlike those of <u>Foster</u> and <u>Miller-El</u>, where circumstantial

evidence, such as shifting explanations for juror strikes,

mischaracterizing the record by the State, persistent focus on

race in the prosecutors' file, use of a graphic script, trickery,

and a policy of the prosecutor of excluding African Americans,

heavily weighed in favor of the discrimination findings. <u>Foster</u>,

136 S. Ct. at 1754; <u>Miller-El v. Dretke</u>, 545 U.S. 231, 253-64

(2005). And, petitioner's comparative analysis fails to establish

legal error, because fair-minded jurists could disagree on the

correctness of the state court decision. <u>Davis v. Ayala</u>, 135 S.

Ct. 2187, 2199 (2015).

The State exercised a peremptory strike against Martima Mays

("Mays"), giving the explanation:

> She served on a jury that resulted in a mistrial. She
> also, with regard to several questions on her
> questionnaire, wrote, I have not thought about it, in
> regard to her feelings on the death penalty.

> She believed that the death penalty should never be
> invoked. She again writes, I've not thought about it,

---

[21]The analysis is questionable since the juror questionnaires are not part of the record before the court. Accordingly, the court is not considering them. See <u>Reed v. Quarterman</u>, 555 F.3d 364, 375 n.6 (5th Cir. 2009).

for two more questions dealing with the death penalty,
but that she would not lose any sleep over the fact
that she did not get picked.

~~She also believed that the death penalty was not at the~~
top of her list for a possible punishment for a crime.
She hesitated during questioning with regard to
Question No. 2 with the parties issue.

31 RR 20.

Petitioner says that the State accepted a white panelist,
David Defalco ("Defalco"), who had prior jury service on a
capital murder case where the death penalty was not imposed and
that Defalco posed a greater danger to the State than did Mays.
Doc. 25 at 77. The contention is absurd. The record reflects that
petitioner challenged Defalco for cause based on his saying that
there would be a "very, very, very small likelihood" of him
voting no to the second penalty phase question if the first
question had been answered "yes." 10 RR 139-40. Defalco had
earlier stated that he thought the death penalty should be
imposed more often. 10 RR 85.

Petitioner next contends that five white veniremembers had
similar reservations about the death penalty, but the State
accepted them. Doc. 25 at 78-79. The court is satisfied that the
other panelists were not in the same position as Mays. But, even
assuming Mays' position was comparable, she still stands apart
because of her prior service on a jury that could not reach a
decision. Mays was not frustrated by that outcome. 28 RR 156. In
addition, she said that death was not at the top of her rating

45

for punishment. 28 RR 159-60. And, contrary to petitioner's

contention, the record clearly reflects that Mays hesitated in

~~responding to the question of whether she could judge another. 28~~

RR 171. Petitioner has not shown that Mays was struck for

discriminatory reasons.

Petitioner next argues that Sheracey Golightly Hooper

("Hooper") was struck for pretextual reasons. The State explained

its reasoning as follows:

> . . . Hooper indicated on her questionnaire her
> church's position on the death penalty was thou shalt
> not kill; therefore, no one has the right to kill. She
> did not find herself in disagreement wit this
> principle. She also indicated that she was not in favor
> of the death penalty because she did not believe we had
> the right to kill one another and that she believed
> that the death penalty should never be invoked.

31 RR 19.

Hooper explained that she was not generally in favor of the

death penalty, because she did not believe we have a right to

kill one another. 27 RR 12. That was her opinion even though she

said she could follow the laws of the land. 27 RR 12, 13. She

believed the death penalty should not be used at all. 27 RR 14-

15. Rebecca Cardona, on the other hand (to whom petitioner

compares Hooper), clearly stated that the death penalty would

"absolutely" be appropriate in some circumstances. 28 RR 256. Her

answers indicated that she would not be bound by the Catholic

Church's stance on the death penalty, reciting other ways she had

46

strayed from its teachings. 28 RR 289. These jurors were not in
the same position.

Petitioner next addresses Talmadge Spivey ("Spivey"), saying
that he was similarly situated to panel members who were not
struck. The State explained the reasons for striking Spivey as
follows:

> With regard to Mr. Spivey whose original number was 41,
> during our initial meeting on August 2nd, he slept
> during your instructions and most of our time
> downstairs in the Central Jury Room. He denied arrests
> on his questionnaire. He actually had two, one in 1998
> and one in 2010. He checked he did not want to serve on
> the jury because he did not believe the Defendant could
> get a fair trial. He also indicated that he did not
> like jury service because he didn't want to sit around
> all day and that he works a lot of forced overtime, so
> he did not think he wanted to be on the panel. And he
> had problems sitting in judgment of other people.

31 RR 17-18. Petitioner says that each of these reasons is
pretextual.

Petitioner mischaracterizes the first reason given for
striking Spivey. He was not stricken because of his working
nights, but rather because he actually slept through the
instructions and most of the time in the Central Jury Room. The
record does not reflect that veniremember Crews, to whom
petitioner compares Spivey, actually slept through the
proceedings.

Petitioner next compares Spivey to Henry Hackbusch. The
prosecutor said that Spivey had two arrests that were not
disclosed on his juror questionnaire. Petitioner does not have

any evidence, much less information, to the contrary. Hackbusch,
on the other hand (and contrary to petitioner's allegation),
stated on his questionnaire that he had been accused of breach of
computer security. 9 RR 267. He also explained that he had
contested a seat belt violation some 20-25 years earlier, but
there is no reason to believe he was arrested on that charge. 9
RR 267, 269.

Petitioner next contends that Spivey would have been a good
juror for the State despite his having checked that he did not
want to serve on the jury because he did not think petitioner
could get a fair trial. He tries to explain away Spivey's remarks
that he only believed there could be a fair trial if people who
looked like him were on the jury. He does not address the fact
that Spivey said he did not want to serve.

Petitioner then jumps to the final reason given, that Spivey
had problems sitting in judgment of other people, saying that
other veniremembers felt the same way. Even if true, however,
this is not a ground for relief since there is no evidence that
these other people likewise did not like jury service because
they did not want to sit around all day, they worked a lot of
overtime, and they did not think they wanted to be on the panel.
31 RR 17-18.

Finally, petitioner argues that the State's reasons for striking Somsouk Southichack ("Southichack") were pretextual. The prosecutor explained:

> Ms. Southichack . . . indicated on her questionnaire that she has a problem judging. She believed that if someone committed a crime, they should get a fair trial, but she did not want to be a jury member for that because she had issues with judgment. She also indicated on her questionnaire she was not in favor of the death penalty. She also indicated that she did not believe that it should ever be invoked.
>
> She had a couple of issues understanding some of the legal issues that Mr. Gill was trying to explain to her during the individual voir dire portion. She was very hesitant when asked if the State proved beyond a reasonable doubt, could you actually find someone guilty, because she was indicating that she had problems with judging someone if it led to a capital murder conviction.
>
> She also indicated that she did not agree with the second part of Question No. 2, the parties question and believed she would have trouble answering that yes if she believed that this person was not the trigger person.

31 RR 18-19.

Petitioner admits that Southichack's responses to the juror questionnaire were "equivocal." Doc. 25 at 86. Her responses during voir dire were no better. She said she "wouldn't be able to make a judgment on another human being," 21 RR 33, then she said she would be able to follow her oath, id. Again, when asked if she could carry out her duties as a juror, she said that she did not know how to answer that question. 21 RR. 32. With regard to the legal issues, Southichack said proving intent would be

49

really hard and it would be up to the sides to prove it. 21 RR

43. She also expressed confusion over the definition of

~~reasonable doubt. 21 RR 48. And, she said she did not know if she~~

agreed with the law of parties. 21 RR 52-56. She also expressed

confusion as to how consideration of mitigating evidence would

work. 21 RR 76-80. The State challenged Southichack for cause. 21

RR 82, 92-93. After additional questioning by petitioner's

counsel, then the trial judge, who noted that Southichack had

given different answers, the challenge was denied. 21 RR 105.

Petitioner does not cite to any other juror who gave as many

conflicting answers or who had so much trouble understanding the

issues. He has not shown that the State's reasons for striking

Southichack were pretextual.

D.   <u>Ineffective Assistance re Batson Claim</u>

     In his fourth ground, petitioner says that his counsel were

ineffective in failing to properly litigate the third step of the

<u>Batson</u> claim process. Doc. 25 at 90. As previously discussed,

petitioner did raise ineffective assistance of counsel in his

state habeas petition. Thus, <u>Martinez</u> and <u>Trevino</u> do not provide

relief with regard to this claim. Further, and in any event, for

the reasons discussed in the preceding section of this memorandum

opinion and order, petitioner could not have prevailed on his

<u>Batson</u> claims. His counsel cannot have been ineffective in

failing to pursue losing arguments. <u>United States v. Kimler</u>, 167 F.3d 889, 893 (5th Cir. 1999).

E.   <u>Napue/Giglio Violation</u>

In his final ground, petitioner contends that he was deprived of due process as set forth in <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972), because the State knowingly allowed Ricky Seely to testify falsely that he had made no deal with prosecutors and did not expect any benefits in exchange for his testimony at trial. Petitioner bases this argument on a declaration signed by Seely on December 9, 2016,[22] and a letter from Seely to the prosecutor dated January 4, 2013,[23] which petitioner claims was discovered on August 16, 2016 by his federal habeas counsel. Doc. 25 at 100. This issue was not raised on direct appeal or in the state habeas proceeding.

Petitioner admits that this ground is unexhausted, but says that he can now present it to the state court because the factual basis for the claim was unavailable at the time of his state habeas filing. Doc. 25 at 99-100. As he admits, however, the

_____

[22]As respondent notes, the declaration was not included in the original petition. Doc. 41 at 141, n.57. Its inclusion in the amended petition does not relate back to the original so as to make it timely. <u>Mayle v. Felix</u>, 545 U.S. 644, 662-63 (2005).

[23]Petitioner says that the letter expresses Seely's understanding of a reduced sentence in exchange for his testimony against petitioner and asks that the prosecutors "please assist [him] once more." Doc. 25 at 98. The court notes that the letter was written after the trial and thus would not have been required to be disclosed by the State. <u>Dist. Attorney's Office for Third Judicial Dist. v. Osborne</u>, 557 U.S. 52, 68-69 (2009).

January 4, 2013, letter was in the prosecutors' files. That his counsel only recently discovered it does not mean that the factual basis of the claim could not have been timely discovered with the exercise of due diligence. Tex. Code Crim. Proc. art. 11.071, § 5(e).[24] And, in fact, there is no reason to believe that petitioner's state counsel were not aware of the letter.

Even assuming petitioner could now present this claim, he cannot show that it has any merit. The letter is entirely consistent with Seely's testimony at trial. It does not say that any promise or deal was made before he testified.[25] Doc. 26 at 269. More importantly, the letter establishes that Seely's testimony regarding petitioner's murder of Holden was true and that Seely has suffered as a result of his having testified. Seely describes petitioner's conduct as a "horrific crime" and that he is "[scarred] for [] life by seeing the crime as it happened." Doc. 26 at 270.[26]

To establish a due process violation as alleged here, petitioner must show that Seely's testimony was actually false,

_____

[24]Petitioner does not argue in his amended petition that his trial counsel or habeas counsel were ineffective for having failed to discover the letter or urge this ground in state court. The court will not consider an argument raised for the first time in a reply.

[25]The court notes that the declaration proffered by petitioner is inconsistent with the letter in that it says that both prosecutors were present at all meetings, whereas the letter is telling the recipient that the other prosecutor said that they would help him get parole. Doc. 26 at 269; Doc. 29 at 1477.

[26]Even if Seely truly meant that he was "scared for my life by seeing the crime as it happened," the sentiment is the same. He witnessed a horrific crime. Doc. 26 at 270.

that it was material, and that the prosecution knew that the testimony was false. <u>Fuller v. Johnson</u>, 114 F.3d 491, 496 (5th Cir. 1997). He has not met this burden. Even if he had, however, a new trial is only required if the false testimony could in any reasonable likelihood have affected the judgment of the jury. A new trial is not automatically required where the evidence that was withheld might have been useful to the defense but was not likely to have changed the verdict. <u>Giglio</u>, 405 U.S. at 154. In this case, as recited earlier, and as respondent notes, Doc. 41 at 148-50, the evidence that petitioner killed Holden is solid. Moreover, from the cross-examination of Seely, the jury could easily have surmised that he expected something in return for his testimony, whether he actually had a deal or not. Petitioner has not shown that there is a reasonable likelihood that the outcome of the trial would have been different absent the alleged false testimony.

VI.

<u>Other Motions</u>

Also pending are motions (denominated "applications") of petitioner for (1) reasonably necessary funds for a fact investigator, (2) for reasonably necessary funds for an expert in life-long incarceration, and (3) for reasonably necessary funds for a psychiatric expert. The court, having considered the motions, the response of respondent, the record, and applicable

53

authorities, finds that the motions should be denied. Petitioner has not met his burden of showing that any of the requested services are reasonably necessary for his representation.

In addition, petitioner has filed a motion for stay and abatement pending exhaustion of state remedies. In light of the court's rulings in this memorandum opinion and order, the motion is moot. No legitimate purpose would be served by granting the relief sought.

### VII.

### Order

The court ORDERS that all relief sought by petitioner through his amended petition and through the motions described in the preceding section of this memorandum opinion and order be, and is hereby, denied.

SIGNED March 29, 2017.

JOHN McBRYDE
United States District Judge